# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AMAZON CONTENT SERVICES LLC;
COLUMBIA PICTURES INDUSTRIES,
INC.; DISNEY ENTERPRISES, INC.;
NETFLIX US, LLC; NETFLIX
WORLDWIDE ENTERTAINMENT,
LLC; PARAMOUNT PICTURES
CORPORATION; SONY PICTURES
ANIMATION INC.; SONY PICTURES
TELEVISION INC.; UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP;
UNIVERSAL CITY STUDIOS LLC;
AND WARNER BROS.
ENTERTAINMENT, INC.,

        Plaintiffs,

      vs.

BRANDON WEIBLEY; AND DOES 1-10,
D/B/A BEASTMODEBUILDS.COM
AND VONWIK.COM,

        Defendants.

Civil Action No. 1:25-cv-00388

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR
DEFAULT JUDGMENT AND
PERMANENT INJUNCTION
AGAINST DEFENDANT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................1

II.   FACTUAL BACKGROUND & PROCEDURAL HISTORY ......................2

    A.   Weibley's History of Infringement .........................................3

    B.   Procedural History..................................................................5

III.  STATEMENT OF QUESTIONS ....................................................5

IV.   LEGAL STANDARD .....................................................................5

V.    ARGUMENT...................................................................................6

    A.   The *Chamberlain* Factors Favor Entry of Default Judgment ..............6

        1.   Plaintiffs Will Be Prejudiced Absent Entry of Default Judgment ......................................................................................6

        2.   Weibley Does Not Have a Litigable Defense.............................7

        3.   Weibley's Default Is Due to His Culpable Conduct...................8

    B.   Plaintiffs' Complaint Is Sufficiently Pled .............................................9

        1.   Copyright Infringement (Claim 1).............................................9

        2.   Contributory Copyright Infringement (Claim 2) .....................10

        3.   Inducement of Copyright Infringement (Claim 3)...................13

    C.   Plaintiffs Are Entitled to Their Requested Relief ...............................15

        1.   Plaintiffs' Request for Statutory Damages for Willful Copyright Infringement Is Reasonable ....................................................15

            (a)   Willfulness......................................................................16

            (b)   Number of Registered Works.........................................17

            (c)   The Statutory Maximum Is Proportional to the Harm Inflicted by Defendant..................................................17

2.      Attorneys' Fees Should Be Granted .........................................19

3.      Plaintiffs Are Entitled to Post-Judgment Interest ......................20

4.      Plaintiffs Are Entitled to a Permanent Injunction.....................21

        (a)     The Factors for a Permanent Injunction Are Satisfied...21

        (b)     The Court Should Issue the Relief in the Proposed Order
                .......................................................................................23

VI.     CONCLUSION..............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A&N Music Corp. v. Venezia,*
733 F. Supp. 955 (E.D. Pa. 1990) ........................................................................22

*ABC, Inc. v. Aereo, Inc.,*
573 U.S. 431 (2014) ..............................................................................................11

*Adlife Mktg. & Commc'ns Co. v. Ad Post Graphics Media Mktg., Inc.,*
708 F. Supp. 3d 567 (M.D. Pa. 2023) ...................................................................23

*Amazon Content Servs. LLC v. DeBarr,*
- F. Supp. 3d -, 2025 WL 2217715 (C.D. Cal. Aug. 4, 2025) ...............12, 17, 18

*AMC Tech., L.L.C. v. SAP AG,*
2005 WL 3008894 (E.D. Pa. Nov. 3, 2005) ..........................................................13

*Anchorage Assocs. v. V.I. Bd. of Tax Rev.,*
922 F.2d 168 (3d Cir. 1990) ...................................................................................6

*BGSD, Inc. v. SpazeUp, LLC,*
2024 WL 1619279 (E.D. Pa. Apr. 15, 2024) ...................................................21, 22

*Broad. Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.,*
555 F. Supp. 2d 537 (E.D. Pa. 2008) ...................................................9, 16, 17, 21

*Chamberlain v. Giampapa,*
210 F.3d 154 (3d Cir. 2000) ...............................................................................6, 8

*Chen v. ADEDIY,*
2025 WL 1489240 (W.D. Pa. Feb. 24, 2025) ........................................................22

*CME Grp. Inc. v. Nagovskiy,*
2019 WL 13252888 (N.D. Ill. Apr. 8, 2019) .........................................................25

*Columbia Pictures Indus., Inc. v. Fung,*
2013 WL 12098334 (C.D. Cal. Aug. 5, 2013) .......................................................22

*Columbia Pictures Indus., Inc. v. Fung,*
710 F.3d 1020 (9th Cir. 2013) .........................................................................13, 14

*Columbia Pictures Indus., Inc. v. Galindo*,
2022 WL 17094713 (C.D. Cal. Nov. 18, 2022) ...........................................12, 19

*Comdyne I, Inc. v. Corbin*,
908 F.2d 1142 (3d Cir. 1990) .................................................................................9

*Commodity Futures Trading Comm'n v. Salerno*,
2020 WL 7122418 (E.D. Pa. Sept. 23, 2020) ........................................................8

*DISH Network, L.L.C. v. Dima Furniture Inc.*,
2019 WL 2498224 (D. Md. June 17, 2019),
*R&R adopted*, 2019 WL 5588901 (D. Md. July 12, 2019) ................................18

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ...............................................................................18

*Evony LLC v. Holland*,
2011 WL 1230405 (W.D. Pa. Mar. 31, 2011) .....................................................24

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)................................................................................................9

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
930 F.2d 277 (3d Cir. 1991) ................................................................................10

*Fox Television Stations, Inc. v. FilmOn X LLC*,
966 F. Supp. 2d 30 (D.D.C. 2013)........................................................................19

*Frank Music Corp. v. Emerson's Pub, Inc.*,
2009 WL 744964 (M.D. Pa. Mar. 18, 2009) .........................................................7

*G&G Closed Cir. Events, LLC v. Remsen Assocs., Inc.*,
2023 WL 7110677 (D.N.J. Oct. 27, 2023) ..........................................................20

*Gordon v. Pearson Educ., Inc.*,
85 F. Supp. 3d 813 (E.D. Pa. 2015).....................................................................11

*Grant Heilman Photography, Inc.*,
2024 WL 666147 (M.D. Pa. Feb. 16, 2024).........................................................8

*Hritz v. Woma Corp.*,
732 F.2d 1178 (3d Cir. 1984) ...............................................................................5

*Kennedy v. Creditgo, LLC*,
  2015 WL 7760181 (D.N.J. Dec. 2, 2015)..............................................................16

*Leonard v. Stemtech Int'l, Inc.*,
  834 F.3d 376 (3rd Cir. 2016) ................................................................10, 11, 12

*Louis Vuitton Malletier, S.A. v. Mosseri*,
  2009 WL 3633882 (D.N.J. Oct. 28, 2009) ...........................................................15

*Martin v. Nat'l Check Recovery Servs., LLC*,
  2016 WL 3670849 (M.D. Pa. July 11, 2016) ........................................................9

*MGM Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)..............................................................................................14

*Moroccanoil, Inc. v. JMG Freight Grp. LLC*,
  2015 WL 6673839 (D.N.J. Oct. 30, 2015) .............................................................6

*Pa. Bus. Bank v. Biz Bank Corp.*,
  330 F. Supp. 2d 511 (E.D. Pa. 2004).....................................................................24

*Sas v. Sawabeh Info. Servs. Co.*,
  2012 WL 12886442 (C.D. Cal. Apr. 6, 2012).......................................................24

*Strike 3 Holdings, LLC v. Doe*,
  2022 WL 952728 (E.D. Pa. Mar. 30, 2022) ...........................................6, 7, 8, 10

*T.D. Bank N.A. v. Hill*,
  928 F.3d 259 (3rd Cir. 2019)................................................................................21

*Teri Woods Publ'g, L.L.C. v. Williams*,
  2013 WL 6179182 (E.D. Pa. Nov. 25, 2013) .......................................................17

*United States v. Osborn*,
  2025 WL 1134449 (E.D. Pa. Apr. 16, 2025)...........................................................6

*Virgin Recs. Am., Inc. v. Bagan*,
  2009 WL 2170153 (D.N.J. July 21, 2009) ............................................................16

*Warner Bros. Ent. Inc. v. Doe*,
  2014 WL 12543818 (S.D.N.Y. May 29, 2014)......................................................25

*Warner Bros. Ent. Inc. v. WTV Sys., Inc.*,
  824 F. Supp. 2d 1003 (C.D. Cal. 2011)................................................................18

*Warner Bros. Ent., Inc. v. Tusa*,
  2021 WL 6104399 (C.D. Cal. Oct. 25, 2021) .......................................12, 13, 14

*Warner Bros. Ent., Inc. v. Vega*,
  2012 WL 13008442 (C.D. Cal. Mar. 29, 2012).................................................24

*Warner Bros. Recs. Inc. v. Walker*,
  704 F. Supp. 2d 460 (W.D. Pa. 2010)..................................................................19

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275, 285 (2d Cir. 2012) .......................................................................19

*Zuffa, LLC v. Cuebas*,
  2025 WL 1699354 (M.D. Pa. June 17, 2025)......................................................20

**Federal Statutes**

17 U.S.C.
  § 101...................................................................................................................2
  § 106(1)...........................................................................................................9, 11
  § 106(4)...........................................................................................................9, 11
  § 410(c) .............................................................................................................10
  § 501(b)...............................................................................................................6
  § 502(a) .............................................................................................................21
  § 504(c)(1) ........................................................................................................15
  § 504(c)(2) ........................................................................................................15
  § 505.............................................................................................................19, 20

28 U.S.C.
  § 1331..................................................................................................................6
  § 1338(a) .............................................................................................................6
  § 1961(a) ...........................................................................................................20

**Rules**

Fed. R. Civ. P. 55(b)(2)........................................................................................1, 5

Fed. R. Civ. P. 65(d)(2)....................................................................................23, 24

## I.    INTRODUCTION

Plaintiffs Amazon Content Services LLC, Columbia Pictures Industries, Inc., Disney Enterprises, Inc., Netflix US, LLC, Netflix Worldwide Entertainment, LLC, Paramount Pictures Corporation ("Paramount"), Sony Pictures Animation Inc., Sony Pictures Television Inc., Universal City Studios Productions LLLP, Universal City Studios LLC, and Warner Bros. Entertainment, Inc. (collectively, "Plaintiffs") request the Court to enter default judgment against Defendant Brandon Weibley ("Weibley" or "Defendant") pursuant to Federal Rule of Civil Procedure 55(b)(2).

Weibley operated, managed, and directly profited from his network of unauthorized movie and television streaming services: Beast Mode Live, BTV, Viking Media, and GreenWing Media (the "Initial Infringing Services"), offered through the domain beastmodebuilds.com; and Shrugs and Zing (the "Current Infringing Services"),[1] offered through the domain vonwik.com, (together with beastmodebuilds.com, "Infringing Domains"). Defendant engaged in massive and willful infringement of Plaintiffs' copyrights in their movies and television shows. The Clerk has entered default against Defendant for his failure to appear or otherwise defend this action. Entry of default judgment and injunctive relief is

---

[1] Throughout this Motion, "Infringing Services" refers to both the Initial Infringing Services and Current Infringing Services.

appropriate against willful infringers, such as Defendant, who made a strategic decision not to defend his conduct in court.

Plaintiffs have met the requirements for default judgment and injunctive relief. Plaintiffs request that the Court grant this motion and the following relief: maximum statutory damages under the Copyright Act of $150,000 for willful infringement of each of the 60 copyrighted works listed in Exhibit A to the Complaint ("Copyrighted Works"), totaling $9,000,000; attorneys' fees; post-judgment interest; and entry of a permanent injunction.

## II.    FACTUAL BACKGROUND & PROCEDURAL HISTORY

Plaintiffs and their affiliates produce and distribute many of the world's most critically acclaimed movies and television programs. ECF No. 1 ("Compl.") ¶ 29. Plaintiffs are the legal owners of the exclusive rights to reproduce, distribute, and perform (including by means of streaming) their copyrighted films and television programs. *Id.* ¶¶ 11–21, 30. The Motion Picture Association ("MPA") and Alliance for Creativity and Entertainment ("ACE") investigated Weibley's infringing activities on behalf of Plaintiffs and their affiliates. Declaration of Larissa L. Knapp ("Knapp Decl.") ¶ 6. MPA and ACE's investigation uncovered Defendants' mass infringement scheme. *Id*. ¶¶ 6–15.

The investigation confirmed that Weibley's mass infringement is willful and has usurped Plaintiffs' rights to control their copyrighted works and the terms on

which those works are provided to customers. Compl. ¶ 10. Weibley's egregious conduct demonstrates that he will not cease his infringement unless the Court awards substantial damages and issues a permanent injunction.

### A.    Weibley's History of Infringement

Weibley has engaged in willful copyright infringement for years. His conduct began at least as early as 2017 when he registered the domain beastmodebuilds.com and began selling subscriptions to illicit internet streaming services. Compl. ¶ 6. By August 2023, Weibley used the beastmodebuilds.com domain to sell subscriptions to the Initial Infringing Services, which provided subscribers with unauthorized access to hundreds of pirated television channels, including Plaintiffs' Copyrighted Works. *Id.* ¶¶ 6, 35, 41.

Weibley profited from his Initial Infringing Services by selling subscriptions at prices ranging from $13 per month to $120 per year. *Id.* ¶ 37. Weibley's beastmodebuilds.com domain received nearly 230,000 visits between August 2022 and July 2023, an average of almost 20,000 visits each month. *Id.* ¶ 41. These figures likely understate the full scale of infringement, as Weibley enabled access to his illicit content via third-party media players. *Id*. As a result, customers needed to visit the beastmodebuilds.com domain only once to purchase or renew their subscription. *Id.*

Weibley took steps to attempt to conceal his Initial Infringing Services, including by warning customers not to refer to the services by name when making

payments, by omitting his identifying information from invoices, and by using an alias to communicate with subscribers. *Id.* ¶¶ 38–40.

In December 2023, Plaintiffs sent Weibley a cease-and-desist letter demanding that he stop infringing Plaintiffs' works. *Id.* ¶ 7. Plaintiffs followed up with letters, emails, and voicemails to Weibley reiterating their demands. *Id.* ¶ 42. Not only did Weibley ignore Plaintiffs' demands, but in February 2024, he attempted to evade Plaintiffs' enforcement efforts by moving his services to a new domain, vonwik.com, and rebranding the services as Shrugs and Zing. *Id*. ¶¶ 7, 44. Weibley's Current Infringing Services provide his customers with unauthorized access to more than 9,000 live channels, including channels that stream movies and seasons of popular television shows in a continuous loop. *Id.* ¶¶ 47, 51.

Although Weibley (through his former attorney) eventually responded to Plaintiffs in March 2024, Weibley ceased communicating with Plaintiffs by June 2024. *Id.* ¶ 43; Knapp Decl. ¶ 13. Despite receiving notice of this lawsuit in March 2025, Weibley's Current Infringing Services remain online. Commerson Decl. ¶ 3; Knapp Decl. ¶ 15. Weibley's history of and continued infringement, and his pattern of shutting down and rebranding his illicit services, demonstrates that he will continue to engage in further infringement absent judicial intervention. Knapp Decl. ¶¶ 13–15, 26–27.

## B.    Procedural History

Plaintiffs initiated this action on March 4, 2025. ECF No. 1; Commerson Decl. ¶ 2. On March 30, 2025, Plaintiffs completed personal service on Weibley. ECF No. 6; Commerson Decl. ¶ 3. In addition to personally serving Weibley, Plaintiffs emailed the Complaint and summons to Weibley's former attorney. Commerson Decl. ¶ 4. Weibley's former attorney informed Plaintiffs that he no longer represented Weibley and confirmed he forwarded Plaintiffs' email to Weibley. *Id.*  On May 22, 2025, the Clerk entered default against Weibley. ECF No. 17; Commerson Decl. ¶ 5. Plaintiffs mailed the order entering default to Weibley. Commerson Decl. ¶ 6. Although not required, Plaintiffs are mailing the instant Motion and accompanying documents to Weibley. Commerson Decl. ¶ 7.

## III.    STATEMENT OF QUESTIONS

1.    Should the Court grant default judgment and award Plaintiffs the requested relief? (Yes.)

## IV.    LEGAL STANDARD

Granting default judgment is within the Court's discretion. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984). The Court may enter default judgment following the entry of default by the Clerk of the Court. Fed. R. Civ. P. 55(b)(2).

In the Third Circuit, courts consider the following factors in deciding whether to enter default judgment: "(1) prejudice to the plaintiff if default [judgment] is denied, (2) whether the defendant appears to have a litigable defense,

and (3) whether defendant's delay [to defend against the litigation] is due to [their] culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000). If the defendant has been properly served but fails to appear or defend an action, a court may "enter a default judgment based solely on the fact that the default has occurred," without considering the *Chamberlain* factors. *Anchorage Assocs. v. V.I. Bd. of Tax Rev.*, 922 F.2d 168, 177 n.9 (3d Cir. 1990). Here, Weibley failed to defend this action after proper service, and the *Chamberlain* factors compel the entry of default judgment.

## V. ARGUMENT

### A. The *Chamberlain* Factors Favor Entry of Default Judgment[2]

#### 1. Plaintiffs Will Be Prejudiced Absent Entry of Default Judgment

Without entry of default judgment, Plaintiffs will suffer severe prejudice because they will be unable to recover damages from Defendant or stop his infringing conduct, and therefore will lack any remedy. *See Strike 3 Holdings, LLC v. Doe*, 2022 WL 952728, at *4 (E.D. Pa. Mar. 30, 2022)[3] ("[p]laintiff will be

---

[2] A court must confirm that it has personal and subject matter jurisdiction when considering a motion for default judgment. *See Moroccanoil, Inc. v. JMG Freight Grp. LLC*, 2015 WL 6673839, at *1 (D.N.J. Oct. 30, 2015). Here, the Court has subject matter jurisdiction over Plaintiffs' federal copyright claims pursuant to 28 U.S.C. §§ 1331, 1338(a), and 17 U.S.C. § 501(b). The Court has personal jurisdiction over Weibley because Weibley resides within this district in Mechanicsburg, Pennsylvania. *See United States v. Osborn*, 2025 WL 1134449, at *1 (E.D. Pa. Apr. 16, 2025).

[3] In accordance with Local Rule 7.8(a), Plaintiffs submit copies of each unpublished opinion cited in this memorandum as Exhibits A-Z (submitted in alphabetical order).

prejudiced if default judgment is denied because [d]efendant has failed to answer or otherwise defend this matter"). Weibley infringed Plaintiffs' Copyrighted Works, interfered with Plaintiffs' right to control the distribution of their Works and the terms on which the Works were provided, and diverted customers and revenue from legitimate sources. Compl. ¶ 10; Knapp Decl. ¶¶ 22–24. Weibley has known since at least 2023 that his services infringe Plaintiffs' copyrights, yet he continued to operate them. Compl. ¶¶ 42–46; Knapp Decl. ¶¶ 13, 15. Indeed, even after being personally served with the Complaint and knowing about this action, Weibley continues to operate the Current Infringing Services. Knapp Decl. ¶ 15. Weibley's persistent and ongoing conduct establishes that he will not refrain from infringement absent court intervention. *See Frank Music Corp. v. Emerson's Pub, Inc.*, 2009 WL 744964, at *1 (M.D. Pa. Mar. 18, 2009) (finding prejudice to plaintiff due to potential continued infringement absent default judgment). The first factor favors default judgment.

### 2. Weibley Does Not Have a Litigable Defense

Weibley does not have a litigable defense, because he has "not asserted any defense in this action, whether by responding to the Complaint or responding to this Motion…or by otherwise contesting the allegations." *Strike 3 Holdings*, 2022 WL 952728, at *4 (finding no litigable defense where defendant failed to respond to action). Weibley has not answered the Complaint or made any attempt to contact

7

Plaintiffs' counsel. Commerson Decl. ¶ 9. The second factor favors default judgment.

### 3. Weibley's Default Is Due to His Culpable Conduct

"Culpable conduct refers to actions that are taken willfully or in bad faith." *Commodity Futures Trading Comm'n v. Salerno*, 2020 WL 7122418, at \*7 (E.D. Pa. Sept. 23, 2020) (internal quotations omitted). Here, Weibley was first put on notice of his infringing conduct in December 2023, and Weibley's former attorney initially responded to Plaintiffs' counsel in early 2024. Compl. ¶ 42; Knapp Decl. ¶ 13. However, Weibley continued infringing Plaintiffs' Copyrighted Works and ignored Plaintiffs' further outreach. Compl. ¶ 43; Knapp Decl. ¶¶ 13, 15.

Plaintiffs filed suit on March 4, 2025. *See* Compl.; Commerson Decl. ¶ 2. On March 30, 2025, Plaintiffs personally served Weibley. ECF No. 6; Commerson Decl. ¶ 3. Plaintiffs also emailed the Complaint and Summons to Weibley's former attorney, who confirmed he forwarded the documents to Weibley. Commerson Decl. ¶ 4. Weibley's failure to respond or engage in the litigation process constitutes culpable conduct. *See Strike 3 Holdings*, 2022 WL 952728, at \*4 (failure "to engage in the litigation process and to offer [any] reason for this failure" constitutes culpable conduct); *see also Grant Heilman Photography, Inc.*, 2024 WL 666147, at \*3 (M.D. Pa. Feb. 16, 2024) (same).

All the *Chamberlain* factors favor default judgment.

### B.    Plaintiffs' Complaint Is Sufficiently Pled

"A finding that default judgment is appropriate, however, is not the end of

the inquiry." *Martin v. Nat'l Check Recovery Servs., LLC*, 2016 WL 3670849, at

\*1 (M.D. Pa. July 11, 2016). Before granting default judgment, "the Court must

first ascertain whether the unchallenged facts constitute a legitimate cause of

action." *Broad. Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.*, 555 F.

Supp. 2d 537, 541 (E.D. Pa. 2008) (citation and internal quotations omitted).

Weibley's default, however, serves as an admission of Plaintiffs' allegations of

fact. *See Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990) (on a

default judgment motion, the court must accept the complaint's allegations as true,

with the exception of damages allegations).

Plaintiffs' well-pled and detailed Complaint establishes Weibley's liability.

### 1.    Copyright Infringement (Claim 1)

To prove copyright infringement, Plaintiffs must demonstrate:

"(1) ownership of a valid copyright and (2) copying of constituent elements of the

work[.]" *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

Among a copyright holder's exclusive rights are "to reproduce the copyrighted

work" and "to perform the copyrighted work publicly." 17 U.S.C. § 106(1), (4).

First, Plaintiffs' ownership of their Copyrighted Works is uncontroverted.

Plaintiffs submitted a representative list of Copyrighted Works that Weibley

infringed, ECF No. 1-2 (Ex. A to Compl.), and certificates of registration issued by

9

the Copyright Office, which create a presumption of copyright validity and ownership. Commerson Decl. Exs. 1–60; 17 U.S.C. § 410(c); *see Ford Motor Co. v. Summit Motor Prods.*, *Inc.*, 930 F.2d 277, 294 (3d Cir. 1991).

Second, Plaintiffs have sufficiently alleged that Weibley is directly liable for infringement of Plaintiffs' copyrights: (1) Plaintiffs examined the Infringing Services, including the works available on the service (Compl. ¶¶ 33–41; Knapp Decl. ¶¶ 11–12); (2) Plaintiffs determined that the Infringing Services provided access to unauthorized reproductions of copyrighted works owned by Plaintiffs (Compl. ¶¶ 4–5, 44, 47, 50–52, Ex. A; Knapp Decl. ¶ 9); and (3) Plaintiffs never granted permission to Weibley to reproduce or publicly display their works (Compl. ¶¶ 32, 68–69; Knapp Decl. ¶ 12).

Thus, Weibley is liable for copyright infringement. *See Strike 3 Holdings*, 2022 WL 952728, at *3 (allegations that defendant "downloaded, reproduced, and distributed" plaintiff's copyrighted works without authorization stated claim for copyright infringement).

### 2. Contributory Copyright Infringement (Claim 2)

To state a claim for contributory copyright infringement, "a plaintiff must first show direct infringement by a third party," *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376, 386–87 (3rd Cir. 2016). As discussed above, Plaintiffs own valid copyrights for the Copyrighted Works and have established that third parties have directly infringed Plaintiffs' works through the Infringing Services. These third

parties include (1) the third-party subscribers to Weibley's Infringing Services, and (2) any third parties that control the facilities and equipment used to copy and stream performances of the Copyrighted Works. These third parties infringed and continue to infringe Plaintiffs' exclusive rights under Sections 106(1) and (4) to reproduce and publicly perform their Copyrighted Works. Compl. ¶¶ 79–81; *see ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431, 442 (2014) ("[T]he concep[t] of public performance…cover[s] not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public.").

Plaintiffs also must show Weibley (1) had "knowledge of the third-party infringement"; and (2) provided "a material contribution to the infringement." *Gordon v. Pearson Educ., Inc.*, 85 F. Supp. 3d 813, 817 (E.D. Pa. 2015); *see also Leonard*, 834 F.3d at 387.

Here, Weibley's knowledge is clear from the following facts: he advertised the Infringing Services' ability to stream unauthorized works; he provided subscribers with material aid to access the Copyrighted Works; and he continued to operate the Infringing Services after Plaintiffs put him on notice of his infringing conduct. *Id.* ¶¶ 44–46; Knapp Decl. ¶¶ 9, 12–15; *see Gordon*, 85 F. Supp. 3d at 823 (knowledge element satisfied when court could infer that defendant intended for third parties to violate plaintiff's copyright rights).

11

Weibley also materially contributed to the infringement by:

(1) "configur[ing] and promot[ing] the use of the Infringing Services…to connect subscribers to unauthorized streams of Plaintiffs' Copyrighted Works"; and (2) "operating the Infringing Services[,]" which "facilitate[d], encourage[d], and enable[d] the direct infringement of" any Copyrighted Works that were uploaded, streamed, copied, or reproduced by third parties. Compl. ¶ 69. Weibley thus made a "material contribution" to infringement by "knowingly tak[ing] steps that [we]re substantially certain to result in…direct infringement." *Leonard*, 834 F. 3d at 387 (finding material contribution where defendant provided infringing materials to third parties); *Columbia Pictures Indus., Inc. v. Galindo*, 2022 WL 17094713, at *9 (C.D. Cal. Nov. 18, 2022) (finding defendant made material contribution by "substantially assist[ing]…a worldwide audience of users to access infringing materials").

The Complaint's allegations, admitted by default, establish that Weibley is liable for contributory copyright infringement. *See Warner Bros. Ent. v. Tusa*, 2021 WL 6104399, at *4 (C.D. Cal. Oct. 25, 2021) (granting default judgment on contributory copyright infringement claim where defendant sold access to unauthorized streams of copyrighted works); *accord Amazon Content Servs. LLC v. DeBarr*, - F. Supp. 3d -, 2025 WL 2217715, at *4 (C.D. Cal. Aug. 4, 2025).

### 3.    Inducement of Copyright Infringement (Claim 3)

Inducement of copyright infringement requires: (1) distribution of a device, product, or service; (2) acts of infringement; (3) an object of promoting use of the device, product, or service to infringe copyright; and (4) causation. *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013). Plaintiffs have proven this claim.

First, Weibley "distributed and sold subscriptions to the [Infringing Services], which constitutes 'the distribution of a device or product by the defendant.'" *Tusa*, 2021 WL 6104399, at *5; Compl. ¶¶ 4, 36, 48; *see also Fung*, 710 F.3d at 1033 ("[T]he inducement copyright doctrine…applies to services available on the Internet[.]").

Second, Weibley created a demand for unauthorized reproduction of Plaintiffs' Copyrighted Works by providing access to the Infringing Services on more favorable terms (*i.e.*, no contract and at lower prices) than legitimate channels that are authorized to distribute and publicly perform the Copyrighted Works. Compl. ¶¶ 10, 31–32, 37. Weibley thus induced direct infringement. *See Tusa*, 2021 WL 6104399, at *5 (creating a demand for infringing service satisfied inducement element); *AMC Tech., L.L.C. v. SAP AG*, 2005 WL 3008894, at *5 (E.D. Pa. Nov. 3, 2005) ("Providing users with instructions enabling them to copy [copyrighted works] would constitute inducement to copyright infringement.").

Third, Weibley knowingly and intentionally distributed the Infringing Services "with the object of promoting its use to infringe copyright" (*Fung*, 710 F.3d at 1032) by acting with "a clear expression or other affirmative steps taken to foster infringement." *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919 (2005). Specifically, Weibley "aim[ed] to satisfy a known source of demand for copyright infringement" by shutting down the Initial Infringing Services after Plaintiffs complained and then redirecting subscribers to the Current Infringing Services. Compl. ¶¶ 44-45; *Tusa*, 2021 WL 6104399, at *5 (finding defendant's "repeated rebranding and relaunching on infringing services" indicated unlawful intent). Taken together, Weibley's facilitation of access to and launching of the Infringing Services support his aim to encourage third-party infringement.

Fourth, as to causation, "if one provides a service that could be used to infringe copyrights, with the manifested intent that the service actually be used in that manner, that person is liable for the infringement that occurs through the use of the service." *Tusa*, 2021 WL 6104399, at *5 (quoting *Fung*, 710 F.3d at 1037). Weibley distributed and promoted the Infringing Services with the clear intent that subscribers would publicly perform unauthorized copies of Plaintiffs' Copyrighted Works, and "the infringing conduct predictably followed." *See id.* Causation is satisfied.

14

The Complaint's allegations, admitted by default, establish Weibley's liability for inducement of copyright infringement.

### C.   Plaintiffs Are Entitled to Their Requested Relief

Plaintiffs request that the Court enter a default judgment awarding (1) maximum statutory damages for willful infringement of $150,000 per work, for a total of $9,000,000; (2) reasonable attorneys' fees; (3) post-judgment interest; and (4) a permanent injunction prohibiting Weibley from engaging in infringing conduct and ordering the Infringing Domains to be turned over to Plaintiffs. Commerson Decl. ¶¶ 13–16.

#### 1.   Plaintiffs' Request for Statutory Damages for Willful Copyright Infringement Is Reasonable

The Copyright Act authorizes an award of statutory damages of $750 to $30,000 per infringed work and enhanced statutory damages of up to $150,000 per infringed work for willful infringement. 17 U.S.C. § 504(c)(1)-(2). Statutory damages are appropriate where the defendant failed to mount any defense, thereby increasing the difficulty of ascertaining plaintiffs' lost profits. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 2009 WL 3633882, at *2 (D.N.J. Oct. 28, 2009) (awarding statutory damages where defendant's failure to answer rendered it impossible to determine lost profits).

Because awards of statutory damages serve punitive purposes, "[p]laintiffs do not have to prove actual damages to be entitled to statutory damages" for

15

reasons of deterring future infringement. *Virgin Recs. Am., Inc. v. Bagan*, 2009 WL 2170153, at *4 (D.N.J. July 21, 2009). "In determining the amount of statutory damages, it is important that the infringer not reap a benefit from its violation of the copyright laws [and] that statutory damages should exceed the unpaid license fees so that defendant will be put on notice that it costs less to obey the copyright laws than to violate them." *Broad. Music*, 555 F. Supp. 2d at 544.

Here, Plaintiffs request $9,000,000 in statutory damages under the Copyright Act, representing an award of $150,000 for each of the 60 Copyrighted Works that Weibley willfully infringed. *See* Commerson Decl. ¶ 13; Proposed Order ¶ 2.

### (a)    Willfulness

"Because Defendant has defaulted, the Court must accept as true Plaintiff's factual allegations [regarding willfulness]." *See Kennedy v. Creditgo, LLC*, 2015 WL 7760181, at *5 (D.N.J. Dec. 2, 2015). The facts detailed in the Complaint also establish Weibley's willfulness: (1) for years, Weibley profited from selling subscriptions to the Infringing Services, despite not having a license or agreement with Plaintiffs; (2) Weibley owned and operated an extensive and commercially-scaled streaming service that offered unauthorized access to thousands of works; (3) Weibley continued operating the Infringing Services despite Plaintiffs' cease-and-desist efforts; and (4) Weibley rebranded and moved his services to a different domain in an attempt to conceal his activities. Compl. ¶¶ 4, 9–10, 42–46. Further, "Defendant['s] default and [his] decision not to defend against these allegations are

grounds for concluding that [his] actions were willful." *Broadcast Music*, 555 F. Supp. 3d at 542.

### (b)   Number of Registered Works

Plaintiffs have submitted a representative sample of 60 of Plaintiffs' Copyrighted Works that investigators confirmed were illegally streamed on the Infringing Services. Compl. Ex. A; Commerson Decl. Exs. 1–60. The Copyrighted Works, however, represent a mere fraction of the copyright infringement perpetuated by Defendant. Knapp Decl. ¶ 25. Plaintiffs have confirmed that thousands of additional copyrighted works were available for viewing on the Infringing Services, and subscribers had the capability to stream an unlimited number of Plaintiffs' copyrighted films and television shows. Compl. ¶¶ 47, 52; Knapp Decl. ¶ 12.

### (c)   The Statutory Maximum Is Proportional to the Harm Inflicted by Defendant

There can be no doubt that Weibley's infringement was willful. Courts have awarded the statutory maximum in actions involving similar widespread and flagrant infringement. *See*, *e.g.*, *Teri Woods Publ'g, L.L.C. v. Williams*, 2013 WL 617918, at *4 (E.D. Pa. Nov. 25, 2013) (granting default judgment and awarding maximum statutory damages per infringed work for willful infringement); *Amazon Content Servs.*, 2025 WL 2217715, at *7 (same).

17

Although the true scope of harm that Weibley inflicted cannot be known, the $9,000,000 award that Plaintiffs seek is proportional to the immense harm he has caused. Indeed, seeking maximum damages for a representative set of works is reasonable because "the works identified in Exhibit A represent only a small portion of the total copyrighted works—and for which [Weibley] would be liable if [he] were to appear and litigate this case." *Amazon Content Servs.*, 2025 WL 2217715, at *6. Thus, "[a] complete accounting of [Weibley's] infringement would likely entail thousands of Plaintiffs' copyrighted works." *Id.*; Knapp Decl. ¶ 25.

Weibley's willful infringement has caused significant damage to Plaintiffs' businesses. Knapp Decl. ¶¶ 16–22; *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (finding that unauthorized streaming services undermine "the value of the Studios' copyrighted works" and their business models); *DISH Network, L.L.C. v. Dima Furniture Inc.*, 2019 WL 2498224, at *6 (D. Md. June 17, 2019), *R&R adopted*, 2019 WL 5588901 (D. Md. July 12, 2019) (awarding maximum statutory damages for willful infringement where "the business model of [the unauthorized streaming service] depend[ed] on copyright infringement").

Indeed, Weibley deprived Plaintiffs of their exclusive rights to control how, when, on what terms, and to whom they will disseminate their Copyrighted Works. Knapp Decl. ¶ 23; *see Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012–13 (C.D. Cal. 2011) (finding that defendant's unauthorized streaming

"interfere[s] with Plaintiffs' ability to control the use and transmission of their Copyrighted Works, thereby causing irreparable injury"); *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 49 (D.D.C. 2013) (finding "[e]very court that has considered the question of whether unauthorized Internet streaming of television…causes irreparable harm to the copyright owners has concluded unequivocally that it does"); *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (finding unauthorized streaming would cause television copyright holders irreparable harm).

Weibley's illegal conduct also undermined the legitimate marketplace for authorized streaming services. In the legitimate marketplace, consumers purchase access to the same Copyrighted Works that Weibley appropriated to enrich himself. This conduct irreparably harms Plaintiffs, who have invested significantly not only in the underlying content but in the development of a lawful marketplace. Knapp Decl. ¶¶ 17, 19; *see Galindo*, 2022 WL 17094713, at *11 ("Plaintiffs' business model, as well as the entertainment industry itself, hinges on copyright owners' ability to control the distribution and use of their copyrighted works.").

In summary, the $9,000,000 in statutory damages Plaintiffs request represents only a fraction of the actual damage inflicted by Weibley on Plaintiffs.

### 2.    Attorneys' Fees Should Be Granted

Attorneys' fees are recoverable on Plaintiffs' copyright claims under 17 U.S.C. § 505. *See Warner Bros. Recs. Inc. v. Walker*, 704 F. Supp. 2d 460, 469

(W.D. Pa. 2010). "Courts will grant requests for costs and fees under Section 505 where the defendant fails to appear, and the plaintiff submits evidence of their costs and fees." *Zuffa, LLC v. Cuebas*, 2025 WL 1699354, at \*6 (M.D. Pa. June 17, 2025) (citing *Adlife Mktg. & Commc'ns Co. v. Ad Post Graphics Media Mktg., Inc*., 708 F. Supp. 3d 567, 579 (M.D. Pa. 2023) (awarding fees)).

When the Court awards attorneys' fees on default judgment, it may conduct a lodestar calculation to determine the reasonable fee. *See G&G Closed Cir. Events, LLC v. Remsen Assocs., Inc.*, 2023 WL 7110677, at \*2 (D.N.J. Oct. 27, 2023). "The lodestar calculation multiplies the reasonable number of hours exerted by the reasonable hourly rate." *Id*. Applying the lodestar methods here, the Court should award $63,241 in attorneys' fees, representing the total time expended by attorneys on the matter multiplied by their reasonable hourly rate. Commerson Decl. ¶¶ 14–16. Notably, the rates for the out-of-state attorneys who worked on this matter have been discounted to align with the local rates of attorneys. *Id*.

### 3.    Plaintiffs Are Entitled to Post-Judgment Interest

Plaintiffs request post-judgment interest calculated "at a rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a).

### 4.   Plaintiffs Are Entitled to a Permanent Injunction

The Copyright Act allows courts to grant permanent injunctions "to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). "When past infringement and a substantial likelihood of future infringements is established, a copyright holder is ordinarily entitled to a permanent injunction against the infringer." *Broad Music*, 555 F. Supp. 2d at 543. A plaintiff seeking permanent injunction must demonstrate: "(1) it will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in its favor, and (4) an injunction would not disserve the public interest." *T.D. Bank N.A. v. Hill*, 928 F.3d 259, 278 (3rd Cir. 2019).

### (a)   The Factors for a Permanent Injunction Are Satisfied

First, Weibley's infringements have irreparably harmed Plaintiffs by undermining the value of the Copyrighted Works, damaging Plaintiffs' standing in the marketplace, interfering with Plaintiffs' relationships and goodwill with licensees, and threatening customer confusion. Compl. ¶¶ 65, 77, 85; Knapp Decl. ¶¶ 22–25.

Further, because Plaintiffs have established the "continuing nature of the infringement, particularly in the face of takedown notices," a permanent injunction is warranted. *BGSD, Inc. v. SpazeUp, LLC*, 2024 WL 1619279, at *6 (E.D. Pa. Apr. 15, 2024). Weibley continues to operate the Current Infringing Services even after Plaintiffs filed this action. Knapp Decl. ¶¶ 15, 26. An injunction provides

assurance, backed by the Court's contempt power, that Weibley will shut down the Infringing Services. *A&N Music Corp. v. Venezia*, 733 F. Supp. 957, 958 (E.D. Pa. 1990) ("When past infringement and a substantial likelihood of future infringements is established, a copyright holder is ordinarily entitled to a permanent injunction against the infringer").

Second, a monetary award would neither protect Plaintiffs from future infringement nor adequately compensate them for the harm Defendant has caused. Those harms include Plaintiffs' loss of control over the Copyrighted Works, damage to their business goodwill, and harm to the continued advancement of the legitimate marketplace for distribution of creative works. Knapp Decl. ¶¶ 23–25; *see Chen v. ADEDIY*, 2025 WL 1489240, at *2 n.2 (W.D. Pa. Feb. 24, 2025) (finding similar harms supported inadequate remedy at law). Moreover, the fact that Defendant will not defend himself in this lawsuit suggests that he will not satisfy a damages award. Under these circumstances, a monetary remedy is insufficient. *See*, *e.g.*, *Columbia Pictures Indus., Inc. v. Fung*, 2013 WL 12098334, at *2 (C.D. Cal. Aug. 5, 2013) ("Damages are no remedy at all if they cannot be collected.").

Third, "granting an injunction will not harm [Defendant] as the injunction will only prevent [him] from infringing [Plaintiffs'] copyrights which [he] is not entitled to do." *BGSD*, 2024 WL 1619279, at *6. In contrast, absent a permanent

injunction, Plaintiffs will face the ongoing threat of continuing, irreparable harm from Weibley resuming his infringing activity. *Adlife Mktg.*, 708 F. Supp. 3d at 575 (granting an injunction on a copyright claim where "injunction will only prohibit [d]efendants from further violating copyright law").

Fourth, "the Third Circuit has noted that 'it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work.'" *Id.* (quoting *Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1255 (3rd Cir. 1983)).

### (b)    The Court Should Issue the Relief in the Proposed Order

Plaintiffs' proposed injunction (1) enjoins Weibley from infringing Plaintiffs' copyrights and from aiding others in such infringement (Proposed Order ¶ 6), and (2) orders service providers who are in active participation with Weibley and who receive actual notice of the order to transfer the Infringing Domains, and any other domain associated with the operation of the Infringing Services, and cease providing services to such domains (Proposed Order ¶¶ 7–8).

Consistent with Federal Rule of Civil Procedure 65(d)(2), the proposed injunction covers the named Defendant and his "officers, agents, servants, employees, and attorneys, and [*all others*] *in active concert or participation with*

[*him*]" who receive "*actual notice*" of the order. Fed. R. Civ. P. 65(d)(2) (emphasis added).

To prevent further infringement of their copyrighted works, Plaintiffs request an order requiring that the respective registries and registrars for the Infringing Domains transfer such domains, and any additional domains associated with the Infringing Services, to Plaintiffs or cause them to be relisted with a registrar selected by Plaintiffs. Proposed Order ¶ 7. Courts routinely order the transfer of domains associated with infringing activities. *See Pa. Bus. Bank v. Biz Bank Corp.*, 330 F. Supp. 2d 511, 527 (E.D. Pa. 2004) (ordering transfer of domain as remedy to infringement); *Evony LLC v. Holland*, 2011 WL 1230405, at \*8 (W.D. Pa. Mar. 31, 2011) (same); *Warner Bros. Entm't, Inc. v. Vega*, 2012 WL 13008442, at \*5 (C.D. Cal. Mar. 29, 2012) (same).

Plaintiffs similarly seek an order directing the hosting providers of the Infringing Domains, and of any domain names found to be associated with Weibley's operation of the Infringing Services, who receive notice of the order, to suspend services to such domains and to prevent the content on the websites associated with the domains from being transferred to another domain name or hosting service. Proposed Order ¶ 8. This is consistent with relief courts have issued in similar cases. *See, e.g.*, *Sas v. Sawabeh Info. Servs. Co.*, 2012 WL 12886442, at \*13 (C.D. Cal. Apr. 6, 2012) (enjoining service providers from

24

"operating or hosting" infringing websites); *Warner Bros. Ent. Inc. v. Doe*, 2014

WL 12543818, at *3 (S.D.N.Y. May 29, 2014) (same); *CME Grp. Inc. v.*

*Nagovskiy*, 2019 WL 13252888, at *5 (N.D. Ill. Apr. 8, 2019) (same).

## VI.    CONCLUSION

Plaintiffs respectfully request that the Court enter default judgment against

Weibley as set forth in the concurrently filed Proposed Order.

DATED: October 9, 2025          Respectfully submitted,

<div style="margin-left:3em">

By:/s/ *L. Danielle Toaltoan*
L. Danielle Toaltoan (NY Bar No. 5074315)
*(Pro Hac Vice)*
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY  0020-1104
Telephone: (212) 489-8230
danielletoaltoan@dwt.com

Scott R. Commerson (CA Bar No. 227460)
Sean M. Sullivan (CA Bar No. 229104)
Katelyn A. Feliciano (CA Bar No. 350385)
(*Pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071-3487
Telephone: (213) 633-6800
Fax: (213) 633-6899
scottcommerson@dwt.com
seansullivan@dwt.com
katelynfeliciano@dwt.com

Barry Cohen
ROYER, COOPER, COHEN, BRAUNFELD
Three Logan Square
1717 Arch Street, 47th Floor
Philadelphia, Pennsylvania 19103
Telephone: (484) 362 -2628
bcohen@rccblaw.com

*Attorneys for Plaintiffs*

</div>

## Word Court Certification

*I certify that this memorandum contains <u>5415</u> words, in compliance with the*

*Court's Order permitting an over-length brief. LR 7.8(b).*

By: /s/ *L. Danielle Toaltoan*

# EXHIBIT A

2025 WL 2217715
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

AMAZON CONTENT SERVICES LLC et al.

v.

Zachary Adam-Lane DEBARR et al.

Case No. 5:25-cv-00685-JLS-DTB

|

Filed August 4, 2025

**Synopsis**
**Background:** Producers and distributors of movies and
television shows brought copyright infringement action
against owner and operator of subscription-based streaming
service, claiming direct copyright infringement, contributory
copyright infringement, and inducement of copyright
infringement, and alleging that their copyrighted works had
been streamed without authorization. After clerk entered
default against defendants, who failed to appear or respond
to complaint despite being properly served, producers and
distributors moved for default judgment, seeking $15,000,000
in statutory damages, $303,600 in attorneys' fees, eligible
costs, post-judgment interest, and a permanent injunction.

**Holdings:** The District Court, Josephine L. Staton, J., held
that:

[1] in sum, 🚩 *Eitel* factors, 782 F.2d 1470, including
possibility of prejudice to plaintiffs, merits of claims
and sufficiency of complaint, amount of money at stake,
possibility of dispute concerning material facts, possibility
of excusable neglect, and policy favoring decisions on the
merits, weighed in favor of granting default judgment to
producers and distributors;

[2] it would award producers and distributors $15,000,000 in
statutory damages;

[3] it would permanently enjoin defendants, as well as their
officers, agents, employees, attorneys, and all other persons
acting in concert or participation with them, from infringing
plaintiffs' copyrights and from aiding and abetting others in
such infringement;

[4] an award of attorneys' fees was warranted, but it could not
determine whether substantial fee request was reasonable;

[5] an award of litigation costs was appropriate, but to recover
any eligible litigation costs, plaintiffs would have to submit
further documentation; and

[6] it would grant plaintiffs post-judgment interest.

Motion granted with directions.

**Procedural Posture(s):** Motion for Default Judgment/Order
of Default; Motion for Permanent Injunction.

West Headnotes (44)

**[1]** **Federal Civil Procedure** 🔑 Entry of default
**Federal Civil Procedure** 🔑 Final judgment
Default judgment is a two-step process: an entry
of default judgment must be preceded by an entry
of default. 🚩 Fed. R. Civ. P. 55.

**[2]** **Federal Civil Procedure** 🔑 Matters admitted
Upon entry of default, factual allegations of
complaint, save for those concerning damages,
are deemed to have been admitted by defaulting
party, but a defendant is not held to admit facts
that are not well-pleaded or to admit conclusions
of law. Fed. R. Civ. P. 8(b)(6), 🚩 55.

**[3]** **Federal Civil Procedure** 🔑 Pleadings to
Sustain Judgment
Facts which are not established by pleadings of
prevailing party, or claims which are not well-
pleaded, are not binding and cannot support
default judgment. 🚩 Fed. R. Civ. P. 55.

**[4]** **Federal Civil Procedure** 🔑 Discretion
A district court has discretion to grant or deny a
motion for default judgment. 🚩 Fed. R. Civ. P.
55.

**[5]**    **Federal Civil Procedure** 🔑 Grounds and Factors

The Ninth Circuit has set forth seven 🔖 *Eitel factors, 782 F.2d 1470*, to be considered by courts in reviewing a motion for default judgment: (1) possibility of prejudice to plaintiff, (2) merits of plaintiff's substantive claim, (3) sufficiency of complaint, (4) sum of money at stake in action, (5) possibility of a dispute concerning material facts, (6) whether default was due to excusable neglect, and (7) strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. 🔖 Fed. R. Civ. P. 55.

**[6]**    **Federal Civil Procedure** 🔑 Determination and relief

If court ruling on a motion for default judgment determines that allegations in complaint are sufficient to establish liability, it must then determine amount and character of relief that should be awarded, because allegations of number of damages suffered are not taken as true.

Fed. R. Civ. P. 8(b)(6), 🔖 55.

**[7]**    **Federal Civil Procedure** 🔑 Application or motion for judgment

**Federal Civil Procedure** 🔑 Notice

Producers and distributors of copyrighted works satisfied requirements of local rule governing default judgments, in their copyright infringement action against owner and operator of subscription-based streaming service; producers and distributors accompanied their motion for default judgment with a sworn declaration, providing pleading on which default was entered and when it was entered, and stating that defendants were not infants or incompetent persons and that the Servicemembers Civil Relief Act did not apply, and service of the motion was not required since defendants had not appeared, but nevertheless, producers and distributors served defendants with a copy of the motion. U.S.Dist.Ct.Rules C.D.Ca., Civil Rule 55-1.

**[8]**    **Federal Civil Procedure** 🔑 Grounds and Factors

Possibility of prejudice to plaintiff, as an 🔖 *Eitel factor, 782 F.2d 1470*, weighed in favor of granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based streaming service; defendants had elected not to respond to complaint, thereby denying plaintiffs their right to have their claim heard and to seek relief.

🔖 Fed. R. Civ. P. 55.

1 Case that cites this headnote

**[9]**    **Federal Civil Procedure** 🔑 Grounds and Factors

Possibility of prejudice to plaintiff, as an 🔖 *Eitel factor, 782 F.2d 1470*, considers whether a plaintiff will suffer prejudice if a default judgment is not entered. 🔖 Fed. R. Civ. P. 55.

1 Case that cites this headnote

**[10]**    **Federal Civil Procedure** 🔑 Grounds and Factors

Prejudice can be shown if denying default judgment would leave a plaintiff without a remedy. 🔖 Fed. R. Civ. P. 55.

1 Case that cites this headnote

**[11]**    **Federal Civil Procedure** 🔑 Pleadings to Sustain Judgment

Merits of claims and sufficiency of complaint, as 🔖 *Eitel factors, 782 F.2d 1470*, to be considered in reviewing a motion for default judgment, examine plaintiff's likelihood of success on the merits. 🔖 Fed. R. Civ. P. 55.

**[12]** **Federal Civil Procedure** 🚩 Pleadings to Sustain Judgment

Under 🚩 *Eitel factors, 782 F.2d 1470,* of merits of claims and sufficiency of complaint, plaintiffs seeking default judgments must state a claim on which they may recover. 🚩 Fed. R. Civ. P. 55.

**[13]** **Federal Civil Procedure** 🚩 Pleadings to Sustain Judgment

**Federal Civil Procedure** 🚩 Matters admitted

In considering sufficiency of complaint and merits of plaintiff's substantive claims, as 🚩 *Eitel factors, 782 F.2d 1470,* to be considered in reviewing a motion for default judgment, facts alleged in complaint not relating to damages are deemed to be true upon default. Fed. R. Civ. P. 8(b)(6), 🚩 55.

**[14]** **Federal Civil Procedure** 🚩 Particular actions

Merits of claims and sufficiency of complaint, as 🚩 *Eitel factors, 782 F.2d 1470,* weighed in favor of granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based streaming service; producers and distributors asserted claims for direct copyright infringement, contributory copyright infringement, and inducement of copyright infringement, and they had sufficiently pled each of those claims. 🚩 Fed. R. Civ. P. 55.

**[15]** **Copyrights and Intellectual Property** 🚩 Nature and Elements in General

To establish a claim for direct copyright infringement, a plaintiff must demonstrate (1) that it owns a valid copyright of allegedly infringed material, and (2) that defendant violated plaintiff's exclusive rights under the Copyright Act. 🚩 17 U.S.C.A. § 101 et seq.

**[16]** **Copyrights and Intellectual Property** 🚩 Copyright infringement

**Copyrights and Intellectual Property** 🚩 Motion pictures and other audiovisual works

Producers and distributors of movies and television shows sufficiently pled a claim for direct copyright infringement against owner and operator of subscription-based streaming service; producers and distributors had provided certificates of registration from the United States Copyright Office for all allegedly infringed works listed in complaint, copyright registration was prima facie evidence of validity of copyright, producers and distributors alleged that, by providing subscribers access to unauthorized reproductions of their copyrighted works, defendants had infringed their exclusive rights to reproduce and display their copyrighted works publicly, and complaint contained screenshots of several copyrighted works that were illegally streamed through defendants' service. 🚩 17 U.S.C.A. §§ 106, 410(c).

**[17]** **Copyrights and Intellectual Property** 🚩 Contributory Liability

To establish a claim for contributory copyright infringement, a plaintiff must show (1) direct infringement by a third party, (2) that defendant knew or had reason to know of the third party's infringing activity, and (3) that defendant induced, caused, or materially contributed to the infringing conduct.

**[18]** **Copyrights and Intellectual Property** 🚩 Copyright infringement

Producers and distributors of movies and television shows sufficiently pled a claim for contributory copyright infringement against owner and operator of subscription-based streaming service; producers and distributors alleged that third-party subscribers to streaming service directly infringed upon their exclusive

rights to reproduce and publicly perform their copyrighted works, producers and distributors established that defendants had actual knowledge of third-party subscribers' infringing activity, and by operating streaming service's domains and supplying subscribers with unauthorized access to producers' and distributors' copyrighted works, defendants had facilitated, encouraged, and enabled direct infringement of those works. 🚩17 U.S.C.A. §§ 106(1), 🚩106(4).

**[19]** **Copyrights and Intellectual Property** 🔑 Materiality of contribution

A "material contribution" to a third party's infringing conduct, as an element of contributory copyright infringement, may be established where defendant substantially assists a worldwide audience of users to access infringing materials.

**[20]** **Copyrights and Intellectual Property** 🔑 Inducement

To establish a claim for inducement of copyright infringement, a plaintiff must demonstrate four elements: (1) distribution of a device or product, (2) acts of infringement, (3) an object of promoting use of the device or product to infringe copyright, and (4) causation.

**[21]** **Copyrights and Intellectual Property** 🔑 Copyright infringement

Producers and distributors of movies and television shows sufficiently pled a claim for inducement of copyright infringement against owner and operator of subscription-based streaming service; defendants distributed and sold subscriptions to their streaming service, defendants infringed on producers' and distributors' copyrighted works by streaming the works without authorization and by providing subscribers access to the works, defendants knowingly distributed copyrighted works through their service with object of

promoting its use to infringe copyright, defendants distributed and promoted their streaming service with clear intent that subscribers would publicly perform producers' and distributors' copyrighted works without authorization, and infringing conduct predictably followed.

**[22]** **Copyrights and Intellectual Property** 🔑 Inducement

Enticing or persuading another to infringe by advertising is classic case of inducing infringement.

**[23]** **Copyrights and Intellectual Property** 🔑 Secondary liability in general

If one provides a service that could be used to infringe copyrights, with manifested intent that the service actually be used in that manner, that person is liable for infringement that occurs through use of the service.

**[24]** **Federal Civil Procedure** 🔑 Grounds and Factors

Under amount of money at stake, as an 🚩*Eitel factor, 782 F.2d 1470*, to be considered in reviewing a motion for default judgment, court must consider amount of money at stake in relation to seriousness of defendant's conduct, as default judgment is disfavored where sum of money at stake is too large or unreasonable in relation to defendant's conduct. 🚩Fed. R. Civ. P. 55.

**[25]** **Federal Civil Procedure** 🔑 Grounds and Factors

Amount of money at stake, as an 🚩*Eitel factor, 782 F.2d 1470*, weighed in favor of granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based

streaming service, as damages requested were commensurate with nature and scope of defendants' misconduct; producers and distributors sought statutory maximum of $150,000 for each infringed-upon copyrighted work listed in complaint, that amount was reasonable in light of seriousness, willfulness, and extent of defendants' infringement, and works identified in complaint represented only a small portion of total copyrighted works that defendants infringed, and for which they would be liable if they were to appear and litigate. 🚩 17 U.S.C.A. § 504(c)(2); 🚩 Fed. R. Civ. P. 55.

**[26]    Copyrights and Intellectual Property** 🔑 Elements, Measure, and Amount of Recovery; Multiple Infringements

District courts have wide discretion in determining amount of statutory damages to be awarded for copyright infringement, constrained only by specified maxima and minima. 🚩 17 U.S.C.A. §§ 504(c)(1), 🚩 504(c)(2).

**[27]    Federal Civil Procedure** 🔑 Grounds and Factors

Possibility of dispute concerning material facts, as an 🚩 Eitel factor, 782 F.2d 1470, to be considered in reviewing a motion for default judgment, examines likelihood of dispute between parties regarding material facts surrounding case; where a plaintiff has filed a well-pleaded complaint, possibility of dispute concerning material facts is remote. 🚩 Fed. R. Civ. P. 55.

**[28]    Federal Civil Procedure** 🔑 Grounds and Factors

Possibility of dispute concerning material facts, as an 🚩 Eitel factor, 782 F.2d 1470, weighed in favor of granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action

against owner and operator of subscription-based streaming service; producers and distributors had adequately pled their claims and provided evidence to support those claims, and thus, a dispute concerning material facts was unlikely. 🚩 Fed. R. Civ. P. 55.

**[29]    Federal Civil Procedure** 🔑 Defenses and Objections

Possibility of excusable neglect, as an 🚩 Eitel factor, 782 F.2d 1470, weighed in favor of granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based streaming service; defendants were properly served but had failed to appear and defend. 🚩 Fed. R. Civ. P. 55.

**[30]    Federal Civil Procedure** 🔑 Defenses and Objections

Possibility of excusable neglect, as an 🚩 Eitel factor, 782 F.2d 1470, to be considered in reviewing a motion for default judgment, considers possibility that default resulted from excusable neglect, and favors default judgment when defendant has been properly served or plaintiff demonstrates that defendant is aware of the lawsuit. 🚩 Fed. R. Civ. P. 55.

**[31]    Federal Civil Procedure** 🔑 Grounds and Factors

Policy favoring decisions on the merits, as an 🚩 Eitel factor, 782 F.2d 1470, did not weigh against granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based streaming service; defendants had forfeited opportunity to defend themselves on the merits by failing to appear and respond. 🚩 Fed. R. Civ. P. 55.

[32]    **Federal Civil Procedure** 🚩 Grounds and Factors

Policy favoring decisions on the merits, as an 🚩 *Eitel* factor, 782 F.2d 1470, to be considered in reviewing a motion for default judgment, examines whether strong policy favoring deciding cases on the merits prevents a court from entering default judgment; although cases should be decided upon their merits whenever reasonably possible, rule allows a court to decide a case before merits are heard if defendant fails to appear and defend.

🚩 Fed. R. Civ. P. 55.

[33]    **Copyrights and Intellectual Property** 🚩 Elements, Measure, and Amount of Recovery; Multiple Infringements

District court, granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based streaming service, would award producers and distributors $15,000,000 in statutory damages, as damages requested were commensurate with nature and scope of defendants' misconduct; producers and distributors sought statutory maximum of $150,000 for each infringed-upon copyrighted work listed in complaint, that amount was reasonable in light of seriousness, willfulness, and extent of defendants' infringement, and works identified in complaint represented only a small portion of total copyrighted works that defendants infringed, and for which they would be liable if they were to appear and litigate. 🚩 17 U.S.C.A. § 504(c)(2); 🚩 Fed. R. Civ. P. 55.

[34]    **Copyrights and Intellectual Property** 🚩 Permanent relief in general

A party seeking a permanent injunction under the Copyright Act must demonstrate (1) that it has suffered an irreparable injury, (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (3)

that, considering balance of hardships between plaintiff and defendant, a remedy in equity is warranted, and (4) that public interest would not be disserved by a permanent injunction. 🚩 17 U.S.C.A. § 502(a).

[35]    **Copyrights and Intellectual Property** 🚩 Copyright Infringement

District court, granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based streaming service, would permanently enjoin defendants, as well as their officers, agents, employees, attorneys, and all other persons acting in concert or participation with them, from infringing plaintiffs' copyrights and from aiding and abetting others in such infringement; any continuing infringement of plaintiffs' exclusive rights over their works would likely undermine value of those works, harm plaintiffs' business model, and damage their reputation, defendants' history showed a significant threat of future infringement if not enjoined, balance of hardships favored plaintiffs, and public had a compelling interest in protecting copyright owners' marketable rights and economic incentive to continue creating works. 17 U.S.C.A. § 502(a); 🚩 Fed. R. Civ. P. 55.

[36]    **Copyrights and Intellectual Property** 🚩 Particular cases

An award of attorneys' fees was warranted, upon granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based streaming service; plaintiffs had achieved complete success on the merits, their complaint had not been shown to be frivolous, they were motivated to recover legally cognizable damages, no party had presented any objections to plaintiffs' arguments, and attorneys' fees were warranted to deter both defendants' substantive copyright infringement

and their unresponsiveness to plaintiffs' filings.

17 U.S.C.A. § 505; 📙 Fed. R. Civ. P. 55.

**[37]    Copyrights and Intellectual Property** 🔑 **Costs and Fees**

District courts have wide latitude to exercise equitable discretion to award attorneys' fees under the Copyright Act. 17 U.S.C.A. § 505.

**[38]    Copyrights and Intellectual Property** 🔑 **Grounds for Award**

In guiding their discretion to award attorneys' fees under the Copyright Act, courts may consider (1) degree of success obtained, (2) frivolousness, (3) motivation, (4) reasonableness of losing party's legal and factual arguments, and (5) need to advance considerations of compensation and deterrence. 17 U.S.C.A. § 505.

**[39]    Costs, Fees, and Sanctions** 🔑 **Time Spent and Rates Charged**

Courts generally employ "lodestar" method to determine reasonableness of attorneys' fees requested, which consists of multiplying number of hours reasonably expended on litigation by a reasonable hourly rate.

**[40]    Costs, Fees, and Sanctions** 🔑 **Presumptions, inferences, and burden of proof**

Party requesting attorneys' fees bears burden of adducing evidence to support hours worked and rates claimed.

**[41]    Costs, Fees, and Sanctions** 🔑 **Default judgment**

**Costs, Fees, and Sanctions** 🔑 **Reasonableness in general**

Although local rule governing default judgment schedule of attorneys' fees gives lawyers who obtain default judgments and who are entitled to statutory fees option of recovering a set amount

without going through hassle of submitting billing records, district courts still have a duty to ensure that claims for attorneys' fees are reasonable, and thus, district courts must scrutinize attorneys' fees requests when a defendant fails to appear or otherwise defend itself. U.S.Dist.Ct.Rules C.D.Ca., Civil Rule 55-3.

**[42]    Copyrights and Intellectual Property** 🔑 **Documentation of costs and fees; specificity**

District court, granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based streaming service, could not determine whether their requested attorneys' fees were reasonable, so would order plaintiffs to submit supplemental declarations, including supporting billing records, that identified proposed lodestar for case; plaintiffs based their request for $303,600 in attorneys' fees on fee schedule set forth in local rule governing default judgment schedule of attorneys' fees, but had not provided any evidentiary support for their request, or any information regarding hours worked or billing incurred in case. 17 U.S.C.A. § 505; U.S.Dist.Ct.Rules C.D.Ca., Civil Rule 55-3.

**[43]    Copyrights and Intellectual Property** 🔑 **Particular cases**

**Copyrights and Intellectual Property** 🔑 **Documentation of costs and fees; specificity**

An award of litigation costs was appropriate, upon granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based streaming service, but, in accordance with local rules governing costs, to recover any eligible litigation costs, plaintiffs would have to submit a "Bill of Costs" and an "Application to the Clerk to Tax Costs." U.S.Dist.Ct.Rules C.D.Ca., Civil Rule 54-2, 54-2.1, 54-3.

[44]  **Interest**  🔑  Interest required or allowed

**Interest**  🔑  Copyrights and intellectual property

District court, granting default judgment to producers and distributors of copyrighted works, in their copyright infringement action against owner and operator of subscription-based streaming service, would grant plaintiffs post-judgment interest, calculated under statutory rate provided by rule governing interest on any money judgment in a civil case recovered in a district court. 28 U.S.C.A. § 1961(a).

**Attorneys and Law Firms**

Scott R. Commerson, Katelyn Alexsis Feliciano, Sean M. Sullivan, Davis Wright Tremaine LLP, Los Angeles, CA, L. Danielle Toaltoan, Pro Hac Vice, Davis Wright Tremaine LLP, New York, NY, for Amazon Content Services LLC et al.

**PROCEEDINGS: (IN CHAMBERS) ORDER GRANTING MOTION FOR DEFAULT JUDGMENT**

JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is a motion for default judgment filed by Plaintiffs Amazon Content Services LLC, Apple Video Programming LLC, Columbia Pictures Industries, Inc., Disney Enterprises, Inc., Netflix US, LLC, Paramount Pictures Corporation, Universal City Studios Productions LLLP, Universal City Studios LLC, and Warner Bros. Entertainment Inc. (collectively, "Plaintiffs"). (Mot, Doc. 30.) The Court finds this matter appropriate for decision without oral argument, and the hearing set for August 8, 2025, at 10:30 a.m. is VACATED. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15. For the following reasons, the Court GRANTS Plaintiffs' motion as to the request for default judgment. However, the Court requires additional information to determine a reasonable attorneys' fees award.

**I. BACKGROUND**

Plaintiffs initiated this action against Defendants Zachary Adam-Layne DeBarr and iLockSports LLC (collectively, "Defendants") on March 4, 2025. (Compl., Doc. 1.) Plaintiffs and their affiliates produce and distribute some of the most popular and critically acclaimed movies and television shows in the world. (*Id.* ¶¶ 1, 29.) Plaintiffs invest substantial resources to develop, produce, distribute, and publicly perform their copyrighted works, and have the exclusive U.S. rights to do so. (*Id.* ¶¶ 29–30.) Defendant DeBarr is a California resident who owns and operates Defendant iLockSports, a California limited liability company. (*Id.* ¶¶ 21–22.)

Plaintiffs allege that their copyrighted works have been streamed without authorization through Defendants' service, Outer Limits IPTV, which operated at the domains outerlimitsiptv.com and outerlimitshosting.net. (*Id.* ¶¶ 1, 22, 26, 35.) In exchange for a subscription fee ranging from $20 per month to $200 per year, Defendants provided Outer Limits' subscribers with unauthorized access to "more than 13,000 movie titles and over 3,000 television series, as well as over 4,000 printed channels, including international content and live sports events." (*Id.* ¶ 7.) Exhibit A to the Complaint contains a list of 100 of Plaintiffs' copyrighted works to which Defendants offered subscribers unauthorized access. (Ex. A to Compl., Doc. 1.) An investigation conducted by the Motion Picture Association and Alliance for Creativity and Entertainment confirmed that this list constitutes a "mere fraction" of the total copyrighted content available through Outer Limits. (Willet Decl. ¶ 12, Doc. 30-2; Compl. ¶ 3.) The investigation also revealed that the Outer Limits domains "receive[d] nearly 300,000 visits annually [and] an average of almost 30,000 monthly visitors." (Compl. ¶ 46.)

Plaintiffs have "tried since as far back as 2020 to get Defendants to stop infringing without the need for court intervention." (*Id.* ¶ 9.) Plaintiffs sent Defendants a cease-and-desist letter in September 2020, which prompted Defendants to temporarily shut down Outer Limits in November 2020. (*Id.* ¶¶ 42, 44.) However, Defendants re-activated Outer Limits in August 2021. (*Id.* ¶ 45.) Plaintiffs sent Defendants another cease-and-desist letter in May 2024 and have since made numerous attempts to contact DeBarr via phone, email, and mail. (*Id.* ¶¶ 61–62.) Defendants disregarded Plaintiffs' demands and communications, leading Plaintiffs to file this lawsuit. (Compl. ¶ 9.)

**\*2** Based on the above allegations, Plaintiffs bring claims against Defendants for direct copyright infringement,

contributory copyright infringement, and inducement of copyright infringement. (*Id.* ¶¶ 64–96.) Plaintiffs properly served DeBarr and iLockSports with the Summons and Complaint on March 8, 2025, and March 10, 2025, respectively. (DeBarr Proof of Serv., Doc. 21; iLockSports Proof of Serv., Doc. 12.) The Clerk entered default against Defendants on April 18, 2025. (Entry of Default, Doc. 25.)

Soon after Defendants received notice of this lawsuit, the Outer Limits domains went offline and became inaccessible within the United States. (Willet Decl. ¶ 15.) However, Plaintiffs maintain that there remains a substantial risk that Defendants may reactivate Outer Limits in light of DeBarr's history of copyright infringement, which dates back to at least 2017. (*Id.*; Compl. ¶ 6.)

Plaintiffs now move for default judgment against Defendants, seeking $15,000,000 in statutory damages, $303,600 in attorneys' fees, eligible costs, post-judgment interest, and a permanent injunction. (Mot. at 2.)

## II. LEGAL STANDARD

**[1]  [2]  [3]** Under Rule 55 of the Federal Rules of Civil Procedure, default judgment is a two-step process: an entry of default judgment must be preceded by an entry of default.

*See* Fed. R. Civ. P. 55; *see also Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986). Upon entry of default, the factual allegations of the complaint, save for those concerning damages, are deemed to have been admitted by the defaulting party. *See Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977); *see also* Fed. R. Civ. P. 8(b)(6). "On the other hand, a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *United States v. Cathcart*, 2010 WL 1048829, at *4 (N.D. Cal. Feb. 12, 2010). "[I]t follows from this that facts which are not established by the pleadings of the prevailing party, or claims which are not well-pleaded, are not binding and cannot support the judgment." *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978).

**[4]  [5]** A district court has discretion to grant or deny a motion for default judgment. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). The Ninth Circuit has set forth seven factors to be considered by courts in reviewing a motion for default judgment:

(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel*, 782 F.2d at 1471–72.

**[6]** "If the court determines that the allegations in the complaint are sufficient to establish liability, it must then determine the amount and character of the relief that should be awarded." *Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725 F. Supp. 2d 916, 920 (C.D. Cal. 2010) (quotations omitted). This is because the allegations of the number of damages suffered are not taken as true. *See Geddes*, 559 F.2d at 560.

## III. DISCUSSION

### A. Local Rule 55-1

**[7]** Plaintiffs' motion complies with Local Rule 55-1. Plaintiffs accompanied the motion with a sworn declaration, providing the pleading on which default was entered and when it was entered, and stating that Defendants are not infants or incompetent persons and that the Servicemembers Civil Relief Act does not apply. (Commerson Decl. ¶¶ 2–8, Doc. 30-1.) Because Defendants have not appeared in this case, service of the motion is not required. Fed. R. Civ. P. 55(b)(2). Nevertheless, Plaintiffs served Defendants with a copy of the motion. (Mot. Proof of Serv., Doc. 31; Commerson Decl. ¶¶ 6–7.) The requirements of Local Rule 55-1 have been satisfied.

### B. *Eitel* Factors

#### 1. Possibility of Prejudice to Plaintiff

**\*3** **[8]** **[9]** **[10]** "The first 🚩 *Eitel* factor considers whether a plaintiff will suffer prejudice if a default judgment is not entered." *Landstar Ranger*, 725 F. Supp. 2d at 920. Prejudice can be shown if denying default judgment would leave a plaintiff without a remedy. *See id.* Here, Defendants have elected not to respond to the complaint, "thereby denying [Plaintiffs] [their] right to have [their] claim heard and to seek relief." *Custer v. Cristo Armstrong Powers, Inc.*, 2020 WL 5223559, at \*1 (C.D. Cal. July 7, 2020) (Staton, J.); *accord Evans v. Creditor's Specialty Serv., Inc.*, 2016 WL 730217 at \*2 (N.D. Cal. Feb. 24, 2016). Accordingly, the first 🚩 *Eitel* factor weighs in favor of granting default judgment.

### 2. Merits of Claims and Sufficiency of Complaint

**[11]** **[12]** **[13]** The next two 🚩 *Eitel* factors examine the plaintiff's likelihood of success on the merits. Under these two factors, plaintiffs seeking default judgments must "state a claim on which the[y] [ ] may recover. *See* 🚩 *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002) (cleaned up). "In considering the sufficiency of the complaint and the merits of the plaintiff's substantive claims, facts alleged in the complaint not relating to damages are deemed to be true upon default." *Bd. of Trs. of Sheet Metal Workers v. Moak*, 2012 WL 5379565, at \*2 (N.D. Cal. Oct. 31, 2012) (citing 🚩 *Geddes*, 559 F.2d at 560; Fed. R. Civ. P. 8(d)).

**[14]** Plaintiffs assert claims against Defendants for direct copyright infringement, contributory copyright infringement, and inducement of copyright infringement. (Compl. ¶¶ 64–96.) The Court finds that Plaintiffs have sufficiently pled each of these claims, and thus the second and third 🚩 *Eitel* factors weigh in favor of granting default judgment.

#### i. Direct Copyright Infringement

**[15]** To establish a claim for direct copyright infringement, a plaintiff must demonstrate (1) that it owns a valid copyright of the allegedly infringed material, and (2) that defendant violated plaintiff's exclusive rights under the Copyright Act. 🚩 *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

**[16]** Plaintiffs have provided certificates of registration from the United States Copyright Office for all 100 of the allegedly infringed works listed in Ex. A to the Complaint. (Certificates of Registration, Exs. 1–100 to Commerson Decl., Doc. 30-1.) "A copyright registration is 'prima facie evidence of the validity of the copyright and the facts stated in the certificate.' " 🚩 *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) (quoting 17 U.S.C. § 410(c)); *see also* ⚠️ *Ent. Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997) (explaining that a certificate of registration bearing the plaintiff's name "creates a presumption of ownership of a valid copyright").

As copyright holders, Plaintiffs have the exclusive rights to reproduce, prepare, distribute, publicly perform, and import their copyrighted works. 🚩 17 U.S.C. § 106. Plaintiffs allege that, by providing Outer Limits subscribers access to unauthorized reproductions of Plaintiffs' copyrighted works, Defendants have infringed their exclusive rights to reproduce and display their copyrighted works publicly. (Compl. ¶¶ 32–47, ¶¶ 52–56, 66–68.) Plaintiffs' Complaint contains screenshots of several popular movies and television series that were illegally streamed through the Outer Limits domains. (*See, e.g.*, Compl. ¶ 5, Figure 1 (depicting Universal's *Wicked* streaming on Outer Limits); *see also id.* ¶ 55, Figure 9 (depicting Disney's *Moana* 2 streaming on Outer Limits).)

**\*4** Accordingly, Plaintiffs have sufficiently pled a claim for direct copyright infringement against Defendants.

#### ii. Contributory Copyright Infringement

**[17]** To establish a claim for contributory copyright infringement, a plaintiff must show (1) direct infringement by a third party; (2) that the defendant knew or had reason to know of the third party's infringing activity; and (3) that the defendant induced, caused, or materially contributed to the infringing conduct. 🚩 *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788,795 (9th Cir. 2007); 🚩 *A&M Records*, 239 F.3d at 1020. Plaintiffs have satisfied each of these requirements.

**[18]** First, Plaintiffs allege that the third-party subscribers to Outer Limits directly infringed upon Plaintiffs' valid copyrighted works insofar as they illegally streamed the

works and/or uploaded them to the internet. (Compl. ¶¶ 78–79.) This conduct infringes Plaintiffs' exclusive rights under the Copyright Act to reproduce and publicly perform their copyrighted works. 🚩 17 U.S.C. § 106(1), 🚩 (4); 🚩 *ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431, 442, 134 S.Ct. 2498, 189 L.Ed.2d 476 (2014) ("The concept of public performance covers not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public") (cleaned up).

Second, Plaintiffs have established that Defendants had actual knowledge of the third-party subscribers' infringing activity. Plaintiffs allege that (1) Defendants "systemically offer[ed] for sale thousands of live television channels, movies, and television series containing copyrighted works that can only be lawfully accessed through a limited number of legitimate services"; (2) DeBarr "publicly promoted" Outer Limits' access to content on his YouTube account on multiple occasions; and (3) Defendants emailed subscribers with a username, password, and access link with instructions to download a third-party media player that facilitated the streaming of the copyrighted works. (Compl. ¶¶ 38–44, 48–51, 78.) *See Columbia Pictures Industries, Inc. v. Galindo*, 2022 WL 17094713, at *9 (C.D. Cal. Nov. 18, 2022) (finding knowledge element satisfied where the complaint provided "detailed summary" of how defendants "actively encourage[d]" infringement by third parties). Further, Plaintiffs allege that Defendants continued to operate Outer Limits even after Plaintiffs notified Defendants that their conduct infringed upon Plaintiffs' copyrighted works and demanded that Defendants cease such conduct. (Compl. ¶¶ 60–62.)

[19] Third, Plaintiffs have shown that Defendants materially contributed to the third parties' infringement. A "material contribution" may be established where the defendant "substantially assists ... a worldwide audience of users to access infringing materials." 🚩 ⚠️ *Perfect 10, Inc. v. Amazon.com Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007). Plaintiffs allege that Defendants "configure[d] and promote[d]" the use of Outer Limits "to connect subscribers to unauthorized streams" of Plaintiffs' copyrighted works. (Compl. ¶ 79.) Those third parties directly infringe Plaintiffs' exclusive rights by copying and/or publicly performing the copyrighted works without Plaintiffs' authorization. By operating Outer Limits' domains and supplying subscribers with unauthorized access to Plaintiffs' copyrighted works,

Defendants have facilitated, encouraged, and enabled the direct infringement of Plaintiffs' copyrighted works.

**\*5** Accepting Plaintiffs' allegations as true, the Court finds that Plaintiffs have sufficiently pled a claim for contributory copyright infringement.

### *iii. Inducement of Copyright Infringement*

[20] To establish a claim for inducement of copyright infringement, a plaintiff must demonstrate four elements: "(1) the distribution of a device or product; (2) acts of infringement; (3) an object of promoting use of the device or product to infringe copyright, and (4) causation." 🚩 *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020,1032 (9th Cir. 2013). Plaintiffs have satisfied all four elements.

[21] First, Defendants distributed and sold subscriptions to Outer Limits, which constitutes "the distribution of a device or product." *See* 🚩 *Fung, 710 F.3d at 1033* (explaining that "services available on the Internet" provide a basis for inducement liability).

Second, as discussed above, Defendants infringed on Plaintiffs' copyrighted works by streaming the works through Outer Limits without authorization and by providing subscribers access to the works.

[22] Third, Defendants knowingly distributed copyrighted works through Outer Limits "with the object of promoting its use to infringe copyright." 🚩 *Fung, 710 F.3d at 1032.* Plaintiffs allege that DeBarr advertised Outer Limits on his YouTube channel and gave away free subscriptions to Outer Limits over a recorded live chat on YouTube that attracted an audience of over 100 people. (Compl. ¶¶ 38–41.) "Entic[ing] or persuad[ing] another to infringe ... by advertising" is the "classic case" of inducing infringement. 🚩 *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 935–36, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005).

[23] Fourth, "if one provides a service that could be used to infringe copyrights, with the manifested intent that the service actually be used in that manner, that person is liable for the infringement that occurs through the use of the service." 🚩 *Fung, 710 F.3d at 1037.* Defendants distributed and

promoted Outer Limits with the clear intent that subscribers would publicly perform Plaintiffs' copyrighted works without authorization, and "infringing conduct predictably followed." *Warner Bros. Ent., Inc. v. Tusa*, 2021 WL 6104399, at \*5 (C.D. Cal. Oct. 25, 2021). Thus, the causation element is plainly met.

Accordingly, Plaintiffs have sufficiently pled their claim for inducement of copyright infringement.

### 3. Amount of Money at Stake

**[24]** Under the fourth *Eitel* factor, "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct." *PepsiCo*, 238 F. Supp. 2d at 1176. "Default judgment is disfavored where the sum of money at stake is too large or unreasonable in relation to defendant's conduct." *Vogel v. Rite Aid Corp.*, 992 F. Supp. 2d 998, 1012 (C.D. Cal. 2014).

**[25]** **[26]** Plaintiffs seek statutory damages in the amount of $15,000,000, which reflects the statutory maximum of $150,000 for each of the 100 infringed upon copyrighted works listed in Exhibit A to the Complaint. (Mot. at 22.) Under the Copyright Act, the Court can award statutory damages of between $750 and $30,000 with respect to any one work. 17 U.S.C. § 504(c)(1). If the Court finds that the infringement was willful it may, at its discretion, "increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2). District courts have "wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984).

\*6 The Court finds the requested amount of statutory damages reasonable in light of the seriousness of Defendants' infringement and the harm it caused. The nature and scope of Defendants' conduct indicates that they willfully engaged in egregious copyright infringement on a massive scale. For nearly five years, Defendants operated and publicly promoted a service that offered subscribers access to a vast library of unauthorized content, which included more than 4,000 live channels, 13,000 movies, and 3,000 television series. (Compl. ¶¶ 38–42, 47.) The Outer Limits domains received nearly 300,000 visits annually—a figure that likely understates the

scope of the infringement perpetuated by Defendants, as subscribers could access the unauthorized content without visiting those domains at all. (*Id.* ¶ 46.) Defendants' business model deprives copyright owners of their exclusive rights to control the use of their works, undermines Plaintiffs' legitimate service offerings, threatens the economic structure of the entertainment industry, and encourages growth of the illicit market for infringing content. (Willet Decl. ¶¶ 23–24.) Moreover, Defendants' decisions to temporarily shut down Outer Limits in 2020 following Plaintiffs' first cease-and-desist letter—only to later reactivate Outer Limits and disregard Plaintiffs' second cease-and-desist letter in 2024—further underscore their willfulness. (Compl. ¶¶ 42–44, 61.) Given the extent of Defendants' willful conduct, the Court finds an award of $150,000 for each of the 100 copyrighted works listed in Exhibit A to the Complaint reasonable.

The Court also notes that the works identified in Exhibit A represent only a small portion of the total copyrighted works that Defendants infringed—and for which they would be liable if they were to appear and litigate this case. A complete accounting of Defendants' infringement would likely entail thousands of Plaintiffs' copyrighted works.

For these reasons, the Court finds the statutory damages requested to be commensurate with the nature and scope of Defendants' misconduct. *See Galindo*, 2022 WL 17094713, at \*11 (awarding maximum statutory damages where defendants willfully engaged in "egregious" copyright infringement and plaintiffs requested damages for only a fraction of the total works likely infringed). The fourth *Eitel* factor therefore weighs in favor of default judgment.

### 4. Possibility of Dispute Concerning Material Facts

**[27]** "The fifth *Eitel* factor examines the likelihood of dispute between the parties regarding the material facts surrounding the case." *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1060 (N.D. Cal. 2010). "Where a plaintiff has filed a well-pleaded complaint, the possibility of dispute concerning material facts is remote." *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1082 (C.D. Cal. 2012); *see also Landstar Ranger*, 725 F. Supp. 2d at 921–22 ("Since [plaintiff] has supported its claims with ample evidence, and defendant has made no attempt to challenge

the accuracy of the allegations in the complaint, no factual disputes exist that preclude the entry of default judgment.").

**[28]** As discussed above, Plaintiffs have adequately pled their claims against Defendants and provided evidence to support those claims. Thus, a dispute concerning material facts is unlikely, and this factor weighs in favor of default judgment.

### 5. Possibility of Excusable Neglect

**[29]** **[30]** "The sixth *Eitel* factor considers the possibility that the default resulted from excusable neglect." *PepsiCo,* 238 F. Supp. 2d at 1177. This factor favors default judgment when the defendant has been properly served or the plaintiff demonstrates that the defendant is aware of the lawsuit. *See id.* Here, Defendants were properly served but have failed to appear and defend. (*See* DeBarr Proof of Serv.; iLockSports Proof of Serv.) Therefore, the sixth *Eitel* factor weighs in favor of granting default judgment.

### 6. Policy Favoring Decisions on the Merits

**[31]** **[32]** "The final *Eitel* factor examines whether the strong policy favoring deciding cases on the merits prevents a court from entering default judgment." *Craigslist,* 694 F. Supp. 2d at 1061. Although "[c]ases should be decided upon their merits whenever reasonably possible," *Eitel,* 782 F.2d at 1472, "'Rule 55(a) allows a court to decide a case before the merits are heard if defendant fails to appear and defend.'" *Landstar Ranger,* 725 F. Supp. 2d at 922. In this case, Defendants have forfeited the opportunity to defend themselves on the merits by failing to appear and respond. Therefore, this final *Eitel* factor does not weigh against granting default judgment.

### 7. Conclusion as to *Eitel* Factors

**\*7** In sum, the *Eitel* factors weigh in favor of granting default judgment on Plaintiffs' claims for copyright

infringement against Defendants. The Court turns next to the issue of remedies.

## IV. REMEDIES

### A. Statutory Damages

**[33]** As discussed above in Section III.B.3, Plaintiffs request $15,000,000 in statutory damages. For the reasons set forth therein, the Court finds this amount reasonable. Accordingly, the Court, exercising its discretion, awards Plaintiffs $15,000,000 in statutory damages under the Copyright Act.

### B. Permanent Injunction

Plaintiffs also seek to permanently enjoin Defendants, as well as their officers, agents, employees, attorneys, and all other persons who are acting in concert or participation with them, from infringing Plaintiffs' copyrights and from aiding and abetting others in such infringement. (Proposed Order ¶¶ A–E, Doc. 30-3.) In addition, Plaintiffs seek an order requiring service providers who are in active participation with Defendants, and who receive actual notice of such an order, to turn over the domains associated with the Outer Limits domains to Plaintiffs and to cease providing services to any such domain. (*Id.* ¶¶ F–G.)

**[34]** The Copyright Act allows courts to grant permanent injunctions "to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). A party seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.,* 762 F.3d 867, 879 (9th Cir. 2014) (citations omitted). The Court finds that Plaintiffs have satisfied all four elements.

**[35]** First, Plaintiffs have shown that they are likely to suffer irreparable harm in the absence of an injunction. Any continuing infringement of Plaintiffs' exclusive rights over their copyrighted works will likely undermine the value of those works, harm Plaintiffs' business model, and damage Plaintiffs' reputation in the industry. (Compl. ¶¶ 8, 10, 75, 86; Willet Decl. ¶¶ 23–25, Doc. 30-2.) *See Wetzel's Pretzels,*

*LLC v. Johnson v. Johnson*, 797 F. Supp. 2d 1020, 1028 (C.D. Cal. 2011) (finding irreparable harm where Plaintiff's "ability to control its reputation and goodwill associated with [its] marks [would] be significantly reduced" in the absence of an injunction).

Second, monetary damages will not fully compensate Plaintiffs for the harm caused by Defendants' infringement. Although Defendants deactivated Outer Limits soon after this lawsuit was filed, Defendants' history of infringement shows that they are likely to engage in further infringement absent an injunction. If Defendants are not enjoined, Plaintiffs argue that Defendants may simply relaunch Outer Limits (as they did in the past) or start a new infringing service. (Mot. at 30.) Defendants' non-appearance in this case, combined with Defendants' history of willful infringement, convince the Court that there is a significant threat of future infringement.

**\*8** Third, the balance of hardships favors Plaintiffs because, without an injunction, they will potentially lose profits and suffer harm in their business dealings, while an injunction will simply prohibit Defendants from infringing Plaintiffs' copyrights. *See Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) ("In this circuit ... a defendant who knowingly infringes another's copyright cannot complain of the harm that will befall it when properly forced to desist from its infringing activities").

Finally, the public interest factor tips in favor of Plaintiffs because "the public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming and motion pictures." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017) (internal quotation marks and citation omitted).

The Court therefore concludes that Plaintiffs are entitled to the requested permanent injunction.

### C. Attorneys' Fees

**[36]** **[37]** **[38]** Section 505 of the Copyright Act permits district courts to award "a reasonable attorney's fee to the prevailing party." 17 U.S.C. § 505. "District courts have wide latitude to exercise equitable discretion to award attorneys' fees" under the Copyright Act. *Essex Music, Inc. v. Sonora Claremont, Inc.*, 2009 WL 10671986, at \*5 (C.D. Cal. Jan. 27, 2009) (quotations omitted). In guiding their discretion, courts may consider the following factors: "(1) the degree

of success obtained, (2) frivolousness, (3) motivation, (4) reasonableness of losing party's legal and factual arguments, and (5) the need to advance considerations of compensation and deterrence." *Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 787 (9th Cir. 2006). In a default judgment case such as this one, these factors are readily met. Plaintiffs have achieved complete success on the merits, their complaint has not been shown to be frivolous, they were motivated to recover legally cognizable damages, no party has presented any objections to Plaintiffs' arguments, and attorneys' fees are warranted to deter both Defendants' substantive copyright infringement and their unresponsiveness to Plaintiffs' filings. Accordingly, the Court concludes that an award of attorneys' fees is warranted.

**[39]** **[40]** The remaining question, then, is the size of an appropriate fee award. Courts generally employ the "lodestar" method to determine the reasonableness of the attorneys' fees requested. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000). "[A] court determines the 'lodestar' amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (citations omitted). The party requesting fees bears the burden of adducing evidence to support the hours worked and the rates claimed. *Id.* Here, Plaintiffs seek $303,600 in attorneys' fees, calculated in accordance with Local Rule 55-3. (Mot. at 29.) C.D. Cal. R. 55-3.

**[41]** Although Local Rule 55-3 "gives lawyers who obtain default judgments and who are entitled to statutory fees the option of recovering a set amount without going through the hassle of submitting billing records," district courts still have "a duty to ensure that claims for attorneys' fees are reasonable." *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1160 (9th Cir. 2018) (emphasis and citations omitted). Thus, district courts must scrutinize attorneys' fees requests when a defendant fails to appear or otherwise defend itself.

*Id.*; *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (holding that once a party has established that it is entitled to an award of attorneys' fees, "[i]t remains for the district court to determine what fee is 'reasonable' ").

**\*9** **[42]** Because Plaintiffs base their request for $303,600 in attorneys' fees on the fee schedule set forth in Local Rule 55-3, they have not provided any evidentiary support

for their request. However, absent any information regarding the hours worked or billing incurred in this case, the Court cannot determine whether the substantial fee request is reasonable. Accordingly, Plaintiffs are ORDERED to submit supplemental declaration(s), including supporting billing records, that identify the proposed lodestar for this case.

### D. Costs

**[43]** The Court also concludes that an award of litigation costs is appropriate. In accordance with Local Rules 54-2 and 54-3, Plaintiffs must submit a "Bill of Costs" and an "Application to the Clerk to Tax Costs" to recover any eligible litigation costs in this action. *See* C.D. Cal. L.R. 54-2, 54-2.1.

### E. Post-Judgment Interest

**[44]** Lastly, Plaintiffs request post-judgment interest calculated under the statutory rate provided by 28 U.S.C. § 1961(a). (Mot. at 23.) The Court grants Plaintiffs' request. *See* 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.").

### V. CONCLUSION

For the above reasons, the Court GRANTS Plaintiffs' motion and awards Plaintiffs (1) $15,000,000 in statutory damages, (2) eligible litigation costs under Local Rule 54-3, and (3) post-judgment interest at the statutory rates provided in 28 U.S.C. § 1961. The Court also GRANTS Plaintiffs' request for a permanent injunction, as set forth in the proposed order attached to Plaintiffs' motion.

As for an attorneys' fees award, Plaintiffs are ORDERED to submit supplemental declaration(s), including supporting billing records, that identify the proposed lodestar for this case. Any such declarations must be filed no later than **five (5) days** from the issuance of this Order.

Plaintiffs shall submit a proposed judgment within **seven (7) days** of the Court's ruling on attorneys' fees.

### All Citations

--- F.Supp.3d ----, 2025 WL 2217715

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2005 WL 3008894, 2005 Copr.L.Dec. P 29,090, 78 U.S.P.Q.2d 1834

2005 WL 3008894

United States District Court,
E.D. Pennsylvania.

AMC TECHNOLOGY, L.L.C., Plaintiff

v.

SAP AG, SAP America, Inc., and
SAP Labs, L.L.C., Defendants.

No. Civ.A.05-CV -4708.
|
Nov. 3, 2005.

**Attorneys and Law Firms**

Jeffrey S. Waksman, Vincent V. Carissimi, William J. Brennan, IV, Pepper Hamilton LLP, Philadelphia, PA, for Plaintiff.

Annette L. Hurst, Daniel N. Kassabian, Heller Ehrman LLP, San Francisco, CA, J. Kevin Fee, Morgan Lewis & Bockius LLP, Philadelphia, PA, Kevin R. Casey, Stradley, Ronon, Stevens & Young, LLP, Malvern, PA, Michael M. Markman, Heller, Ehrman, White & McAuliffe, LLP, Menlo Park, CA, Robert D. Fram, Samuel F. Ernst, Heller Ehrman LLP, San Francisco, CA, for Defendants.

*MEMORANDUM AND ORDER*

SHAPIRO, J.

**\*1** Plaintiff AMC Technology, L.L.C. ("AMC"), a software company, brought this action against its former licensee, SAP AG and its subsidiaries, SAP America, Inc., and SAP Labs. [1] It its complaint, AMC alleged counts of direct, contributory, and vicarious copyright infringement, breach of contract, and misappropriation of trade secrets. With respect to copyright infringement, AMC alleged that: (1) the SAP application called "mySAP CRM 5.0," soon to be released to the public, contained copyrighted AMC code that SAP was not authorized to copy; and (2) SAP was about to distribute detailed instructions to its customers that would allow them to copy the AMC Multi-Channel Management Suite ("MCMS") code for use with mySAP CRM 5.0..

Together with its complaint, AMC filed a motion for a preliminary injunction based on the direct, contributory, and vicarious copyright infringement claims to enjoin SAP from:

(1) including AMC code in its product; and (2) instructing, describing, or purporting to authorize the copying of AMC code by users of mySAP CRM 5.0 and any future versions of the SAP software.

At a hearing on the motion for preliminary injunction, AMC stated that it was satisfied AMC code would not be included in mySAP CRM 5.0, so it would dismiss the direct infringement claim. The remaining issue is whether AMC is entitled to a preliminary injunction on its contributory or vicarious copyright infringement claims. The court will grant the preliminary injunction because AMC has a reasonable likelihood of success on the merits of its contributory copyright infringement claim, will otherwise suffer irreparable harm, and the harm to AMC outweighs the harm to SAP by granting the injunction. Therefore, the action is in the public interest. An appropriate Order follows.

I. FACTUAL BACKGROUND

A. The Parties and Their Products
AMC Technology, L.L.C., is a software company based in Virginia. SAP AG is a German software company and the parent corporation of SAP America and SAP Labs. SAP develops, markets and sells business software.

The SAP product at issue is "mySAP CRM." "CRM" stands for "customer relationship management." Companies use mySAP CRM to rationalize and improve various aspects of their communications with customers. SAP states that a company's employees can use mySAP CRM to place customers' orders for the company's products; report service problems with the products; plan and execute marketing campaigns, including telemarketing programs; and generate reports about sales volumes and other data.

One element of mySAP CRM is the "CRM Interaction Center," used by call center agents to manage and track their interactions with customers by retrieving information about the customers, taking purchase orders and other information and transmitting it to other departments within the company, and so on.

AMC makes and sells a product called "Multi-Channel Management Suite" or "MCMS." MCMS adds to programs such as mySAP CRM the ability to handle email and web chat interactions with customers in addition to telephone calls. AMC MCMS connects directly to the communication channel servers (e.g., telephone switches and email servers)

AMC Technology, L.L.C. v. SAP AG, Not Reported in F.Supp.2d (2005)
Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 52 of 237
2005 WL 3008894, 2005 Copr.L.Dec. P 29,090, 78 U.S.P.Q.2d 1834

and is able to check agent availability, queue and route all incoming customer phone calls, emails, and web chat communications, and allow an agent to respond to all customers from the same computer, regardless of the channel used.

**\*2** The AMC MCMS software has several components. One part of the software is installed on the user's computer and provides user interface. Declaration of Johnnie Wilkenschildt, Development Manager of mySAP CRM Interaction Center, in Support of SAP's Opposition to Motion for Preliminary Injunction ("Wilkenschildt Decl.") ¶ 12. A second part is installed on a server rather than the user's own computer and allows a particular agent to receive phone calls and messages or stops calls and messages from going to that agent. *Id.* The third part of the AMC MCMS software-"connectors"-allows it to interact with a company's telephone switch or email or web chat server. Each different connector is designed to work with a particular manufacturer's switch or server. Declaration of Wolfgang Bauer, Product Management Specialist, SAP AG, in Support of SAP's Opposition to Motion for Preliminary Injunction ("Bauer Decl.") ¶ 4; Wilkenschildt Decl. ¶ 9. Different organizations using mySAP CRM and AMC MCMS require different connectors, depending on the organization's intended use (e.g., for telephone, email, web chat, or a combination) and other variables, such as the organization's provider of telephone switchboard services and email server software. Bauer Decl. ¶ 4.

B. The Agreement Between the Parties

Until 2001, SAP offered only telephone communication management capability with mySAP CRM. On September 1, 2001, wishing to expand the capabilities of the CRM Interaction Center to include email and web chat, SAP entered into a licensing agreement with AMC (the "OEM Agreement") for AMC's MCMS software.

The OEM Agreement gave SAP the right to sublicense certain parts of AMC MCMS "as a product embedded into SAP software." OEM Agreement § 3.2. A subsequent amendment also gave SAP the right to license other parts of the MCMS code, namely, the "connectors," as "a complementary product to SAP's software." OEM Agreement, Amendment 1, §§ I-II.

AMC MCMS is only one component of a complex software package; not every user of mySAP CRM immediately (or ever) makes use of AMC MCMS. The payment terms of the OEM Agreement reflected this. Under the contract, SAP

paid AMC only for "productive users." OEM Agreement, Attachment A, ¶ 2.1. In order for a user to become "productive," the user had to activate the AMC software by registering his license with AMC and obtaining an activation key from AMC (or from SAP during the one-year period between March 1, 2003 and February 29, 2004). Declaration of Georg Schräder, Vice President, Corporate Third Party Licensing, SAP AG, in Opposition to the Motion for Preliminary Injunction ("Schräder Decl.") ¶ 4. (Additionally, the relevant connectors had to be installed on the user's server. Bauer Decl. ¶ 4.) The agreement provided for SAP to pay AMC an annual license fee of one million dollars to cover 10,000 "productive users," and $100 for each user beyond that number. OEM Agreement, Attachment A, ¶ 2.1. AMC was to report to SAP periodically the number of registrations so SAP would know how many "productive users" existed. *Id;* Schräder Decl. ¶ 4. During the one-year period that SAP handled registration, SAP gave customers wishing to become "productive users" of AMC MCMS a "Master License Key" it had received from AMC. Schräder Decl. ¶ 5. SAP paid AMC $500,000 for the use of the Master Key. *Id.* ¶ 6. Both the individual registration keys provided from September 2001 to March 2003 and from March 2004 to the present and the master key provided between March 1, 2003 and February 29, 2004 were for licenses with "no expiration". Bauer Decl. ¶ 7-9; Schräder Decl. ¶ 7.

**\*3** The OEM Agreement also contains a series of provisions addressing the relationship between the parties after termination of any part of the agreement.

§ 11.3 Termination of this Agreement shall not affect any of the individual sublicense agreements between End Users and SAP. Except for cases of termination for cause by Licensor, SAP remains entitled to make copies of the Software Products to the extent required in order to fulfill all contracts with End Users and/or Applicable Entities concluded in the ordinary course of business prior to the date on which the termination becomes effective. [2]

§ 11.4 Upon the expiration of this Agreement or any termination, SAP shall be deemed to be granted a non-exclusive, perpetual license to use, modify, distribute and sublicense the Software Products with the then current version of SAP Software, as it exists at the time of such expiration or termination and not with future versions on the same basis as is said [*sic*] forth in Section 3 hereof, and SAP shall pay a royalty fee to Licensor of

2005 WL 3008894, 2005 Copr.L.Dec. P 29,090, 78 U.S.P.Q.2d 1834

$100 per Productive User up to the maximum Software
Product Fee of USD $4,000,000....

In December 2003, AMC and SAP terminated the
sublicensing portion of the OEM Agreement, effective March
1, 2004, and enacted Amendment No. 7 to the OEM
Agreement:

  2. Term and Termination

  c) Section 11 of the Original Agreement shall apply
  concerning the termination for the Software Products
  MCMS described in Attachment A.

  d) In addition the parties agree that for each End User
  licensing MCMS as part of the SAP Software (which
  shall include only CRM 4.0 for purposes of Section
  11 of the Original Agreement) after February 29,
  2004, [AMC] shall report to SAP [various identifying
  information for new "productive users"]....

The portion of the OEM Agreement regarding SAP's right
to license the connectors (Amendment 1 to the OEM
Agreement) remained in force.

C. The Dispute

When SAP planned the release of the next version of its
software, mySAP CRM 5.0, SAP considered how to ease the
transition for mySAP CRM customers using AMC MCMS as
their multi-channel management software. SAP had provided
its mySAP CRM customers with different multi-channel
management options, one of which was its own program,
"Web-based IC" or "Web Client." Testimony of A. Uliano,
President and Chief Technology Officer of AMC, 10/11/2005,
Transcript of October 11, 2005 Hearing ("Hr.Tr.") at 35-36.
"Web-based IC in mySAP CRM version 4.0 contained
features that provide the same or similar functionality to
MCMS." SAP's Complaint for Declaratory Relief in Case
No. 05-04595, E.D. Pa., 8/30/2005, ¶ 12. Nonetheless, SAP
wished to enable those customers who had already licensed
MCMS with an earlier version of mySAP CRM to keep using
MCMS.

SAP instructed its developers that it would no longer issue
MCMS with any new version of mySAP CRM, but that
licensees of MCMS for use with earlier versions of mySAP
CRM had the right to continue using it with any new version.
Wilkenschildt Decl. ¶ 22. During the spring and early summer
2005, its developers worked to remove all MCMS code from
mySAP CRM 5.0 and drafted a set of instructions that would

allow existing customers upgrading to mySAP CRM 5.0
to copy into the new version the AMC MCMS code they
had received with an earlier version of mySAP CRM. *See*
"Component Upgrade Guide," Pl's Exh. 16; Wilkenschildt
Decl. ¶¶ 23, 27-29. In this way, customers who had used the
AMC MCMS as their multi-channel management software
within earlier versions of mySAP CRM would be able to use
it with mySAP CRM 5.0. Wilkenschildt Decl ¶ 34.

 **\*4** On May 12, 2005, an AMC developer, Aimee Stinson,
contacted an SAP developer, Satit Nuchitsiripattara, to ask
when the process of ensuring compatibility of MCMS with
the new mySAP CRM would take place. Def's Exh. 54.
Nuchitsiripattara informed Stinson that mySAP CRM 5.0
would not include MCMS, but he would appreciate her
assistance in ensuring that the instructions he was preparing
for mySAP CRM 5.0 customers to use previously obtained
MCMS code would work as planned. Wilkenschildt Decl. ¶
32; Def.'s Exh. 54. Stinson replied that she had "confirmed
with Tony" (Anthony Uliano, AMC's CEO) that mySAP
CRM would not include MCMS; she added that she would
be "happy to review the upgrade procedure." *Id.* This is how
Uliano learned of SAP's plans to instruct its customers on
migrating AMC's MCMS software from mySAP CRM 4.0 to
mySAP 5.0. Uliano Testimony, Hr. Tr. 43-44. On June 24,
2005, Wilkenschildt asked Nuchitsiripattara to send a draft of
the "Component Upgrade Guide" to Stinson for her feedback.
Wilkenschildt Decl. ¶ 36. Uliano then reviewed the draft.
Uliano Testimony. Hr. Tr. at 48.

On June 29, 2005 Uliano expressed his concern to SAP that
the planned Component Upgrade Guide was a sign it was
"finding ways to circumvent" the OEM Agreement. Def.'s
Exh. 54. On July 7, 2005, Uliano wrote more explicitly to
SAP officials that:

> AMC does not agree with SAP's action
> to instruct customers, partners, and
> SAP employees on how to copy AMC
> source code from CRM 4.0 to CRM
> 5.0. The right to use our software
> in CRM 5.0 is strictly prohibited in
> our last Amendment (number 7).... It
> is very important for SAP to prevent
> these instructions from being released
> until such time that SAP has secured

the rights to license our software for customers using CRM 5.0.

Def.'s Exh. 54.

On August 30, 2005, SAP AG filed an action in this court for a declaratory judgment that SAP could issue instructions allowing existing users of mySAP CRM 3.0, 3.1 or 4.0 to migrate the AMC software from earlier mySAP CRM versions into mySAP CRM 5.0. A week later it voluntarily dismissed the action.

On August 31, 2005, AMC filed a complaint and the motion for a preliminary injunction presently before the court.[3] The issue before the court at this time is whether a preliminary injunction should issue on the basis of AMC's contributory and vicarious copyright infringement claims.

MySAP CRM 5.0 is scheduled to be released on a limited basis at the end of October 2005. Wilkenschildt Decl. ¶ 6. Its full release is scheduled for the end of the second quarter of 2006. Uliano Testimony, 10/11/2005 Hr. Tr. 17:13-15.

## II. DISCUSSION

The decision to grant or refuse a preliminary injunction is within the discretion of the district court. *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240 (3d Cir.1983). To obtain a preliminary injunction for copyright infringement, the plaintiff must show: "(1) that it is reasonably likely to succeed on the merits of its copyright infringement claim and (2) a likelihood that it will suffer irreparable harm if the injunction is denied. Other issues to consider if relevant are (3) the likelihood of irreparable harm to the non-moving party and (4) the public interest." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 342 F.3d 191, 196 (3d Cir.2003) (internal citations omitted). Additionally, in deciding whether to grant or deny a preliminary injunction, the district court should also consider the possibility of harm to other interested persons. *Anderson v. Davila,* 125 F.3d 148, 159 (3d Cir.1997). "[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 197 (3d Cir.1990).

## A. Reasonable probability of success on the merits

**\*5** Copyright law protects "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102. It is settled law that software can be copyrighted and the copyright can be infringed. *Apple Computer,* 714 F.2d at 1247-49. Subject to certain enumerated exceptions within the Copyright Act, copyright owners have the exclusive right to: (1) reproduce the copyrighted work; (2) prepare derivative works; and (3) distribute copies. 17 U.S.C. § 106. To prove copyright infringement pursuant to 17 U.S.C. § 501, the plaintiff must demonstrate two elements: (1) ownership of a copyright and (2) copying by the defendant. *Dam Things From Denmark v. Russ Berrie & Co.,* 290 F.3d 548, 561 (3d Cir.2002). "One infringes contributorily by intentionally inducing or encouraging direct infringement." *Metro-Goldwyn Mayer Studios Inc. v. Grokster,* --- U.S. ----, ----, 125 S.Ct. 2764, 2776, 162 L.Ed.2d 781 (2005) (internal citations omitted). *See also Columbia Pictures Indus., Inc. v. Redd Home, Inc.,* 749 F.2d 154, 160 (3d Cir.1984) (contributory infringement occurs when, "with knowledge of the infringing activity, [the defendant] induces, causes or materially contributes to the infringing activity of another.") One infringes vicariously "by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn Mayer,* 125 S.Ct. at 2776. Providing users with instructions enabling them to copy AMC code would constitute inducement to copyright infringement. "Evidence of active steps taken to encourage direct infringement, such as ... instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe...." *Id.* at 2779. SAP does not dispute that AMC MCMS is protected by copyright[4] or that SAP's distribution of the Component Upgrade Guide constitutes contributory copyright infringement if the recipients of the guide, current users of mySAP CRM 3.0, 3.1, or 4.0, do not otherwise have the right to copy AMC's MCMS software. Because there is no question that the distribution of the Component Upgrade Guide induces SAP's customers to copy AMC's MCMS code, there is no need to analyze AMC's vicarious infringement theory.

Whatever rights SAP's licensees may have, they are valid with respect to AMC's MCMS software only to the extent that they do not exceed SAP's rights, i.e., that they are "in compliance with" the OEM Agreement.[5] *See* OEM

2005 WL 3008894, 2005 Copr.L.Dec. P 29,090, 78 U.S.P.Q.2d 1834

Agreement § 5.2. A defendant in a contributory copyright infringement case cannot use as a defense its own grant of a sublicense exceeding the scope of its license. The issue before the court is whether SAP could grant its licensees the right to copy MCMS from an earlier version of mySAP CRM to mySAP CRM 5.0.

The OEM Agreement clearly does not allow users of earlier versions of mySAP CRM to copy AMC's MCMS code and use it with mySAP CRM 5.0. SAP contends that the OEM Agreement only bars it from issuing sublicences of MCMS to *new* users acquiring licences to mySAP CRM 5.0 as their first mySAP CRM product, butcustomers who have already purchased a license for an earlier version of mySAP CRM have the right to continue to use their "no expiration" AMC MCMS sublicenses, even if the MCMS software is operating with an newer version of mySAP CRM. SAP claims the users are authorized to use the software under perpetual licences, so assisting them to do so cannot be unlawful, because there cannot be contributory infringement in the absence of direct infringement by a third party.

**\*6** The disagreement between the parties can be reduced to two major issues: 1) the scope of SAP's sublicensing rights during the term of validity of the OEM Agreement (Section 3.2); and 2) SAP's rights after the termination of the contract (Section 11.4). The OEM Agreement is governed by Pennsylvania contract law. *See* OEM Agreement, § 17.5.

(i) Scope of SAP's Sublicensing Rights
Section 3.2 of the OEM Agreement reads:

> Licensor hereby grants to SAP the non-exclusive right to make copies of the master media copies of the Software Products and sublicense and distribute them to End Users ... as a product embedded into SAP Software. Such sublicenses shall be granted by SAP in the same license agreement by which SAP licenses SAP Software to End Users .....

The parties disagree on the meaning of the word "embedded," not defined in the contract. AMC argues it means "encapsulated in" or "hosted in" a larger program, and that

this limits SAP's use and distribution rights by mandating that mySAP CRM and MCMS must be distributed together if at all. [6] SAP argues it is not a limitation on its sublicensing rights, and simply means "licensed together with." [7] Despite the parties' apparent disagreement, the word "embedded" is not ambiguous. *See* Bohler-Uddeholm America Inc. v. Ellwood Group, Inc., 247 F.3d 79, 94-95 (3d Cir.2001) (under Pennsylvania contract law, "(1) mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous; (2) each party's proffered interpretation must be reasonable, in that there must be evidence in the contract to support the interpretation beyond the party's mere claim of ambiguity; and (3) the proffered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning.") According to *Webster's Third International Dictionary* (1993), "to embed" is "to enclose closely in or as if in a matrix ...; to surround closely.". The Microsoft Computer Dictionary defines "embedded" as "[i]n software, pertaining to code or a command that is built into its carrier." Microsoft Press, *Microsoft Computer Dictionary* (4th Ed.1999). There is no evidence either in common use or in the contract to support SAP's interpretation. [8] The contract contains evidence *contrary* to SAP's position: the very next sentence of Section 3.2 goes on to specify, as an *additional* requirement, that the sublicenses to AMC's software must be "granted by SAP in the same license agreement by which SAP licenses SAP Software to End Users." OEM Agreement, § 3.2.

(ii) SAP's Rights After Termination
Section 11.4 of the OEM Agreement provides:

> Upon the expiration of this agreement or any termination, SAP shall be deemed to be granted a non-exclusive, perpetual license to *use, modify, distribute and sublicense* the Software Products with the *then current version* of SAP Software, as it exists at the time of such expiration or termination and *not with future versions* on the same basis as is said [*sic* ] forth in Section

3 thereof [and pay AMC specified royalty fees for such distribution].

**\*7**  (emphasis added).

This section clearly states SAP has no rights with respect to MCMS past the version of mySAP CRM current at the termination of the licensing agreement (which Appendix 7 to the OEM Agreement identifies as mySAP CRM 4.0). SAP argues that Section 11.4 simply requires it to remove the MCMS code from future versions of mySAP CRM, but does not affect those customers who licensed MCMS with older versions; it contends those customers can continue using the MCMS code with any future versions. To understand the contract otherwise, SAP argues, would be to place before these customers the choice of foregoing the right to mySAP CRM upgrades or having to expend considerable time and money to install an alternative multi-channel management system and then train their workers in its use.

Under Pennsylvania contract law, when a contract is unambiguous, "the focus of contract interpretation is on the terms of the agreement as manifestly expressed rather than, perhaps, as silently intended." 🚩 *Amoco Oil Co. v. Snyder,* 505 Pa. 214, 478 A.2d 795, 798 (Pa.1984). *See also* 🚩 *Morningstar v. Hallett,* 858 A.2d 125, 129 (Pa.Super.2004) ("[t]he paramount goal of contractual interpretation is to give effect to the intent to the parties. In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.") "Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." 🚩 *401 Fourth St., Inc. v. Investors Ins. Group,* 583 Pa. 445, 879 A.2d 166, 171 (Pa.2005).

What is expressed in Section 11.4 is that SAP's right to "use" as well as "distribute" MCMS is limited and does not extend to any versions of mySAP CRM subsequent to 4.0; any sublicense to an end user must also be so limited. SAP attempts to call the provision's plain meaning into doubt by arguing that it would create internal contradiction and ambiguity within the contract and that SAP interpretation is supported both by the commercial circumstances surrounding the deal and the parties' subsequent course of conduct, but its arguments are not persuasive.

SAP argues that Sections 3.2 and 11.4 could not limit SAP's rights in the manner asserted by AMC, because such limitation would make other clauses nonsensical. SAP points to Section 11.3 of the OEM Agreement, which provides that "[t]ermination of this Agreement shall not affect any of the individual sublicense agreements between End Users and SAP" and claims termination would necessarily impair either the right to upgrade or the right to use MCMS in perpetuity, both granted in SAP's standard licensing agreement ("Standard End User Licensing Agreement" or "Standard EULA"). In addition, Appendix 1 of the OEM Agreement, allowing SAP to license AMC connectors, is still in effect (*see* OEM Agreement, Appendix 1), and AMC is bound under Section 4.5 of the OEM Agreement to "ensure that all Software Products are and continue *during the entire term of this Agreement* always fully compatible to SAP Software including new versions or releases thereof" (emphasis added).[9] Sections 11.6 and 11.7 provide that AMC must cooperate with SAP in servicing the embedded MCMS code for three years after termination and then take over the service.

**\*8**  There is no contradiction between the plain language of Section 11.4 and the provisions cited by SAP. Denying the users the right to use MCMS with any mySAP CRM version subsequent to 4.0 does not necessarily result in a violation of Section 11.3: to the extent that the sublicense agreements SAP has entered into are "in compliance with [the OEM Agreement]," as mandated by Section 5.2, they are unaffected. The standard End User License Agreements ("EULAs") that SAP uses in the United States do not grant the right to upgrades in the main (and only mandatory) portion of the EULA; that right is contracted for and paid for separately. Even the rights granted in the EULA are qualified, so that no right actually granted in the EULA would be significantly affected.[10] SAP's argument that AMC is obliged to make to make its connectors compatible with SAP software would lead to the absurd result that AMC must provide new as well as existing users of mySAP CRM with MCMS, so the connectors continue to work. The evidence in the record does not support SAP's contention that AMC's post-termination service obligations under Sections 11.6 and 11.7 would be meaningless if present MCMS users could not use it with mySAP CRM 5.0. Users do not immediately switch over to new versions of mySAP CRM; there may still be users of mySAP CRM 4.0 with MCMS more than three years from now.[11]

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 57 of 237

AMC Technology, L.L.C. v. SAP AG, Not Reported in F.Supp.2d (2005)
2005 WL 3008894, 2005 Copr.L.Dec. P 29,090, 78 U.S.P.Q.2d 1834

As the contract is not ambiguous with respect to SAP's post-termination rights, there is no need to turn to extrinsic evidence of the alleged commercial background of the agreement or the parties' course of conduct to divine the intentions of one of the parties. *See Amoco Oil Co. v. Snyder,* 478 A.2d at 798 ("the focus of contract interpretation is on the terms of the agreement as manifestly expressed rather than, perhaps, as silently intended."); *Regscan v. Con-Way Transp. Serv.,* 875 A.2d 332, 337 (Pa.Super.2005) ("When the language of a written contract is clear and unequivocal, its meaning must be determined by its contents alone. Only if the words used are ambiguous may a court examine the surrounding circumstances to ascertain the intent of the parties.") (internal citations omitted).

Even if there were a need to turn to extrinsic evidence, it would support AMC's position. SAP contends that the commercial realities make it clear that SAP would not have entered into the agreement as AMC understands it; because of the cost of installation and training for customers and the long development cycles of software, it would have made no commercial sense for SAP to agree that installed customers would have to stop using MCMS after a certain point. *See* Schräder Decl. ¶ 8-10; Tisa Decl. ¶ 8. However, it would have made little sense for AMC to agree to the limitless use of its software with mySAP CRM upgrades without further payment, since AMC alleges SAP installed users are the only "proven market" for MCMS. Affidavit of Anthony X. Uliano, President and Chief Technology Officer, AMC Technology ("Uliano Decl.") ¶ 13.

**\*9** SAP also argues that the parties' course of conduct shows AMC understood SAP's existing licensees could use MCMS with any version of mySAP CRM, since AMC itself described the master activation key it provided SAP between March 2003 and February 2004 as having "no expiration date." AMC's grant of licenses with "no expiration" is qualified by the termination clauses of the OEM Agreement. The licenses are perpetual so long as MCMS is used "in compliance with the OEM Agreement," (OEM Agreement, Section 5.2), i.e., "embedded" with the version of mySAP CRM current at termination or earlier versions.

Evidence of prior negotiations supports AMC's position. Section 11.4 was the result of bargaining by AMC and modified the following version of the same section, submitted by SAP as part of its form OEM agreement: "Upon the expiration of this Agreement or any termination SAP shall be deemed to be granted a non-exclusive, perpetual and fully paid license to use, modify, distribute and sublicense the Software Products as it exists [*sic* ] at the time of such expiration or termination on the same basis as is said [*sic* ] forth in Section 3 hereof, and SAP shall have no further obligation to make license fee payments to Licensor hereunder." Pl.'s Exh. 17 § 11.4. AMC obtained two major changes by negotiation: the right to be paid for any copies of its software licensed after the termination of the agreement, and a limitation of SAP's rights to the "then current" version of SAP's product. [12]

AMC has shown that it has a reasonable likelihood to succeed on the merits. SAP's licensees do not have the right to copy MCMS to use with mySAP CRM 5.0 because they could not have received from SAP a right SAP did not have, and SAP's instructing them to do so by providing the Component Upgrade Guide would constitute contributory copyright infringement. The OEM Agreement plainly and unambiguously limits SAP's rights both during the term of the contract and after its termination. SAP can distribute AMC MCMS only as a product "embedded" into SAP software. What SAP is proposing to do is to allow its customers to "disembed" AMC from earlier versions of mySAP CRM so they can use it with mySAP CRM 5.0. This is a right that SAP never had and could not have granted its customers. Section 11.4 clearly spells out that SAP never had-and could not grant-the right to use MCMS with any version subsequent to the one current at the time of termination of the licensing part of the OEM Agreement. [13] AMC is likely to succeed in showing that SAP's customers have no right to use MCMS with mySAP CRM 5.0 and that SAP is liable for contributory copyright infringementby inducing them to do so.

B. Irreparable harm to AMC

The court must consider whether the movant will suffer irreparable harm in the absence of preliminary relief preserving the status quo until the merits of the case can be tried. Irreparable harm is an injury that "cannot be redressed by a legal or equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight,* 882 F.2d 797, 801 (3d Cir.1989). An irreparable injury is one that "is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate." *FMC Corp. v. Control Solutions, Inc.,* 369 F.Supp.2d 539, 573 (E.D.Pa.2005).

**\*10** A showing of a prima facie case of copyright infringement, or reasonable likelihood of success on the merits, raises a presumption of irreparable harm. 🚩 *Apple Computer,* 714 F.2d at 1254. The presumption may be relaxed when the alleged infringement is of "material peripheral to the [copyright holder's] business," in which case the Third Circuit requires "a stronger showing of irreparable harm as the [copyright holder's] likelihood of success on the merits wanes." 🚩 *Marco v. Accent Publ'g Co.,* 969 F.2d 1547, 1553 (3d Cir.1992); *see also* 🚩 *Apple Computer,* 714 F.2d at 1254 (no stronger showing needed where the copyrighted material is "central to the essence of plaintiff's operations.") MCMS is clearly central to AMC's operations. AMC counts eleven full-time employees and its revenues in the last few years have been around two million dollars. Uliano Testimony, Hr. Tr. 29-30. At least half of that amount can be traced to SAP's licensing of MCMS. *See* OEM Agreement, Attachment A, § 2.1 (providing for a yearly upfront licensing fee of one million dollars). AMC claims the SAP installed base is "the entire proven market for MCMS." Uliano Decl. ¶ 13. [14] A stronger showing of irreparable harm is not needed here.

SAP's attempt to rebut the presumption of irreparable harm fails. SAP argues that even if AMC is correct in its interpretation of the OEM Agreement, its losses can easily be quantified at trial by multiplying the per-user licensing fee that AMC charged SAP under the OEM Agreement by the number of users that have taken advantage of SAP's instructions to transfer the AMC MCMS code to mySAP CRM 5.0. It is not possible to know how many users are presently using MCMS (since no records were kept during the year that MCMS registration and activation was accomplished through a "master key"), *see* Uliano Testimony, Hr. Tr. 74:17-25, or how many of the users will actually follow the instructions and copy the AMC MCMS code into mySAP CRM 5.0. *Id.* at 104:2-10.

SAP argues that it would be possible to calculate the number of users who have activated AMC MCMS simply by ascertaining users who have purchased MCMS connectors from SAP, *see* Tisa Decl. ¶ 18, but: (a) SAP has not shown that it possesses accurate lists of connector licensees outside the United States; [15] (b) it appears that *organizations* license connectors, *see* Tisa Supplemental Decl ¶¶ 2-4, while royalties for the main part of the MCMS software are paid at the rate of $100 per *individual user;* the correlation between the one and the other is not clear (compare standard letter

explaining connector installation, Exh. A to Bauer Decl., to OEM Agreement, Attachment A, § 2.1); and (c) SAP has conceded that if AMC wins at trial, this method would at most enable the decision-maker to determine the *maximum* number of users who might have upgraded and copied MCMS (because MCMS needs a connector to work), *see* Schäder Testimony, Hr. Tr. 144:22-145:11. SAP has not explained how it would find the individual users who would copy the AMC MCMS software.

**\*11** Because there is no reliable way to calculate AMC's damages, AMC has shown that it will suffer irreparable harm if an injunction does not issue.


C. Irreparable Harm to SAP

SAP argues that a preliminary injunction would harm it by placing it in breach of its own licensing agreement with its customers and in violation of its customers' expectations, subjecting it to legal and commercial consequences. These potential troubles do not outweigh the presumed harm to AMC.

SAP argues that the requested injunction would expose it to litigation because it would make it impossible for SAP to fulfill its contractual obligations to its existing customers: if it keeps its promise by delivering the upgraded mySAP CRM 5.0 to its customers, it will deprive them of the opportunity to "Use" the AMC MCMS software embedded in the version the customer originally licensed. *See* Tisa Decl. ¶ 13 and Exh. A thereto ("Standard EULA"), § 1.9. [16] SAP also argues that it would face commercial consequences: both the initial licensing and installation of mySAP CRM and the subsequent upgrades require a substantial investment of time and money, and its customers would be upset to find that the upgraded version actually deprived them of a feature they had been using. *See* Schräder Testimony, Tr. 152:22-153:6.

Whatever problems may arise for SAP from disgruntled customers will be limited. It is not clear that discontinuing the use of MCMS would place SAP in violation of its contract with its customers or that SAP would be subject to legal action even if it were in violation. SAP customers license a functionality, not MCMS specifically. *See* Schräder Testimony, Hr. Tr. 171-172. This functionality could be provided by a piece of software other than MCMS; it can be provided by SAP's own Web Client software. Uliano testimony, Tr. 35-39; SAP's Compl. for Declaratory Relief in Case No. 05-04595, E.D. Pa., 8/30/2005, ¶ 12. [17] SAP

AMC Technology, L.L.C. v. SAP AG, Not Reported in F.Supp.2d (2005)
Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 59 of 237
2005 WL 3008894, 2005 Copr.L.Dec. P 29,090, 78 U.S.P.Q.2d 1834

frequently "retires" functionalities of its software and replaces them with other functionalities. Uliano Testimony, Hr. Tr. 71. Even if denying some customers the opportunity to participate in the limited rollout of mySAP CRM 5.0 could somehow be construed as a breach of contract on SAP's part, SAP's Standard EULA (used in the United States) severely limits its customers' ability to take legal action against SAP. SAP America's Standard EULA provides that at SAP's option, it can cure negligence or breach by bringing "the performance of the Software into substantial compliance with the functional specifications." Standard EULA § 9.1.

Difficulties that SAP brought upon itself by sublicenses with its customers exceeding its license cannot outweigh the presumed harm to AMC from the violation of its copyright.

*See* Opticians Ass'n of America v. Indep. Opticians of America, 920 F.2d 187, 192 (3d Cir.1990) (defendant was not harmed when it openly, intentionally, and illegally appropriated the plaintiff's trademark); *Apple Computer,* 714 F.2d at 755 (if a knowing copyright infringer were permitted to plead as irreparable harm damages directly arising from its infringement, it "would be permitted to build its business around its infringement, a result we cannot condone").

**\*12** Scheduled for the end of October 2005 is a limited release of the new version of mySAP CRM, targeted to what a "very, very small number" of customers; the general release is contemplated for the end of June 2006, by which time a decision on the merits can be reached. *See* Schräder Testimony, Hr. Tr. 163:17-164:3. There is no evidence that any customers have been promised an upgrade by any particular date.

Finally, SAP could avoid any harm by paying for its right to distribute MCMS, as it has done in the past.

SAP has not convincingly demonstrated that it will be subjected to greater harm if the requested injunction is granted than AMC will suffer if it is not.

Harm to Third Parties
SAP argues that in deciding whether to grant a preliminary injunction, the court should also take into account the harm it could cause to SAP's customers. In some cases, the Third Circuit has considered the potential harm to other interested persons in evaluating the balance of hardships.

*See* Anderson v. Davila, 125 F.3d 148, 159 (3d Cir.1997);

*see also* Apple Computer, 714 F.2d at 1246 (noting without comment that district court below had considered "the improbability of harm to other interested persons").

Even such potential harm does not favor SAP. The only customers that could possibly be harmed by an order enjoining SAP from distributing its Component Upgrade Guide would be those who currently use mySAP CRM 3.0, 3.1, or 4.0 with AMC MCMS who are scheduled to participate in the limited release of mySAP CRM 5.0 with the intention of continuing to use MCMS with mySAP CRM 5.0. Commercial and practical realities may make it advisable for companies to upgrade their business software regularly, *see* Schräder Testimony, Hr. Tr. 122-23, 127-28, but there is no evidence it is urgent for any of SAP's customers to do so; the court has no reason to believe that SAP customers would suffer great harm since the majority of SAP customers appear to be willing to wait at least until the general release date, and none of the users of mySAP CRM 4.0 will lose their right to support from SAP until 2008. *See* Schräder Testimony, Hr. Tr. 125:23-127:9. Any harm to SAP customers is further mitigated by two factors: being deprived of MCMS does not mean losing multi-channel functionality altogether, since mySAP CRM has provided other options for that functionality at least since the 4.0 version; and any SAP customer who is unwilling to relinquish MCMS can acquire a license directly from AMC.

D. Public interest
The public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in a protected work. *Apple Computer,* 714 F.2d at 755. This principle applies here.

III. CONCLUSION
Plaintiff's motion for a preliminary injunction will be granted because AMC has shown a reasonable likelihood of success on the merits of its contributory copyright infringement claim and likelihood of irreparable harm if the injunction does not issue; the potential harm to SAP and interested third parties does not outweigh the harm to AMC if the injunction does not issue. The public interest favors an injunction protecting copyright.

2005 WL 3008894, 2005 Copr.L.Dec. P 29,090, 78 U.S.P.Q.2d 1834

### ORDER OF PRELIMINARY INJUNCTION

**\*13** AND NOW, this 3rd day of November, 2005, upon consideration of AMC Technology, L.L.C. ("AMC")'s Motion for Preliminary Injunction and SAP AG, SAP America, and SAP Labs ("SAP")'s Opposition to Motion for Preliminary Injunction, and following an evidentiary hearing on October 11, 2005, it appearing that:

1. This court has jurisdiction over the subject matter and the parties;

2. Venue lies in the Eastern District of Pennsylvania;

3. SAP intends to distribute a "Component Upgrade Guide" teaching customers how to copy AMC's copyrighted software program, "AMC MCMS," from earlier versions of "mySAP CRM";

4. AMC has not authorized this copying;

5. AMC has shown a reasonable likelihood of success on the merits of its contributory copyright infringement claim against SAP and likelihood of irreparable harm if SAP is not enjoined from distributing the "Component Upgrade Guide" or otherwise disseminating instructions for copying AMC's

MCMS software; SAP has not shown irreparable harm to itself or interested third parties; and the public interest favors an injunction protecting a copyrighted work;

IT IS ORDERED THAT:

1. Plaintiff AMC Technology, L.L.C.'s motion for preliminary injunction (Paper # 3) is GRANTED.

2. Defendants, SAP AG, SAP America, Inc., and SAP Labs, LLC, their employees, agents, and assigns, are preliminarily enjoined from describing or purporting to authorize the copying, migration, or incorporation of AMC MCMS code embedded in mySAP CRM 3.0, 3.1, or 4.0 into any version of mySAP CRM released after mySAP CRM 4.0 unless specifically authorized or licensed to do so by AMC; defendants are also ordered to retrieve any copy of the Component Upgrade Guide or equivalent information already distributed and inform the recipients that the copying, migration, or incorporation of ACM MCMS into mySAP CRM5.0 has not been authorized by AMC;

3. This injunction will be effective upon AMC's filing a bond in the amount of $750,000.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 3008894, 2005 Copr.L.Dec. P 29,090, 78 U.S.P.Q.2d 1834

---

## Footnotes

1    This opinion will refer to the three SAP entities collectively as "SAP" except where more specificity is needed.

2    On the official copy of the OEM Agreement, both this section number and the next one are inserted by hand in the margin and followed by a question mark. The parties have adopted this numbering and so has the court.

3    This court has jurisdiction over the action under 28 U.S.C. § 1331 and jurisdiction over SAP through the venue clause of the OEM Agreement (§ 17.5). At the hearing, counsel for SAP specifically stated that SAP AG submitted to the jurisdiction of the court and had no objection to it. Hr. Tr. 116:11-117.8.

4    AMC has submitted a Certificate of Registration for its MCMS Software. Pl.'s Exh. 17. Registration certificates constitute "prima facie evidence of the originality of the work and the facts stated in the certificates." 17 U.S.C. § 410.

5    Section 5.2 of the OEM reads: "SAP shall enter into legally enforceable, written, license agreements with each of its customers ... containing the terms and conditions under which the Software Products are sublicensed *in compliance with this Agreement*" (emphasis added).

AMC Technology, L.L.C. v. SAP AG, Not Reported in F.Supp.2d (2005)
Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 61 of 237
2005 WL 3008894, 2005 Copr.L.Dec. P 29,090, 78 U.S.P.Q.2d 1834

6    Q What is embedding?

   A Well, embedding in a software sense is when-is when you have a larger program that has a separate program encapsulated in it. So you have a larger program that hosts a smaller program. And in this case, the [SAP] interaction center as a program hosted our MCMS as a program....

   THE COURT: It comes with it?

   THE WITNESS: It comes with it, yes, your Honor.

   Testimony of A. Uliano, Hr. Tr. 58:16-22.

7    Q. You mention embedded software. What does embedded software mean?

   A. Embedded software, first of all, means that we are licensing an SAP product towards a customer, and this includes third-party software as part of the SAP product licenses. So the customer is not licensing the third-party product on its own, stand alone.

   ....

   Q. Does the upgrade procedure change that?

   A The embedding, itself, is not changed.

   Testimony of G. Schräder, Tr. 129:25-130:6, 130:9-10.

   Later, Mr. Schräder testified that "embedded" means that "it can only be used together." *See* Hr. Tr. 176, 181-82.

8    No general or technical dictionary consulted by the court supports SAP's understanding of "embedding" as "licensing together," although the particular context of software "embedded" in other software is not specifically mentioned in any of the other sources consulted. *See* Webster's New World Computer Dictionary (10th Ed.2004); Douglas A. Downing et al., Dictionary of Computer and Internet Terms (8th Ed.2003), Sybil P. Parker ed. in chief, McGraw-Hill Concise Encyclopedia of Science and Technology (4th Ed.1998).

9    Mr. Schräder testified that additional software would be needed to use the AMC connectors with any program other than AMC MCMS, including SAP's mySAP CRM Interaction Center Web Client. *See* Hr. Tr. 146:4-15, 147:7-149:18.

10   *See, e.g.,* Declaration of Charles F. Tisa, Vice-President, Contracts, SAP America, in Support of SAP's Opposition to Motion for Preliminary Injunction ("Tisa Decl."), Exh. A ("Standard EULA"), § 7.1 (warranting "that the Software will substantially conform to the functional specifications contained in the Documentation for six months following delivery").

   SAP has not submitted any documents or declarations relating to its agreements with customers outside the United States; to the extent that the discussion involves the terms of the contract between SAP and its customers, it will be based on the "Standard EULA" licensing mySAP CRM to United States Customers.

11   Mr. Schräder testified that customers are not obligated to accept upgrades, although a very high percentage of them do. Schräder Testimony, Hr. Tr. 128:12-16. SAP limits support for any given version five years after its release and terminates it eight years after its release. Hr. Tr. 125:23-126:9. Some customers may still use mySAP CRM 3.0. Hr. Tr. 141:21-22.

12   In its answer to the complaint, SAP also pleaded a series of affirmative defenses, all of which have been considered although none of which was specifically addressed in oral argument. SAP believes that AMC should be estopped from reneging on its commitment to SAP that it could grant "perpetual" licenses to AMC's software. Of course, the interpretation of the extent of that commitment is tightly bound up with the interpretation of the OEM Agreement. Since the agreement limited SAP's licensing rights to the last current version at the termination of the contract, AMC's grant of licenses with "no expiration date" does not contradict with its position in this litigation. SAP also raises a defense of laches. To prevail, SAP must prove inexcusable delay in instituting suit and prejudice resulting to the defendant from such delay. *Gruca v. United States Steel Corp.,* 495 F.2d 1252, 1258 (3d Cir.1974). Mr. Uliano first learned of SAP's plans to distribute a Component Upgrade Guide in May 2005; during the summer he notified SAP that he believed such distribution constituted an infringement of AMC's copyright, and AMC brought this lawsuit on August 31, 2005. Three months between discovering the proposed violation and filing a complaint does not constitute inexcusable delay, especially when SAP was given prompt notice of ACM's position.

13   SAP concedes that it could not ship a version of mySAP CRM 5.0 with MCMS to any customers, including customers already using MCMS (*see* Winkenschildt Decl. ¶ 22; Schräder's Testimony, Hr. Tr. 121:17-20), yet SAP's description of the upgrade procedure makes it difficult to appreciate the difference. According to SAP, the procedure consists of "first of all, sav[ing the MCMS code], then send[ing] that procedure to upgrade [mySAP CRM] where we are deleting [MCMS], and then fill it in back what's required." Schräder Testimony, Hr. Tr. 136: 20-23.

14   These allegations are sufficiently strong to support a finding of irreparable harm even in the absence of the presumption.

15   SAP's list currently includes fifteen U.S.-based organizations. *Id.;* Supplemental Declaration of Charles F. Tisa in Support of SAP's Opposition to Motion for Preliminary Injunction ("Tisa Supplemental Decl.") ¶¶ 2-4.

16   SAP has not provided examples of the EULAs it uses outside the United States. From SAP's submissions it appears that eleven U.S.-based companies and government entities have both purchased AMC connectors (and thus are likely to be users of the MCMS software) and have paid maintenance dues. Tisa Decl. ¶ 35; Tisa Supplemental Decl. ¶¶ 2-4. SAP also argues that it might be subject to "a multiplicity of suits" in different jurisdictions and that this risk constitutes irreparable damage. The possibility of actions in multiple jurisdictions is not a consideration at this stage.

17   Admissions by attorneys are admissible against their clients, where the attorney acted within the scope of his authority. Fed.R.Evid. 801(d)(2)(D); *Mangual v. Prudential Lines, Inc.,* 53 F.R.D. 301, 301 (E.D.Pa.1971).

     *See also* *First Bank of Marietta v. Hogge,* 161 F.3d 506, 510 (8th Cir.1998) ("Although these statements from First Bank's abandoned state court pleadings do not constitute binding judicial admissions, these statements are admissible evidence that can be weighed like any other admission against interest of First Bank.")

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

2024 WL 1619279
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

BGSD, INC., d/b/a Luxury Lane, Plaintiff,
v.
SPAZEUP, LLC, Defendant.

No. 5:23-cv-4855
|
Signed April 15, 2024

**Attorneys and Law Firms**

Allison R. Tramontana, Douglas Panzer, Caesar Rivise, PC,
Philadelphia, PA, for Plaintiff.

<u>OPINION</u>

**Plaintiff's Second Motion for Default Judgment,
ECF No. 13 – Granted in part, Denied in part**

Joseph F. Leeson, Jr., United States District Judge

**I. INTRODUCTION**

**\*1**  Presently before the Court is BGSD, Inc.'s Second
Motion for Default Judgment. The underlying matter arises
out of SpazeUp's unlicensed use of BGSD's copyrighted
images to market and sell its products online. For the reasons
that follow, BGSD's motion is this time granted in part and
denied in part.

**II. BACKGROUND**

**A. Procedural Background**
BGSD filed a Complaint on December 8, 2023, asserting
copyright infringement, false designation of origin, and
violations of Pennsylvania, Wyoming, New York, and
California's unfair competition laws. *See* Compl., ECF No.
1. The Complaint and Summons were served on December
22, 2023. *See* ECF No. 7. SpazeUp has failed to answer or
otherwise appear before the Court. On January 9, 2024, the
Clerk entered Default against SpazeUp for failure to plead
or otherwise defend. *See* ECF No. 9. On February 6, 2024,
BGSD filed its initial Motion for Default Judgment against
SpazeUp. *See* ECF No. 10. The same was denied by this
Court in an Opinion & Order entered February 20, 2024, for

lack of personal jurisdiction over SpazeUp. *See* ECF Nos. 11,
12. However, the Court granted BGSD leave to file a second
motion for default judgment with an accompanying brief and
additional facts to support a finding of personal jurisdiction.
*See* ECF No 12. BGSD did just that on March 11, 2024. [1] *See*
ECF No. 13.

**B. Factual Background**
The factual allegations, taken from the Complaint, *see*
Compl., ECF No. 1, and supplemented by the Second Motion
for Default Judgment, *see* ECF Nos. 13-14, are as follows:

BGSD, Inc. sells coats, jackets, vests, jewelry, and home
decorations via its website and through Amazon's online
storefront. Compl. ¶ 17. To market those goods, BGSD
creates original and copyrighted photographs of models
wearing its clothing. *Id.* ¶¶ 18, 19. In August of 2023, BGSD
became aware of another company, SpazeUp, using these
copyrighted photos to sell its products. *Id.* ¶ 22. SpazeUp
also sells apparel through its website and through the Amazon
storefront. *Id.* ¶ 20.

Shortly after becoming aware of these uses, BGSD filed a
number of infringement takedown notices through Amazon's
platform. *Id.* ¶ 27. Within two days, SpazeUp responded to
BGSD, apologizing and offering to take down the infringing
uses. *Id.* ¶ 28. Afterwards, SpazeUp changed the photographs
subject to the complaints. *Id.* ¶ 30. Then, on September
7, 2023, SpazeUp filed counter notices on several of the
complaints. *Id.* ¶ 31.

On September 20, BGSD became aware of more infringing
uses of its photos and again complained of the practice
through Amazon. *Id.* ¶¶ 32, 35. Again, SpazeUp filed counter
notices. *Id.* ¶ 36. These photographs continued to be used
as recent as November 22, 2023. *Id.* ¶ 42. At no time did
SpazeUp have BGSD's permission or authorization to use
these photos. *Id.* ¶¶ 26, 34.

After this Court's prior Opinion & Order, on February 29,
2024, Plaintiff's counsel placed an order through SpazeUp's
Amazon storefront for one "SpazeUp Rick Grimes Jacket -
Trucker Jacket Men - Walking Brown Winter Jacket." ECF
No. 13, Mot., Ex. 10 at ¶ 2. The same was delivered to
Narbeth, Pennsylvania on March 1, 2024. *Id.* ¶ 6. On March 6,
2024, Plaintiff's counsel placed an order for one "USAF 21st
Century A-2 Flight Black Bomber Leather Jacket" through
Defendant's website www.usaleatherjackets.com for delivery

BGSD, Inc. v. SpazeOp, LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1619279

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 65 of 237

to Narbeth, PA. [2] *Id.* Ex. 14. To supplement proof of contacts, BGSD has provided an order and transaction confirmation. *Id.* Ex. 15, 16.

## III. LEGAL STANDARDS

### A. Default Judgment – Standard of Review

**\*2** Federal Rule of Civil Procedure 55(b)(2) provides that a district court may enter default judgment against a properly served defendant when a default has been entered by the Clerk of Court. *See* Fed. R. Civ. P. 55(b)(2); *see also Anchorage Assocs. v. Virgin Is. Bd. of Tax Rev.,* 922 F.2d 168, 177 n.9 (3d Cir. 1990). "It is well settled in this Circuit that the entry of a default judgment is left primarily to the discretion of the district court." *Hritz v. Woma Corp.,* 732 F.2d 1178, 1180 (3d Cir. 1984). The Court considers three factors in determining whether to enter default judgment: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa,* 210 F.3d 154, 164 (3d Cir. 2000). In considering these factors, the "court should accept as true the well-pleaded factual allegations of the complaint, but the court need not accept the moving party's legal conclusions[.]" *Polidoro v. Saluti,* 675 F. App'x 189, 190 (3d Cir. 2017). Because "a party in default does not admit mere conclusions of law[,]" the district court must "ascertain whether 'the unchallenged facts constitute a legitimate cause of action,' " before granting default judgment. *Broad. Music, Inc. v. Spring Mt. Area Bavarian Resort, LTD,* 555 F. Supp. 2d 537, 541 (E.D. Pa. May 21, 2008) (citation omitted).

### B. General & Specific Personal Jurisdiction – Review of Applicable Law

Federal Rule of Civil Procedure 4(k) provides that personal jurisdiction in a United States District Court is established in accordance with the law of the state in which the District Court sits. *See* Fed. R. Civ. P. 4(k)(1)(A) ("Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant: (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located...."); *see also O'Connor v. Sandy Lane Hotel Co.,* 496 F.3d 312, 316 (3d Cir. 2007). This Court therefore looks to the law of Pennsylvania, and Pennsylvania's

long-arm statute in particular, to determine the existence of personal jurisdiction over defendants.

Pennsylvania's long-arm statute provides that "the jurisdiction of the tribunals of this Commonwealth shall extend ... to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. C.S.A. § 5322(b); *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir. 1992) ("The Pennsylvania [long-arm] statute permits the courts of that state to exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment."). "Accordingly, in determining whether personal jurisdiction exists," this Court must ask "whether, under the Due Process Clause [of the Fourteenth Amendment], the defendant has 'certain minimum contacts with ... [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *O'Connor,* 496 F.3d at 316-17 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). "These basic due process principles are reflected in the two recognized types of personal jurisdiction"—general jurisdiction and specific jurisdiction. *Marten v. Godwin,* 499 F.3d 290, 296 (3d Cir. 2007).

"General jurisdiction exists when a defendant has maintained systematic and continuous contacts with the forum state. *Helicopteros Nationals' de Colombia, S.A. v. Hall,* 466 U.S. 408, 414-15 n.9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific jurisdiction exists when the claim arises from or relates to conduct purposely directed at the forum state. *See id.* at 414-15, 104 S.Ct. 1868 & n.8." *Kehm Oil Co. v. Texaco, Inc.,* 537 F.3d 290, 300 (3d Cir. 2008). The specific jurisdiction inquiry has three parts: (1) the defendant must have "purposefully directed his activities at residents of the forum;" (2) the litigation must "arise out of or relate to those activities;" and (3) the assertion of personal jurisdiction must "comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal quotations omitted).

**\*3** If an evidentiary hearing is not held, a plaintiff "need only establish a prima facie case of personal jurisdiction." *See*

BGSD, Inc. v. SpaceUp, LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1619279

🚩 *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). A plaintiff meets this burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." 🚩 *Provident Nat. Bank v. California Fed. Sav. & Loan Assoc.*, 819 F.2d 434 (3d. Cir. 1987).

## IV. ANALYSIS

### A. Personal Jurisdiction

BGSD has put forward a prima facie case of this Court's personal jurisdiction over SpaceUp. In its prior opinion, this Court held that the mere interactivity of SpaceUp's website and the use of Amazon's storefront was insufficient to establish specific jurisdiction "*absent any evidence of actual sales* to the forum state." *BGSD, Inc. v. SPAZEUP, LLC*, No. 5:23-CV-4855, 2024 WL 688665, at *4 (E.D. Pa. Feb. 20, 2024) (emphasis in original). Nevertheless, the Court permitted BGSD to refile its motion with sufficient facts that would establish jurisdiction. It has done so by providing evidence of actual sales to Pennsylvania. More specifically, BGSD has provided a declaration through its counsel that an order was placed for a "SpaceUp Rick Grimes Jacket - Trucker Jacket Men - Walking Brown Winter Jacket." Amazon confirmed the payment and the jacket was shipped from SpaceUp and delivered to a Pennsylvania address.

BGSD has also provided evidence of a more direct ecommerce transaction with SpaceUp's affiliate website. BGSD has supplied evidence that SpaceUp operates several ecommerce websites including www.SpaceUp.com and www.usaleatherjackets.com. *See* ECF No. 13, Ex. F. (showing that www.SpaceUp.com cross references www.usaleatherjackets.com on its website and noting that the latter offers SpaceUp refund options.) More of the same, Plaintiff's Counsel purchased a "USAF 21st Century A-2 Flight Black Bomber Leather Jacket" from www.usaleatherjackets.com. The SpaceUp site confirmed the order, charged the credit card, and notified the purchaser that it was preparing the order for dispatch to Pennsylvania. Accordingly, the Court finds that BGSD has made a prima facie showing that SpaceUp has purposefully directed its activities at Pennsylvania and that this litigation arises out of those contacts where the jackets sold used BGSD's copyrighted images. *See* 🚩 *Telebrands Corp. v. Mopnado*, No. CV21407969JLLJAD, 2016 WL 368166 (D.N.J. Jan. 12, 2016), *report and recommendation adopted*, No. CV147969JLLJAD, 2016 WL 355072 (D.N.J. Jan. 28,

2016) (finding that the defendant's internet sales to forum state consumers were sufficient to constitute purposeful availment.)

The Court also holds that asserting personal jurisdiction over SpaceUp comports with notions of fair play and substantial justice. At the outset, the Court notes that defendant carries the fairness inquiry burden. *See* 🚩 *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). Here that inquiry is frustrated by SpaceUp's failure to appear. Nevertheless, the Court finds that subjecting SpaceUp to personal jurisdiction in Pennsylvania is appropriate. BGSD provided SpaceUp with several takedown notices. Thus, SpaceUp was aware it was infringing on this Pennsylvania firm's copyright but continued to use the images. Further, upon receiving a purchase from the forum state, SpaceUp fulfilled the order twice. *See General Nutrition Inv. Co. v. Laurel Season, Inc.*, 2020 WL 5077465 at *3, 2020 U.S. Dist. LEXIS 154857 at *8 (W.D. Pa. Aug. 26, 2020) (finding the exercise of personal jurisdiction over the defendant comported with fair play and substantial justice where the defendant "took no measures to restrict sales in Pennsylvania after receiving [the plaintiff's] cease and desist letter and is continuing to engage in efforts to evade enforcement.").

**\*4** Satisfied that BGSD has put forward a prima facie case of personal jurisdiction over SpaceUp, the Court turns to the underlying claims.

### B. Substantive Claims

#### 1. Copyright Infringement

In Counts I-III, BGSD asserts copyright infringement in violation of sections 106 and 501 of the Copyright Act, 🚩 17 U.S.C. §§ 106, 🚩 501. "To establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." 🚩 *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). "Copying refers to the act of infringing any of the exclusive rights that accrue to the owner of a valid copyright, as set forth at 🚩 17 U.S.C. § 106, 'including the rights to distribute and reproduce copyrighted material.' " 🚩 *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 207 (3d Cir. 2005) (quoting 🚩 *Ford Motor Co. v. Summit Motor*

BGSD, Inc. v. SpazeUp, LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1619279

*Prods., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991)). An entity willfully violates a copyright where it "knows or should have known that [its] actions constitute copyright infringement." 🚩 *Graphic Styles/styles Int'l LLC v. Kumar*, Civ. A. No. 14-4283, 2016 U.S. Dist. LEXIS 8056, 2016 WL 299083, at *5 (E.D. Pa. Jan. 25, 2016).

The Court concludes that SpazeUp infringed on BGSD's copyrights. BGSD holds copyrights in several professional photographs displaying its products on models. In August of 2023, BGSD became aware of SpazeUp's use of photoshopped versions of the copyrighted photographs to sell like jackets through a standalone website and through Amazon. SpazeUp has done so without permission or a license. The Court also concludes that the violation was willful. Upon becoming aware of the infringing uses, BGSD sent a series of takedown notices to SpazeUp which initially apologized and offered to remove the photographs. Ultimately, SpazeUp continue to use BGSD's photographs and even sold Plaintiff's Counsel jackets based on these infringing uses.

These allegations constitute a legitimate cause of action for willful copyright infringement.

### 2. False Advertising

In Count IV of its Complaint, BGSD asserts false advertising under 🚩 15 U.S.C. § 1125(a). Under BGSD's theory of recovery, it must show:

> (1) that the defendant has made false or misleading statements as to his own product [or another's]; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

🚩 *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 590 (3d Cir. 2002) (quoting 🚩 *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms.*, 19 F.3d 125, 129 (3d Cir. 1994)).

BGSD has satisfied this showing. As outlined above, SpazeUp has used lightly edited versions of BGSD's copyrighted work to sell products, thereby misleading prospective buyers as to the nature of its products. Specifically, the audience is misled where SpazeUp represents that it is selling BGSD's products while it is actually selling its own versions of the jackets. This has the natural effect of diverting sales from BGSD to SpazeUp. Finally, as the order placed by Plaintiff's Counsel demonstrated, the goods have traveled in interstate commerce. These facts are sufficient to state a claim for false advertising under the Lanham Act.

### 3. Unfair Trade Practice [3]

**\*5** The facts as averred do not constitute a legitimate cause of action for unfair trade practices under the UTPCPL. The UTPCPL "is a remedial statute intended to protect consumers from unfair or deceptive practices or acts[.]" *Baldston v. Medtronic Sofamor Danek, Inc.*, 152 F. Supp. 2d 772, 776 (E.D. Pa. 2001) (citing 🚩 *Commonwealth by Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 329 A.2d 812, 816 (Pa. 1974)). Therefore, to bring a private action under the UTPCPL, the plaintiff must be a "person" who made a purchase for "primarily ... personal, family, or household purposes." *Id.* (cleaned up) (holding that the plaintiff, a doctor running a medical practice, could not state a claim under the UTPCPL because the surgical screws purchased from the defendants were for his business, and not personal use) (citing 🚩 *Valley Forge Towers S. Condo. Ass'n v. Ron-Ike Foam Insulators, Inc.*, 393 Pa.Super. 339, 574 A.2d 641, 645 (Pa. Super. 1990)); 🚩 73 Pa. Stat. Ann. § 201-9.2(a).

Here, BGSD has brought suit to enjoin SpazeUp's infringing conduct and to recover damages arising from the same. However, BGSD has not alleged any facts which would suggest it had consumer or commercial dealings with SpazeUp or that it was misled into purchasing one if its products. Indeed, the only purchase which was made was

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 68 of 237

BGSD, Inc. v. SpazeUp, LLC, Not Reported in Fed. Supp. (2024)
2024 WL 1619279

done with the knowledge the jacket would not be one manufactured by BGSD. Thus, the Court dismisses the claim because BGSD does not have standing to recover under the UTPCPL. *See* Mohanan v. Liberty Mut. Pers. Ins. Co., No. 22-2956, 2023 WL 8026106 at *——, 2023 U.S. Dist. LEXIS 207191 at *7 (E.D. Pa. Nov. 20, 2023) ("The Court can raise challenges to standing *sua sponte.*").

**C.** *Chamberlain* **Factors**

Consideration of the *Chamberlain* factors supports entry of default judgment against SpazeUp on Counts I-IV. First, denying the Motion would prejudice BGSD by indefinitely delaying its ability to pursue this litigation. *See Spring Valley Produce, Inc. v. Stea Bros.*, No. 15-193, 2015 WL 2365573, at *1 (E.D. Pa. May 18, 2015). *See also Grove v. Rizzi*, No. 04-2053, 2013 WL 943283, at *2 (E.D. Pa. March 12, 2013) (explaining that a plaintiff suffers prejudice when denial of default judgment would "impair the plaintiff's ability to effectively pursue his or her claim").

Second, SpazeUp has no apparent litigable defense. The Court notes "[i]t is not the court's responsibility to research the law and construct the parties' arguments for them[.]" *Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 271-72 (E.D. Pa. 2014) (quoting *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008)). Nevertheless, having considered the facts presented and any applicable defenses, the Court finds none.

Finally, SpazeUp's delay is due to culpable conduct. As noted, SpazeUp received several takedown notices yet persisted in its unlawful conduct. It has also failed to respond or otherwise defend this suit. Thus, SpazeUp's "failure or refusal to engage in the litigation process and to offer no reason for this failure or refusal may qualify as culpable conduct with respect to the entry of a default judgment[.]" *Joe Hand*, 3 F. Supp. 3d at 272 (cleaned up) (citing *E. Elec. Corp. of N.J. v. Shoemaker Constr. Co.*, 657 F. Supp. 2d 545, 554 (E.D. Pa. 2009)); *see also Amerisourcebergen Drug Corp. v. Greenwall Pharm. Disc., Inc.*, No. 14-5812, 2016 U.S. Dist. LEXIS 172958, at *10 (E.D. Pa. Dec. 13, 2016) (holding that "[t]here is nothing in the record to indicate that [the defendants'] failure to act in this case is due to anything other than deliberate inaction, which should constitute culpable conduct and weigh in favor of a default judgment").

**D. Relief**

Plaintiff seeks the following relief: 1) injunctive relief; 2) statutory damages pursuant to 17 U.S.C. § 504(c); 3) SpazeUp's profits pursuant to 15 U.S.C. § 1117(a); and 4) attorney's fees and costs. The Court addresses each in turn.

*1. Injunctive Relief*

**\*6** 17 U.S.C. § 502(a) permits this Court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." On that basis, BGSD requests that SpazeUp be enjoined from:

> [1.] Infringing, in any manner, United States Copyright Registration No. VA 2-079-023; [2.] Using any product photograph appearing on BGSD's Website in connection with Defendant's product listings on SPAZEUP's Website or SPAZEUP's Amazon Product Listings without BGSD's prior authorization; [3.] Unfairly competing with Plaintiff in any manner whatsoever or otherwise injuring its business reputation in the manner complained of herein; [4.] Engaging in any other conduct that causes or is likely to cause confusion, mistake or misunderstanding as to the affiliation, connection, association, origin, sponsorship or approval of Defendant's goods with Plaintiff or Plaintiff's goods and business; and [5.] Engaging in assignments or transfers, formation of new entities or associations, or utilization of any other device for the purpose of circumventing or otherwise avoiding the prohibitions

ECF No. 13, Mot. at 32-33. BGSD also requests that SpazeUp "deliver up to Plaintiff for destruction all labels, signs, prints, packages, wrappers, receptacles, advertisements, electronic or computer files in the possession, custody, or control of

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 69 of 237

BGSD, Inc. v. SpazeUp, LLC, Not Reported in Fed. Supp. (2024)
2024 WL 1619279

Defendant, bearing any photograph created by Plaintiff." *Id.* at 35.

In determining whether to grant a permanent injunction, the Court considers whether: (1) the moving party has shown actual success on the merits; (2) the denial of injunctive relief will result in irreparable harm to the moving party; (3) the granting the permanent injunction will result in even greater harm to the defendant; and (4) the injunction serves the public interest. *See* 🚩*Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001).

The substantive analysis of BGSD's claims as outlined above satisfies the first element. To the second factor, while BGSD may no longer rest on a bare presumption of irreparable harm in the context of copyright infringement, *see TD Bank N.A. v. Hill*, 928 F.3d 259, 280-81 (3d Cir. 2019), the continuing nature of the infringement, particularly in the face of takedown notices, suggests that denying injunctive relief will irreparably harm BGSD. *See Strike 3 Holdings, LLC v. Doe*, No. CV 21-15681 (WJM), 2022 WL 16744122 (D.N.J. Nov. 7, 2022) (granting a preliminary injunction in the context of a default judgment based, in part, on the prejudice the plaintiff incurs by defendant's refusal to defend the claims and the continuing nature of the infringements.); *see also Strike 3 Holdings, LLC v. Vokoun*, No. 120CV14321NLHAMD, 2022 WL 310201, at *5 (D.N.J. Feb. 2, 2022) (finding that "because there is a significant risk that Defendant will continue to infringe without an injunction and because the harm is ongoing and not past in nature, monetary damages are not enough.").

Third, granting an injunction will not harm SpazeUp as the injunction will only prevent it from infringing BGSD's copyrights which it is not entitled to do. *Adlife Mktg. & Commc'ns Co. v. Ad Post Graphics Media Mktg., Inc.*, No. 1:19-CV-1701, 2023 WL 8845280 at *5 (M.D. Pa. Dec. 21, 2023) (reasoning that granting an injunction would not further harm the defendant where the injunction merely enjoined behavior the defendant could not legally do.) Finally, to the fourth factor, "[s]ince Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." 🚩*Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) (quoting

🚩*Klitzner Indus., Inc. v. H. K. James & Co.*, 535 F. Supp. 1249, 1259-60 (E.D. Pa. 1982)). Accordingly, the Court will grant BGSD's request for injunctive relief.

### 2. Copyright Infringement - Statutory Damages

**\*7** Under 🚩17 U.S.C. § 504(c)(1), a copyright owner may elect to recover statutory damages "of not less than $750 or more than $30,000" in lieu of actual damages and profits. Where, as here, the infringement was willful, "the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." 🚩*Id.* § 504(c)(2). Here, BGSD seeks $300,000.00, representing the maximum amount of statutory damages "for each of the two claims of infringement pursuant to 🚩17 U.S.C. § 504(c), plus any interest on this amount as appropriate." Mot. at 34.

In determining the appropriate amount of statutory damages, the Court considers: "(1) expenses saved and profits reaped by the infringer; (2) revenues lost by the plaintiff; (3) the strong public interest in insuring the integrity of the copyright laws; and (4) whether the infringement was willful and knowing or innocent and accidental." *Original Appalachian Artworks, Inc. v. J.F. Reichert, Inc.*, 658 F. Supp. 458, 465 (E.D. Pa. 1987).[4] Where the plaintiff seeks statutory damages in excess of the minimum, the Court looks to the facts of the Complaint to gauge what statutory damages are just. *See Broad. Music*, 555 F. Supp. 2d at 544-45.

While this assessment is hampered by SpazeUp's refusal to defend, the Court finds that an award of $300,000.00 is plainly excessive. Instead, the Court will award $20,000.00 in statutory damages, consisting of $10,000.00 for each infringement. Having considered the framework, the Court finds this award reasonably sufficient to compensate BGSD. The Court also relies on the willful nature of SpazeUp's actions and the need to deter future infringement.

### 3. False Advertising – Actual Damages and Profits

For violations of Section 43(a) of the Lanham Act, "the plaintiff shall be entitled ... to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C.A. § 1117(a). Having already found a violation of this section, the Court finds this relief appropriate.

**BGSD, Inc. v. SpazeUp, LLC, Not Reported in Fed. Supp. (2024)**

2024 WL 1619279

To aid in this assessment of damages and profits, the Court will order SpazeUp to provide BGSD with an accounting of all sales made using BGSD's copyrights.

#### 4. Attorney's Fees and Costs

Both 17 U.S.C. § 505 and 15 U.S.C. § 1117(a) provide for attorney's fees. Given the willful nature of the infringement, the Court finds attorney fees appropriate. *See Grant Heilman Photography, Inc. v. Gallagher*, No. 3:23-CV-1129, 2024 WL 666147 (M.D. Pa. Feb. 16, 2024) (granting reasonable attorney's fees and costs given the willful nature of the infringement and the defendant's refusal to defend the suit.); *see also Mnemania, Inc. v. Forrest*, No. CV 20-5209, 2021 WL 2291321 (E.D. Pa. June 9, 2021) (same). Accordingly, Plaintiff's Counsel shall file a written accounting of the costs incurred in this matter.

### V. CONCLUSION

Upon review of the Complaint, the Renewed Motion for Default Judgment, and the supporting documents, the Court finds that BGSD has put forward a prima facie case of this Court's jurisdiction over SpazeUp. BGSD has also demonstrated an entitlement to relief on all claims save for the UTPCPL claim. Finally, for the reasons outlined above, the Court orders relief as it finds appropriate.

**\*8** A separate Order follows.

### All Citations

Not Reported in Fed. Supp., 2024 WL 1619279

---

### Footnotes

1      On March 13, 2024, BGSD supplemented its Motion by filing "Exhibit G," which "contains HTML and other web browser instructions that do not permit for its submission via ECF." *See* ECF No. 14, Ex. 6.

2      BGSD has also averred that SpazeUp markets and sells jackets through its related website: www.usaleatherjackets.com. BGSD has established this through cross references in each website. *See* ECF No. 13, Exs. D-F.

3      Counts V through VIII bring claims for unfair competition under Pennsylvania, New York, California, and Wyoming law. While ordinarily, a protracted choice-of-law analysis would resolve which law applies, the Court finds that even if it were to find an actual conflict exists, the contacts of each forum and its relation to the policies and interests at play would plainly lead to Pennsylvania law.

     To be certain, this analysis is hampered by the procedural posture of the case. Without the benefit of discovery or adversary pleadings, the Court is constrained to conduct its choice of law analysis on the complaint and the documents supporting the motion for default judgment. However, key to this analysis is the contacts or relation of each state to the incident. *Shuder v. McDonald's Corp.*, 859 F.2d 266 (3d Cir. 1988). And based upon these pleadings, it is unclear what connection, if any, New York or California has to the controversy. While BGSD avers that SpazeUp maintains mailing addresses in New York and California, it alleges no further facts implicating those jurisdictions. *See* Compl. ¶¶ 11-13.

     For their part, Pennsylvania and Wyoming have more apparent contacts as SpazeUp is incorporated in Wyoming and has infringed Pennsylvania-based BGSD's copyrights. But turning to the Restatement's factors, the Court finds Pennsylvania most appropriate largely because it is without information as to where the place causing the injury occurred. Those facts inform the Court's factor analysis. *See Atkinson v. Luitpold Pharm., Inc.*, 414 F.Supp.3d 742, 745 (E.D. Pa. 2019) ("In evaluating the most significant relationship, Pennsylvania courts look to the factors in the Restatement (Second) of Conflicts: the place where the injury

2024 WL 1619279

occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered.") *see also* Restatement (Second) of Conflict of Laws § 145(2). But given what little information the Court has been provided, it is unable to tell where SpazeUp infringed upon the copyrighted material or even where the jackets were shipped from. In the absence of these details, the Court turns to the only contacts its sure of in the Pennsylvania incorporation of BGSD and the injury to that Pennsylvania company. The Court thus applies Pennsylvania law.

4    Within this framework, courts often find the plaintiff's licensing fee to be a useful metric in awarding statutory damages. *See e.g., Cochran v. Dipset Couture LLC*, No. 2:23-CV-02037 (WJM), 2024 WL 658612 (D.N.J. Feb. 15, 2024) (awarding seven times the plaintiff's licensing fee); *see also Prepared Food Photos, Inc. v. David & Sons Meats LLC*, No. CV 23-1781 (RBK/MJS), 2024 WL 912454 (D.N.J. Mar. 4, 2024) (awarding two times the plaintiff's licensing fee). However, no such details have been provided here.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

2025 WL 1489240
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Huishan CHEN, Plaintiff,

v.

ADEDIY, et al., Defendants.

Civil Action No. 2:24-cv-1516
|
Signed February 24, 2025

**Attorneys and Law Firms**

Kimberly J. Kisner, Kisner Law LLC, Pittsburgh, PA, Pete Scott Wolfgram, Stratum Law Firm, Muskego, WI, Xiyan Zhang, Philadelphia, PA, for Plaintiff.

Tianyu Ju, Xionghui Murong, Glacier Law LLP, Pasadena, CA, Tao Liu, Glacier Law LLP, New York, NY, for Defendants Artsadd.

### MEMORANDUM ORDER

WILLIAM S. STICKMAN IV, UNITED STATES DISTRICT JUDGE

**\*1**  On December 18, 2024, the Court issued a preliminary injunction against a number of defendants. (ECF No. 26). More than one month later, on January 28, 2025, Defendant No. 1-ADEDIY, Defendant No. 3-AnnHomeArt, Defendant No. 5-Artsadd, Defendant No. 9-CustomSurprise, Defendant No. 15-gogogosky, Defendant No. 12-DragonDesignGifts, Defendant No. 21-onlyYown, and Defendant No. 23-Personalizationcity (collectively "Defendants") moved to vacate the preliminary injunction. (ECF No. 51). For the following reasons, the Court denies the motion.

"[T]he law has entrusted the power to grant or dissolve [a preliminary] injunction to the discretion of the trial court in the first instance, and not to the appellate court...." *Glasco v. Hills*, 558 F.2d 179, 180 (3d Cir. 1977). This deference to the district court reflects the need for flexibility by the trial court in making determinations "almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief." *United*

*States Steel Corp. v. Fraternal Ass'n of Steelhaulers*, 431 F.2d 1046, 1048 (3d Cir. 1970). "The standard that the district court must apply when considering a motion to dissolve an injunction is whether the movant has made a showing that changed circumstances warrant the discontinuation of the order." *Township of Franklin Sewerage Auth. v. Middlesex County Utils. Auth.*, 787 F.2d 117, 121 (3d Cir. 1986). "The need for changed circumstances prevents an enjoined party from constantly challenging the imposition of a preliminary injunction and relitigating arguments on motions to dissolve that have already been considered by the district court in its initial decision." *Sprint Commc'ns Co. L.P. v. CAT Commc'ns Intern., Inc.* 335 F.3d 235, 242 (3d Cir. 2003).

Defendants have failed to show a change of circumstances that makes the preliminary injunction inequitable.[1] The Court does not find Defendants' contention that their alleged Chinese Copyright No. 00724827 ("Chinese Copyright") predates Plaintiff Huishan Chen's ("Chen") copyright to be a persuasive argument for vacating the preliminary injunction. Because copyright law has international implications, the Berne Convention for the Protection of Literary and Artistic Works (Berne Convention), which took effect in 1886, is the principal accord governing international copyright relations. *Golan v. Holder*, 565 U.S. 302, 306 (2012); *see also* 17 U.S.C. § 104(b)(2); *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, L.L.C.*, 586 U.S. 296, 306-07 (2019) (recognizing that Congress removed foreign works from the Copyright Act's registration requirement in 1988). This simply means that foreign copyright holders are afforded the same protection as domestic copyright holders – they are subject to the same United States copyright law analysis.

**\*2**  Defendants' proffered evidence (ECF No. 51-1) is insufficient to establish the existence of a Chinese Copyright. The proffered Chinese Copyright has only been partially translated, and it has not been certified by a lawful custodian of the Chinese Copyright Office, or authenticated by a certification of a United States consular office based in China under the seal of that office. Thus, it is not certified under 22 CFR § 92.39. No indication exists that Defendants registered their work with the United States Copyright Office. Hence, it is premature at this stage of the case to treat the Chinese Copyright registration as presumptively authentic. Furthermore, Defendants have come forth with no verifiable evidence supporting the "Work Completion Date: June 1st, 2010," or the "Registration Date: February 18th, 2019." (ECF No. 51, p. 14). Defendants have failed to offer evidence (e.g.,

date-stamped product webpages, articles, or sales data) to corroborate the purported 2010 publication date to show that Defendants used the disputed images before Chen put her product on the market. Chen, however, submitted unrebutted evidence that in 2022, she registered as United States Copyright Nos. VA002299841 and VA0002299839 images she created and designed of a boy's and a girl's smiling faces to be printed on a container for collecting children's loose teeth. (ECF No. 66-2). She also came forth with evidence that she created, marketed, and sold her product as early as 2016 in the United States. In sum, the Court will not vacate the preliminary injunction based on Defendants' argument related to their alleged Chinese Copyright.

Furthermore, Defendants have not pointed to any intervening changes in the controlling law, or clear errors of fact or law creating a manifest injustice. The Court finds that what Defendants are seeking is reconsideration based on what they believe was error committed by the Court. [2] The only change

in circumstances is that Defendants want to relitigate the merits of the preliminary injunction. Defendants are asking the Court to rethink what it already thoroughly considered in rendering the preliminary injunction. It will not. The Court is reminded of Justice Cardozo's words in 🚩*United States v. Swift & Co.*, 286 U.S. 106, 119 (1932), "[n]o doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardships so extreme and unexpected as to justify [ ] saying that they are the victims of oppression." The preliminary injunction is equitable as originally crafted by the Court, and it will remain in place. [3]

**\*3** AND NOW, this 24 day of February 2025, IT IS HEREBY ORDERED that Defendants' Motion to Vacate Preliminary Injunction (ECF No. 51) is DENIED.

**All Citations**

Slip Copy, 2025 WL 1489240

---

### Footnotes

Defendants never appeared at the preliminary injunction hearing. Notably, they have not objected to the injunction on the ground that the notice requirement of Federal Rule of Civil Procedure 65(a) was not met. Counsel for Defendants formally entered their appearance on December 26, 2024. (ECF Nos. 29 and 30). No timely motion for reconsideration was filed, and Defendants did not file an interlocutory appeal under 🚩28 U.S.C.A. § 1292(a)(1).

Chen made the requisite showing of minimum contacts needed for the Court to exercise personal jurisdiction over Defendants as they offer to sell and sell infringing products to consumers residing in the United States, including Pennsylvania residents in this judicial district, through Defendants' online storefronts (e.g., Amazon.com, Wal-mart.com/Walmart.com, Alibaba.com). The Court finds the declarations proffered by Defendants to be of little evidentiary value on this issue. (ECF Nos. 51-2 – 51-9)

As to the Court's decision to grant the preliminary injunction, "[t]he decision to grant or deny ... injunctive relief is an act of equitable discretion by the district court." 🚩*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also* 🚩35 U.S.C. § 283 (generally providing that courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable"). Chen submitted substantial evidence establishing a case of copyright infringement – that Defendants knowingly and intentionally promote, advertise, distribute, have manufactured, import, offer for sale, and sell Defendants' infringing products, which are children's tooth boxes bearing the images of Chen's copyrights. (*See* ECF Nos. 2-4, 66-1, and 66-2). In the eye of an ordinary observer, the design of Defendants' infringing tooth boxes and Chen's copyrighted tooth boxes are substantially similar. Looking at Plaintiff's boxes and Defendants' boxes side by side, they are nearly identical down to the girl's three-dotted bowtie and eyelashes. (ECF No. 2-4; ECF No. 51, p. 14). Chen demonstrated a likelihood of success on the merits

to the satisfaction of the Court. She also established that Defendants are causing irreparable harm (e.g., the erosion of Chen's control of her copyrights, damage to the market for tooth boxes that embody the images protected by Chen's copyrights, damage to Chen's licensees and authorized sellers of tooth boxes embodying the images claimed in her copyrights, and confusion to consumers as well as harm to her reputation, value, and goodwill), and that monetary damages are inadequate to compensate her for Defendants' infringement. The Court determined that the balance of equities weigh in favor of Chen. Lastly, the Court determined that an injunction would serve the public interest. Chen met her evidentiary burden; she provided substantial evidence to demonstrate the necessary requirements for the Court to issue the preliminary injunction.

3    As to Defendants' challenge to the asset restraint, the only figures presented by Defendants are those referenced in the declarations. (ECF Nos. 51-2 – 51-9). The Court finds this "evidence" to be unreliable and insufficient. The Court has no information as to actual sales Defendants made from the online sales platforms. No data has been obtained from online sales platforms with accompanying affidavits from employees at the online sales platforms explaining how the platforms collected the data. Defendants have failed to demonstrate that the assets they take issue with are *not* the proceeds of counterfeiting. In other words, no verifiable documentary evidence has been produced that shows the amount of assets restrained is disproportionate to the amount Defendants generated through allegedly infringing sales.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

2019 WL 13252888
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

CME GROUP INC., Chicago Mercantile Exchange
Inc., New York Mercantile Exchange, Inc.,
Commodity Exchange, Inc., Board of Trade of the
City of Chicago, Inc., and Pivot, Inc., Plaintiffs,
v.
Dmitro NAGOVSKIY, Konstantin Chechurin,
Evgeniy Golub, OVH SAS, Webzilla B.V., EuroByte
LLC, GoDaddy.com, LLC, Registrar of Domain
Names REG.RU LLC, and Does 1-3, Defendants.

Civil Action No. 1:19-cv-01621
|
Signed April 8, 2019

**Attorneys and Law Firms**

Joseph Thomas Kucala, Jr., Kucala Law LLC, New Lenox,
IL, Joseph V. Norvell, Norvell IP LLC, Northfield, IL,
Angela Jean Simmons, Leydig, Voit & Mayer Ltd., Chicago,
IL, Christian Stephan Morgan, Matthew Daniel Witsman,
Norvell IP LLC, Chicago, IL, for Plaintiffs.

Brian W. Norkett, Bryan Eliot Curry, Litchfield Cavo LLP,
Chicago, IL, for Defendant Wix.com Ltd.

ORDER GRANTING PLAINTIFFS' MOTION TO
CONVERT TEMPORARY RESTRAINING ORDER TO
PRELIMINARY INJUNCTION AS TO DEFENDANTS
DMITRO NAGOVSKIY, KONSTANTIN CHECHURIN,
EVGENIY GOLUB, OVH SAS, EUROBYTE, LLC AND
REGISTRAR OF DOMAIN NAMES REG.RU LLC

SHARON JOHNSON COLEMAN, United States District
Court Judge

**\*1** Plaintiffs CME Group Inc., Chicago Mercantile
Exchange Inc., New York Mercantile Exchange, Inc.,
Commodity Exchange, Inc., Board of Trade of the City of
Chicago, Inc. and Pivot, Inc. (collectively, "CME Group")
moved to convert the Temporary Restraining Order issued
in this case on March 7, 2019, to a preliminary injunction
under the Lanham Act, 15 U.S.C. § 1051, *et seq.* 🚩17
U.S.C. §§ 106 & 1202 *et seq.* CME Group further requested

a modification of the existing Temporary Restraining Order
to address the newly-registered infringing domain names and
active counterfeit websites and the newly-added Defendants
as detailed in the First Amended Complaint. The Court,
having read and considered CME Group's motion, and after
holding a preliminary injunction hearing on April 4, 2019,
finds as follows:

**Findings of Fact and Conclusions of Law**

1. A temporary restraining order or a preliminary injunction
is appropriate where the moving party demonstrates: (1)
that its case has *some* likelihood of success on the merits;
(2) that no adequate remedy at law exists; and (3) that it
will suffer irreparable harm if the injunction is not granted.
🚩*Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir.
2001) (emphasis added); Fed. R. Civ. P. 65(b). If the court
is satisfied that these three conditions have been met, it then
must consider the irreparable harm that the nonmoving party
will suffer if preliminary relief is granted, balancing such
harm against the irreparable harm the moving party will suffer
if relief is denied. *Id.* Finally, the court must consider the non-
party public interest in denying or granting the injunction. *Id.*

2. On March 7, 2019, this Court entered a Temporary
Restraining Order, having found that CME Group
demonstrated (i) a likelihood of success on one or
more of its claims; (ii) no inadequate remedy at law;
and (iii) irreparable harm if the injunction is not
granted. After a hearing with notice to Defendants
Dmitro Nagovskiy ("Nagovskiy"), Konstantin Chechurin
("Chechurin"), Evgeniy Golub ("Golub"), OVH SAS
("OVH"), EuroByte LLC ("EuroByte"), and Registrar of
Domain Names REG.RU LLC ("REG.RU") (collectively
"Defendants") on CME Group's Motion to Convert
Temporary Restraining Order to a Preliminary Injunction, the
Court finds that CME Group satisfied all of the requirements
for a preliminary injunction.

3. Additionally, CME Group's request to modify the
existing Temporary Restraining Order to address the recently
registered <CMEgroupcenters.com>, <CMErussia.com> and
<CMErussians.com> domain names, the recently launched
www.CMEgroupcenters.com and www.CMErussia.com
websites, and the newly-added Defendants Golub,
EuroByte and REG.RU is reasonable, and this
Court is justified in entering this new order
to specifically cover the <CMEgroupcenters.com>,
<CMErussia.com> and <CMErussians.com> domain names,

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 78 of 237

CME Group Inc. v. Nagovskiy, Not Reported in Fed. Supp. (2019)
2019 WL 13252888

the www.CMEgroupcenters.com and www.CMErussia.com websites, and Defendants Golub, EuroByte and REG.RU.

4. CME Group has shown it has a reasonable basis to believe that these new domain names and websites were registered and are being operated by Defendants Nagovskiy and Chechurin and/or someone working in concert with them or at their direction. CME Group also confirmed that Defendant GoDaddy.com LLC ("GoDaddy") is the domain registrar for the <CMErussians.com> domain name, Defendant Reg.RU is the domain registrar for the <CMEgroupcenters.com> and <CMErussan.com> domain names, Defendant OVH is the Internet Service Provider ("ISP") for the www.CMEgroupcenters.com website, and Defendant Eurobyte is the ISP for the www.CMErussia.com website. CME Group has received account information from Defendant Webzilla B.V. ("Webzilla") indicating that Defendant Golub is an operator of the www.CMErussian.com website.

**\*2** 5. Accordingly, the same arguments and legal analysis set forth in the Court's March 7th Order apply to these new domain names, websites and defendants. Because the new domain names and websites are nearly identical to the domain names and websites detailed in CME Group's original Motion for a Temporary Restraining Order, CME Group has shown a likelihood of success on the merits of these claims; CME Group has no adequate remedy at law and will suffer irreparable harm absent entry of a preliminary injunction; the balance of harms tips in CME Group's favor; and the public interest favors issuance of a preliminary injunction that specifically addresses these new domain names, websites and defendants.

6. In this case, CME Group has established a high likelihood of success on its trademark counterfeiting, trademark infringement and unfair competition claims since it has shown that it has protectable trademarks, and there is a likelihood of confusion as to the origin of the Defendants' services. *See* Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1084 (7th Cir. 1988). Based upon CME Group's longstanding, prior use, CME Group owns protectable interests in the marks

CME, CME GROUP,  ,

CBOT, NYMEX, COMEX, ⊕ , CME CLEARPORT, CLEARPORT, E-MINI, CME GLOBEX, GLOBEX, CME DIRECT, CME STP, CME PIVOT, PIVOT, CME DATAMINE, CHICAGO MERCANTILE EXCHANGE, CHICAGO BOARD OF TRADE, and NEW YORK MERCANTILE EXCHANGE, among a number of other CME-formative marks (collectively, "CME Marks"). CME Group also owns U.S. registrations for the marks CME, CME GROUP, ⊕ CME Group ,

⊕ CME Group
CBOT, NYMEX, COMEX, ⊕ , CME CLEARPORT, CLEARPORT, E-MINI, CME GLOBEX, GLOBEX, CME DIRECT, CME STP, CME PIVOT, PIVOT, CME DATAMINE, CHICAGO MERCANTILE EXCHANGE, CHICAGO BOARD OF TRADE, and NEW YORK MERCANTILE EXCHANGE. In addition, the CME and CME GROUP marks have become distinctive and famous under Section 43(c) of the Lanham Act, ⚑15 U.S.C. § 1125(c). As a result, the CME Marks are distinctive and entitled to a broad scope of protection.

7. CME Group has also demonstrated that Defendants Nagovskiy, Chechurin, Does 1-3, and/or someone working in concert with them or at their direction, without authorization or consent, registered and used the CME and CME GROUP trademarks in connection with the <CMEgroupcenter.com>, <CMEgroupcenters.com>, <CMErussia.com>, <CMErussian.com> and <CMErussians.com> domain names ("Infringing Domain Names"). Defendants GoDaddy and REG.RU provided the domain name registration services associated with the Infringing Domain Names.

8. Defendants Nagovskiy, Chechurin, Golub, Does 1-3, and/or someone working in concert with them or at their direction also used the CME Marks in connection with the operation of the www.CMEgroupcenter.com, www.CMEgroupcenters.com, www.CMErussian.com and www.CMErussia.com websites ("Counterfeit Websites"), and this use is likely to cause confusion. Specifically, Defendants Nagovskiy, Chechurin, Golub, Does 1-3, and/or someone working in concert with them or at their direction used the identical registered marks CME and

Case 1:25-cv-00388-JPW Document 23 Filed 10/10/25 Page 79 of 237

CME Group Inc. v. Nagovskiy, Not Reported in Fed. Supp. (2019)
2019 WL 13252888

CME GROUP in connection with identical services as they are operating fake websites designed to collect personal information and account details for prospective and current CME Group customers. Defendants OVH and Eurobyte are complicit in this scheme. Defendant OVH is a French ISP that provides website hosting services and/or related services for the www.CMEgroupcenter.com and www.CMEgroupcenters.com websites. Defendant Eurobyte is a Russian ISP that provides website hosting services and/or related services for the www.CMErussia.com. Defendant Webzilla is a Dutch ISP that provides website hosting services and/or related services for the www.CMErussian.com website.

**\*3** 9. CME Group has shown a likelihood of success on its cybersquatting claim because it has established that Defendants Nagovskiy, Chechurin, Does 1-3, and/or someone working in concert with them or at their direction have registered, trafficked in, or used in bad faith the Infringing Domain Names, which are identical to or confusingly similar to the distinctive or famous CME and CME GROUP trademarks owned by CME Group. *See* 🚩 *Int'l Profit Associates, Inc. v. Paisola*, 461 F. Supp. 2d 672, 677 (N.D. Ill. 2006); *Tory Burch LLC v. Does 1-100*, 12-C-7163, 2012 WL 4581409 (N.D. Ill. Oct. 2, 2012).

10. Further, CME Group has shown a likelihood of success on its copyright infringement claim because it established that it owns valid rights in copyrightable subject matter in certain copyrighted materials as shown at the CME Group website at www.cmegroup.com ("Copyrighted Materials"), and reflected in U.S. copyright registrations. Defendants Nagovskiy, Chechurin, Golub, OVH, Eurobyte, Does 1-3, and/or someone working in concert with them or at their direction have copied the Copyrighted Materials without authorization, and their infringing works in the Counterfeit Websites are substantially similar to that of CME Group. *See* 🚩 17 U.S.C. § 106; *see also, Tillman v. New Line Cinema Corp.*, No. 08-1667, 2008 WL 4488204 (7th Cir. Oct. 7, 2008).

11. CME Group has also shown a likelihood of success on its Digital Millennium Copyright Act claim because it established that Defendants Nagovskiy, Chechurin, Golub, Does 1-3, and/or someone working in concert with them or at their direction have altered or removed CME Group's copyright notice and contact information, which constitutes its copyright management information. 17 U.S.C. § 1202.

12. CME Group has shown a likelihood of success on its anti-phishing claim because Defendants Nagovskiy Chechurin, Golub, Does 1-3, and/or someone working in concert with them or at their direction set up the Counterfeit Websites and solicit or request personally identifiable information, such as user IDs and passwords, all without authority from CME Group.

13. Finally, CME Group has demonstrated that it does not have an adequate remedy at law and will suffer an irreparable injury should Defendants' actions not be enjoined. *See* 🚩 *Int'l Kennel Club of Chicago, Inc.*, 846 F.2d at 1092. Only two of the Infringing Domain Names (<CMEgroupcenter.com> and <CMErussian.com>) have been transferred to an account controlled by CME Group's counsel. The three newly-discovered domain names (<CMEgroupcenters.com>, <CMErussia.com> and <CMErussians.com>) have not yet been transferred. Further, absent a preliminary injunction, there is nothing to prevent Defendants and/or someone working in concert with them or at their direction from registering new domain names that will result in the exact same harm caused. Conversion of the Temporary Restraining Order to a preliminary injunction and the modification of the order to address the new domain names is the only course of action that ensures the transfer of the three new Infringing Domain Names during the pendency of this action, and prevents Defendants and/or someone working in concert with them or at their direction from registering new infringing domain names or creating new infringing websites. Moreover, absent such an order, there is nothing to prevent Defendants and/or someone working in concert with them or at their direction from conducting further illegal activities, changing ownership details for the Infringing Domain Names, switching Internet Service Providers, deleting the relevant data associated with the Counterfeit Websites, all of which will thwart CME Group's ability to seek relief from this Court.

**\*4** 14. Defendants' unauthorized use of the CME Marks has and will continue to irreparably harm CME Group through damage to the CME Group reputation, diminished goodwill, loss of exclusivity and control over use, and possible diversion of sales. CME Group also will suffer losses associated with the use of captured user IDs and passwords from existing customers, which can potentially compromise customer data, disclose confidential information, and adversely impact the integrity of CME Group systems and operations. In addition, the public and individuals will suffer irreparable harm by this illicit, phishing

scheme and become victims of identity theft. Only by issuance of this preliminary injunction can the harm to CME Group's reputation and the goodwill associated with the CME Marks be stopped.

15. The public is also injured by Defendants' actions because customers looking for CME Group on the Internet will believe they reached CME Group when they arrive at some of the Defendants' Counterfeit Websites and will be confused and misled by this conduct. In fact, CME Group believes there is actual confusion in the marketplace, which heightens the public injury. Moreover, some of the Defendants can take advantage of the customers' CME Group login information if the customers reveal it when attempting to sign into the Counterfeit Websites. Individuals providing information on the Counterfeit Websites are at risk of having their identities stolen because the Counterfeit Websites seek personally identifiable information such as full name, email, phone number, Skype name, and password.

16. In this case, the potential harm to CME Group and the public outweighs any potential harm to Defendants because any harm to Defendants in this matter is purely monetary, which would be gained at the expense of CME Group through unauthorized use of CME Group's intellectual property rights.

17. The public interest will also be served by the issuance of the preliminary injunction because "enforcement of the trademark laws prevents consumer confusion." 📙 🔺 *Eli Lily & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000). In this case, enjoining Defendants' use of the CME Marks prevents harm to consumers by eliminating the possibility of confusion as to source and sponsorship and preventing potential abuse of CME Group's customers' login information. Here, the public interest is further served by preventing the theft of individual personal information, which goes beyond the mere interest of CME Group.

18. CME Group provided Defendants in this litigation with notice of this action and the Court's April 4 th hearing and the Defendants have been served.

19. Based on the foregoing facts and pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, the Court finds that CME Group has some likelihood of success on the merits; CME Group has no adequate remedy at law; CME Group will suffer irreparable harm if the injunction is not granted; the balance harms weighs decidedly in CME Group's favor; and the public interest favors entry of the preliminary

injunction. Therefore, CME Group's Motion to Convert the Temporary Restraining Order to a Preliminary Injunction is hereby granted.

**Terms of Preliminary Injunction:**

IT IS ORDERED that DEFENDANTS Nagovskiy, Chechurin, Golub, Does 1-3 and their officers, directors, agents, servants, employees, affiliates, successors, shareholders, assigns and attorneys, as well as all those in active concert or participation with them, be preliminarily and permanently enjoined and restrained from:

A. Using the CME Marks, including but not limited to the marks CME, CME GROUP, , CBOT, NYMEX, COMEX, , CME CLEARPORT, CLEARPORT, E-MINI, CME GLOBEX, GLOBEX, CME DIRECT, CME STP, CME PIVOT, PIVOT, CME DATAMINE, CHICAGO MERCANTILE EXCHANGE, CHICAGO BOARD OF TRADE, and NEW YORK MERCANTILE EXCHANGE or any reproduction, counterfeit, copy, or colorable imitation thereof in any manner in connection with the sale, offering for sale, distribution, or advertising of any goods or services that are not genuine CME Group goods or services or not authorized by CME Group;

**\*5** B. Using any name, mark, or domain name that wholly incorporates the CME Marks or is confusingly similar to, including but not limited to any reproduction, counterfeit, copy or a colorable imitation of, the CME Marks;

C. Registering, transferring, selling, owning or exercising control over any domain name that incorporates, in whole or in part, the CME Marks or anything confusingly similar thereto;

D. Doing any other act or thing calculated or likely to induce or cause confusion or the mistaken belief that Defendants are in any way affiliated, connected, or associated with CME Group or its services;

E. Licensing or authorizing others to use the CME Marks or any confusingly similar mark;

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 81 of 237
CME Group Inc. v. Nagovskiy, Not Reported in Fed. Supp. (2019)
2019 WL 13252888

F. Injuring CME Group's business reputation and the goodwill associated with the CME Marks, and from otherwise unfairly competing with CME Group in any manner whatsoever;

G. Passing off Defendants' goods or services as those of CME Group;

H. Committing any acts which will blur or dilute, or are likely to blur or dilute the distinctive quality of the famous CME Marks;

I. Reproducing and displaying the Copyrighted Materials;

J. Violating any of the exclusive rights owned by CME Group in the Copyrighted Materials or any other materials in which CME Group owns copyright; and

K. Otherwise infringing upon the copyrights owned by CME Group.

IT IS FURTHER ORDERED that DEFENDANTS deliver up and destroy all products, labels, signs, packages, wrappers, advertisements, promotions and all other matter in the custody or under the control of Defendants that bear the CME Marks, include the CME Copyrighted Materials, or any other mark that is likely to be confused with the CME Marks.

IT IS FURTHER ORDERED that DEFENDANTS Nagovskiy, Chechurin, Does 1-3, and REG.RU transfer ownership, if not already transferred, of the <CMErussian.com>, <CMEgroupcenter.com>, <CMErussians.com>, <CMErussia.com> and <CMEgroupcenters.com> domain names, and any other domain names under the control of Defendants that incorporate, in whole or in part, the CME Marks or anything confusingly similar thereto, to CME Group.

IT IS FURTHER ORDERED that DEFENDANTS Nagovskiy, Chechurin, Golub, and Does 1-3 file with the Court and serve on CME Group within thirty (30) days after issuance of this order, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction.

IT IS FURTHER ORDERED that those in privity with, working with, or providing services of any kind to DEFENDANTS Nagovskiy, Chechurin, Golub, and Does 1-3, and with notice or receipt of the injunction or any such Court order, including any Internet search engines,

domain name registrars, domain name registries, Internet Service Providers, and web hosts (except for Defendants GoDaddy and Webzilla, which are subject to a separate order to be entered by the Court), shall (a) be and are restrained and enjoined from facilitating access to any and all websites and accounts through which Defendants engage in the counterfeiting use of the CME Marks, including but not limited to the Infringing Domain Names and Counterfeit Websites; (b) be ordered to provide any and all identification, contact and registration information associated with the Infringing Domain Names and Counterfeit Websites; (c) be ordered to produce any and all documents and electronically stored information regarding use, access, download, and visitors to the Counterfeit Websites; and (d) be enjoined and restrained from altering, interlining, removing, destroying, permitting the destruction of, or in any other fashion changing any records, including electronic records, in their actual or constructive care, custody or control that are relevant to the subject matter of this lawsuit or likely to lead to the discovery of relevant records or evidence, wherever said records are physically located.

**\*6** IT IS FURTHER ORDERED that DEFENDANTS OVH, EuroByte, REG.RU, and their officers, directors, agents, servants, employees, affiliates, successors, shareholders, assigns and attorneys, as well as all those in active concert or participation with them, be preliminarily enjoined and restrained from:

A. Altering, interlining, removing, destroying, permitting the destruction of, or in any other fashion changing any records, including electronic records, in their actual or constructive care, custody or control that are relevant to the subject matter of this lawsuit or likely to lead to the discovery of relevant records or evidence, wherever said records are physically located;

B. Providing Defendants Nagovskiy, Chechurin, Golub, and Does 1-3 access to any material or activity residing at the Counterfeit Websites; and

C. Providing Defendants Nagovskiy, Chechurin, Golub, and Does 1-3 access to any account associated with the Infringing Domain Names and Counterfeit Websites.

IT IS FURTHER ORDERED that a subpoena be issued pursuant to 17 U.S.C. § 512(h), compelling Defendants OVH, EuroByte and REG.RU to expeditiously disclose to CME Group or any person authorized by CME Group, information sufficient to identify Defendants Nagovskiy, Chechurin,

Golub, and Does 1-3, to the extent such information is available as to each such Defendant. The foregoing is not intended to replace the parties' obligations under the Mandatory Initial Discovery Pilot program or other obligations set forth herein.

IT IS FURTHER ORDERED that all Defendants shall preserve and not destroy any and all records, documents, files, electronically stored information and things relating to the CME Marks, Copyrighted Materials, Infringing Domain Names, and Counterfeit Websites, including but not limited to registration materials, login data, user information, file structure and directory, data packets, and shall take steps to retrieve files that may have been deleted before entry of the Temporary Restraining Order and/or this preliminary injunction.

IT IS FURTHER ORDERED that CME Group does not need to post any bond.

IT IS FURTHER ORDERED that the case shall be unsealed.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the above preliminary injunction shall remain in effect until further order of this Court.

IT IS FURTHER ORDERED that this Order is effective as of April 5, 2019.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 13252888

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 84 of 237
Columbia Pictures Industries, Inc. v. Fung, Not Reported in Fed. Supp. (2013)
2013 WL 12098334

2013 WL 12098334
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

COLUMBIA PICTURES
INDUSTRIES, INC., et al., Plaintiffs,
v.
Gary FUNG, et al., Defendants.

Case No. 2:06-cv-05578-SVW (JCx)
|
Signed 08/05/2013

**Attorneys and Law Firms**

Farnaz M. Alemi, Motion Picture Association of America,
Sherman Oaks, CA, Gianni P. Servodidio, Jenner and Block
LLP, New York, NY, Karen R. Thorland, Loeb and Loeb,
Brent L. Caslin, Jenner and Block LLP, Los Angeles, CA,
Steven B. Fabrizio, David A. Handzo, Kenneth L. Doroshow,
Jenner and Block LLP, Washington, DC, for Plaintiffs.

Ira P. Rothken, Jared Robinson Smith, Robert L. Kovsky,
Rothken Law Firm, Novato, CA, Seth Eliot Spitzer, Michael
S. Elkin, Thomas P. Lane, Winston and Strawn LLP, New
York, NY, Erin R. Ranahan, Winston and Strawn LLP, Los
Angeles, CA, Jennifer A. Golinveaux, Robb Christopher
Adkins, Thomas James Kearney, Winston and Strawn LLP,
San Francisco, CA, for Defendants.

**MODIFIED ORDER GRANTING PLAINTIFFS'
MOTION FOR PERMANENT INJUNCTION**

HON. STEPHEN V. WILSON, UNITED STATES
DISTRICT JUDGE

**I. BACKGROUND**

**\*1** On December 21, 2009, the Court granted Plaintiffs'
Motion for Summary Judgment on Liability (the "Order,"
docket no. 391), finding that Defendants Gary Fung and
Isohunt Web Technologies, Inc. (collectively, "Defendants")
induced infringement of Plaintiffs' copyrights in violation of
United States copyright law. See Metro-Goldwyn-Mayer
Studios, Inc. v. Grokster, 545 U.S. 913, 125 S. Ct. 2764,
162 L.Ed. 2d 781 (2005). The Court found that "evidence of
Defendants' intent to induce infringement is overwhelming
and beyond reasonable dispute," Order at 25, and therefore

that "Defendants' inducement liability is overwhelmingly
clear," id. at 15.

On the issue of a permanent injunction, the Court has
considered the briefs filed by the parties, the arguments
presented at the March 22, 2010 hearing on this matter, and
the proposed language and arguments presented by the parties
in response to the Court's proposed order. The Court has
also considered the instructions of the Ninth Circuit regarding
the permanent injunction in its opinion dated March 21,
2013. Columbia Pictures Indus. v. Fung, 710 F.3d 1020,
1047-1049 (9th Cir. 2013). Based on the foregoing and all
matters of record in this action, pursuant to Federal Rule of
Civil Procedure 65 and 17 U.S.C. § 502, the Court enters
a Permanent Injunction in favor of Plaintiffs and against
Defendants in accordance with the terms contained herein.

**II. DISCUSSION**

The Court concludes that a permanent injunction should
issue to restrain further infringement of Plaintiffs' copyrights.

Plaintiffs have satisfied their burden under eBay Inc.
v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837,
164 L.Ed. 2d 641 (2006), "(1) that [they have] suffered an
irreparable injury; (2) that remedies available at law, such
as monetary damages, are inadequate to compensate for
that injury; (3) that, considering the balance of hardships
between the plaintiff[s] and defendant[s], a remedy in equity
is warranted; and (4) that the public interest would not be
disserved by a permanent injunction." Id. at 391.

**A. Irreparable Harm**

Plaintiffs have demonstrated that they have suffered
irreparable harm, and would suffer further irreparable
harm from Defendants' continued infringement, in three
independent ways. First, given the staggering volume of
infringement of Plaintiffs' copyrights, it is extremely unlikely
that Defendants will be able fully to compensate Plaintiffs
monetarily for the infringements Defendants have induced
in the past, or the infringements they could induce in the
future. Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,
518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007) ("Grokster V").
Second, given the way in which Defendants' system works,
when Defendants' end-users download one of Plaintiffs'
works, the end-users automatically and simultaneously
further distribute the work to innumerable others as a
required part of the download process; additionally, at the

2013 WL 12098334

conclusion of the download, Defendants' end-users obtain an unprotected digital copy of Plaintiffs' work that those end-users can further distribute indefinitely at will. [1] Thus, when Defendants induce infringement, "Plaintiffs' copyrighted works can be unstoppably and near-instantaneously infringed throughout the computer-literate world with the files obtained by [Defendants'] end-users. Plaintiffs' power to control their rights has been so compromised by the means through which [Defendants] encouraged endusers to infringe (digital files plus the internet) that the inducement amounts to irreparable harm." *Id.* at 1218-19. Third, it is axiomatic that the availability of free infringing copies of Plaintiffs' works through Defendants' websites irreparably undermines the growing legitimate market for consumers to purchase access to the same works. *E.g.,* Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 928-29, 125 S. Ct. 2764, 162 L.Ed. 2d 781 (2005) ("digital distribution of copyrighted material threatens copyright holders as never before, because every copy is identical to the original, copying is easy, and many people (especially the young) use file-sharing software to download copyrighted works"); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1017 (9th Cir. 2001) (citing "Napster's deleterious effect on the present and future digital download market").

### B. Inadequate Remedy at Law

**\*2** For many of the same reasons, [2] Plaintiffs have demonstrated that they do not have an adequate remedy at law for the harm that has been or could be caused by Defendants' infringement. " 'Damages are no remedy at all if they cannot be collected.' " Grokster V, 518 F. Supp. 2d at 1219 (quoting Douglas Laycock, *The Death of the Irreparable Injury Rule,* 103 Harv. L. Rev. 687, 716 (1990)). Likewise, "[a] legal remedy is inadequate if it would require a multiplicity of suits." *Id.* at 1220 (quoting Laycock, 103 Harv. L. Rev. at 714) (alteration in original).

Here, as in Grokster V, "[t]he irreparable harm analysis centers on two basic themes: (1) [Defendant] has and will continue to induce far more infringement than it could ever possibly redress with damages; and (2) Plaintiffs' copyrights (especially those of popular works) have and will be rendered particularly vulnerable to continuing infringement on an enormous scale due to [Defendant's] inducement."

Grokster V, 518 F. Supp. 2d at 1217. Both of these elements are present in this case as well.

In the Summary Judgment Order, the Court concluded that the evidence "strongly suggests that some 2.5 million United States citizens visited Defendants' websites each month" and that "at one point, Defendants' websites were accessed over 50 million times from the United States in a single month." Order at 41. The Court also concluded that Plaintiffs' statistical evidence showed that over 90% of the downloads using Defendants' websites were associated with copyright-infringing materials. Accord A& M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001) (relying on statistical evidence to show extent of infringement); Grokster V, 518 F. Supp. 2d at 1217-19 (same). Defendants have introduced no evidence to rebut these showings.

In addition, given the multiplicity of infringements of Plaintiffs' works caused by a single user downloading a single dot-torrent file from Defendants' sites, see Order at 6-7, it would be untenable for Plaintiffs to track and proceed against each infringing end-user. Additionally, Plaintiffs would not be able to recover damages from Defendants for the inevitable derivative infringements that would occur outside Defendants' websites when copyrighted content acquired as a result of Defendants' inducement is further distributed by Defendants' users. These further infringements are a continuing threat, making remedies at law insufficient to compensate for Plaintiffs' injuries. The only realistic method for remedying such future harm from Defendants' inducement is by way of a permanent injunction. Grokster V, 518 F. Supp. 2d at 1220.

### C. Balance of Hardships

The balance of hardships between Defendants and Plaintiffs also warrants the issuance of a permanent injunction. As described, absent an injunction, Plaintiffs would suffer a severe hardship as a result of Defendants' inducement of infringement. The injunction being ordered by the Court would not pose a corresponding hardship on Defendants. The Court has already found that Defendants' websites are used overwhelmingly for copyright infringement, with upwards of 95% of all dot-torrent files downloaded from Defendants' websites corresponding to works that are infringing or at least highly likely to be infringing. Summary Judgment Order at 10-11. Obviously, the harm to Defendants from no longer

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 86 of 237
Columbia Pictures Industries, Inc. v. Fung, Not Reported in Fed. Supp. (2013)
2013 WL 12098334

being able to exploit and profit from that infringement is not a hardship the Court need consider. See 🚩 Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824, 829 (9th Cir. 1997) (defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities") (citation and internal quotation marks omitted). Beyond that, the Court's injunction is limited to Plaintiffs' copyrights and will not substantially interfere with any claimed non-infringing aspects of Defendants' system.

**\*3** The Court is further persuaded that Defendants would likely continue to induce infringement in the absence of a permanent injunction. As this Court observed in Grokster:

> [A] successful inducer will sometimes have no need to repeat the infringing message ad infinitum. This is especially likely to be the case where the product in question is overwhelmingly used for infringing purposes, and requires little or no specialized training to operate. At a certain point, the inducer can simply continue to distribute the product without any additional active encouragement, recognizing that the marketplace will respond in turn. Thus, once the market has internalized the inducer's promotion of infringement, the resulting infringements should be attributable to that defendant even though he/she no longer chooses to actively promote that message.

🚩 Grokster V, 518 F. Supp. 2d at 1233-34.

The Court finds those observations fully applicable to this case. For years, Defendants operated their websites as popular destinations for copyright infringement and etched their niche in the market for infringement. Defendants were enormously successful in building a user-base of infringers that, by Defendants' own account, number in the millions. See Order at 42. As stated, the evidence of Defendants' illegal objective was "overwhelming" and the resulting amount of infringement of Plaintiffs' copyrights has been

staggering. Defendants' websites "remain[ ] inexorably linked to [Defendants'] historical efforts to promote infringement." 🚩 Grokster V, 518 F. Supp. 2d at 1235. Absent an injunction directing Defendants to prevent infringement of Plaintiffs' works, it is highly likely that Defendants' existing users and new users would continue to use Defendants' system to infringe Plaintiffs' copyrights.

Moreover, the Court's conclusion that Defendants are likely to continue to induce copyright infringement is warranted by (1) the great extent to which Defendants have actively encouraged copyright infringement in the past; (2) the fact that Defendants' very business model, at its core, depends upon copyright infringement, and Defendants would financially benefit from further infringement; and (3) the fact that, even since the Court's Order finding Defendants liable for inducing copyright infringement, Defendants have not taken meaningful steps to mitigate the infringement of Plaintiffs' works. Defendants' proposed "primal" or "lite" website contains all of the same indexing and searching functions as the original websites, only with a different interface for the users to operate. (See Servodidio Reply Decl., Ex. G, at 15-21.) In fact, Defendants have not even ceased all of the active conduct of encouraging and promoting infringement which the Court specifically identified in its Summary Judgment Order. A number of features mentioned in this Court's Summary Judgment Order remain active: a "top 20" TV shows and movies feature; a "top searches" feature (which invariably includes all, or almost all, copyrighted works); and access to Plaintiffs' works that are specifically identified as the subject of this action. (Pls. Reply at 10.) Defendant Fung has affirmatively stated that he will not take steps to prevent infringement on his websites unless he is ordered to do so by this Court. (Fung interview, quoted in Defs. Opp. at 3.) In short, Defendants' past and present statements and conduct establish that Defendants "fully intend[ ] to continue [their] distribution of the" tools that are central to their inducement of copyright infringement.

See 🚩 Grokster V, 518 F. Supp. 2d at 1229-30.

**\*4** As this Court explained at length in Grokster V, a defendant who is liable for inducing infringement may be enjoined from **distributing** his products in the future, **even if** he no longer promotes an inducing message. Although the quote is lengthy, it is worth setting forth in full:

> The Court is mindful of the following critical passage from the Supreme Court's opinion in this case:

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 87 of 237
Columbia Pictures Industries, Inc. v. Fung, Not Reported in Fed. Supp. (2013)
2013 WL 12098334

It is not only that encouraging a particular consumer to infringe a copyright can give rise to secondary liability for the infringement that results. Inducement liability goes beyond that, and the distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe. In such a case, the culpable act is not merely the encouragement of infringement but also the distribution of the tool intended for infringing use.

🚩 Grokster, 545 U.S. at 940 n. 13, 125 S.Ct. 2764.

In effect, the "culpable act," which induces third parties to infringement, certainly manifests itself once two components are present—distribution and promotion/encouragement. See 🚩⚠ Amazon.com, 487 F.3d at 727 n. 11; 🚩 Visa, 494 F.3d at 800-01. It is important to recognize that the Supreme Court did not impose any strict timing relationship between specific acts promoting infringements, distribution, and the direct infringements themselves. For a party to be liable for inducement, distribution may begin prior to any promotion of infringement, distribution and promotion can occur at the same time, and most critically, **distribution can follow past promotion**. This highlighted portion of the above sentence is crucial. As a matter of common sense, a successful inducer will sometimes have no need to repeat the infringing message ad infinitum. This is especially likely to be the case where the product in question is overwhelmingly used for infringing purposes, and requires little or no specialized training to operate. At a certain point, the inducer can simply continue to distribute the product without any additional active encouragement, recognizing that the marketplace will respond in turn.

Thus, once the market has internalized the inducer's promotion of infringement, the resulting infringements should be attributable to that defendant even though he/she no longer chooses to actively promote that message. There is no difference between these infringements and those that are consummated while the defendant is still engaging in the active promotion of infringement.

Critically, Justice Souter recognized the importance of this relationship between past promotion and future distribution during the Supreme Court's oral argument in this case:

But I don't ... understand how you can separate the past from the present in that fashion. One, I suppose, could

say, "Well, I'm going to make inducing remarks Monday through Thursday, and I'm going to stop, Thursday night." The sales of the product on Friday are still going to be sales which are the result of the inducing remarks Monday through Wednesday. And you're asking, in effect—you're asking us—to ignore Monday through Thursday.

🚩 Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd., No. 04-480, Mar. 29, 2005 ("Oral Argument Transcript"), at 30. Thus, distribution of a product capable of substantial noninfringing uses, even after the promotion/encouragement of infringement ceases, can by itself constitute inducement. StreamCast's future distribution is undoubtedly connected to past promotional efforts. In its September 27, 2006 Order, this Court recounted in detail, among other undisputed facts, StreamCast's efforts to promote its software to the Napster market as a mechanism for infringing Plaintiffs' copyrighted works. 🚩 Grokster, 454 F.Supp.2d at 985-86. These promotional efforts proved to be wildly successful, especially because StreamCast marketed itself to Napster users at a particularly important juncture—while Napster was in imminent legal jeopardy. End-user infringement exponentially increased, evidencing that StreamCast's express and implied messages of promotion were received, absorbed, and responded to by the market. Or as more recently stated by the Ninth Circuit:

**\*5** The software systems in ... Grokster were engineered, disseminated, and promoted explicitly for the purpose of facilitating piracy of copyrighted music and reducing legitimate sales of such music to that extent. Most ... users understood this and primarily used those systems to purloin copyrighted music. Further, the ... operators explicitly targeted then-current users of the Napster program by sending them ads for its OpenNap program.

🚩 Visa Int'l Serv. Ass'n, 494 F.3d at 801. StreamCast's revenues skyrocketed as a result. Furthermore, StreamCast could not reasonably claim ignorance of the infringements perpetrated by Morpheus endusers. 🚩 Grokster, 454 F.Supp.2d at 992.

StreamCast has etched its niche in the market for infringement. Under the facts of this case, and the doctrinal point raised by Justice Souter, neither the simple passage of time nor the entry of judgment in this case can remedy StreamCast's past promotion as the "next Napster." The fact

Columbia Pictures Industries, Inc. v. Fung, Not Reported in Fed. Supp. (2013)

2013 WL 12098334

that a permanent injunction is imposed also does not leave Morpheus magically reborn as a product safe for unfiltered distribution under Sony.

As stated by Justice Scalia to StreamCast's counsel at oral argument, "the point is that those past acts [of encouragement] are what have developed your client's current clientele." Oral Argument Transcript at 29.

...

StreamCast is not being "punished" for its past actions; rather, StreamCast's past activity is relevant to what future actions constitute inducement going forward.

An unfiltered Morpheus, which StreamCast intends to distribute if provided the opportunity, necessarily capitalizes on and remains inexorably linked to its historical efforts to promote infringement. The bell simply cannot be unrung. Accordingly, Morpheus's connection to the past promotion of infringement means that StreamCast's continued distribution of Morpheus alone constitutes inducement. This Court is empowered to regulate Morpheus under 17 U.S.C. § 502(a) in order to prevent this distribution from causing future harm to Plaintiffs' rights.

Grokster V, 518 F. Supp. 2d at 1233-35.

### D. Public Interest

Finally, the Court agrees that the public interest will be served with a permanent injunction, since it will protect Plaintiffs' copyrights against increased and unrestrained infringement. Id. at 1222. Although Defendants argue that the BitTorrent "ecosystem" would be harmed by the present injunction, Defendants have not introduced any evidence to show the harmful "wider implications" of this injunction, nor have they shown that further discovery is warranted because the relevant evidence is exclusively within Plaintiffs' possession. (See Opp. at 15-17.) In addition, this injunction is aimed solely at *Defendants'* unlawful use of BitTorrent and similar technology, not at *third parties'* lawful use of BitTorrent and similar technology. The public interest will not be harmed by the injunction.

### E. Summary

The Court thus finds that the four part eBay test favors the imposition of a permanent injunction to restrain Defendants'

infringement. In its discretion, the Court deems it appropriate for a permanent injunction to issue.

In issuing the injunction, the Court is cognizant that "[t]he fact that absolutely perfect compliance is unattainable does not of itself preclude an injunction." Withrow v. Concannon, 942 F.2d 1385, 1388 (9th Cir. 1991). "If a violating party has taken 'all reasonable steps' to comply with the court order, technical or inadvert[e]nt violations of the order will not support a finding of civil contempt." Gen. Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir. 1986) (citation omitted). Ultimately, Defendants have the option — and the burden — of deciding how they will comply with the following injunction. Triad Systems Corp. v. Southeastern Exp. Co., 64 F.3d 1330, 1337 (9th Cir. 1995) ("Putting this burden on Southeastern is appropriate because Southeastern is the infringer."), *overruled on other grounds by* Gonzales v. Texaco Inc., 344 Fed. Appx. 304, 306 (9th Cir. 2009).

## III. INJUNCTION

**\*6** It is therefore ORDERED, ADJUDGED, and DECREED that:

1. For the purposes of this Permanent Injunction, the following definitions shall apply:

(a) "Defendants" shall mean Gary Fung and Isohunt Web Technologies, Inc., whether acting jointly or individually.

(b) "Isohunt System" shall mean the websites www.isohunt.com, www.podtropolis.com, www.torrentbox.com, and www.ed2k-it.com, and shall further include any servers, trackers, software, and electronic data that make up or support such websites.

(c) "Comparable System" shall mean any website, system or software that provides users access to Plaintiffs' Copyrighted Works, using BitTorrent or any peer-to-peer or other file-sharing or content delivery technology.

(d) "Copyrighted Works" shall mean each of those works, or portions thereof, whether now in existence or later created, in which any Plaintiff (or parent, subsidiary or affiliate of any Plaintiff), at the time of Defendants' conduct in question, owns or controls a valid and subsisting exclusive right under the United States Copyright Act,

Columbia Pictures Industries, Inc. v. Fung, Not Reported in Fed. Supp. (2013)

2013 WL 12098334

17 U.S.C. §§ 101 et seq., and which Plaintiffs have identified to Defendants by the title of the work.

(e) "Dot-torrent or similar files" shall mean dot-torrent files, magnet links, hash links, or other functionally similar files, links or identifiers.

(f) "Infringement-Related Terms" shall mean:

(i) terms that refer to the titles or commonly understood names of Plaintiffs' Copyrighted Works (for example, the full title or common name of a television series);

(ii) the following terms: "warez," "Axxo," "Jaybob," "DVD Rips," "Cam," "Telesync," "Telecine," "Screener," "PPV," or "R5";

(iii) Plaintiffs may request that this Court modify (ii) above to include additional terms upon competent proof that such terms should be included in Paragraph 1(f)(ii).

2. Subject to the terms of Paragraph 5 below, Defendants shall be permanently enjoined from knowingly engaging in any of the following activities in connection with the Isohunt System or any Comparable System:

(a) hosting, indexing, linking to, or otherwise providing access to any Dot-torrent or similar files that correspond, point or lead to any of the Copyrighted Works;

(b) assisting with end-user reproductions or transmissions of any of the Copyrighted Works through a tracker server, or any other server or software that assists users in locating, identifying or obtaining files from other users offering any of the Copyrighted Works for transmission; or

(c) hosting or providing access to any of the Copyrighted Works.

Defendants shall be in knowing violation of this paragraph if they fail to act in response to the list of titles as set forth in Paragraph 5.1.

3. Defendants shall immediately and permanently be enjoined from knowingly engaging in any activities having the object or effect of fostering infringement of Plaintiffs' Copyrighted Works, including without limitation, by engaging in any of the following activities:

(a) advertising or promoting access to or the availability of Plaintiffs' Copyrighted Works;

(b) encouraging or soliciting users to reproduce or distribute Plaintiffs' Copyrighted Works;

*7 (c) encouraging or soliciting users to upload, post or index any Dot-torrent or similar files that correspond, point or lead to any of the Copyrighted Works;

(d) encouraging or soliciting users to link to copies of Plaintiffs' Copyrighted Works;

(e) providing technical assistance or support services to users engaged in infringement of, or seeking to infringe, Plaintiffs' Copyrighted Works;

(f) creating, maintaining, highlighting or otherwise providing access to lists of "top" downloads of, or search terms for, Dot-torrent or similar files that include, refer to or signal the availability of Plaintiffs' Copyrighted Works;

(g) including Infringement-Related Terms in metadata for any webpages;

(h) creating, maintaining or providing access to browsable website categories of Dot-torrent or similar files using or based on Infringement-Related Terms;

(i) organizing, harvesting or categorizing Dot-torrent or similar files using or based on Infringement-Related Terms;

(j) engaging in any of the following activities with regard to the "Sites" defined below:

(i) using the names of any of the Sites in meta tags on any web pages;

(ii) bidding on, purchasing or using the names of any of the Sites as keywords in any advertising campaigns;

(iii) placing advertisements on any of the Sites; and

(iv) advertising by referring to any of the Sites by name.

For purpose of this provision, "Sites" shall mean: The Pirate Bay, Torrentspy, Aimster, Kazaa, Grokster, Morpheus, Newzbin, BT Junkie, Torrentreactor.net, kat.ph, torrents.net, SurftheChannel.com, Kino.to, Movie2k.to, and/or Dl4all.com.

(v) Plaintiffs may request that this Court modify the injunction to include additional websites upon competent proof that such websites should be added to Paragraph 3(j).

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 90 of 237
Columbia Pictures Industries, Inc. v. Fung, Not Reported in Fed. Supp. (2013)
2013 WL 12098334

(k) transferring or redirecting users of the Isohunt System to any other service that, directly or indirectly, provides access to unauthorized copies of Plaintiffs' Copyrighted Works;

(l) indexing or providing access to Dot-torrent or similar files harvested or collected from the following sites or services: The Pirate Bay, Torrentspy, BT Junkie, Torrentreactor.net, kat.ph or torrents.net;

   (i) Plaintiffs may request that this Court modify the injunction to include additional source websites upon competent proof that such websites should be added to Paragraph 3(l).

(m) soliciting revenue from third party advertisers or advertising brokers based on (or by referring to or highlighting) the availability of Plaintiff's Copyrighted Works.

4. The terms of Paragraphs 2 and 3 of this Permanent Injunction shall not apply to any Copyrighted Work for which Defendants have obtained express written authorization or license for the use being made of such Copyrighted Work from each Plaintiff that owns or controls the rights to such Copyrighted Work, provided such authorization or license is in force and valid at the time of Defendants' use of the Copyrighted Work.

5. Defendants shall not be in violation of this Permanent Injunction as to Copyrighted Works that Plaintiffs, or representatives of Plaintiffs, have not (a) identified to Defendants by title of the work, and (b) represented to Defendants that, based on a reasonable review and good faith belief, a Plaintiff (or a parent, subsidiary or affiliate of a Plaintiff) owns or controls a valid and subsisting exclusive right under the United States Copyright Act, 📙 17 U.S.C. §§ 101 et seq. in the work (a "list of titles").

  **\*8** (a) Plaintiffs shall be permitted to supplement and update their list of titles without restriction, including without limitation with works soon-to-be but not yet released to the public.

(b) Plaintiffs shall provide Defendants with the list of titles in electronic form.

(c) Defendants shall promptly provide Plaintiffs with a valid email address to use for the lists of titles, and Defendants shall immediately notify Plaintiffs in writing of any change in such email address. A list of titles shall be deemed delivered when sent to the most current email provided by Defendants.

(d) With regard to the initial list of titles provided by Plaintiffs pursuant to this Permanent Injunction, Defendants shall be required to comply with the terms of Paragraph 2 above no later than 14 calendar days from the date Plaintiffs deliver the initial list of titles.

(e) For all subsequent lists of titles, Defendants shall be required to comply with the terms of Paragraph 2 above no later than 24 hours from the time Plaintiffs deliver the list of titles.

(f) In the event a commercial vendor or other third party becomes able to provide Defendants with a reliable list of Plaintiffs' Copyrighted Works, Plaintiffs may apply to the Court for an order modifying this Permanent Injunction to relieve them of the obligation of providing Defendants with lists of titles, even if there is a cost to Defendants of securing the lists of titles from the commercial vendor or third party.

6. Prior to Defendants entering into any agreement or transaction whatsoever to sell, lease, license, assign, convey, give away, distribute, loan, barter, hypothecate, encumber, pledge or otherwise transfer, whether or not for consideration or compensation, any part of the software, source code, data files, other technology, domain names, trademarks, brands, or Dot-torrent or similar files used in connection with the Isohunt System or any Comparable System (a "Transfer of Isohunt-Related Assets"), Defendants shall require, as a condition of any such transaction, that the transferee:

   (a) submit to the Court's jurisdiction and venue;

   (b) agree to be bound by the terms herein; and

   (c) apply to the Court for an order adding it as a party to this Permanent Injunction.

Defendants shall not permit any Transfer of Isohunt-Related Assets to close until the Court has entered such an order. Defendants further shall not engage in a Transfer of Isohunt-Related Assets with or to any person whom Defendants know to be engaged in, or intending to be engaged in, conduct that would violate the terms of Paragraphs 2 or 3 above.

7. This Permanent Injunction shall bind Gary Fung, individually, and Isohunt Web Technologies, Inc., and their officers, agents, servants, employees, attorneys, successors,

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 91 of 237
Columbia Pictures Industries, Inc. v. Fung, Not Reported in Fed. Supp. (2013)

2013 WL 12098334

and assigns, and all those in active concert or participation with any of them, who receive actual notice of this Permanent Injunction by personal service or otherwise. Defendants shall provide a copy of this Permanent Injunction to each of their respective officers, agents, servants, employees, attorneys, principals, shareholders, current and future administrators or moderators for the Isohunt System (or Comparable System) or any online forums associated with the Isohunt System (or Comparable System), and any domain name registries or registrars responsible for any domain names used in connection with the Isohunt System (or Comparable System).

**\*9**  8. Nothing in this Permanent Injunction shall limit the right of Plaintiffs to seek to recover damages under 17 U.S.C. § 504, or costs, including attorneys' fees, under 17 U.S.C. § 505.

9. For purposes of clarity, as the Court has personal jurisdiction over Defendants and has concluded that the conduct of Defendants induces infringement of Plaintiffs' Copyrighted Works in the United States under the copyright laws of the United States, this Permanent Injunction enjoins the conduct of Defendants wherever they may be found, including without limitation in Canada.

10. The Court further clarifies that this injunction covers any acts of direct infringement, as defined in 17 U.S.C. § 106, that take place in the United States. To the extent that an act of reproducing, copying, distributing, performing, or displaying takes place in the United States, it may violate 17 U.S.C. § 106, subject to the generally applicable requirements and defenses of the Copyright Act. As explained in the Court's December 23, 2009 Order, "United States copyright law does

not require that both parties be located in the United States. Rather, the acts of uploading and downloading are each independent grounds of copyright infringement liability." Summary Judgment Order at 19. Each download or upload of Plaintiffs' copyrighted material violates Plaintiffs' copyrights if even a single United States-based user is involved in the "swarm" process of distributing, transmitting, or receiving a portion of a computer file containing Plaintiffs' copyrighted content.

11. Violation of this Permanent Injunction shall expose the Defendants, and all others properly bound by it, to all applicable penalties, including for contempt of Court.

12. The Court shall maintain jurisdiction over this action for the purposes of enforcing this Permanent Injunction and for amending the injunction in response to future changes in the law or factual circumstances. See Grokster V, 518 F. Supp. 2d at 1239-40 (collecting cases).

13. Gary Fung, individually, shall not be deemed to be in violation of this injunction solely as a result of his being a bona fide employee or independent contractor of a third party entity that may be engaged in acts that violate this injunction or whose services might be used by third parties to engage in infringement, provided that Mr. Fung does not personally direct or participate in conduct that violates this injunction. IT IS SO ORDERED.

DATED: August 5, 2013.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 12098334

---

## Footnotes

1    Defendants argue that the Supreme Court's holding in Grokster was limited solely to "devices" that induce infringement. Defendants further argue that they are immune from an injunction against their "activities." (Opp. at 6-7, 19.) Defendants' argument lacks merit. Nothing in Grokster requires that there be a "device"; the central inquiry is based on the defendants' "purposeful, culpable expression and conduct." Grokster, 545 U.S. at 937. The Supreme Court's holding in Grokster was not limited solely to "devices." The Supreme Court used terms such as "device," "product," and "tool" interchangeably. Id. at 940 n.13.

In addition, the clear import of the Supreme Court's opinion was that a defendant may be secondarily liable for his conduct and activities, separate and apart from any products, devices, or tools he distributes.

Columbia Pictures Industries, Inc. v. Fung, Not Reported in Fed. Supp. (2013)

2013 WL 12098334

2    The "irreparable harm" and "inadequate remedies at law" inquiries are essentially identical. 🚩 Grokster V,
518 F. Supp. 2d at 1219

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT G

Columbia Pictures Industries, Inc. v. Galindo, Not Reported in Fed. Supp. (2022)

2022 WL 17094713

2022 WL 17094713
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

COLUMBIA PICTURES
INDUSTRIES, INC., et al., Plaintiffs,
v.
Alejandro GALINDO, et al., Defendants.

Case No.: 2:20-cv-03129-MEMF (GJSx)
|
Signed November 18, 2022

**Attorneys and Law Firms**

Andrew Gregory Sullivan, Effiong Kara Dampha, Kristen Green, Madeline Paige Skitzki, Julie A. Shepard, Jenner and Block LLP, Los Angeles, CA, Satenik Sati Harutyunyan, Jenner and Block LLP, Los Angeles, DC, Gianni P. Servodidio, Pro Hac Vice, Jenner and Block LLP, New York, NY, for Plaintiffs.

Steven Charles Vondran, Law Offices of Steven Vondran PC, Santa Monica, CA, for Defendants.

ORDER GRANTING PLAINTIFFS' MOTION FOR
DEFAULT JUDGMENT AGAINST DEFENDANTS
RICHARD HORSTEN, ANNA GALINDO,
MARTHA GALINDO, OSVALDO GALINDO, RAUL
ORELLANA, AND FIRESTREAM LLC [ECF NO.
227] AND GRANTING PLAINTIFFS' REQUESTS
FOR RELIEF PURSUANT TO PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION FOR TERMINATING SANCTIONS AND
ENTRY OF JUDGMENT AGAINST DEFENDANT
ALEJANDRO GALINDO [ECF NO. 226]

MAAME EWUSI-MENSAH FRIMPONG, United States District Judge

*1 Before the Court is the Motion for Default Judgment filed by Plaintiffs Columbia Pictures, Industries, Inc.; Amazon Content Services, LLC; Disney Enterprises, Inc.; Paramount Pictures Corporation; Warner Bros. Entertainment Inc.; Universal City Studios Productions LLLP; Universal Television LLC; and Universal Content Productions LLC. ECF No. 227. Also before the Court is Plaintiffs' Supplemental Brief in Support of their Motion for Terminating Sanctions and Entry of Judgment against Defendant Alejandro Galindo. ECF No. 226. For the reasons stated herein, the Court hereby GRANTS the Motion for Default Judgment and GRANTS Plaintiffs' Request for judgment against Alejandro Galindo.

## I. **Factual Background** [1]

This case involves large-scale copyright infringement through an unlicensed internet streaming [2] service. Plaintiffs Columbia Pictures Industries, Inc. ("Columbia"); Amazon Content Services, LLC ("Amazon"); Disney Enterprises, Inc. ("Disney"); Paramount Pictures Corporation ("Paramount"); Warner Bros. Entertainment, Inc. ("Warner Bros."); Universal City Studios Productions LLLP ("Universal City"); and Universal Content Productions LLC ("Universal Content") (collectively, "Plaintiffs"), either directly or through affiliates, "produce and distribute a significant portion of the world's most popular television programs and motion pictures." SAC ¶ 31. Plaintiffs own or hold "the exclusive U.S. rights ... to reproduce, distribute, and publicly perform countless works, including by means of streaming those works over the Internet to the public." *Id.* ¶ 32.

Defendants Richard Horsten (a/k/a "Rik de Groot") ("Horsten"), Alejandro ("Alex") Galindo, Anna Galindo, Martha Galindo, Osvaldo Galindo, Raul Orellana (a/k/a "Touchstone") ("Orellana"), and Firestream LLC ("Firestream") (collectively, the "Nitro Defendants") owned and operated Nitro TV, an unlicensed Internet Protocol television service ("IPTV"). *Id.* ¶¶ 1, 34.

### A. Nitro TV Platforms

Nitro TV is a collection of web-based and application-based streaming platforms for use on mobile phones and smart TVs (collectively, the "Nitro TV Platforms"). *Id.* ¶ 2. For $20 per month, the Nitro Defendants offered Nitro TV subscription packages consisting of thousands of live and title-curated television channels available twenty-four hours a day, seven days a week, in the United States and abroad. *Id.* ¶¶ 1–3, 42. Beginning in or around May 2017, Nitro Defendants marketed, promoted, and sold Nitro TV subscriptions through NitroIPTV.com. *Id.* ¶ 41. Alex Galindo registered the domain name NitroIPTV.com with Domain.com LLC in December 2016. *Id.* In April 2017, Horsten, under the alias Rik de Groot, registered the domain names for TekkHosting.com, Lalaluhosting.com, and Nitro.ltd with Namecheap, Inc. *Id.* All three sites are connected to the Nitro TV Platforms.

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 95 of 237

Columbia Pictures Industries, Inc. v. Galindo, Not Reported in Fed. Supp. (2022)

2022 WL 17094713

**\*2** Subscribers can obtain access to Nitro TV in two ways: (1) by purchasing a subscription through the Nitro TV website or another website maintained by the Nitro Defendants or (2) purchasing a subscription through a Nitro TV reseller. *Id.* ¶ 41. Many of the channels include popular television programs and movies such as *The Office, Spider-Man: Homecoming, Toy Story 3, Star Trek Beyond*, and *Joker*, and include works whose copyrights Plaintiffs own or exclusively control ("Copyrighted Works" or the "Works"). *Id.* ¶ 1. The channels also include live, California-based television networks such as Los Angeles ABC, CBS, CW, NBC, and FOX affiliates. *Id.* ¶ 50. Nitro TV also includes a "Catch Up" feature [3] which allows a subscriber to access "television programming from the prior two days," *id.* ¶ 51, and "24/7, title-curated channels," which "are devoted to a single television series, motion picture, or franchise." *Id.* ¶ 52.

During the many years the Nitro Defendants operated Nitro TV, they infringed upon, at a minimum, 1,897 Copyrighted Works. *See* SAC, Ex. A. The Nitro Defendants' infringement was willful—they actively selected the programming they sold and streamed illegally on Nitro TV, notified Nitro TV subscribers when channels containing the Copyrighted Works became available, solicited feedback from subscribers regarding preferred television programs, and added television shows in response to such feedback. *Id.* ¶ 3. The Nitro Defendants also took steps to actively advertise Nitro TV, such as on YouTube channels and through Facebook. *See id.* ¶¶ 28, 35–37. However, at no point did the Nitro Defendants seek to register a Digital Millennium Copyright Act ("DMCA") agent for any Nitro TV website they operated. *Id.* ¶ 4. Instead, the Nitro Defendants took steps to operate anonymously and "hide their tracks," such as concealing registrant information on the primary Nitro TV website from public access and advising subscribers to use a Virtual Private Network ("VPN"). [4] *Id.* ¶¶ 4, 39, 41.

**B. Nitro TV Reseller Network**
In addition to selling subscription packages directly to users, the Nitro Defendants also developed a robust "reseller network" by which resellers market and sell the Nitro TV Platforms to subscribers all over the world. *Id.* ¶¶ 5, 54. Nitro TV resellers purchase reseller credits hosted on nitroiptv.com or other websites hosted by the Nitro Defendants. *Id.* ¶ 41. Profits and payments generated from the reseller network are managed by Anna Galindo, Martha Galindo, and Osvaldo Galindo who "hold and operate critical payment processor

and bank accounts through which millions of dollars' worth of Nitro TV reseller credits and subscriptions have been sold." *Id.* ¶¶ 6, 40. Anna Galindo, Martha Galindo, and Osvaldo Galindo also used these accounts to pay Horsten, Orellana, and Firestream for their work in connection with the "promotion, sales, and operation of Nitro TV." *Id.* ¶ 40

## II. Procedural Background

**\*3** On April 3, 2020, Plaintiffs filed their initial complaint against Alex Galindo and Does 1–20 for direct and secondary copyright infringement associated with Nitro TV. ECF No. 1. Soon after, Plaintiffs sought—and were awarded—a preliminary injunction to enjoin Alex Galindo's copyright infringement, including his ongoing operation of Nitro TV. ECF Nos. 12 ("Motion for Preliminary Injunction"); 34 ("Order Granting Preliminary Injunction").

On May 4, 2020, Plaintiffs filed an application for entry of default against Alex Galindo. ECF No. 31. The Clerk of Court entered default on May 5, 2020. ECF No. 32. However, on May 19, 2020, pursuant the parties' stipulation, ECF No. 36, the Court set aside the entry of default. ECF No. 37. Discovery commenced soon after. *See* Civil Trial Order, ECF No. 43.

However, Alex Galindo refused to cooperate in discovery and did not produce any documents. *See* ECF Nos. 53, 57. On August 19, 2020, Plaintiffs, suspecting that Alex Galindo had engaged in spoliation of evidence, filed a discovery motion requesting an order requiring, among other things, the preservation and production of relevant evidence and responses to interrogatories. ECF No. 57. Magistrate Judge Gail Standish granted the motion and ordered Alex Galindo to propound the requested discovery. *See* Report & Recommendation on Plaintiffs' Motion for Sanctions Against Alejandro Galindo, ECF No. 209 ("R&R") at 9–10, *report and recommendation adopted* ECF No. 222. Again, Alex Galindo failed to produce the ordered discovery. [5] R&R at 11–12. As a result, Plaintiffs filed a Motion for Terminating Sanctions against Alex Galindo. ECF No. 112. Judge Standish issued a Report and Recommendation granting the Motion for Terminating Sanctions and granting Entry of Judgment on June 30, 2022. *See* R&R. On August 15, 2022, this Court adopted the R&R and ordered Plaintiffs to submit supplemental briefing on the issue of statutory damages and the amount of damages sought by Plaintiffs. [6] ECF No. 222. Plaintiffs filed the requested brief on October 3, 2022. ECF No. 226 ("Supplemental Brief").

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 96 of 237

Columbia Pictures Industries, Inc. v. Galindo, Not Reported in Fed. Supp. (2022)

2022 WL 17094713

On August 27, 2020, Plaintiffs filed a First Amended Complaint adding Horsten as a defendant. ECF No. 63. On March 23, 2021, Plaintiffs filed the operative SAC adding Defendants Anna Galindo, Osvaldo Galindo, Raul Orellana, Firestream, and Martha Galindo. [7] ECF No. 112. Plaintiffs allege three causes of action pursuant to the Copyright Act, 17 U.S.C. § 101, *et seq.*: (1) direct copyright infringement against Defendants Alex Galindo, Anna Galindo, Martha Galindo, Osvaldo Galindo, and Horsten; (2) secondary copyright infringement against all Nitro Defendants; and (3) intentional inducement of infringement against all Nitro Defendants. *See* SAC ¶¶ 64–91. Alex Galindo filed an answer on April 13, 2021. ECF No. 126. Despite properly effecting service on each remaining defendant, *see* ECF Nos. 130, 131, 132, 133, 134, 190, the remaining defendants (collectively, the "Defaulted Defendants") failed to appear in this action. [8] Plaintiffs filed Requests for the Clerk to enter default judgment on each remaining defendant. ECF Nos. 140, 141, 142, 143, 148, 191. Each request was granted pursuant to Federal Rule of Civil Procedure 55(a). ECF Nos. 144, 145, 146, 147, 149, 192. Plaintiffs filed the instant Motion for Default Judgment on October 3, 2022. ECF No. 227 ("Motion" or "Mot."). Plaintiffs served the Motion and notice of the Motion hearing on all Nitro Defendants and filed proof of service with the Court. *See* ECF Nos. 229, 235. The Court heard oral argument on November 17, 2022. None of the Nitro Defendants appeared at the hearing.

## MOTION FOR DEFAULT JUDGMENT

**\*4** By their Motion for Default Judgment, Plaintiffs seek default judgment against the Defaulted Defendants and statutory damages in the same amount as sought against Alex Galindo.

### III. Applicable Law

#### A. Motion for Default Judgment

Federal Rule of Civil Procedure 55(b) authorizes a district court to grant default judgment after the Clerk of the Court enters default under Rule 55(a). FED. R. CIV. P. 55(b). Local Rule 55-1 requires the party seeking default judgment to file a declaration establishing: (1) when and against what party the default was entered; (2) the pleading on which default was entered; (3) whether the defaulting

party is an infant or incompetent person, and if so, whether that person is represented by a general guardian, committee, conservator, or other like fiduciary who has appeared; (4) that the Servicemembers Civil Relief Act does not apply; and (5) that the defaulting party was properly served with notice. C.D. Cal. L.R. 55-1.

Once default has been entered, the well-pled factual allegations in the complaint, except those concerning damages, are deemed admitted by the non-responding party.

*See* FED. R. CIV. P. 8(b)(6); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). However, default judgment is not automatic upon the Clerk's entry of default; rather, it is left to the sound discretion of the court.

*Aldabe v. Aldabe*, 616 F.2d 1089, 1092–93 (9th Cir. 1980). When deciding whether to enter default judgment, courts consider seven factors, commonly known as the *Eitel* factors:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

"Well-pleaded allegations" require "sufficient factual matter ... to 'state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It requires "more than a sheer possibility that a defendant has acted unlawfully" but does not require "detailed factual allegations." *Id.* Instead, the plaintiff need only show more than "threadbare recitals of the elements of a cause of action." *Id.* "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 97 of 237
Columbia Pictures Industries, Inc. v. Galindo, Not Reported in Fed. Supp. (2022)
2022 WL 17094713

" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

### B. Personal Jurisdiction

When granting a motion for default judgment pursuant to Federal Rule for Civil Procedure 55, the Ninth Circuit requires that the district court "determine whether it has the power, i.e., the jurisdiction, to enter the judgment in the first place." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). The purpose of this requirement is to prevent the district court from "entering a default judgment that can later be successfully attacked as void." *Id.* As such, the district court must consider whether the defendant is subject to personal jurisdiction in this forum. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004). And though the district court has an obligation to determine whether jurisdiction is proper, *see id.*, it is the *plaintiff's* obligation to establish that the Court has personal jurisdiction over a defendant. *See Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003) (holding that the plaintiff "bears the burden of establishing the district court's personal jurisdiction over the Defendants"); FED. R. CIV. P. 8(a)(1) ("A pleading that states a claim for relief must contain [...] a short and plain statement of the grounds for the court's jurisdiction ....").

### IV. Discussion

### A. The Court has personal jurisdiction over the Nitro Defendants.

 **\*5** "For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least minimum contacts with the relevant forum such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Schwarzenegger*, 374 F.3d at 801 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)). Under the minimum contacts test, jurisdiction can be either general or specific. *Id.*

Courts view copyright infringement as a tort claim and thus apply the "purposeful direction" minimum contacts test. *See Mavrix Photo, Inc. v. Brand Technologies,*

*Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (applying the "purposeful direction" analysis to a copyright infringement claim). Purposeful direction is analyzed under the *Calder* "effects" test, which requires the defendant to have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (citing *Calder v. Jones*, 465 U.S. 783, 789–90 (1984)). The test is composed of three elements: "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix Photo*, 647 F.3d at 1228 (citing *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010), *abrogation recognized by Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017)).

The Court finds that Plaintiffs have satisfied each element of the *Calder* effects test. The first factor—intentional act—is satisfied as copyright infringement is generally considered to be an intentional act. *See, e.g., Mavrix Photo*, 647 F.3d at 1229 (finding that defendant had "committed an intentional act" by "allegedly infringing" on plaintiff's copyright-protected materials.).

Next, the second factor—whether the Nitro Defendants' conduct was "expressly aimed" at California—is satisfied, as Plaintiffs have alleged that the Nitro Defendants marketed Nitro TV subscriptions in California and hosted California-specific programming on the Platform. Specifically, the SAC alleges that the Nitro Defendants "have marketed and sold Nitro TV subscriptions to end users in California as well as TekkHosting Nitro Reseller Credits (which are exchanged for Nitro TV subscriber credentials) to resellers in California [and] do business with California-based companies," and that the alleged copyright infringement "caused harm to Plaintiffs in California." SAC ¶¶ 9–12. The SAC also alleges that the Nitro TV Platforms contain "a collection of [California-specific] broadcast television networks" such as "Los Angeles ABC, CBS, CW, NBC and FOX" affiliates. *Id.* ¶ 50; *see also Mavrix Photo*, 647 F.3d 1230 (finding that defendant expressly aimed its business activity to the forum state because the defendant's website contained advertisements targeting California residents, indicating "that [defendant] kn[ew]—either actively or constructively—about its California user base, and that it exploit[ed] that base for commercial gain").

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 98 of 237
Columbia Pictures Industries, Inc. v. Galindo, Not Reported in Fed. Supp. (2022)
2022 WL 17094713

The third and final element—foreseeability of harm—is also satisfied. The Ninth Circuit has held that "a corporation can suffer [jurisdictionally sufficient] economic harm both where the bad acts occurred and where the corporation has its principal place of business." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002). Plaintiffs argue that "Defendants reasonably expected or should have reasonably expected their acts to cause harm in California because Plaintiffs either maintain headquarters or offices in California, and it is the location of a significant portion of Plaintiffs' production and distribution operations." SAC ¶ 12; *see also id.* ¶¶ 14–21 (listing Plaintiffs' headquarters and principal places of business). As seven of the eight plaintiffs are headquartered and have their principal place of business in California, the Court finds that it was foreseeable that Plaintiffs would have suffered harm in the forum state. *Dole Food Co.*, 303 F.3d at 1114 ("[W]hen a forum in which a plaintiff corporation has its principal place of business is in the same forum toward which defendants expressly aim their acts, the 'effects' test permits that forum to exercise personal jurisdiction.").

**\*6** The remaining plaintiff, Amazon, is described as "incorporated under the laws of the State of Delaware with its principal place of business in Seattle, Washington." SAC ¶ 15. This, however, does not negatively impact a finding of foreseeability of harm. Indeed, in *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, the Ninth Circuit held that "jurisdictionally significant harm" extends to a defendant's actions that "destroy[ ] ... California-based value." 647 F.3d at 1231–32. The plaintiff in *Mavrix Photo* was a Florida corporation with its principal place of business in Miami. *Id.* at 1221. Regardless, the Ninth Circuit found that as the defendant republished photos under plaintiff's exclusive ownership, "it was foreseeable that ... economic loss would be inflicted not only in Florida ... but also in California [as a] substantial part of the photos' value was based on the fact that a significant number of Californians would have bought publications ... in order to see the photos." *Id.* at 1231–32. Similar reasoning applies here. Plaintiffs contend that Amazon "owns or controls the copyrights or exclusive rights in the content that it or its affiliates produce or distribute." SAC ¶ 15. As was found in *Mavrix Photo*, the Court finds that it was foreseeable that Amazon would suffer economic loss in California as "a significant number of Californians would

have bought" Amazon's content but-for the Nitro Defendants' conduct.

Accordingly, the Court finds that it has personal jurisdiction over the Nitro Defendants.

## B. Plaintiffs have satisfied the procedural requirements of Local Rule 55-1.

The Clerk of the Court entered default against the Defaulted Defendants on May 6, 2021, May 14, 2021, and November 15, 2021. ECF Nos. 144 (Entry of Default Against Raul Orellana); 145 (Entry of Default Against Firestream LLC); 146 (Entry of Default Against Anna Galindo); 147 (Entry of Default Against Osvaldo Galindo); 149 (Entry of Default Against Richard Horsten); 192 (Entry of Default Against Martha Galindo). The Defaulted Defendants have not responded to the Complaint or otherwise defended the action. Pursuant to Local Rule 55-1, the Motion states that the Defaulted Defendants are not minors, infants, or otherwise incompetent persons, nor subject to the Servicemembers Civil Relief Act. Mot. at 6. Finally, Plaintiffs served the Defaulted Defendants with a copy of this Motion. Proof of Service, ECF No. 229; Declaration of Julie A. Shepard, ECF No. 227-1 ("Shepard Decl.") ¶ 2. As such, the Court finds Waters has complied with the procedural requirements of Local Rule 55-1.

## C. The *Eitel* factors weigh in favor of granting default judgment.

### i. Plaintiffs would suffer prejudice without a default judgment.

The first *Eitel* factor requires the Court to consider the harm to a plaintiff in the absence of default judgment. *See Eitel*, 782 F.2d at 1471. Plaintiffs argue that by failing to appear in this action, the Defaulted Defendants have likely "left [Plaintiffs] ... without any recourse or any ability to recoup damages absent entry of a default judgment." Mot. at 7. Moreover, given the nature and extent of the evasive conduct previously employed by the Nitro Defendants, *see infra* Section IV.C.ii.2.ii.1, it is likely that without further Court action, the Nitro Defendants may continue the infringing conduct. And while Plaintiffs acknowledge that Alex Galindo has appeared in this action and that they have obtained

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 99 of 237
Columbia Pictures Industries, Inc. v. Galindo, Not Reported in Fed. Supp. (2022)
2022 WL 17094713

terminating sanctions against him, *see* ECF No. 222, it appears that Plaintiffs believe that these sanctions will be insufficient to provide Plaintiffs with adequate relief. *See id.* 7–8. The Defaulted Defendants failed to appear to contest this allegation.

Taking the well-pled factual allegations as true—as this Court must, given that the Clerk has entered default—Plaintiffs will be prejudiced if the Court does not grant default judgment. Accordingly, the Court finds that this factor weighs in favor of granting default judgment.

### ii. The Court finds Plaintiffs' SAC sufficient and the claims alleged therein meritorious. [9]

**\*7** The second and third *Eitel* factors consider the substantive merits and sufficiency of the complaint. *See* *Eitel*, 782 F.2d at 1471. Notwithstanding the entry of default, the Court must still determine whether the facts alleged give rise to a legitimate cause of action because "claims [that] are legally insufficient ... are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992). Plaintiffs maintain that they have sufficiently pleaded the Copyright Act claims set forth in the SAC. Mot. at 8.

To establish a claim for direct copyright infringement, Plaintiffs must establish (1) ownership of a valid copyright of the allegedly infringed materials, and (2) "demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders." 17 U.S.C. § 106." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Upon review of the Motion and the SAC, the Court finds that Plaintiffs have satisfied both requirements.

#### 1. Plaintiffs have sufficiently pleaded evidence of ownership of a valid copyright.

First, Plaintiffs have presented detailed evidence indicating that they own and control all 1,897 Copyrighted Works. To bring a copyright suit, a plaintiff must show that she has registered the works at issue with the U.S. Copyright Office. *See* 17 U.S.C. § 411(a); *Fourth Est. Pub. Benefit Corp. v. WallStreet.com, LLC*, 139 S. Ct. 881, 886 (2019) (citing 17 U.S.C. § 411(a)). "A copyright registration is 'prima facie

evidence of the validity of the copyright and the facts stated in the certificate.' " *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) (quoting 17 U.S.C. § 410(c)).

Plaintiffs have provided a "representative list of titles, along with their [federal] registration numbers, as to which [the Nitro] Defendants have directly and secondarily infringed." SAC ¶ 22; *id.*, Ex. A. Therefore, Plaintiffs are the presumed owners of the Copyrighted Works, and this first element is met.

#### 2. Plaintiffs have sufficiently demonstrated that the Defaulted Defendants violated at least one exclusive right granted to copyright holders.

Plaintiffs proceed under two theories in support of the second element—whether the Defaulted Defendants violated at least one exclusive right granted to copyright holders. *A&M Records, Inc.*, 239 F.3d at 1013. First, that Horsten, in collaboration with Alex Galindo, directly infringed on "Plaintiffs' exclusive rights to publicly perform their works and reproduce their works." Mot. at 9. Second, that all Nitro Defendants are liable under both theories of secondary liability—contributory infringement and inducement. *Id.* at 12. The Court evaluates both theories in turn.

##### i. Plaintiffs have established that Horsten and Galindo directly infringed on Plaintiffs' exclusive rights to publicly perform and reproduce the Works. [10]

Section 106 of the Copyright Act enumerates the specific rights exclusive to copyright owners. Among these rights is the right "to perform the copyrighted work publicly." 17 U.S.C. § 106(4). ("[I]n the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly."). While the law indicates that there are two ways to "perform a work publicly," [11] Plaintiffs proceed under the second definition, that is, "to transmit or otherwise communicate a performance or display of the work ... to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. §

2022 WL 17094713

101. Streaming a copyrighted work over the Internet qualifies as public performance. *See, e.g.,* William F. Patry, PATRY ON COPYRIGHT § 14:2 (Sept. 2022) ("Transmission of a copy of a work stored on a computer server to members of the public is a public display, even if to only one person, because people in different locations can also receive it."); 🚩 *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 445–48 (2014) (finding that a provider that "streams ... programs over the Internet to ... subscribers" qualifies as a public performance under the meaning of the statute).

**\*8** Plaintiffs allege that Horsten and Galindo "continuously transmitted [without Plaintiffs' authorization] Plaintiffs' Copyrighted Works [by] provid[ing] subscribers with access to thousands of live and title-curated television channels —containing countless Copyrighted Works—that were streamed twenty-four hours a day, seven days a week." Mot. at 10; *see also* SAC ¶¶ 2–5, 34. As the law indicates that streaming falls under the purview of public performance, the Court finds that Plaintiffs have sufficiently established that Horsten and Galindo publicly performed the Copyrighted Works without authorization.

Plaintiffs further contend that Horsten and Galindo violated Plaintiffs' "exclusive right to reproduce their Works." Mot. at 10. The Copyright Act reserves the right to "reproduce the copyrighted work in copies" to the holder of the copyright. *See* 🚩 17 U.S.C. § 106; *see also* 2 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 8.02 (2022) ("Nimmer") ("The reproduction right consists of the exclusive right to reproduce the copyrighted work in copies or phonorecords." (quotation marks omitted)). Under the DMCA, a copy is defined as a "material object[ ] ... in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 🚩 17 U.S.C. § 101. To qualify as a copy under the Copyright Act, the "allegedly infringing work must be fixed in some tangible form, from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 🚩 *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1519 (9th Cir. 1992) (quotation marks omitted) (citing 🚩 17 U.S.C. § 101). Plaintiffs highlight two instances of unauthorized reproduction of their Works: (1) Nitro TV's "Catch-Up" feature, which "allowed subscribers to watch television programs from the prior two days," Mot.

at 10; SAC ¶ 51, and (2) Nitro TV's "24/7 channels" which "continuously streamed episodes of a single television series, single movie, or collection of movies at all times of the day and night, seven days a week." *Id.* at 11; SAC ¶¶ 52–53. Both features, Plaintiffs argue, require making copies of or otherwise reproducing the relevant television programs and movies. *See* Mot. at 10–11; SAC ¶¶ 51–53. As previously stated, at no point did Plaintiffs give Horsten or Galindo authorization to reproduce their Copyrighted Works. *See* Section III.C.ii.2.i. Thus, the Court—taking all allegations as true—finds that Plaintiffs have sufficiently pleaded a direct infringement copyright claim against Horsten and Galindo.

### ii. Plaintiffs have sufficiently alleged that the Defaulted Defendants secondarily infringed Plaintiffs' Copyrighted Works.

Plaintiffs next argue that the Defaulted Defendants are liable under two theories of secondary liability: contributory infringement and inducement. Mot at 12. Plaintiffs allege that the Nitro Defendants, through Nitro TV, "provided subscribers with access to thousands of live and title-curated television channels—containing countless Copyrighted Works ...." *Id.* at 10.

#### 1. Plaintiffs have sufficiently alleged contributory infringement.

"[I]n general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement ...." 🚩🅰 *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1175 (9th Cir. 2007). A defendant is a contributory infringer if "it has knowledge of a third party's infringing activity, and (2) induces, causes, or materially contributes to the infringing conduct." *Perfect 10, Inc. v. Visa Intern. Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007) (citing 🚩 *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)). "Liability for contributory copyright infringement attaches if the [defendants] (1) knew of the direct infringement; and (2) they either induced, caused, or materially contributed to the infringing conduct." 🚩 *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (citing 🚩 *A&M Records*, 239 F.3d at 1019). In the context of the Internet, contributory liability occurs "when the defendant engages in personal conduct that

2022 WL 17094713

encourages or assists the infringement." 🚩*Visa Intern. Serv. Ass'n*, 494 F.3d at 795.

**\*9** The Court begins with the first element of "knowledge." Plaintiffs allege that "Defendants knew that Nitro TV was used to infringe Plaintiffs' Copyrighted Works [as] Defendants specifically curated the programming and channels available on Nitro TV, even asking subscribers for feedback on additional shows to include." Mot. at 12 (citing SAC ¶¶ 37–38). The SAC also alleges that the Nitro Defendants "used the Nitro TV Facebook Group as a vehicle to advise ... subscribers how to hide infringing activity," including providing instructions on how to use a VPN. SAC ¶ 39. Plaintiffs further contend that the Nitro Defendants' decision to "anonymize the operation of Nitro TV" after learning of a similar lawsuit against a "similarly-infringing" streaming service implies that the Nitro TV Defendants had knowledge of the infringing activity. Mot. at 12 (citing SAC ¶ 3).

While the Ninth Circuit requires "more than a generalized knowledge ... of the possibility of infringement," there is an inconsistency in this circuit's case law regarding the requisite "knowledge" standard in the context of contributory infringement. *See* 🚩*Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 832 (9th Cir. 2019) (summarizing the inconsistency). In *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, the Ninth Circuit held that "know or have reason to know" is the appropriate "knowledge" standard. 🚩658 F.3d 936, 943 (9th Cir. 2011). Two years later, however, in *Luvdarts, LLC v. AT&T Mobility, LLC*, the Ninth Circuit held that "knowledge" is defined only as "actual knowledge of specific acts of infringement" and "[w]illful blindness of specific facts." 🚩710 F.3d at 1072–73.

Even with this inconsistency in mind, the Court finds that Plaintiffs have satisfied the standard. The instant case is akin to *Columbia Pictures Industries, Inc. v. Fung*, where the Ninth Circuit found that a detailed accounting of the defendant "actively encouraging infringement, by urging his users to both upload and download particular copyrighted works, providing assistance to those seeking to watch copyrighted films, and helping his users burn copyrighted material on to DVDs" was sufficient to meet the first prong of the contributory infringement analysis. 🚩710 F.3d 1020, 1043 (9th Cir. 2013). Here, the SAC provides a detailed summary of the Nitro Defendants "actively encouraging infringement"

by soliciting download suggestions and providing subscribers with guidance on how to best subvert detection while viewing the Works. These facts—taken as true—imply that the Nitro Defendants were aware that Nitro TV contained unlicensed works and took steps to both encourage third-party infringement of the material and aid in the concealment of the infringement itself. Thus, the Court finds that Plaintiffs have satisfied the first element of contributory infringement.

The Court next considers the second element—whether the Nitro Defendants "either induced, caused, or materially contributed to the infringing conduct." 🚩*Luvdarts, LLC*, 710 F.3d at 1072. As stated by Plaintiffs, a "material contribution" may be established where the defendant "substantially assists ... a worldwide audience of users to access infringing materials." 🚩*Perfect 10, Inc.*, 508 F.3d at 1172; Mot. at 13. Plaintiffs lodge two allegations in support of this factor. First, Plaintiffs allege that the Nitro Defendants "have done precisely this by architecting and operating ... Nitro TV [and] by designing and managing the distribution channels that provide access to Nitro TV, all with the goal of growing [Nitro TV's] subscriber base ... to be as large as possible." Mot. at 13; SAC ¶¶ 55–57. Second, Plaintiffs allege that Anna Galindo, Martha Galindo, and Osvaldo Galindo operated and facilitated the payment processor and bank accounts used to sell and process Nitro TV subscriptions and reseller credits and pay Horsten and Orellana for their work operating, promoting, and marketing the Nitro TV Platform. *See* Mot. at 13; SAC ¶¶ 2, 5, 6, 40, 54–58. Evaluating the allegations in the SAC, the Court finds that Plaintiffs have sufficiently shown that the Defaulted Defendants facilitated and were otherwise actively involved in the infringing conduct. Indeed, the SAC indicates that but for the Defaulted Defendants' conduct, subscribers would not have been able to access the Works.

*See* 🚩*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (finding that defendant had materially contributed because "it would be difficult for the infringing activity to take place in the massive quantities alleged without the ... services provided by the [defendant]. These services include, *inter alia*, the provision of space, utilities, parking, advertising, plumbing, and customers.").

**\*10** Upon full review of the SAC's allegations, the Court finds that the Defaulted Defendants can be held contributorily liable for the subscribers' direct infringement of the Works. Indeed, the allegations in the SAC imply that the Defaulted Defendants "could be held contributorily liable if [they] had knowledge that [the infringing Works] were available using

Columbia Pictures Industries, Inc. v. Galindo, Not Reported in Fed. Supp. (2022)

2022 WL 17094713

the [Platform], could take simple measures to prevent further damage to [the Plaintiff's copyrighted works, and failed to take such steps." *Perfect 10, Inc.*, 508 F.3d at 1172. In sum, the Court finds Plaintiffs' contributory infringement claim sufficiently pleaded for the purposes of this Motion.

*2. Plaintiffs have sufficiently pleaded inducement.*

Plaintiffs also allege secondary liability under the theory of inducement. Mot. at 13; SAC ¶¶ 83–88. A plaintiff proceeding under the theory of inducement must establish four elements: "(1) the distribution of a device or product, (2) acts of infringement, (3) an object of promoting its use to infringe copyright, and (4) causation." *Fung*, 710 F.3d at 1032 (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936–37 (2005)). The Court finds that Plaintiffs have satisfied all four elements.

As to the first two elements—"the distribution of a device or product" and "acts of infringement"—as previously established, the Defaulted Defendants directly infringed on the Copyrighted Works by and through streaming the Copyrighted Works through the Platform and by granting subscribers and the reseller network access to the Platform. *See* Mot. at 14. This satisfies the first two elements.

The third element—whether the Defaulted Defendants acted with "an object of promoting its use to infringe copyright"—is also satisfied. This element is premised on a "clear expression or other affirmative steps taken to foster infringement." *Grokster*, 545 U.S. at 937. This element requires a "high degree of proof of the improper object," and the improper object being "plain and ... affirmatively communicated through words or actions." *Fung*, 710 F.3d at 1034 (citing *Grokster*, 545 U.S. at 937). While "[t]he classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations," the Supreme Court has also found sufficient proof of inducement where defendants engaged in communications that, while not directly promoting infringing uses, "provided information affirmatively supporting such uses." *Grokster*, 545 U.S. at 937.

Here, Plaintiffs provide evidence of advertisements and communications "affirmatively supporting" infringement.

The SAC alleges that the Defaulted Defendants, along with Alex Galindo, advertised the Platform through the use of the Hosting Sites, YouTube advertisements, and through the use of resellers. *See* SAC ¶¶ 35, 36, 41, 56, 58, 62. The Defaulted Defendants also "utilized social media, including the Nitro TV Facebook group, to advise subscribers on how to hide their true locations from detection while using Nitro TV," *id.* ¶ 39, and likely "designed to stimulate others to commit [copyright] violations." *Fung*, 710 F.3d at 1036 (citing *Grokster*, 545 U.S. at 937) (alterations in original). This evidence is more than sufficient to satisfy the third element. *See id.*

Finally, the Court finds that the fourth element of causation is clearly met. Causation is established "if [a defendant] provides a service that could be used to infringe copyrights, with the manifested intent that the service actually be used in that manner." *Id.* at 1037. Here, Plaintiffs argue that "Defendants have made clear their unlawful intent that the Nitro TV enterprise be used to facilitate infringement" because the Nitro Defendants took steps to actively "curat[e]" and promote the infringing Works on the Platform and "developed an extensive web of resellers to market Nitro TV and expand its subscriber base." Mot. at 14 (citing SAC ¶¶ 28–29, 35–39, 54). Further, because the Nitro Defendants provided subscribers with tips on how to use a VPN to best view the infringing works on the Platform, *see* SAC ¶ 39, the SAC's allegations indicate that the Nitro Defendants intended for subscribers to use the Platform with the express purpose of viewing the infringing content. Accordingly, the Court finds that the causation element is met.

**\*11** As the allegations in the SAC satisfy all four elements of inducement, the Court finds that Plaintiffs have sufficiently pleaded this claim.

Plaintiffs' claims for both direct and secondary copyright infringement are sufficiently pleaded. As such, the Court finds that these two *Eitel* factors—merits of the claim and sufficiency of the complaint—point towards granting default judgment.

iii. The sum of money at stake is reasonable.

2022 WL 17094713

In evaluating this factor, the Court must balance the amount of money at stake in relation to the seriousness of Defendants' conduct. *See* ⚑ *Eitel*, 782 F.2d at 1471–72.

### 1. Plaintiffs are entitled to the maximum statutory award for willful infringement for a reasonable subset of the infringed Works.

Pursuant to ⚑ 17 U.S.C. § 504, Plaintiffs seek statutory damages in the amount of $51.6 million. *See* Mot. at 16; SAC ¶¶ 70, 80, 89.

Plaintiffs argue that they are entitled to an award of $150,000 on each infringed Work because the Nitro Defendants engaged in willful and egregious conduct, but are seeking this award only on a subset of Works. Supplemental Brief at 18. The Copyright Act provides for an award of enhanced statutory damages upon a finding of willful infringement. Specifically, it provides that "[i]n a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." ⚑ 17 U.S.C. § 504(c) (2). Moreover, "[a] plaintiff may elect statutory damages regardless of the adequacy of the evidence offered as to his actual damages or the amount of the defendant's profits." ⚑ *Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1195 (9th Cir. 2001) (internal quotation marks omitted) (quoting Nimmer § 14.04[A]). "The court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." ⚑ *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984). "In measuring the damages, the court is ... guided by what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like ...." ⚑ *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990) (quoting ⚑ *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 232 (1952)).

The Court, exercising its discretion—finds that Plaintiffs are entitled to the full statutory award amount on each Work in the subset of infringed Works. Specifically, the nature and scope of Alex Galindo and the Defaulted Defendants' conduct indicate that the Nitro Defendants willfully engaged

in egregious Copyright infringement. *See* Mot. at 15–17; Supplemental Brief at 20–22. The Nitro Defendants' conduct and the conduct's impact are wide-ranging. Nitro TV's very existence "creates the impression that [the Nitro Defendants and reseller network] are providing a legitimate, licensed service" which "undermine[s] [and stunts the growth of] the market" for Plaintiffs' "legitimate offerings." Declaration of Sean Jaquez, ECF No. 15 ("Jaquez Decl.") ¶¶ 31–32. Indeed, Plaintiffs' business model, as well as the entertainment industry itself, hinges on copyright owners' ability to control the distribution and use of their copyrighted works. *See id.* ¶¶ 4–11. The Nitro Defendants' infringement compromises this business model by depriving Plaintiffs of their ability to "control the distribution and use of [their] Works"; "threatens [Plaintiffs'] relationships with [their] legitimate licenses and ... digital distribution business"; "encourage[s] the growth of the illicit market for infringing content"; and exposes Plaintiffs to continued risk of piracy. *Id.* ¶¶ 12–38. Moreover, Alex Galindo engaged in spoliation and blocked Plaintiffs from conducting meaningful discovery to determine the full scope of the Nitro Defendants' infringement and Nitro TV-related profits or determine the extent of Plaintiffs' financial loss. *See* R&R at 4–8. The Nitro Defendants should not be rewarded for or given the benefit of the doubt due to their wrongful conduct. Given the extent of the Nitro Defendants' willful conduct, the Court finds an award of the maximum $150,000 per Work reasonable.

### 2. Plaintiffs' requested award of $51.6 million is reasonable.

**\*12** Plaintiffs indicate that the Nitro Defendants infringed upon at least 1,872 Works. *See* SAC, Ex. A; *see also* Declaration of Julie A. Shepard, ECF No. 226-1, Exs. A–G (listing 689 separate Copyrighted Works); Declaration of Kevin Shuai, ECF No. 226-2, Ex. 1 (providing hundreds of copyright registration certificates for Copyrighted Works owned by Paramount Pictures); Declaration of Gary Lim, ECF No. 226-3, Exs. 1–2 (providing hundreds of copyright registrations for Copyrighted Works owned by the Walt Disney Company). An award of $150,000 on each of the 1,872 Works would amount to statutory damages in excess of $280 million. However, rather than request $150,000 per *each* Work, Plaintiffs request that all Nitro Defendants be held jointly and severally liable for statutory damages in the amount of $51.6 million—an amount derived from awarding the statutory maximum on a selection of just 344 Works. [12] Supplemental Brief at 20; *see* Mot. at 16–25. This requested amount is consistent with statutory awards granted by courts

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 104 of 237

Columbia Pictures Industries, Inc. v. Galindo, Not Reported in Fed. Supp. (2022)

2022 WL 17094713

in this district. [13] Thus, given the circumstances of the alleged infringement, the Court finds this request reasonable and awards $51.6 million or $150,000 per work on 344 Works. [14]

### 3. Plaintiffs are entitled to post-judgment interest.

"[P]ost-judgment interest is determined by federal law." *Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988). 28 U.S.C. § 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Post-judgment interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *Id.*

Here, Plaintiffs seek post-judgment interest as provided under 28 U.S.C. § 1961. Mot. at 23. The record provides no countervailing evidence setting post judgment interest at a different amount.

Accordingly, the Court finds that Plaintiffs are entitled to the amount permitted by Section 1961(c).

### i. There is little possibility of dispute.

The fifth *Eitel* factor requires the Court to consider the possibility of dispute about material facts in the case. *See Eitel*, 782 F.2d at 1471–72. This *Eitel* factor generally weighs in favor of default judgment where a complaint is well-pleaded and the defendants make no effort to respond.

The Defaulted Defendants have not responded to this action. And though Alex Galindo did appear in this case, there is no indication from the SAC nor the Motion that there are any facts in dispute. Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages. *TeleVideo Sys., Inc.*, 826 F.2d at 917–18. Considering the low likelihood of disputed facts, the Court finds this factor to weigh in favor of default judgment.

### ii. The Court is unable to conclude whether there is excusable neglect.

**\*13** The sixth *Eitel* factor considers the possibility that the default resulted from excusable neglect. *See Eitel*, 782 F.2d at 1472.

Here, Plaintiffs allege that they have properly served the Defaulted Defendants with the Complaint, summons, and this motion for default judgment. *See supra* Section II.B, Mot. at 18. Absent any further information, the Court is unable to conclude whether the Defaulted Defendants' failure to respond is due to excusable neglect.

### iii. Policy favoring resolution on the merits weighs against granting default judgment.

The Ninth Circuit's "starting point is the general rule that default judgments are ordinarily disfavored. Cases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. Therefore, the policy favoring resolution on the merits weighs against granting default judgment.

Taken as a whole, the Court finds that the *Eitel* factors weigh towards granting default judgment against the Defaulted Defendants.

### V. Remedies

#### A. The Court grants the request for permanent injunction.

Having found in favor of granting default judgment, the Court next considers whether it should award Plaintiffs a permanent injunction against the Defaulted Defendants. The Copyright Act allows courts to grant permanent injunctions "to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Plaintiffs seek a permanent injunction

> enjoining Defendants and their officers, agents, servants, employees, attorneys, and all persons acting in active concert or participation

2022 WL 17094713

with them, from publicly performing, reproducing, distributing or otherwise infringing in any manner (including without limitation by materially contributing to or intentionally inducing the infringement of) any right under copyright in any of the Copyrighted Works, including without limitation by publicly performing or reproducing those Works, or by distributing any software of proving any service or device that does or facilitates any of the foregoing acts.

SAC at Prayer ¶ 1.

Plaintiffs also seek to "impound[ ] hardware in Defendants' possession, custody, or control, and any and all documents or other records in Defendants' possession, custody, or control relating to Defendants' direct and secondary infringement of the Copyrighted Works." *Id.*

A party seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.,* 762 F.3d 867, 879 (9th Cir. 2014) (citations omitted). The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).

The Court finds that Plaintiffs have satisfied all four required elements. First, as previously discussed, Plaintiffs have shown that they are entitled to judgment on their Copyright claims. Indeed, the allegations set forth in the SAC imply that any continuing infringement of Plaintiffs' exclusive rights over their Copyrighted Works will likely cause harm to Plaintiffs' business model, reputation and standing in the marketplace and undermine the value of the Works. *See* Mot. at 23–24. Second, monetary damages will fail to provide Plaintiffs with full compensation for the Nitro Defendants' infringement. Indeed, as Plaintiffs point out, the Nitro Defendants have either failed to appear in this action

or have engaged in spoilation of evidence, making it nearly impossible for Plaintiffs to grasp the full scope of the Nitro Defendants' infringement. *See id.* at 24. It is thus nearly impossible for Plaintiffs to request monetary damages that will provide full compensation for the harm caused. Third, the balance of hardships tips in Plaintiffs' favor. Again, the Court has found Plaintiffs' claims meritorious. There is no evidence that any defendant will suffer any hardship upon entry of a permanent injunction. Instead, the evidence in the SAC and record indicates that the Nitro Defendants will likely attempt to continue their infringing acts or further stonewall Plaintiffs'—or any other harmed party's—attempts to receive adequate relief. *See* Supplemental Brief at 24–25; *see generally* R&R. Finally, as to public interest, the Supreme Court has held that copyright protections give creators the incentive to share their creations with the public. *See Sony Corp. of Am. v. Universal City Studios, Inc.,* 3464 U.S. 417, 429 (1984) (holding, on a motion for an injunction, that the goal of granting copyright protection to an author or artist is to "motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.").

**\*14** Accordingly, the Court concludes that Plaintiffs are entitled to a permanent injunction.

## PLAINTIFFS' MOTION FOR TERMINATING SANCTIONS AND ENTRY OF JUDGMENT

By their Motion for Terminating Sanctions and Entry of Judgment, Plaintiffs seek terminating sanctions against Alex Galindo and statutory damages against Alex Galindo in the same amount as sought against the Defaulted Defendants.

Plaintiffs, in support of their Motion for Terminating Sanctions and Entry of Judgment against Alex Galindo, have provided supplemental briefing in support of their requests for entry of the following relief: (1) "imposition of the maximum statutory damages per each Copyrighted Work infringed"; (2) "an award of $51.6 million in statutory damages"; and (3) requests for entry of a permanent injunction and post-judgment interest. *See* Supplemental Brief at 9–25.

Finally, Plaintiffs also request that the Court award $51.6 million in statutory damages, permanent injunction and post-judgment interest. Supplemental Brief at 18–25. Plaintiffs' arguments as to these requests are similar—if not identical

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 106 of 237

Columbia Pictures Industries, Inc. v. Galindo, Not Reported in Fed. Supp. (2022)

2022 WL 17094713

—to their requests for the same relief as to the Defaulted Defendants. Accordingly, the Court grants the requested awards on the same bases as those previously discussed. *See supra* Motion for Default Judgment, Section IV.C.iii.1–2; *id.* V.A.

## **CONCLUSION**

For the reasons stated herein, the Court hereby GRANTS Plaintiffs' Motion for Default Judgment as to the Defaulted Defendants and GRANTS Plaintiffs' requested entry of judgment as to Alex Galindo. The Court ORDERS as follows:

1) Plaintiffs are entitled to statutory damages in the amount of $51.6 million for which all Nitro Defendants shall be held jointly and severally liable;

2) Plaintiffs are entitled to a permanent injunction;

3) Plaintiffs are entitled to post-judgment interest.

A Judgment order will follow.

IT IS SO ORDERED.

## **All Citations**

Not Reported in Fed. Supp., 2022 WL 17094713

---

## **Footnotes**

1    Unless otherwise stated, the following factual background is derived from the Second Amended Complaint. ECF No. 113 ("SAC").

2    A "stream" is "digital data (such as audio or video material) that is continuously delivered one packet at a time and is usually intended for immediate processing or playback." *Stream*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/stream (last visited Nov. 8, 2022).

3    The SAC describes the "Catch Up" features as follows: "For example, a Nitro TV subscriber using this feature on a Monday would be shown a guide of what aired on Sunday and Saturday, and may select and watch a program that was telecast at a specific time on a specific channel ... during the prior two days." *Id.* ¶ 51.

4    A VPN is a "a private computer network that functions over a public network." VPN, Merriam-Webster, https://www.merriam-webster.com/dictionary/VPN (last accessed Nov. 10, 2022); *see also* United States v. Fisher, No. 217CR00073APGGWF, 2019 WL 3310508, at *3 (D. Nev. Mar. 28, 2019), *report and recommendation adopted as modified*, No. 217CR00073APGGWF, 2019 WL 2419456 (D. Nev. June 10, 2019) ("A person using a VPN to communicate on the internet can obscure his or her true IP address and identity because the communication appears to originate from the VPN's IP address, rather than the user's actual IP address.").

5    A detailed summary of Alex Galindo's discovery violations may be found in the R&R.

6    The Court addresses Plaintiffs' statutory damage supplemental briefing in a separate order.

7    Because Alex, Anna, Martha, and Osvaldo share the same last name, the Court refers to all four defendants by their first and last names.

8    It should be noted that Anna Galindo, prior to being named as a defendant in this case, filed a non-party motion to quash a subpoena for Woodforest National Bank. ECF No. 85. Anna Galindo did not appear in this action upon receipt of the SAC and related summons.

2022 WL 17094713

9   Plaintiffs cite to a number of district court cases to support their arguments. However, the Court reminds Plaintiffs that trial court decisions are not binding on this Court. *See* 🚩 *Hart v. Massanari*, 266 F.3d 1155, 1174 (9th Cir. 2001) ("[T]he binding authority principle applies only to appellate decisions, and not to trial court decisions ....").

10  Although at various points in discussing direct infringement Plaintiffs refer to "the Defendants," the Court understands that Plaintiffs are contending that only Defendants Horsten and Galindo are liable for direct infringement, and the other Nitro Defendants are only secondarily liable—for contributory infringement and inducement.

11  The statute also defines public performance of a work as "to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." 🚩 17 U.S.C. § 101.

12  Plaintiffs base the $51.6 million award amount on applying the maximum statutory award amount on 344 Works. *See* Supplemental Brief at 20; Mot. at 16. It should be noted that the Motion lists 342 Works rather than 344. *See* Mot. at 16. During oral argument, however, Plaintiffs' counsel clarified that 342 is a typographical error.

13  Courts have reduced the requested award amount where defendants have similarly displayed "egregious" behavior when "the number of copyrighted works at issue would amount to an excessively large award." *Warner Bros. Ent't, Inc. v. Tusa*, No. 2:21-cv-05456-VAP-ASx, 2021 WL 6104399, at *7 (C.D. Cal. Oct. 25, 2021). *See also China Cent. Television v. Create New Tech. (HK) Ltd.*, No. 15-01869, 2015 WL 12732432, at *17–18 (C.D. Cal. Dec. 7, 2015) (reducing plaintiffs' requested award amount from $300,900,000 to $30,000,000 where 2,006 infringed works were at issue). 🚩 *C.f. Peer Int'l Corp.*, 909 F.2d at 1337 (awarding the then-maximum award amount of $50,000 per work on only eighty violations); 🚩 *Warner Bros Ent't Inc. v. Caridi*, 346 F. Supp. 2d 1068, 1074 (C.D. Cal. 2004) (awarding the maximum amount of $150,000 per work where only two infringed works were at issue).

14  The $51.6 million award amount may also be arrived at by awarding damages in the amount of $27,200 per work on each of the indicated 1,872 Copyrighted Works, which the Court finds to be reasonable in light of the relevant minimums and maximums and all of the facts of the case.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

2020 WL 7122418
United States District Court, E.D. Pennsylvania.

COMMODITY FUTURES
TRADING COMMISSION, Plaintiff,

v.

Michael J. SALERNO, Black Diamond Forex LP,
BDF Trading LP (d/b/a Advanta FX), and Advanta
Capital Markets, Inc. (d/b/a Advanta FX), Defendants,
and

Black Diamond Investment Group LLC, Advanta Capital
Markets Ltd., f/k/a Black Diamond Capital Ltd., f/
k/a Black Diamond Forex Ltd., Relief Defendants.

Civil Action No. 18-1585
|
Filed 09/23/2020

**Attorneys and Law Firms**

Elizabeth M. Streit, Scott R. Williamson, Commodity Futures
Trading Commission, Chicago, IL, for Plaintiff.

**ORDER AND JUDGMENT BY DEFAULT
AGAINST DEFENDANTS MICHAEL J.
SALERNO, BLACK DIAMOND FOREX LP,
BDF TRADING LP AND ADVANTA CAPITAL
MARKETS, INC. AND RELIEF DEFENDANT
BLACK DIAMOND INVESTMENT GROUP, LLC**

CYNTHIA M. RUFE, J.

  **\*1** Plaintiff Commodity Futures Trading Commission has
filed a Motion for Default Judgment Against Michael J.
Salerno, Black Diamond Forex LP, BDF Trading LP and
Advanta Capital Markets, Inc. and Relief Defendant Black
Diamond Investment Group ("BDIG"). Good cause having
been shown, judgment by default is hereby entered against
Defendants and Relief Defendants pursuant to Local Rule
of Civil Procedure 55.2(b) and Federal Rule of Civil
Procedure 55(b) as set forth below.

### I. BACKGROUND

On April 17, 2018, Plaintiff filed a Complaint seeking
emergency relief against Defendants and Relief Defendants
to halt ongoing fraudulent conduct in connection with

the fraudulent solicitation of members of the public to
become foreign currency ("forex") proprietary traders in
Defendants Black Diamond Forex LP, BDF Trading LP (a/k/
a "Advanta FX"), and Advanta Capital Markets, Inc. (a/k/a
"Advanta FX") (collectively, the "Black Diamond Entities").
The same day, this Court entered a Statutory Restraining
Order ("SRO") freezing Defendants' and Relief Defendants'
assets, prohibiting the destruction of books and records; and
permitting the CFTC access and inspection of Defendants'
records. [1]

Defendant Salerno, individually and on behalf of Black
Diamond Forex LP, BDF Trading LP, and Advanta
Capital Markets, Inc. and Relief Defendant Black Diamond
Investment Group signed waivers of service of summons on
April 25, 2018. [2] Summons was issued to Advanta Capital
Markets Ltd. and was served through Francine DeYoung, who
is the person designated to accept service for Wilfred Services
Ltd., registered agent for Advanta Capital Markets Ltd. on
June 4, 2018. [3] All Defendants and Relief Defendants are
properly served with copies of all of the CFTC's pleadings,
papers and the SRO. All Defendants and Relief Defendants'
answers were due on June 25, 2018, but none answered
the Complaint. The Court held a hearing on May 15, 2018,
on the motion to approve a consent order for a preliminary
injunction, at which Salerno appeared and did not at that time
contest any allegations. [4] Default has been entered against all
Defendants and Relief Defendant. [5]

### II. DEFAULT JUDGMENT IS WARRANTED

Federal Rule of Civil Procedure 55(b)(2) "authorizes a
court to enter default judgment against a properly served
defendant who fails to file a timely responsive pleading." [6]
Before granting a default judgment, the court must "ascertain
whether the unchallenged facts constitute a legitimate cause
of action." [7] After making that determination, courts consider
three factors in assessing whether to grant a default judgment:
(1) whether the plaintiff will be prejudiced if default judgment
is denied; (2) whether the defendants appear to have a litigable
defense; and (3) whether the defendants' delay is due to
culpable conduct. [8]

### A. Legitimate Cause Of Action

2020 WL 7122418, Comm. Fut. L. Rep. P 34,840

**\*2** Substantial documentation has been submitted in support of the Motion for Default Judgment, including the Declaration of Joy McCormack and the exhibits thereto, which demonstrate that, as alleged in the Complaint and assumed to be true for purposes of default judgment, beginning in at least January 2017, Defendant Salerno, individually and as agent and officer of the Black Diamond Entities, fraudulently solicited members of the public to become foreign currency ("forex") traders and accepted funds from them by intentionally or recklessly making false and misleading statements, in websites and in written and oral communications, and failed to disclose material facts, including: (a) telling prospective traders that their deposits, termed "risk capital," would be placed into live forex trading accounts; (b) that Salerno would supplement these risk capital deposits with Black Diamond Entity funds in prospective traders' live trading accounts; (c) touting his successful forex trading career when in fact he has not personally traded forex in the last five years; (d) failing to disclose Salerno's felony conviction in 2005 for failure to file proper forms and pay employment taxes in connection with a real estate investment firm; and (e) failing to disclose Salerno's Chapter 7 bankruptcy filing and discharge in 2015. Additionally, Salerno misappropriated prospective traders' risk capital deposits by using them for purposes other than for forex trading.

Plaintiff has alleged violations of Section 4b(a)(2)(A)-(C) of the Commodity Exchange Act ("the Act"), 7 U.S.C. § 6b(a)(2)(A)-(C) (2012) (Count I) and Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1) and (3)(2017) (Count II). The allegations of the Complaint and the supporting documentation to the Motion for Default Judgment demonstrate that Defendants acted with the requisite scienter and that, with regard to Regulation 5.2(b), the acts or omissions involved the use of the mails or by any means or instrumentality of interstate commerce. [9]

Section 13(b) of the Act provides that any person who, directly or indirectly, controls any person who has violated the Act, or regulations promulgated thereunder, may be held liable for such violations to the same extent as the controlled person. To establish liability as a controlling person pursuant to Section 13(b), plaintiff must show that the person possesses the requisite degree of control and either: (1) knowingly induced, directly or indirectly, the acts constituting the violation; or (2) failed to act in good faith. [10] As Plaintiff has shown that Salerno was principal, officer, managing member, or managing partner of the Black Diamond Entities during the relevant time period and was responsible for the day-to-day operations of each of the Black Diamond Entities. Accordingly, the Black Diamond Entities are liable for Salerno's violations of the Act and Regulations pursuant to Section 2(a)(1)(B) of the Act, and Regulation 1.2.

The Commission may seek a permanent injunction "[w]henever it shall appear to the Commission that any ... person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation or order thereunder." [11] To obtain a permanent injunction, Plaintiff must show that Defendants violated the Act and are reasonably likely to commit future violations. [12] Future violations of the Act or Regulations "may be inferred, or even presumed, from past unlawful conduct, and the absence of proof to the contrary." [13] Plaintiff therefore has shown the likelihood of future violations, particularly as it does not appear that any of the traders have been repaid to date.

### B. *Chamberlain* Factors

The three *Chamberlain* factors weigh in favor of granting the default judgment here. First, Plaintiff will be prejudiced if default judgment is not entered. Defendants were properly served or waived service but failed to answer and have not otherwise contested the claims. Thus, denying the request for default judgment "will prejudice [Plaintiff] because [it] has 'no other means of vindicating [its] claims.' " [14]

**\*3** The second factor—whether Defendants appear to have a meritorious defense—also supports entering default judgment here. Defendants have not asserted any defense in this action, whether by "responding to the Complaint or by responding to this Motion for Judgment After Default," or by otherwise contesting the allegations. [15] As "it is 'not the court's responsibility to research the law and construct the parties' arguments for them,' " [16] there is no basis for determining that Defendants have a defense to offer.

Finally, Defendants' culpable conduct caused the default. " 'Culpable conduct' refers to actions that are 'taken willfully or in bad faith.' " [17] A defendant's "failure or refusal to 'engage[ ] in the litigation process and [to] offer[ ] no reason for this failure or refusal' " can be considered

culpable conduct. [18] The Court is unable to "find [any] excuse or justification for default, apart from Defendant's own culpability." [19] Accordingly, the Court hereby enters default judgment against Defendants and Relief Defendant Black Diamond Investment Group pursuant to 🏴 Federal Rule of Civil Procedure 55(b) and orders the relief set forth below.

### III. RELIEF GRANTED

#### A. Permanent Injunction and Trading Bans

1. Pursuant to Section 6c of the Act, 🏴 7 U.S.C. § 13a-1 (2012), Defendants are permanently restrained, enjoined and prohibited from directly or indirectly engaging in conduct in violation of Section 4b(a)(2)(A)-(C) of the Act, 🏴 7 U.S.C. § 6b(a)(2)(A)-(C) and Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1) and (3).

2. Defendants are also permanently restrained, enjoined and prohibited from directly or indirectly:

(a) trading on or subject to the rules of any registered entity (as that term is defined in Section la(40) of the Act, 7 U.S.C. § la(40));

(b) entering into any transaction involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy)) for their own personal account or for any account in which they have a direct or indirect interest;

(c) having any commodity interests traded on their behalf;

(d) controlling or directing trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(e) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(f) acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission, except as provided for in Regulation 4.14(a) (9), 17 C.F.R. § 4.14(a)(9); and

(g) engaging in any business activities related to commodity interests.

#### B. Restitution

3. Defendants shall pay jointly and severally restitution in the amount of $298,103.31, plus a total of $37,046.22 in prejudgment interest. ("Restitution Obligation"). If the Restitution Obligation is not paid immediately, post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

**\*4** 4. To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' prospective traders, the Court appoints NFA as Monitor ("Monitor"). The Monitor shall receive restitution payments from Defendants and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

5. Defendants shall make Restitution Obligation payments, and any post-judgement interest payments, under this Order to the Monitor in the name of "Michael Salerno/Black Diamond Restitution Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, under cover letter that identifies the paying Defendant(s) and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, DC 20581.

6. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' prospective traders/customers identified by the Commission or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible prospective traders is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part D below.

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 112 of 237
Commodity Futures Trading Commission v. Salerno, Not Reported in Fed. Supp. (2020)
2020 WL 7122418, Comm. Fut. L. Rep. P 34,840

7. Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' prospective traders/customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendants shall execute any documents necessary to release funds that they hold in any repository, bank, investment, or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

8. The Monitor shall provide the CFTC at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' prospective traders/customers during the previous year. The Monitor shall transmit this report accompanied by a cover letter identifying the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, DC 20581.

9. The amounts payable to each prospective trader/customer shall not limit the ability of any prospective trader/customer from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any prospective trader/customer that exist under state or common law.

**\*5** 10. Pursuant to Federal Rule of Civil Procedure 71, each prospective trader/customer of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the Restitution Obligation that has not been paid by Defendants, to ensure continued compliance with any provision of this Order, and to hold Defendants in contempt for any violations of any provision of this Order.

11. To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

### C. Disgorgement

12. Relief Defendant Black Diamond Investment Group shall pay disgorgement of $1,312, plus $176 in prejudgment

interest, representing the gains illegally obtained to which it is not entitled. [20]

13. To effect payment of the disgorgement obligations of Relief Defendant Black Diamond Investment Group and the distribution of any disgorgement payments to Defendants' customers, the Court appoints NFA as Monitor. The Monitor shall receive disgorgement payments from Black Diamond Investment Group and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

14. Relief Defendant Black Diamond Group shall make its disgorgement payments, and any post-judgment interest payments, under this Order to the Monitor in the name "The Black Diamond Investment Group Disgorgement Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Relief Defendant and the name and docket number of this proceeding. The Relief Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

15. The Monitor shall oversee the disgorgement obligations and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' customers identified by the Commission or may defer distribution until such time as the Monitor deems appropriate. To the extent Defendants' customers receive restitution from Defendants or are otherwise compensated for their losses, the disgorgement obligation of the Relief Defendant will be respectively reduced. In the event that the amount of disgorgement payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such disgorgement payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part D below.

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 113 of 237

Commodity Futures Trading Commission v. Salerno, Not Reported in Fed. Supp. (2020)
2020 WL 7122418, Comm. Fut. L. Rep. P 34,840

16. Relief Defendant shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any disgorgement payments. Relief Defendant shall execute any documents necessary to release funds that it has in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment towards its disgorgement obligation.

### D. Civil Monetary Penalty

 **\*6**  17. Defendants are ordered to pay, on a joint and several basis, a civil monetary penalty in the amount of $894,000, plus post-judgment interest thereon ("CMP Obligation"). If the CMP Obligation is not paid in full within thirty days of the date of entry of this Order, then post-judgment interest shall accrue beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

18. Defendants shall pay their CMP Obligation and any post-judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then payment shall be made payable to the Commodity Futures Trading Commission and sent to:

> MMAC/ESC/AMK326
> Commodity Futures Trading
> Commission Division of Enforcement
> 6500 S. MacArthur
> Blvd. HQ Room 181
> Oklahoma City, OK 73169
> (405) 954-6569
> office (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Marie Thorne or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies

of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, DC 20581.

### E. Asset Freeze is Lifted

19. Pursuant to the SRO entered by the Court on April 17, 2019, Plaintiff *froze de minimis* amounts of money in accounts for Advanta Capital Markets, Inc. at SunTrust Bank, for BDF Trading, LP at Wells Fargo, and for Salerno at Sun Federal Bank. As these *de minimis* amounts are too small to distribute to 224 customers, the freeze on those accounts is hereby lifted.

### F. Miscellaneous Provisions

20. Partial Satisfaction: Acceptance by the CFTC or the Monitor of any partial payment of the Restitution Obligation, the disgorgement obligations or the CMP Obligation shall not be deemed a waiver of Defendants' or Relief Defendant Black Diamond Investment Group's obligation to make further payments pursuant to this Order, or a waiver of the CFTC's right to seek to compel payment of any remaining balance.

21. Notice: All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

> Notice to Commission:
>
> Scott R. Williamson, Acting Deputy Director
> 525 West Monroe, Suite 1100
> Chicago, IL. 60661
>
> Notice to Defendants:
>
> Michael J. Salerno
> 205 Country View Lane
> Northampton, PA 18067
>
> Notice to NFA:
>
> Daniel Driscoll, Executive Vice President,
> COO National Futures Association
> 300 S. Riverside Plaza, Suite 1800
> Chicago, IL 60606-3447

22. Change of Address/Phone: Until such time as Defendants and Relief Defendant Black Diamond Investment Group satisfy in full their Restitution Obligation, Disgorgement Obligation, and CMP Obligation as set forth in this Order,

Case 1:25-cv-00388-JPW Document 23 Filed 10/10/25 Page 114 of 237

Commodity Futures Trading Commission v. Salerno, Not Reported in Fed. Supp. (2020)

2020 WL 7122418, Comm. Fut. L. Rep. P 34,840

Defendants and Relief Defendant shall provide written notice to the Commission by certified mail of any change to the telephone number and mailing address within ten calendar days of the change.

23. Invalidation: If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

**\*7** 24. Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon Defendants, Relief Defendant Black Diamond Investment Group, upon any person under their authority or control, and upon any person who receives actual notice of this Order, by personal service, email, facsimile or otherwise insofar as they are acting in active concert or participation with Defendants or Relief Defendant.

25. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action,

including any motion by Defendants or Relief Defendant Black Diamond Investment Group to modify, or for relief from, the terms of this Order.

**AND NOW**, this 23rd day of September 2020, it is hereby **ORDERED** that Plaintiff's Motion for Default Judgment [Doc. No. 26] is **GRANTED** and Default Judgment is entered against Defendants Michael J. Salerno, Black Diamond Forex LP, BDF Trading LP, and Advanta Capital Markets, Inc. and Relief Defendant Black Diamond Investment Group as set forth above.

It is further **ORDERED** that the Clerk is directed to **CLOSE** the case.

It is so **ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7122418, Comm. Fut. L. Rep. P 34,840

---

## Footnotes

1    Doc. No. 5.

2    Doc. No. 8.

3    Doc. No. 16.

4    Doc. No. 15 (minute sheet).

5    Doc. No. 20.

6    *Travelers Cas. & Surety Co. of Am. v. Perlman*, 351 F. Supp. 3d 930, 932 (E.D. Pa. 2019) (citing *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 177 n.9 (3d Cir. 1990)).

7    *Phoenix Ins. Co. v. Small*, 307 F.R.D. 426, 433 (E.D. Pa. 2015) (citing *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 535–36 (D.N.J. 2008)).

8    *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000) (citing *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984)).

Case 1:25-cv-00388-JPW Document 23 Filed 10/10/25 Page 115 of 237
Commodity Futures Trading Commission v. Salerno, Not Reported in Fed. Supp. (2020)
2020 WL 7122418, Comm. Fut. L. Rep. P 34,840

9   *See* McCormack Decl. [Doc. No. 27-2] at ¶¶ 61, 67,75, 104 (Salerno and the Black Diamond Entities operated across the United States, and Salerno emailed written communications containing fraudulent misrepresentations to prospective traders and Black Diamond Entities personnel).

10  *CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150,160-61 (3d Cir. 2009)(defendants continued operating a commodity pool without registering, despite knowing that it was in violation of CFTC registration requirements).

11  7 U.S.C. § 13a-1(a).

12  *CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d Cir. 1986).

13  *CFTC v. Am. Metals Exch. Corp.*, 693 F. Supp. 168, 171 (D.N.J. 1988) (citing *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).

14  *Harty v. Azad Holdings LLC*, No. 14-6566, 2016 WL 4045338, at *3 (E.D. Pa. July 27, 2016) (quoting *Sowell v. RAV Investigatie & Security Servs., Ltd.*, No. 15-3657, 2016 WL 3014881, at *3 (E.D. Pa. May 26, 2016)).

15  *Id.* at *4.

16  *Travelers*, 351 F. Supp. 3d at 933 (quoting *Joe Hand*, 3 F. Supp. 3d at 271–72).

17  *Innovative Office Prods., Inc. v. Amazon.com, Inc.*, No. 10-4487, 2012 WL 1466512, at *3 (E.D. Pa. Apr. 26, 2012) (quoting *Chamberlain*, 210 F.3d at 164).

18  *Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 272 (E.D. Pa. 2014) (quoting *E. Elec. Corp. of N.J. v. Shoemaker Constr. Co.*, 657 F. Supp. 2d 545, 554 (E.D. Pa. 2009)).

19  *Einhorn v. Klayman Produce Co., Inc.*, No. 13-1720, 2013 WL 6632521, at *4 (E.D. Pa. Dec. 17, 2013).

20  McCormack Decl. [Doc. No. 27-2] at ¶¶ 38-43.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT I

DISH Network, L.L.C. v. Dima Furniture Inc., Not Reported in Fed. Supp. (2019)

2019 WL 2498224

KeyCite Yellow Flag

Distinguished by *Verizon Trademark Services LLC v. Verizon Trademark Services LLC,* D.D.C., January 4, 2024

2019 WL 2498224
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

DISH NETWORK, L.L.C., Plaintiff,

v.

DIMA FURNITURE INC., et al., Defendants.

Civil No. TDC-17-3817
|
Signed 06/17/2019

**Attorneys and Law Firms**

Joseph H. Boyle, Pro Hac Vice, Stephen M. Ferguson, Pro Hac Vice, Hagan Noll and Boyle LLC, Houston, TX, Bradshaw Rost, Tenenbaum and Saas PC, Chevy Chase, MD, for Plaintiff.

**REPORT AND RECOMMENDATION**

Timothy J. Sullivan, United States Magistrate Judge

**\*1** This Report and Recommendation addresses the Motion for Default Judgment ("Motion") (ECF No. 35No. 35) filed by Plaintiff DISH Network L.L.C. ("DISH") against Defendant Tareq Hasweh ("Hasweh"). Hasweh has not filed a response and the time for doing so has passed. *See* Loc. R. 105.2(a). On March 21, 2019, in accordance with 28 U.S.C. § 636 and pursuant to Local Rule 301.6, Judge Chuang referred this case to me for a report and recommendation on DISH's Motion. (ECF No. 38No. 38.) I find that a hearing is unnecessary in this case. *See* Fed. R. Civ. P. 55(b)(2); Loc. R. 105.6. For the reasons set forth below, I respectfully recommend that the DISH's Motion be granted.

**I. FACTUAL AND PROCEDURAL HISTORY**

In DISH's First Amended Complaint (ECF No. 17No. 17), it sued Defendants Dima Furniture, Inc. ("Dima"), Mohammad Yusif ("Yusif"), and Hasweh, individually and collectively doing business as Spider-TV (collectively, the "Defendants"). In Count I, DISH brought a claim for Direct Copyright

Infringement, in violation of 17 U.S.C. § 501, against Hasweh. In Count II, DISH brought a claim for Contributory Copyright Infringement, in violation of 17 U.S.C. § 501, against Dima and Yusif. On May 23, 2018, based upon the joint stipulation of DISH, Dima, and Yusif, the Court entered a Final Judgment and Permanent Injunction awarding judgment to DISH on Count II of its First Amended Complaint against Dima and Yusif. (ECF No. 23No. 23.) Because of the Final Judgment and Permanent Injunction, DISH's only remaining claim in this case is the claim that it asserted against Hasweh.

Hasweh was personally served with the First Amended Complaint and summons (*see* ECF No. 28No. 28), but he did not file an answer or responsive pleading within the requisite time period.[1] On October 2, 2018, DISH moved for the Clerk's entry of default (ECF No. 31No. 31), and the Clerk entered default against Hasweh on October 10, 2018 (ECF No. 32No. 32.) Thereafter, DISH sought leave of Court to file a motion for default judgment against Hasweh, as required by the Case Management Order. (ECF No. 33No. 33.) The Court granted DISH leave to file its proposed motion (ECF No. 34No. 34), and on November 6, 2018, DISH filed the Motion. Hasweh has not responded.

**II. LEGAL ANALYSIS**

**A. Standard for Entry of Default Judgment**

**\*2** In determining whether to award a default judgment, the Court accepts as true the well-pleaded factual allegations in the complaint as to liability. *See Ryan v. Homecomings Fin. Network,* 253 F.3d 778, 780-81 (4th Cir. 2001); *United States ex rel. Durrett-Sheppard Steel Co. v. SEF Stainless Steel, Inc.,* No. RDB-11-2410, 2012 WL 2446151, at \*1 (D. Md. June 26, 2012). Nonetheless, the Court must consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law. *Ryan,* 253 F.3d at 780. Although the Fourth Circuit has a "strong policy that cases be decided on the merits," *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 453 (4th Cir. 1993), default judgment "is appropriate when the adversary process has been halted because of an essentially unresponsive party." *S.E.C. v. Lawbaugh,* 359 F. Supp. 2d 418, 421 (D. Md. 2005). If the Court determines that liability is established, the Court must then determine the appropriate amount of damages. *CGI Finance, Inc., v. Johnson,* No. ELH-12-1985, 2013 WL 1192353, at \*1 (D.

DISH Network, L.L.C. v. Dima Furniture Inc., Not Reported in Fed. Supp. (2019)

2019 WL 2498224

Md. March 21, 2013). The Court does not accept factual allegations regarding damages as true, but rather must make an independent determination regarding such allegations. *Durrett-Sheppard Steel Co.*, 2012 WL 2446151 at *1.

If, after entry of default, the plaintiff's complaint does not specify a "sum certain" amount of damages, the Court may enter a default judgment against the defendant pursuant to 🚩 Fed. R. Civ. P. 55(b)(2). A plaintiff's assertion of a sum in a complaint does not make the sum "certain" unless the plaintiff claims liquidated damages; otherwise, the complaint must be supported by affidavit or documentary evidence. *United States v. Redden*, No. WDQ-09-2688, 2010 WL 2651607, at *2 (D. Md. June 30, 2012). 🚩 Rule 55(b)(2) provides that "the court may conduct hearings or make referrals ... when, to enter or effectuate judgment, it needs to ... determine the amount of damages." The Court is not required to conduct an evidentiary hearing to determine damages, however; it may rely instead on affidavits or documentary evidence in the record to determine the appropriate sum. *See, e.g.*, 🚩 *Mongue v. Portofino Ristorante*, 751 F. Supp. 2d 789, 795 (D. Md. 2010).

### B. Liability

"To establish copyright infringement liability, a plaintiff must prove two elements: (1) ownership of the copyright; and (2) copying of original constituent elements by the defendant." *Malibu Media, LLC v. Redacted*, No. DKC-15-0750, 2016 WL 3668034, at *2 (D. Md. July 11, 2016) (citing 🚩 17 U.S.C. § 501(a) and *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). "[T]he Copyright Act does not require that the infringer know that he is infringing or that his conduct amount to a willful violation of the copyright owner's rights." 🚩 *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (noting that while copyright infringement is a strict liability tort, "it nonetheless requires conduct by a person who causes in some meaningful way an infringement").

The following facts are taken from the First Amended Complaint (ECF No. 17 No. 17) and DISH's Memorandum in support of its Motion (ECF No. 35-1 No. 35-1). DISH alleges that it is the "fourth largest pay-television provider in the United States." (ECF No. 17 ¶ 11 No. 17 ¶ 11.) It delivers copyrighted programming to its subscribers throughout the United States "by means of satellite delivery

and over-the-top ("OTT") services whereby programming is delivered using a public Internet infrastructure." (*Id.*) DISH contracts for and purchases rights for the international channels that it distributes from networks and their agents, including MBC FZ LLC, International Media Distribution (Luxembourg) S.A.R.L., World Span Media Consulting, Inc., Peninsula Production Company, and Dream Media (collectively, the "Networks"). (*Id.* ¶ 12.) Among other channels, DISH distributes Arabic-language channels owned by the Networks, including Al Arabiya, Al Hayah 1, Al Jazeera Arabic News, Al Jazeera Mubasher, Al Nahar, Al Nahar Drama, Al Nahar Sport, ART Cinema, Dream 2, Future TV, Hekayat, Iqraa, LBC, LDC, MBC1, MBC Drama, MBC Kids (a/k/a MBC3), MBC Masr, Murr TV (a/k/a MTV Lebanon), NBN, New TV (a/k/a Al Jadeed), Noursat, ONTV, and OTV (collectively, the "Protected Channels"). (*Id.*) The Networks own the copyrights for the works that air on their respective channels. (*Id.*)

**\*3** DISH entered into contracts with the Networks for "the exclusive right to distribute and publicly perform the works that air on the Protected Channels in the United States by means including satellite, OTT, Internet protocol television ('IPTV'), and Internet." (*Id.* ¶ 13.) In addition to the unregistered copyrighted works that aired on the Protected Channels during the relevant times, at least eight works that aired on the Protected Channels are registered with the United States Copyright Office. (*Id.*)

During all relevant times, Defendants owned and operated a streaming television service called Spider-TV (the "Service"). (*Id.* ¶ 14.) Hasweh established the Service and continues to own and control it, as well as the computer servers that retransmit the Protected Channels, and the Service's website. (*Id.* ¶ 15.) Hasweh arranged for set-top boxes for the Service to be shipped to the United States and sought out vendors to distribute the set-top boxes for him within the United States. (*Id.*) Yusif, the founder of Dima, advertised, sold, and distributed set-top boxes and service plans for the Service in the United States. (*Id.* ¶ 16.) Yusif registered "Spider-TV" as a trade name of Dima with Maryland's Department of Assessments and Taxation Charter Division on July 8, 2015.

Defendants use the Service to unlawfully retransmit DISH's Protected Channels to customers of Spider-TV in the United States. To do so, Hasweh captures live broadcast signals of the Protected Channels and transmits the Protected Channels to Spider-TV users in the United States through OTT delivery.

2019 WL 2498224

(*Id.* ¶ 18.) Hasweh has advertised his service on Facebook and on the official website for the Service, located at www.spider-tv.com. (*Id.* ¶¶ 19-21.) Users of the Service may view the Protected Channels by purchasing a set-top box on the Service's website for $ 199, which includes 13 months of access to the Service. (*Id.* ¶ 23.) Defendants also sell service plan extensions. (*Id.* ¶ 24.)

Defendants have actual knowledge that their retransmission of the Protected Channels through the Service infringes the copyrights that DISH acquired through its contracts with the Networks. (*Id.* ¶ 27.) DISH and the Networks sent at least 32 notices of infringement to the Defendants in 2017, demanding that the Defendants cease the retransmission of the Protected Channels. (*Id.* ¶ 27.) Defendants did not respond to the notices of infringement or cease violating DISH's copyrights as requested. (*Id.*) DISH also sent at least 33 notices of infringement to the Internet service providers associated with the service in 2017. (*Id.* ¶ 28.) At least some of the notices were forwarded to the Defendants. (*Id.*) Rather than complying with DISH's requests, the Defendants interfered with the efforts of the Internet service providers to remove the unauthorized content by transmitting the Protected Channels from different locations. (*Id.*)

### 1. Ownership of Valid Copyright

The works shown on the Protected Cannels were authored and first published in the United Arab Emirates, Qatar, Egypt, and Lebanon, which are all parties to copyright treaties with the United States.[2] (*Id.* ¶ 31.) These works are therefore subject to the protections afforded by the Copyright Act pursuant to 17 U.S.C. 104(b)(2).[3] By its agreements with the Networks, DISH held the exclusive right to distribute and publicly perform the works shown on the Protected Channels at all relevant times. *See* 17 U.S.C. §§ 201(d), 204(a) (authorizing transfer of rights protected under the Copyright Act by signed, written agreement). As the exclusive licensee, DISH is permitted to sue for Hasweh's infringement of its rights under the Copyright Act. *See* 17 U.S.C. § 501(b) ("The legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it."). Accepting the allegations in DISH's First Amended Complaint as true, DISH has established that it held the exclusive right to distribute and publicly perform the works shown on the Protected Channels in the United States at all

relevant times, and that it therefore holds the copyrights in the protected works.

### 2. Infringement

**\*4** Hasweh violated DISH's exclusive rights under 17 U.S.C. § 106 by distributing and performing the copyrighted programs that air on the Protected Channels in the United States through use of the Service. (ECF No. 17 ¶ 32; No. 17 ¶ 32.) DISH has not authorized Hasweh to distribute or publicly perform the protected works. (*Id.*) Hasweh's distribution and performance of the copyrighted programs render him a direct infringer of DISH's copyrights pursuant to 17 U.S.C. 501 ("Anyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright or right of the author."). Accepting the allegations in DISH's First Amended Complaint as true, DISH has established that Hasweh infringed its copyrights in works airing on the Protected Channels.

DISH has established that it owned valid copyrights and that Hasweh directly infringed on these copyrights by distributing the Protected Works without authorization. DISH has therefore established Hasweh's liability for direct copyright infringement under Count I of its First Amended Complaint.

### C. Damages

Having determined that DISH has established Hasweh's liability, it is now appropriate to determine the damages to which DISH is entitled. The damages that DISH seeks in its Motion are appropriate under Rule 54(c) so long as "the record supports the damages requested." *See Laborers' Dist. Council Pension v. E.G.S., Inc.*, No. WDQ-09-3174, 2010 WL 1568595, at *3 (D. Md. Apr. 16, 2010). Here, DISH has provided sufficient evidence to support its claim for damages in the amount of $ 1,200,000.

Under the Copyright Act, a copyright owner may recover two types of damages from an infringer: "(1) the copyright owner's actual damages and any additional profits of the infringer ...; or (2) statutory damages." 17 U.S.C. § 504(a). In this case, DISH has elected to seek statutory damages for the eight registered, copyrighted works described in the First Amended Complaint ("Registered Works") (*see* ECF Nos. 17 ¶ 12-3; 35-2 at 5-6, 259-76).[4] Because the eight works

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 120 of 237

DISH Network, L.L.C. v. Dima Furniture Inc., Not Reported in Fed. Supp. (2019)

2019 WL 2498224

were registered within three months of their first publication, the registrations are timely under 17 U.S.C. § 412(2), and statutory damages are available to DISH.

Accepting the allegations of the First Amended Complaint as true, Hasweh is deemed to have infringed DISH's copyrights in the Registered Works by his default. Nonetheless, DISH presents additional evidence of Hasweh's infringement of its copyrights in the Registered Works. (*See* ECF No. 35-1 at 9-10No. 35-1 at 9-10.) In support of its Motion, DISH submitted the Declaration of Gregory Duval (ECF No. 35-2 at 405-10No. 35-2 at 405-10). Mr. Duval is the Chief Operating Officer of NagraStar, LLC ("Nagra"). (*Id.* ¶ 1.) DISH hired Nagra to analyze whether the Protected Channels were aired on the Spider-TV Service. (*Id.*) Nagra began monitoring the Spider-TV Service on January 19, 2017, and continues to monitor the Service. (*Id.*) Nagra purchased set-top boxes required to use the Spider-TV Service and used an Internet Protocol address associated with the United States to access and monitor the Spider-TV Service. (*Id.* ¶ 4.) A summary of Nagra's monitoring results is included in Mr. Duval's declaration. The summary indicates that the Protected Channels were observed to have been routinely broadcast on Spider-TV by Nagra. (*Id.* ¶ 5.) In addition, a comparison of the dates of publication of the Registered Works with the dates that the Protected Channels were observed by Nagra on the Spider-TV Service indicates that Hasweh transmitted the Registered Works on the Service. [5] Based on Hasweh's failure to respond to the allegations in the First Amended Complaint, as well as DISH's evidence that Hasweh transmitted the Registered Works on the Service, the Court finds that DISH is entitled to statutory damages for Hasweh's infringement of DISH's copyrights in the Registered Works.

 **\*5** Under the Copyright Act, a copyright owner may recover an award of statutory damages between $ 750 and $ 30,000 for all infringements related to each work. 17 U.S.C. § 504(c)(1). If the copyright owner proves that the infringement was committed willfully, a court has discretion to "increase the award of statutory damages to a sum of not more than $ 150,000." *Id.* § 504(c)(2). The Court may conclude that infringement was willful from evidence indicating a defendant received notice that a work was protected. *See Superior Form Builders. Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496 (4th Cir. 1996); *see also Lyons P'Ship v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001). Courts consider several

factors in calculating a statutory award for willful copyright infringement, including:

> (1) the defendant's history of copyright infringement; (2) deterrence against future violations of copyright infringement; (3) the defendant's purpose and intent; and (4) the attitude and conduct of the parties.

*Spanski Enterprises, Inc. v. Telewizja Polska S.A.*, No. 12-CV-957 (TSC), 2017 WL 598465, at \*1 (D.D.C. Feb. 14, 2017) (internal citations omitted), *aff'd*, 883 F.3d 904 (D.C. Cir. 2018). *See also Superior Form Builders*, 74 F.3d at 496-98 (upholding a jury's award of maximum statutory damages for willful infringement under the Copyright Act where the infringer had been sued multiple times for copyright infringement and had become the largest supplier in his industry by engaging in a "course of business" of copyright infringement). Courts have wide discretion in determining the appropriate statutory damages award. *See Lyons P'ship, L.P.*, 243 F.3d at 799 ("While we review for clear error any factual finding that would determine the appropriate level of statutory damages, we would review an award of those damages within the statutory range for abuse of discretion.").

DISH seeks statutory damages of $ 150,000 for each of the eight Registered Works that were infringed. (ECF No. 35-1 at 11No. 35-1 at 11.) In support of its argument that Hasweh's infringement was willful, DISH notes that Hasweh "was provided 32 notices demanding that he cease transmitting the Protected Channels" during 2017. (*Id.*) In addition, when Internet service providers associated with the Service were served with an additional 45 notices and removed the Protected Channels from the Service, Hasweh transmitted the Protected Channels from different locations. This allowed him to continue his infringement of DISH's copyrights. Finally, Hasweh continued transmitting the Protected Channels even after he was served with the complaint in this case. DISH also states that Hasweh continues to transmit the Protected Channels up to the time that its Motion was filed.

In addition to the willfulness of Hasweh's infringement, DISH points to other factors in support of its request for the

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 121 of 237

DISH Network, L.L.C. v. Dima Furniture Inc., Not Reported in Fed. Supp. (2019)

2019 WL 2498224

maximum statutory damages award. (ECF No. 35-1 at 12 No. 35-1 at 12.) DISH argues that because Hasweh's Service has distributed the Protected Channels on a "24 hour per day, 7 day per week basis," for nearly two years as of the time that DISH's Motion was filed, it is likely that the Service is "highly profitable." *Id.* This is especially so, DISH argues, because Hasweh does not pay licensing fees. DISH also notes that Hasweh's infringement caused it to "suffer lost subscription revenues, lost market share, and price erosion." (*Id.*) Each consumer who purchases access to the Protected Channels from the Service rather than DISH contributes to a depletion of DISH's revenues.

DISH acknowledges the difficulty in quantifying the profits that the Service has wrongfully generated and the profits that DISH has lost out on. At the same time, it argues that Hasweh "should not be rewarded for his failure to defend this case, which is effectively precluding any attempt at calculating actual damages and profits." (*Id.* at 13.) DISH cites to numerous cases in which other courts have found the maximum statutory damages award to be appropriate under similar circumstances. (*Id.* at 13-14.)

**\*6** I find that DISH is entitled to the maximum statutory damages award, which amounts to a total of $ 1,200,000 ($ 150,000 for each of the eight Registered Works). Several factors weigh in favor of awarding the maximum statutory damages to DISH. First, Hasweh was notified on dozens of occasions that his Service was infringing upon DISH's copyrights. Yet he continued his infringing conduct, and even took steps to obstruct the efforts of his Internet service providers from limiting his ability to continue to unlawfully distribute the Registered Works on the Protected Channels. Second, Hasweh personally profited from his infringement. Users of his Service were required to pay a fee, and the Court presumes that at least some of the collected fees went to Hasweh. The business model of Hasweh's Service depends on copyright infringement, and any profits that the Service has generated are owed to infringing activity. Third, although DISH only seeks statutory damages for the eight Registered Works, Hasweh's infringing conduct extends far beyond the scope of these works. (*See* ECF No. 35-2 at 409 No. 35-2 at 409 (noting that Nagra "identified at least 515 separate instances of the Protected Channels being transmitted on the Spider-TV service between January 2017 and October 2018").) Fourth, there is a need for deterrence against future potential copyright infringers. DISH's Motion mentions numerous instances where its copyrights have been infringed under similar circumstances.

Because of the ability of copyright infringers to profit from their conduct, a damages award far exceeding any potential profit is necessary to deter them from engaging in such conduct. [6] *See MTI Enterprises Inc. v. Theaterpalooza Cmty. Theater Prods., Inc.*, No. 18-650, 2018 WL 6928927, at *5 (E.D. Va. Dec. 7, 2018) (imposing maximum statutory damages for the willful infringement of copyrights where defendant continued to infringe plaintiffs' copyrighted works even after receiving notices of infringement), *report and recommendation adopted*, No. 18-650, 2019 WL 99267 (E.D. Va. Jan. 3, 2019); *Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 511-12 (E.D. Va. 2003) (awarding maximum statutory damages because "[s]tatutory damages are intended not merely for the restitution of profit or reparation of injury, but to deter wrongful conduct"); *Gmbh v. Ilnitskiy*, No. 17-415, 2018 WL 1882823, at *7 (E.D. Va. Jan. 25, 2018) (noting that a "maximum statutory damages award best serves the goal to both repair Plaintiff's injury, the true extent of which his unknown, and to discourage future willful copyright-infringing conduct by Defendant and other potential infringers"), *report and recommendation adopted sub nom. Montblanc-Simplo GmbH v. Ilnitsky*, No. 17-415, 2018 WL 844401 (E.D. Va. Feb. 13, 2018); *Microsoft Corp. v. Grey Computer*, 910 F. Supp. 107, 1091-92 (D. Md. 1995) (imposing the "maximum penalty authorized by the statute" because the defendants' copyright infringement was "intentional, knowing and willful").

### D. Permanent Injunction

The Copyright Act authorizes the Court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The Court may grant a permanent injunction where the plaintiff demonstrates "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). I conclude that a permanent injunction is appropriate in this case.

DISH argues that it has been irreparably harmed by Hasweh's infringing activity. It points to its loss of subscribers and the damage done to its business reputation and goodwill. (ECF No. 35-1 at 15 No. 35-1 at 15.) DISH notes that while

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 122 of 237

DISH Network, L.L.C. v. Dima Furniture Inc., Not Reported in Fed. Supp. (2019)

2019 WL 2498224

it unquestionably loses subscribers to Hasweh's lower-cost Service, it cannot easily determine the amount of its lost revenues to quantify the harm. DISH also points out that the Service is "plagued by interruption or downtime and poor picture quality" (ECF No. 35-1 at 15No. 35-1 at 15), which reflects poorly on DISH because its programming is associated with the Service. Subscribers to the Service might assume that because the quality of the programming distributed through the Service is lacking, the same is true of quality of the programming when it is distributed through DISH. I agree with DISH's arguments and find that DISH has been irreparably harmed by Hasweh's infringing activity. Absent a permanent injunction, DISH is likely to continue to be harmed in the future.

**\*7** DISH argues that other remedies besides a permanent injunction, such as monetary damages, are not adequate to compensate for the harm that Hasweh's Service does to DISH. Considering the substantial statutory damages that I recommend be awarded to DISH, it is likely that Hasweh will be unable to compensate DISH for its current and future monetary damages. A permanent injunction is the only adequate remedy because it will require that Hasweh's Service cease its infringing activity, which will at the very least prevent DISH from suffering additional harm (and monetary damages) for which it might not be compensated. I find that DISH has established that other available remedies besides a permanent injunction are inadequate.

The balance of hardships also weighs in favor of awarding a permanent injunction to DISH. Because of Hasweh's infringing conduct, DISH has suffered lost revenues and damage to its goodwill, and it will continue to suffer these losses in the future unless a permanent injunction issues. These are significant hardships. The only hardship that Hasweh stands to endure is the harm that will come to his business when it is ordered to cease violating DISH's copyrights. But the harm that a business will suffer if it is required to cease violating the Copyright Act is not entitled to any weight in the balancing of hardships. *See* ⚑ *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983).

For the same reasons, the public interest favors a permanent injunction. The public has an interest in the effectuation of the policy and purpose of the Copyright Act, which is to protect intellectual property rights and incentivize the creation of copyrightable works. *See* ⚑ *Kidsaeng v. John Wiley &*

*Sons, Inc.*, 136 S. Ct. 1979, 1986-87 (2016); ⚑ *Fogerty v. Fantasy Inc.*, 510 U.S. 517, 527 (1994). The issuance of a permanent injunction would further this interest. Conversely, the public has no legitimate interest in the continued operation of Hasweh's Service. ⚑ *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1222 (C.D. Cal. 2007) ("The public interest in receiving copyrighted content for free is outweighed by the need to incentivize the creation of original works.").

In addition to enjoining Hasweh from continuing to infringe DISH's copyrights, DISH also seeks to enjoin certain nonparties from providing services to Hasweh that enable his infringing conduct. [7] Rule 65(d) governs the scope of permanent injunctions and provides that injunctions bind

> only the following who receive actual notice of it by personal service or otherwise:
>
> (A) the parties;
>
> (B) the parties' officers, agents, servants, employees, and attorneys; and
>
> (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Fed. R. Civ. P. 65(d)(2).

"In shaping equity decrees, the trial court is vested with broad discretionary power.... [E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable." ⚑ *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973). Nonetheless, an injunction must be "tailored to restrain no more than what is reasonably required to accomplish its ends." *Consolidation Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971). Here, an injunction binding the nonparties identified in DISH's motion is necessary, fair, and workable.

### 1. Nonparty Internet Service Providers

**\*8** DISH requests that the Court order certain nonparty Internet service providers (OVH SAS, OVH GmbH, and OVH Hosting Inc., collectively "OVH") to disable the computer servers that Hasweh's Service uses to unlawfully transmit the Protected Channels. (ECF Nos. 35-1 at 17; 41

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 123 of 237

DISH Network, L.L.C. v. Dima Furniture Inc., Not Reported in Fed. Supp. (2019)

2019 WL 2498224

at 3.) DISH states that Hasweh will be at least temporarily prevented from distributing the Protected Channels through the Service if these servers are disabled.[8] Other courts have ordered similarly situated nonparties to cease providing services that support the efforts of defendants to engage in infringing activity in violation of the Copyright Act. (*See* ECF Nos. 35-2 at 360; 41 at 2-3.)

I find that OVH has received actual notice of the injunction that DISH requests. DISH provided notice to OVH of its request for an injunction requiring it to stop providing certain services to Hasweh, which support infringing activities. (*See* ECF No. 41-1 No. 41-1.) In addition, although OVH has received notice of DISH's Motion and proposed injunction, it has not notified DISH or the Court of any objection.

I further find that OVH may properly be enjoined because of its "active concert or participation" with Hasweh's infringing conduct. *See* Fed. R. Civ. P. 65(d)(2)(C); *see also* 🏳 *TVB Holdings (USA), Inc. v. HTV Int'l Ltd.*, No. 16-1489, 2018 WL 7076022, at *8 (E.D.N.Y. Mar. 9, 2018) (recommending that the court order nonparty "internet service providers and content hosting websites to cease providing hosting services to [the defendant] in relation to its infringement"), *report and recommendation adopted*, No. 16-1489 (E.D.N.Y. Mar. 30, 2018). Hasweh's infringing conduct depends on the Service being able to use OVH's computer servers to transmit the Protected Channels.[9] Without access to OVH's servers, Hasweh's infringing activities will be hindered. Because OVH has received notice of DISH's request for an injunction that binds OVH and has not objected to the request, and because OVH is in "active concert or participation" with Hasweh's infringing conduct, I recommend that OVH be ordered to disable the computer servers under their control that are used by Hasweh's Service, as specified in DISH's proposed injunction (ECF No. 41-3 No. 41-3).[10]

## 2. Domain Transfers

DISH states that Hasweh "promotes Spider-TV set-top boxes at Spider-tv.com and Spideriptv.com." (ECF No. 35-1 at 19 com and Spideriptv.com." (ECF No. 35-1 at 19.) In addition, several domains (including Ipmmss.com, Ipmsactive.com, Tigeriptv.com, and Royaliptv.com) "are used for software updates and in the course of transmitting the Protected Channels." (*Id.*) VeriSign, Inc.[11] ("VeriSign") is the registry for the following domains: Spider-

tv.com, Spideriptv.com, Ipmmss.com, Ipmsactive.com, Tigeriptv.com, and Royaliptv.com. (ECF No. 41 at 4 com, and Royaliptv.com. (ECF No. 41 at 4.) GoDaddy.com is the registrar for the following domains: Spider-tv.com, Spideriptv.com, Ipmmss.com, Tigeriptv.com, and Royaliptv.com. (*Id.*) Name.com is the registrar for the Ipmsactive.com domain. (*Id.*) Hasweh's Service uses these domains to promote its set-top boxes, to distribute software updates, and to transmit the Protected Channels. (*Id.*) DISH requests that VeriSign, GoDaddy.com, and Name.com be ordered to disable the domains associated with the Service so that they are inaccessible to the public, transfer the domain names to DISH (including changing the registrar of record to the registrar selected by DISH, at DISH's reasonable expense), and reenable the domain names once they have been transferred to DISH and are under DISH's full control. Ordering VeriSign, GoDaddy.com, and Name.com to take these actions would "at least temporarily prevent Defendant from distributing the Protected Channels" and using the domains to sell the Spider-TV set-top boxes. (*Id.*) In support of its request, DISH cites to other cases where courts have ordered registries and registrars to disable and transfer infringing domains to copyright and trademark owners. (*Id.* at 19-20; ECF No. 41 at 3-4 No. 41 at 3-4.)

**\*9** DISH has provided notice to VeriSign, GoDaddy.com, and Name.com of its request that the entities be ordered to disable the Service's domains and transfer them to DISH. (*See* ECF No. 41-1 at 7, 8, 20 No. 41-1 at 7, 8, 20.) VeriSign, GoDaddy.com, and Name.com have not objected to such an order. (*See* ECF No. 41 at 2 No. 41 at 2.)

Hasweh uses the domains registered with VeriSign, GoDaddy.com, and Name.com to conduct his infringing activities. Without these domains, his ability to transmit the Protected Channels will be hindered. Under similar circumstances, other courts have concluded that nonparty domain name registries and registrars may be enjoined under Rule 65(d)(2)(C). *See* 🏳 *TVB Holdings (USA), Inc.*, 2018 WL 7076022, at *8 (enjoining nonparty domain name registries and registrars from furthering a defendant's infringing activities and ordering the nonparties to disable the relevant domain names and transfer the domains to the plaintiffs); *N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. Ltd. Co.*, No. 10-1630 (AKH), 2011 WL 12908845, at *3 (S.D.N.Y. June 24, 2011) (concluding that a nonparty domain registry was bound by the court's injunction). (*See also* ECF No. 41 at 3-4 No. 41 at 3-4.) I find that VeriSign, GoDaddy.com, and Name.com may properly be bound by an

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 124 of 237

DISH Network, L.L.C. v. Dima Furniture Inc., Not Reported in Fed. Supp. (2019)

2019 WL 2498224

injunction under Rule 65(d)(2)(C) because they are "in active concert or participation" with Hasweh's infringing activities.

Because disabling the domains and transferring them to DISH will restrain Hasweh's ability to continue to infringe DISH's copyrights through the Service, and given the lack of any objection by VeriSign, GoDaddy.com, and Name.com, I recommend that VeriSign, GoDaddy.com, and Name.com be ordered to disable the domains and transfer them to DISH, as requested in DISH's proposed injunction (ECF No. 41-3No. 41-3.)

**III. CONCLUSION**

In sum, I recommend that the Court:

1. Grant the Motion for Default Judgment Against Tareq Hasweh (ECF No. 35No. 35) filed by Plaintiff DISH Network L.L.C.;

2. Enter judgment in favor of Plaintiff DISH Network L.L.C. against Tareq Hasweh in the amount of $ 1,200,000, for statutory damages, with interest to accrue at the statutory rate, 28 U.S.C. § 1961(a); and

3. Permanently enjoin Tareq Hasweh from continuing to infringe DISH's copyrighted works and permanently enjoin the nonparties (OVH SAS, OVH GmbH, OVH Hosting Inc., VeriSign, GoDaddy.com, and Name.com) from providing the services that allow Tareq Hasweh to engage in his infringing activities, as provided in DISH's proposed Final Judgment and Permanent Injunction [12] (ECF No. 41-3No. 41-3).

Objections to this Report and Recommendation must be served and filed within fourteen (14) days, pursuant to Fed. R. Civ. P. 72(b) and Local Rule 301.5(b).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2498224

---

## Footnotes

1    Fed. R. Civ. P. 4(f)(2) provides that an individual in a foreign country may be served by "delivering a copy of the summons and of the complaint to the individual personally," unless prohibited by the foreign country's law. Hasweh resides in Jordan and was served with the summons and First Amended Complaint by hand delivery. (ECF Nos. 28 & 31.) Jordan is not a party to The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. *See Dep't of State*, Jordan Judicial Assistance Information, https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/Jordan.html (last visited April 16, 2019). Jordanian law allows for the service of process by hand delivery, as DISH arranged in this case. (*See* ECF No. 31 at 1No. 31 at 1.) I conclude that Hasweh was properly served under Rule 4(f)(2).

2    Specifically, the United Arab Emirates, Qatar, Egypt, and Lebanon are parties to the Berne Convention for the Protection of Literary and Artistic works, rendering them "treaty parties" under 17 U.S.C. § 104(b). (ECF No. 35-1 at 6No. 35-1 at 6.)

3    In addition, "eight of DISH's copyrighted works are registered with the United States Copyright Office, which creates a presumption as to ownership and validity." (ECF No. 35-1 at 7No. 35-1 at 7.)

4    DISH does not seek an award of damages in connection with Hasweh's infringement of DISH's copyrights in the unregistered works. (ECF No. 35-1 at 9No. 35-1 at 9.) This is because DISH would be limited to actual damages and the disgorgement of the infringer's profits, both of which are "difficult to quantify." (*Id.* at 9-10.)

5    Mr. Duval's declaration and the exhibits attached thereto do not state that Nagra observed the Registered Works being broadcast on the Spider-TV Service. Nonetheless, DISH has submitted sufficient evidence for the Court to conclude that the Registered Works were distributed and performed on Hasweh's Service. This is because Nagra observed the Protected Channels being broadcast on the Spider-TV Service on the same

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 125 of 237

DISH Network, L.L.C. v. Dima Furniture Inc., Not Reported in Fed. Supp. (2019)

2019 WL 2498224

dates that the Registered Works aired on the Protected Channels. (ECF No. 35-2 at 405-10 No. 35-2 at 405-10.)

6    DISH argues that it is entitled to the maximum statutory damages, in part, because Hasweh's default has "effectively preclude[ed] any attempt at calculating actual damages and profits." (ECF No. 35-1 at 13 No. 35-1 at 13.) I do not find that this factor is relevant in assessing whether DISH is entitled to the maximum statutory damages. Under DISH's argument, every defendant who defaulted in a copyright infringement case would be liable for the maximum statutory damages just because of their default. This could lead to plaintiffs receiving unjust windfalls and defendants being found liable for damages that do not bear a reasonable relationship to their conduct. See 🏳️⚠️ Superior Form Builders, 74 F.3d at 496.

7    On May 1, 2019, the Court ordered DISH to supplement its Motion with (1) information about whether the nonparties had received notice of DISH's Motion and request for an injunction that will bind them, and (2) argument regarding why the nonparties are "in active concert or participation" with the defendants, such that they may be bound by an injunction under Rule 65(d). (ECF No. 39 No. 39.) DISH complied with the Court's order and filed its supplement at ECF No. 41.

8    Previously, DISH requested that the Court enter an injunction specifically identifying Facebook, Inc. and directing it to remove certain content from its website. DISH now reports that "Facebook has since removed Defendant's offending pages, and therefore DISH no longer seeks to have Facebook specifically identified as a nonparty bound by the injunction." (ECF No. 41 at 2 n.1 No. 41 at 2 n.1.)

9    DISH explains that "OVH's servers are continuing to host the infringing transmissions of the Protected Channels, in addition to providing software updates giving Defendant the ability to redirect the Spider-TV set-top boxes to different domains and servers used in the course of retransmitting the Protected Channels." (ECF No. 41 at 3 No. 41 at 3.)

10    The proposed injunction that DISH attached to its supplemental brief (ECF No. 41-3 No. 41-3) includes the following additional OVH IP addresses: 51.89.6.99 and 167.114.211. (ECF No. 41 at 4 No. 41 at 4.)

11    VeriSign "is the exclusive operator of both the .com and .net top-level domains. It operates the .com registry, selling domain names to registrars who in turn sell those names to end users." 🏳️ Verisign, Inc. v. XYZ.COM LLC, 848 F.3d 292, 295 (4th Cir. 2017).

12    There is a minor typo in the second sentence of paragraph 5 of the proposed order (ECF No. 41-3 at 3 No. 41-3 at 3.). The sentence should read as follows: "This includes but is not limited **to** terminating....") (emphasis added).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT J

2011 WL 1230405, 2011 Copr.L.Dec. P 30,068

2011 WL 1230405
United States District Court,
W.D. Pennsylvania.

EVONY, LLC and Regan Mercantile, LLC, Plaintiffs,
v.

Philip HOLLAND, d/b/a Xandium Studios, d/b/
a www.xandiumstudios.net, a/k/a Zero, Defendant.

No. 2:11–cv–00064.
|
March 31, 2011.

**Attorneys and Law Firms**

Andrew T. O'Connor, Steven M. Cowley, Edwards Angell
Palmer & Dodge LLP, Boston, MA, Eric G. Soller,
Pietragallo, Bosick & Gordon, Pittsburgh, PA, for Plaintiffs.

**MEMORANDUM OPINION AND ORDER OF COURT**

TERRENCE F. McVERRY, District Judge.

 *1 Presently pending before the Court for disposition is the
MOTION FOR PRELIMINARY INJUNCTION (*Document
No. 6* )[1] and MOTION FOR ENTRY OF DEFAULT
JUDGMENT AGAINST PHILIP HOLLAND (*Document
No. 16* ) filed by Plaintiffs, Evony LLC and Regan Mercantile,
LLC.

On March 15, 2011, the Court conducted an evidentiary
hearing / argument on the motions. Plaintiffs were represented
by Andrew T. O'Connor, Esquire of the law firm Edwards
Angell Palmer & Dodge LLP and Eric G. Soller, Esquire of
the law firm Pietragallo, Gordon, Alfano, Bosick & Raspanti,
LLP. Defendant Philip James Holland appeared *pro se.*

**Procedural History**

On January 18, 2011, Plaintiffs filed a seven-count Verified
Complaint in which they alleged Copyright Infringement
(Count I), Violation of the Digital Millennium Copyright
Act ("DCMA") (Count II), Infringement of Trademark
(Count III), Infringement of Trade Dress (Count IV),
Breach of Contract (Count V), Tortious Interference with
Contractual Relations (Count VI), and Tortious Interference
with Prospective Economic Advantage (Count VII).

Plaintiff Evony, LLC ("Evony") developed and operates
a Massively Multiplayer Online Real–Time Strategy game
entitled *Evony* (the *"Evony* Game"). Evony is the owner of all
exclusive rights and privileges in U.S. Copyright Registration
Nos. TX07175070 and TX007175079 for the *Evony* Game.
Evony also owns all substantial rights and good will in
U.S. Trademark Registration No. 3,878,532 for the EVONY
trademark ("EVONY Mark") and in the look and feel of
the *Evony* Game (the "Trade Dress"). The *Evony* Game is
designed to be played online by accessing servers maintained
and operated by Evony, which requires authorized players to
agree to the Terms of Use agreement for playing the *Evony*
Game ("Terms of Use"). Distilled to its essence, Plaintiffs
allege that Defendant, through his website, is "devoted to
cheating, hacking, and publishing unauthorized copies of the
*Evony* Game using the EVONY trademark and Trade Dress."
Verified Complaint at 3.

The Summons and Verified Complaint were personally
served upon Defendant Philip James Holland on January 21,
2011. *See* Proof of Service, Document No. 12. The Summons
specifically instructed Defendant that he must serve on the
Plaintiffs an answer to the Verified Complaint or a motion
under Rule 12 of the Federal Rules of Civil Procedure
within twenty-one (21) days after service of the summons.
Defendant's answer due date was February 14, 2011.

Id.

On January 21, 2011, Plaintiffs filed and served on Defendant
their motion for preliminary injunction in which they
sought to prohibit Defendant from continuing in his alleged
infringing activities that are irreparably harming Plaintiffs'
goodwill. *See* Document No. 5. No opposition to the motion
for preliminary injunction has been filed by Defendant.

Defendant never requested an extension of the deadline by
which to respond to the Verified Complaint, did not file
an answer, motion or any other response to the Verified
Complaint, never entered an appearance, or had an attorney
enter an appearance on his behalf. Accordingly, on February
22, 2011, Plaintiffs requested the entry of Default against
Philip Holland for failure to plead or otherwise defend.
Without opposition, default was entered by the Clerk of Court
on February 23, 2011.

 *2 On March 2, 2011, Plaintiffs filed the instant Motion for
Default Judgment against Philip Holland. Not surprisingly,

Holland did not file anything in response to the Motion for Default Judgment. For the reasons stated below, Plaintiffs' Motion for Default Judgment shall be granted and judgment entered in favor of Plaintiffs in the amount of $300,000.00, plus attorneys' fees and costs, with interest, in an amount to be determined.

## DISCUSSION

### I. Default Judgment Standard for Damages

Default judgment establishes the defaulting party's liability for the well-pleaded allegations of a complaint. *United States v. Gant,* 268 F.Supp.2d 29, 32 (D.D.C.2003). "A consequence of the entry of a default judgment is that the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Comdyne I, Inc. v. Corbin,* 980 F.2d 1142, 1149 (3d Cir.1990) (quoting 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2688 at 444 (2d ed.1983)). In other words, a party's default is almost universally deemed an admission of the Plaintiff's well-pleaded allegations of fact pertaining to liability. *See also* *Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation.")

### II. Liability

The Court finds that Plaintiffs have sufficiently established Defendant's liability in this action. The facts pleaded in Plaintiffs' Verified Complaint sufficiently establish violations of the Copyright Act (Count I), the DMCA (Count II), and the Lanham Act (Counts III and IV). Specifically, Plaintiffs have established that Defendant literally copied the *Evony* Game and that his website and the products on his website infringe the intellectual property rights owned by Plaintiffs.

Accordingly, under these facts deemed by the Court to be admitted, the Court finds and rules that Defendant infringed Plaintiffs' copyright and trademarks in violation of the Copyright Act, 17 U.S.C. § 501(a), and the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125. The admissions also satisfy liability under the DMCA, which provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

To circumvent a technological measure "means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(3)(A). Plaintiffs have proven that Defendant's three products, Evony Second Opinion, Evony Task Automater ("ETA"), and Evomap violate the DMCA as all three products allow players of the *Evony* Game to circumvent the *Evony* Game's login procedure and technological measure without Evony's permission or authorization. According to Plaintiffs, the technological measure that is being circumvented not only protects copyrighted material but also protects Evony's exclusive rights in the copyrighted material.

**\*3** The Court finds that Defendant's three products, Evony Second Opinion, ETA, and Evomap, are designed to circumvent a technological measure that effectively controls access to Plaintiffs' copyrighted program. Accordingly, under these facts deemed by the Court to be admitted, the Court finds and rules that Defendant's actions have also violated the DMCA.

Furthermore, the Court finds that the facts pleaded in Plaintiffs' Verified Complaint also sufficiently establish violations under Delaware law of breach of contract and under Pennsylvania law of tortious interference with contractual relations and tortious interference with prospective economic advantage.

### III. Damages

Plaintiffs do not seek actual damages as no discovery has taken place, but instead request assessment of statutory damages for each of Defendant's copyright, DMCA, and trademark violations.[2] The Copyright Act, DMCA, and Lanham Act all contain provisions authorizing an award of statutory damages in lieu of actual damages. *See* 17 U.S.C. § 504(c); 17 U.S.C. § 1203(c)(3)(A); 15 U.S.C. § 117(c). The award of statutory damages is especially fitting in the default judgment context where Plaintiffs are without the benefit of any disclosures by the infringer, leaving damages uncertain.

#### a. Statutory Damages
The Copyright Act provides, in relevant part, that:

(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just.

(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000.

🚩 17 U.S.C. § 504(c). Plaintiffs request the statutory maximum award of $150,000 for the minimum number of acts of willful infringement already documented, that is, one act of willful infringement for each registered copyright, totaling $300,000.00 in statutory damages for willful infringement of U.S. Copyright Registration Nos. TX007175070 and TX007175079.

The DMCA establishes that,

> At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000.

17 U.S.C. § 1203(c)(3)(B). Plaintiffs seek the maximum statutory amount for the minimum number of violations- $25,000 for each of three violations-totaling $75,000.

The Lanham Act provides statutory damages in the amount of,

(1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

**\*4** (2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit

mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c). Plaintiffs request a statutory damages award of $300,000 for Defendant's unauthorized use and willful infringement of the EVONY mark in its Evony Second Opinion and Evony Task Automater products.

Finally, Plaintiffs contend that the same remedies available under the Lanham Act for trademark infringement should also be available to a prevailing party for trade dress infringement.

15 U.S.C. § 1117(a) (citing 🚩 15 U.S.C. § 1125). Plaintiffs request $150,000 for Defendant's one act of trade dress infringement.

### b. Duplicative Damages

Plaintiffs argue that they should be awarded statutory damages under all four federal causes of action established in the Verified Complaint. In general, courts have recognized the bar to double recovery in the intellectual property context. *See, e.g.,* *Tu v. Tad System,* 2009 WL 2905780 (E.D.N.Y.2009); 🚩 *MuscleTech Research and Dev., Inc. v. East Coast Ingredients, LLC,* No. 00–cv–753A, 2007 WL 655755 at \*5 (W.D.N.Y. Feb.26, 2007)* ("Plaintiffs may not ... recover separate awards for both its trademark violations and copyright infringement claims but, rather, must elect between the two theories to avoid a double recovery;) 🚩 *Twentieth Century Fox Film Corp v. 316 W. 49th Street Pub. Corp.,* No. 90–cv–6083, 1990 WL 165680, at \*6 (S.D.N.Y. Oct.23, 1990)* (where identical acts violate both copyright and trademark laws, damages need be determined only once);

🚩 *Manufacturers Techs., Inc. v. Cams, Inc.,* 728 F.Supp. 75, 85 (D.Conn.1989) (separate awards under Lanham and Copyright Acts improper for the same "wrong"); *Original Appalachian Artworks, Inc. v. J.F. Reichert, Inc.,* 658 F.Supp. 458 (E.D.Pa.1987) (any additional award under the Lanham Act would be duplicative of the award already awarded plaintiff under the Copyright Act.)

Nevertheless, other courts have found no double recovery bar where the plaintiff seeks statutory damages under the Copyright Act and disgorgement of the infringer's ill-gotten profits 1010–11 (9th Cir.1994) (awarding statutory damages under Copyright Act and disgorgement of defendant's profits under the Lanham Act); 🚩 *Viacom Int'l, Inc. v. Fanzine*

*Int'l, Inc.,* No. 98–cv–wi 7448, 2001 WL 930248, at *3–6 (S.D.N.Y. Aug.16, 2001) (same).

After due deliberation, the Court holds that Plaintiffs are not entitled to duplicative recoveries for the same intellectual property infringement violations under multiple theories of liability. "The provision for statutory damages serves a dual purpose—to compensate copyright owners and to deter potential infringers." *N.Y. Chinese TV Programs, Inc. v. U.E. Enterprises, Inc.,* No. 89–cv–6082, 1991 WL 113283, at *3 (S.D.N.Y. June 14, 1991) (citing *Fitzgerald Publishing Co. v. Baylor Publishing Co.,* 807 F.2d 1110, 1117 (2d Cir.1986)). First, the Court finds that awarding duplicative statutory damages under different legal theories fails to serve the first aim as compensation for the same injury could be and should be accomplished under a single grant of statutory damages. *See* 🚩 *Gucci v. Duty Free Apparel, Ltd.,* 315 F.Supp.2d 511, 520 (S.D.N.Y.2004) ("To the extent possible statutory damages should be woven out of the same bolt of cloth as actual damages"). Second, the Court finds that while maximizing the judgment against Defendant through duplicative statutory damages may produce a greater deterrent effect, under the facts of this case, the broad range of statutory damages available under either the Copyright Act or the Lanham Act is sufficient to put potential infringers "on notice that it costs less to obey [intellectual property] laws than to violate them." *N.Y. Chinese TV Programs, Inc.,* 1991 WL 113283 at *4.

**\*5** After careful examination of the record, the Court has no doubt that the damages sustained by Plaintiffs are coextensive: it is Defendant's website and the products on his website that account for Plaintiffs' economic damages under any of the three federal statutes Defendant violated, and it is not necessary, therefore, to award the same damages under all four federal causes of action. Accordingly, the Court concludes that Plaintiffs are not entitled to duplicative statutory damages under the Copyright Act, D MCA, and the Lanham Act. Rather, because the gravamen of this case is that Defendant created an independent server, copied the copyrighted *Evony* Game Client and published its own copy of the *Evony* Game, which enables players to play an unauthorized copy of the *Evony* Game operated on Defendant's website, the Court finds that damages under the Copyright Act constitutes the most appropriate remedy.

### c. Computation of Statutory Damages

The Court now addresses the computation of Plaintiffs' statutory damages under the Copyright Act. Under 🚩 § 504(c)(1), the Court must award from $750 to $30,000, "as the court considers just," for each work infringed. 17 U.S.C. § 304(c)(1). Under 🚩 § 504(c)(2), the Court has discretion to increase the award to $150,000 if it finds that the infringement was committed "willfully." 🚩 17 U.S.C. § 504(c)(2).

For the purpose of enhancing statutory damages, a defendant acts willfully within the meaning of 🚩 § 504(c)(2) when the defendant has knowledge that the actions committed constitute infringement. An infringement is willful if the defendant actually or constructively knows (as inferred from the defendant's conduct) that his actions constitute an infringement. 🚩 *N.A.S. Import, Corp. v. Chenson Enters., Inc.,* 968 F.2d 250, 252 (2d Cir.1992), or if the defendant acts with reckless disregard as to the possibility of the same. 🚩 *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1382 (2d Cir.1993).

The Court infers such willful knowledge in this case from Defendant's failure to defend this action and the fact that Defendant twice moved his infringing material and website to different internet service providers after he was sent a "takedown notification." The uncontested record reflects that in February 2010, Plaintiffs sent a "takedown notification" to the designated agent of The Planet, the internet service provider for Defendant's website, pursuant to DMCA, demanding that the infringing content on Defendant's website be taken down or access to the site be disabled. Thereafter, Defendant moved his infringing material and website to a different internet service provider, Peer I, and utilized a Peer 1 server hosting service, ServerBeach, to run his infringing website.

Plaintiffs sent another DMCA "takedown notification" to the designated agent of the new internet service provider, Peer 1 / ServerBeach, and demanded that the infringing content on Defendant's website and server be disabled. Within hours of this second notice of infringement, Defendant posted a discussion threat on his website's forum referencing and quoting Plaintiffs' DMCA takedown notices, which stated that "Evony's not going to stop us" and admitting to "violating Evony IN GAME RULES ...."

**\*6** In response to Plaintiffs' January 4, 2011 DMCA takedown notification, Peer 1/ ServerBeach took down

2011 WL 1230405, 2011 Copr.L.Dec. P 30,068

or disabled access to www.xandiumstudios.net and server. Thereafter, Defendant transferred his website and server to a different internet service provider in the United Kingdom ostensibly to avoid liability in the United States.

For these reasons, the Court finds and rules that an award of the enhanced statutory maximum damages is appropriate and reasonable to compensate Plaintiffs and to deter Defendant and future infringers. The statutory maximum is especially fair in the context of Defendant's additional violation of the D MCA and the Lanham Act. Accordingly, the Court will award statutory damages to Plaintiffs and against Defendant in the amount of $300,000.00.

## IV. Permanent Injunction

In addition to statutory damages, Plaintiffs also request a permanent injunction with regard to every count of their Verified Complaint to prevent any future infringement of their copyrighted material and trademark and to bar any future circumvention of the copyright protection systems of their products. Section 502(a) of the Copyright Act provides that any court may grant "final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Similarly, Section 34(a) of the Lanham Act provides courts with the "power to grant injunctions, according to the principles of equity and upon such terms as the Court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." 15 U.S.C. § 1116(a). Finally, under the DMCA, "the court ... may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation ...." 17 U.S.C. § 1203(b)(1).

The standard for the grant of injunctions is similar under all three statutes. In the copyright context, "[w]hen past infringement and a substantial likelihood of future infringements is established, a copyright holder is ordinarily entitled to a permanent injunction against the infringer." *A & N Music Corp. v. Venezia,* 733 F.Supp. 955, 957 (E.D.Pa.1990). Similarly, injunctive relief is available under the Lanham Act where there is a likelihood of confusion or deception as a result of a defendant's conduct. *MarbleLife, Inc. v. Stone Resources, Inc.,* —— F.Supp.2d ——, 2010 WL 5257815 (E.D.Pa. Dec.23, 2010). Under the DMCA, "injunctive relief is appropriate if there is a reasonable likelihood of future violations absent such relief and, in cases brought by private plaintiffs, if the plaintiff lacks an adequate

remedy at law." 🔖 *Universal City Studios, Inc. v. Reimerdes,* 111 F.Supp.2d 294, 343 (S.D.N.Y.2000). In general, a plaintiff may obtain a permanent injunction if it shows (i) actual success on the merits and (ii) irreparable harm. *MarbleLife, Inc. v. Stone Resources, Inc.,* —— F.Supp.2d ——, 2010 WL 5257815 (E.D.Pa. Dec.23, 2010).

**\*7** In this case, Plaintiffs have achieved "actual success on the merits" through the admission of liability arising from Defendant's default. Furthermore, the Verified Complaint establishes that Defendant unlawfully sells and distributes copyrighted and trademarked material of the Plaintiffs. Nothing in the facts before the Court indicates that Defendant has ceased this infringing activity; thus, a permanent injunction is warranted in this case on all claims of the Verified Complaint.

## V. Impoundment

Plaintiffs also seek an order, pursuant to 17 U.S.C. § 503(b), 17 U.S.C. § 1203(b)(6), and 15 U.S.C. § 1118 to impound and destroy the following items of personal property, which are within Defendant's possession, custody or control: (i) all copies of the *Evony* Game, including any software or source code for the *Evony* Game; (ii) all versions and copies of Defendant's infringing products, including Evony Second Opinion, Evony Task Automater, and Evomap, and any other programs created by Defendant that copy the *Evony* Game; and (iii) all promotional and advertising materials, labels, and packaging using the marks Evony Second Opinion and Evony Task Automater, and any other colorable imitation of the EVONY mark.

The Court notes that 17 U.S.C. § 503(b), 17 U.S.C. § 1203(b)(6), and 15 U.S.C. § 1118 do not make impoundment a mandatory form of relief; rather, the Court "may order the destruction or other reasonable disposition of all copies ... found to have been made or used in violation of the copyright owner's exclusive rights ...."

As discussed *supra,* the Court has found that Plaintiffs have established that Defendant willfully infringed the copyrighted material and trademarks of Plaintiffs. Therefore, the Court rules that Plaintiffs are entitled to impoundment and destruction pursuant to 17 U.S.C. §§ 503(b) 1206(b)(6) and 15 U.S.C. § 1118.

## VI. Attorneys' Fees

Lastly, Plaintiffs seek to recover costs and attorneys' fees. Once again, all three federal statutes at issue in this case authorize courts to award prevailing parties their reasonable costs and attorneys' fees. *See* 17 U.S.C. § 505 ("[T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs."); 17 U.S.C. 1203(b)(5) ("[T]he court ... in its discretion may award reasonable attorney fees to the prevailing party."); 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").

The Copyright Act permits a court to award fees and costs to either a prevailing plaintiff or a prevailing defendant based on a consideration of "the degree of success obtained by the moving party, the frivolousness of any claims, the motivation for the claims, the objective reasonableness of the factual and legal arguments advanced in support of them and the need for compensation and deterrence." *In re Pearman,* 432 B.R. 495 (Bkrtcy.D.N.J.2010).

**\*8** As established above, the Court finds that Defendant acted willfully in infringing Plaintiffs' copyrights and trademark. Accordingly, in furtherance of the goal of deterrence, the Court finds that Plaintiffs are entitled to reasonable attorneys' fees and costs under the Copyright Act. Plaintiffs shall, therefore, on or before **April 15, 2011,** file a Petition for Reasonable Attorney's Fees and Costs, which Plaintiffs incurred as a direct result of Defendant's unlawful infringement activities supported by appropriate Affidavit(s). Said affidavit(s) shall include documentation to support any fee request, including, but not limited to, the issue of prevailing market rates in Pittsburgh, PA, the fair and reasonableness of the fees and costs being requested, the detail of time expended, the usual billing rates of all attorneys and support staff for whom work is claimed, and detailed fee statements, which include the hourly rates for all attorneys and support staff.

Defendant is entitled to a fair opportunity to review and consider the specifics of the fee Petition(s), as well as to respond in a meaningful way. Defendant shall, if he so desires, file any response in opposition to the request for attorney's fees on or before **May 6, 2011.**

## CONCLUSION

For the reasons stated above, Plaintiffs motion for a default judgment will be granted. Defendant shall be liable to

Plaintiffs for $300,000 in statutory damages pursuant to 17 U.S.C. § 504(c). Plaintiffs are also entitled to reasonable attorneys' fees and costs and are directed to file a Petition for Reasonable Attorney's Fees and Costs, on or before **April 15, 2011.** Plaintiffs are also entitled to permanent injunctive relief.

An appropriate Order follows.

## ORDER OF COURT

**AND NOW,** this 31st day of March, 2011, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** that the MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST PHILIP HOLLAND and the MOTION FOR PRELIMINARY INJUNCTION are **GRANTED** as follows:

1. Plaintiffs' Motion for Entry of Default Judgment Against Philip Holland is **GRANTED** and Plaintiffs Evony, LLC and Regan Mercantile, LLC are entitled to a default judgment on all counts in their Verified Complaint against Defendant, Philip Holland.

2. A judgment shall be entered against Philip Holland awarding Plaintiffs a total of $300,000.00 in statutory damages as determined in the foregoing Memorandum Opinion.

3. A judgment shall be entered against Philip Holland awarding Plaintiffs their reasonable attorneys' fees and expenses incurred in this litigation in an amount to be determined. Plaintiffs shall submit a Petition For Reasonable Attorney's Fees and Costs and documentation supporting the award of attorneys' fees and costs on or before April 15, 2011. Defendant shall file, if he so desires, any response in opposition to the request for attorney's fees on or before May 6, 2011.

4. The Motion for Permanent Injunction is **GRANTED.**

**\*9** 5. Philip Holland and his officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, and successors, active in concert or participation with him who receive actual notice of this order by personal service or otherwise, are **PERMANENTLY RESTRAINED AND ENJOINED,** each and every one of them, from the following:

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 133 of 237
Evony, LLC v. Holland, Not Reported in F.Supp.2d (2011)
2011 WL 1230405, 2011 Copr.L.Dec. P 30,068

a. Selling, distributing, advertising, or displaying, directly or indirectly, any copy of the *Evony* Game, game client source code, or software designed to modify the *Evony* Game experience;

b. Selling, distributing, advertising, or displaying, directly or indirectly, any product that contains, implements, or emulates the look and feel of the Evony Game or game client source code; and

c. Advertising any product that uses the EVONY Mark, trade dress or a similar mark, including, but not limited to, Evony Second Opinion, Evony Task Automater, and Evomap.

6. Philip Holland and his officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, and affiliates, active in concert or participation with them who receive actual notice of this Order by personal service or otherwise, are further ordered to immediately and permanently shut down or disable access to xxx.xandiumstudios.net and any related websites, forums, chat rooms, servers, or other online media containing references to Evony.

7. Philip Holland and his officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, and affiliates active in concert or participation with them who receive actual notice of this Order by personal service or otherwise, are further ordered, to immediately and permanently transfer any and all rights in any domain names that contain the EVONY trademark, including www.evonyreports.com, to Plaintiffs on or before **April 8, 2011.**

8. On or before **April 8, 2011,** Philip Holland must notify his officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, and affiliates, in concert or participation with him in the copying, sale, advertising, and display of the *Evony* Game and software that modifies the *Evony* Game experience of this Order and its

directives. Those who receive actual notice of this Order by personal service or otherwise, are further ordered to immediately and permanently shut down or disable access to xxx.xandiumstudios.net and any related websites, forums, chat rooms, servers, or other online media containing any references to Evony.

9. On or before **April 8, 2011,** Philip Holland and his officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, and affiliates active in concert or participation with them who receive actual notice of this Order by personal service or otherwise, are further **ORDERED,** pursuant to 17 U.S.C. § 503(b), 17 U.S.C. § 1203(b)(6), and 15 U.S.C. § 1118, to deliver to Plaintiffs, through local counsel Eric Soller, Esquire, Pietragallo, Gordon, Alfano, Bosick & Raspanti, LLP, 38th Floor, One Oxford Centre, Pittsburgh, PA 15219, the following items for destruction which are within their possession, custody or control, or that can be obtained by them through reasonable efforts:

  **\*10** a. All copies of the *Evony* Game, including any software or source code for the Evony game;

  b. All versions and copies of Defendant Holland's infringing products, including Evony Second Opinion, Evony Task Automater, and Evomap, and any other programs created by Defendant that copy the *Evony* Game; and

  c. All promotional and advertising materials, labels, and packaging using the marks Evony Second Opinion and Evony Task Automater, and any other colorable imitation of the EVONY Mark.

The Court will enter judgment consistent with this Order.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 1230405, 2011 Copr.L.Dec. P 30,068

---

## Footnotes

1    Plaintiffs filed a Motion for Preliminary Injunction; however, due to default being entered against Defendant, the motion for preliminary injunction was converted at the hearing into a motion for permanent injunction.

---

2011 WL 1230405, 2011 Copr.L.Dec. P 30,068

2  Because Plaintiffs cannot obtain discovery relating to the extent of Holland's breach of contract (Count V) and tortious inference with business relations (Counts VI and VII), Plaintiffs seek only injunctive relief on these three counts of their Verified Complaint. Plaintiffs' request for injunctive relief is discussed in this Memorandum Opinion at Paragraph IV.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT K

Frank Music Corp. v. Emerson's Pub, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 744964

KeyCite Yellow Flag

Distinguished by   Davis v. Metropolitan Life Ins. Co.,   M.D.Pa.,   February 11, 2015

2009 WL 744964
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

FRANK MUSIC CORP., et al., Plaintiffs
v.
EMERSON'S PUB, INC. and
Delvin L. Bruce, Defendants.

No. 4:08-CV-0532.
|
March 18, 2009.

**Attorneys and Law Firms**

Brian P. Downey, Justin G. Weber, Pepper Hamilton LLP, Harrisburg, PA, Vincent V. Carissimi, Pepper Hamilton LLP, Philadelphia, PA, for Plaintiffs.

### *MEMORANDUM*

JOHN E. JONES III, District Judge.

**\*1** This matter is before the Court on the plaintiffs' Motion for Judgment by Default (Doc. 12). For the reasons set forth below, the motion will be granted.

### I. BACKGROUND

On March 24, 2008, the plaintiffs, owners of the copyrights in certain musical compositions, filed the complaint in this action against defendants Emerson's Pub, Inc. and its owner Delvin L. Bruce, asserting claims of copyright infringement based on the public performance of their copyrighted works at the defendants' establishment without a license and despite repeated letters and contacts from plaintiffs' representatives informing the defendants of their potential liability. (Doc. 1.) The plaintiffs seek an injunction permanently restraining defendants from causing or permitting the copyrighted compositions from being performed in their premises, statutory damages under 17 U.S.C. § 504(c)(1), and costs and attorney's fees.

On April 28, 2008, the plaintiffs returned executed summonses showing that the complaint has been personally served on the defendants on April 5, 2008. (Docs.6, 7.)

The defendants having not answered or otherwise responded to the complaint, on May 21, 2008, pursuant to the plaintiffs' request (Doc. 8), the Clerk of the Court enter default against the defendants (Doc. 9.)

On February 11, 2009, plaintiffs filed a motion for default judgment (Doc. 12) and a brief in support thereof (Doc. 13). The defendants have not responded to the motion, and in the nearly one year that this action has been pending have never appeared.

### II. DISCUSSION

#### A. Entry of Default Judgment

Federal Rule of Civil Procedure 55(b)(2) grants courts the authority to enter default judgment against a party who has failed to pled or otherwise defend. "Three factors control whether a default judgment should be granted: (1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct."

*Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir.2000) (citing *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir.1984)). In this case, entry of default judgment is appropriate. If default is denied, plaintiffs face the prejudice of being unable to proceed with this action and the potential continued infringement of their copyrighted works. The defendants have asserted no defense to the plaintiffs' claims, which are well supported by their motion. (*See* Aff. of Douglas Jones and Aff. of Vincent V. Carissimi, Doc. 13-2.) Finally, the delay in this case is attributable solely to the defendants' willful refusal to appear or defend despite knowledge of this action. The Court will therefore enter judgment in favor of the plaintiffs.

#### B. Injunctive Relief

The Copyright Act provides that a court may grant "final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). "Where a court enters a default judgment, 'the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.' "

Frank Music Corp. v. Emerson's Pub, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 744964

*DIRECTV, Inc. v. Pepe,* 431 F.3d 162, 165 n. 6 (3d Cir.2005) (quoting *Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149 (3d Cir.1990)). Therefore, the plaintiffs' allegation of infringement is taken as true for the purpose of the instant motion only and the court will issue a permanent injunction. *See Rhino Assoc., L.P. v. Berg Mfg. & Sales Corp.,* C.A. No. 1:04-CV-1611, 2008 WL 144454, at *3 (M.D.Pa. Jan.11, 2008).

### C. Statutory Damages

**\*2** The Copyright Act provides that an infringer of copyright is liable for either the copyright owner's actual damages or statutory damages. 17 U.S.C. § 504(a). The plaintiffs in this case have elected, pursuant to § 504(c)(1), to recover statutory damages, which are authorized "in a sum of not less than $750 or more than $30,000 as the court considers just." *Id.* § 504(c)(1). Another district court in this circuit recently summarized, in a factually analogous case, the law governing a determination of statutory damages:

> Statutory damages serve the dual purposes of compensation and deterrence: they compensate the plaintiff for the infringement of its copyrights; and they deter future infringements by punishing the defendant for its actions. In determining the amount of statutory damages, it is important that an infringer not reap a benefit from its violation of the copyright laws and that statutory damages should exceed the unpaid license fees so that defendant will be put on notice that it costs less to obey the copyright laws than to violate them. In considering the appropriate amount of statutory damages, courts should consider (1) expenses saved and profits reaped by the infringer; (2) revenues lost by the plaintiff; (3) the strong public interest in insuring the integrity of the copyright laws; and (4) whether the infringement was willful and knowing or innocent and accidental. In determining the

just amount of statutory damages, the defendant's conduct is the most important factor.

*Broad. Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.,* 555 F.Supp.2d 537, 544 (E.D.Pa.2008). Because the plaintiffs have requested statutory damages in excess of the statutory minimum [1], the Court must consider whether the facts of the complaint and the evidence adduced by the plaintiffs in their motion for default judgment, provide a sufficient basis to determine whether the requested statutory damages are just. *Id.* at 544-45.

The record in this case indicates that the plaintiffs repeatedly approached the defendants, informed them of their infringement, and offered a license to perform the copyrighted works at issue. [2] (Jones Aff., Doc. 13-2.) The defendants ignored these warnings, refused these offers, and continued their infringement. The estimated licensing fees saved by the defendants and lost by the plaintiffs are $4,703.92. (*Id.*) In addition, the plaintiffs incurred costs investigating and documenting the defendants' infringement. (*Id.*) Given the plaintiffs' repeated warnings, it is clear that the defendants' infringement was willful and knowing. These circumstances justify an award of statutory damages above the statutory minimum. The facts of this case are highly analogous to those presented in *Broadcast Music,* and the Court finds the thorough reasoning and sound conclusion of the court in that case persuasive. Like the *Broadcast Music* court, the Court in this case will award the plaintiffs statutory damages in the amount of $2,000 for each of the four infringements at issue, for a total of $8,000 in statutory damages.

### D. Costs and Attorney's Fees

**\*3** The Copyright Act also provides that as a remedy for infringement, the court in its discretion may allow the recovery of full costs, including attorney's fees, by the prevailing party. 17 U.S.C. § 505. A finding of bad faith is not required to award costs and fees, but neither are costs and fees awarded as a matter of course to every prevailing party. *Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 155-156 (3d Cir.1986). "Factors which should play a part include frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 156.

Frank Music Corp. v. Emerson's Pub, Inc., Not Reported in F.Supp.2d (2009)
2009 WL 744964

An award of costs and attorney's fees is appropriate in this case. The defendants simply ignored the plaintiffs' repeated warnings of infringement and offers of a license, and continued to ignore the plaintiffs throughout this action. *Compare Broad. Music,* 555 F.Supp.2d at 545-46. The defendants' actions were objectively unreasonable, motivated by a complete disregard for copyright law, and present a significant deterrence consideration. Moreover, the plaintiffs should be compensated for the additional expenses of investigating, documenting, and litigating the defendants' infringement occasioned by the defendants' failure to comply with their legal obligations. The Court finds that the rates and costs detailed in the affidavit submitted by the plaintiffs to be reasonable, and therefore, will award the full requested amount of $6,654.99 in costs and attorney's fees.

### E. Interest

Although not expressly addressed by the plaintiffs, an award of post-judgment interest is mandatory, pursuant to 28 U.S.C. § 1961. *See Dunn v. HOVIC,* 13 F.3d 58, 62 (3d Cir.1993) ("[P]ost-judgment interest is awarded by statute as a matter of law so it is automatically added, whether or not the district court orders it."); *see also Broad. Music, Inc. v. Golden Horse Inn Corp.,* 709 F.Supp. 580, 581 (E.D.Pa.1989) (holding in copyright infringement case that "Plaintiff is entitled to an award of postjudgment interest from the date of entry of this judgment as a matter of course"). Therefore, the Court will order interest be allowed on the monetary awards discussed above, consistent with § 1961.

### III. CONCLUSION

For the foregoing reasons, plaintiffs Motion for Judgment by Default will be granted. Judgment will be entered in favor of the plaintiffs, and the defendants will be permanently enjoined from any further infringement of the plaintiffs' copyrights in any manner. The plaintiffs will be awarded a total sum of $14,654.99, consisting of $8,000 in statutory damages pursuant to 17 U.S.C. § 504(c) and $6,654.99 in costs and attorney's fees pursuant to 17 U.S .C. § 505. An appropriate order will be entered.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 744964

---

## Footnotes

1    There is some unclarity as to the amount of statutory damages requested by the plaintiffs. In several places within their motion, they request $10,000 in statutory damages, consisting of $2,500 per each of four infringements. (Doc. 13 at 1, 10, 13.) However, elsewhere, the plaintiffs also request an award of statutory damages of "at least $8,000." (*Id.* at 6.)

2    Given the plaintiffs' thorough documentation submitted regarding damages, the Court finds no need for a hearing on the issue. *See* Fed.R.Civ.P. 55(b)(2).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT L

G&G Closed Circuit Events, LLC v. Remsen Associates, Inc., Not Reported in Fed....
2023 WL 7110677

2023 WL 7110677
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

G&G CLOSED CIRCUIT EVENTS, LLC, Plaintiff,

v.

REMSEN ASSOCIATES, INC. T/A Los
Amigos, Bernabe Rodriguez, John Does
1-10 and ABC Corps. 1-10, Defendants.

Civil Action No. 19-13019 (GC) (JBD)
|
Signed October 27, 2023

**Attorneys and Law Firms**

Michael Jon Peters, Pressler, Felt & Warshaw, LLP,
Parsippany, NJ, for Plaintiff.

**MEMORANDUM ORDER**

CASTNER, District Judge

**I. BACKGROUND**

**\*1** THIS MATTER comes before the Court upon Plaintiff
G&G Closed Circuit Events, LLC's Motion for Attorney's
Fees and Costs against Defendant Bernabe Rodriguez.
(ECF No. 31.) Plaintiff filed the Complaint on May 29,
2019, alleging misappropriation of the *Saul Alvarez v. Julio
Cesar Chavez, Jr., Championship Fight Program* telecast
in violation of 47 U.S.C. § 605, *et seq.*, and 47 U.S.C. §
553, *et seq.* (ECF No. 1.) Plaintiff served Defendant Los
Amigos on July 9, 2019, and then Defendant Rodriguez
on March 3, 2020, after several failed attempts. (*See* ECF
No. 15 ¶¶ 4, 5, 7.) Neither Los Amigos nor Rodriguez
answered, moved, or otherwise defended the action, and
Plaintiff moved for the entry of default on July 10, 2020,
which was entered by the Clerk of Court on the same day.
(*Id.*; Clerk's Entry of Default Docket Entry from July 10,
2020.) Plaintiff then moved for default judgment against
Los Amigos and Rodriguez on August 17, 2020, which was
entered against Los Amigos and denied as to Rodriguez by
the Court on March 24, 2021. (ECF Nos. 16, 17, 18.) In
denying default judgment as to Rodriguez, the Court found
that Plaintiff's allegations fell short of stating a claim for
misappropriation against Rodriguez. (ECF No. 17 at 6.[1])
On June 15, 2021, Plaintiff moved for limited discovery,

seeking to address the deficiencies in his allegations against
Rodriguez. (ECF No. 22.) Limited discovery was granted
on August 11, 2021. (ECF No. 24.) Plaintiff proceeded to
serve various limited discovery requests on Rodriguez, to
which Rodriguez failed to respond, which resulted in Plaintiff
moving again for default judgement against Rodriguez. (ECF
No. 26.) On February 28, 2023, the Court granted default
judgment against Rodriguez for $6,600.00.[2] (ECF Nos. 28,
29.) Plaintiff now moves for $7,472.00 in attorney's fees and
costs to be taxed to the judgment against Rodriguez.[3] (ECF
No. 31-1 ¶ 28.) Rodriguez does not oppose.

The Court has carefully considered Plaintiff's submission
and decides the matter without oral argument under Federal
Rule of Civil Procedure ("Rule") 78(b) and Local Civil Rule
78.1(b). For the reasons set forth below, and other good
cause shown, the Court awards Plaintiff's counsel **$7,472.00**
in attorney's fees and costs to be added to the judgement
entered against Bernabe Rodriguez.[4]

**II. DISCUSSION**

**\*2** "When a court determines that awarding attorney's fees
represents an appropriate sanction, it then conducts a lodestar
calculation to determine the reasonable fee." *Sciore v. Phung*,
Civ. No. 19-13775, 2022 WL 17446505, at \*3 (D.N.J. Dec. 6,
2022) (citation omitted). The lodestar calculation multiplies
the reasonable number of hours exerted by the reasonable
hourly rate. *United Auto. Workers Loc. 259 Soc. Sec. Dep't
v. Metro Auto Ctr.*, 501 F.3d 283, 290 (3d Cir. 2007). "A party
seeking attorney fees bears the ultimate burden of showing
that its requested hourly rates and the hours it claims are
reasonable." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
426 F.3d 694, 703 n.5 (3d Cir. 2005), *as amended* (Nov. 10,
2005).

Plaintiff's counsel includes an itemized certification detailing
his request for attorney's fees and costs. (*See* ECF No. 31-1
¶ 23.) Plaintiff's counsel billed 18.6 hours at an hourly rate
of $325.00 per hour, and Plaintiff's counsel also includes his
secretary's time of 2.4 hours at an hourly rate of $80.00 per
hour. (*See id.*) Plaintiff's counsel's billing entries provide the
specific date, description, time, fee, and individual assigned
to each task. (*Id.*) The Court has carefully reviewed each line
of the itemized fee chart provided by Plaintiff's counsel. (*Id.*)

Comporting with similar awards for attorney's fees and costs
in this District, the Court finds that Plaintiff's counsel's

requested fees and costs are reasonable. *See, e.g., J & J Sports Prod., Inc.*, 2020 WL 832917 at *2 (finding that counsel's requested fees of $325 per hour, his secretary's fees of $80 per hour, a $400 filing fee, and a $525 investigative fee were all reasonable); *Innovative Sports Mgmt., Inc. v. El Punto Marino Rest. LLC*, Civ. No. 20-14251, 2021 WL 5608275, at *1 (D.N.J. Nov. 4, 2021), *report and recommendation adopted*, Civ. No. 20-14251, 2021 WL 5585928 (D.N.J. Nov. 30, 2021) (same); *G & G Closed Cir. Events, LLC v. Don Tequila Bar & Grill, LLC*, Civ. No. 19-84, 2020 WL 4670926, at *1 (D.N.J. Aug. 12, 2020) (same); *J&J Sports Prods., Inc.* v. *2216 Bergenline Ave.*, Civ. No. 18-13165, ECF Nos. 20, 21 (D.N.J. Oct. 21, 2019) (same). The Court awards Plaintiff's counsel **$7,472.00** in attorney's fees and costs, to be added to the judgment entered against Rodriguez.

**III. ORDER**

For the reasons stated above, and other good cause shown,

**IT IS** on this 27th day of October, 2023, **ORDERED** as follows:

1. Plaintiff's Motion for Attorney's Fees and Costs (ECF No. 31) is **GRANTED**.

2. Plaintiff's counsel is awarded **$7,472.00** in attorney's fees and costs, to be added to the judgment entered against Rodriguez.

3. The Clerk of Court shall **TERMINATE** the motion pending at ECF No. 31, and this case is to remain **CLOSED**.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 7110677

---

**Footnotes**

1    Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

2    In its Memorandum Opinion granting default judgment against Rodriguez, the Court granted Plaintiff leave to file an application for attorney's fees and costs within thirty (30) days of the entry of judgment. (ECF No. 28 at 8.)

3    Plaintiff's attorney's fees and costs application consists of: (1) a $400 filing fee; (2) $285 for service of process costs; (3) $550 for investigative fees; (4); and $6,237.00 in attorney-related fees. (ECF No. 31-1 ¶ 17.)

4    Pursuant to 47 U.S.C. § 605 (e)(3)(B)(iii), the Court must "direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." *J & J Sports Prod., Inc. v. Suarez Enterprises, LLC*, Civ. No. 18-08823, 2020 WL 832917, at *1 (D.N.J. Feb. 20, 2020). "Since the Court has entered a default judgment against [Rodriguez], Plaintiff is a prevailing party mandated to receive costs and attorneys' fees under § 605(e)(3)(B)(iii)." *Id.*; (ECF No. 29.)

---

# EXHIBIT M

Grant Heilman Photography, Inc. v. Gallagher, Not Reported in Fed. Supp. (2024)

2024 WL 666147

2024 WL 666147
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

GRANT HEILMAN PHOTOGRAPHY, INC., Plaintiff,

v.

Ronald GALLAGHER dba Life
Expression Wellness Center, Defendant.

CIVIL ACTION NO. 3:23-cv-1129
|
Signed February 16, 2024

**Attorneys and Law Firms**

Joseph A. Dunne, Sriplaw, Brooklyn, NY, for Plaintiff.

**MEMORANDUM**

MALACHY E. MANNION, United States District Judge

 *1 Presently before the court is Plaintiff's renewed motion for default judgment. (Doc. 9.) On July 6, 2023, Plaintiff initiated this action against Defendant for willful copyright infringement. (Doc. 1.) A summons was issued to Defendant on July 7, 2023. (Doc. 2.) On August 9, 2023, a return receipt indicating service upon Defendant on August 3, 2023, was filed with the court. (Doc. 4.) Defendant did not file an answer or otherwise timely respond to the complaint, and the Clerk of Court entered default against the Defendant for failure to answer or otherwise defend the instant suit on September 9, 2023. (Doc. 6.) On January 17, 2024, Plaintiff first motioned for entry of default of judgment against Defendant. (Doc. 7.) However, the court denied that motion without prejudice because Plaintiff failed to also submit an affidavit stating whether or not the Defendant is in military service as required by the Service Members Civil Relief Act. 50 App. U.S.C. § 521(b)(1)(A). (Doc. 8.) Plaintiff has now renewed its motion for default judgment and submitted an appropriate affidavit showing that Defendant is not in military service. Accordingly, and for the reasons stated below, the court will grant Plaintiff's motion and award all relief requested, except prejudgment interest, which Plaintiff has not shown entitlement to.

**I. Background**

Plaintiff is a professional photographer and longtime provider of stock photography. In 1988, Plaintiff created the photograph of a plant at issue here. On August 22, 2008, Plaintiff registered this photograph with the Register of Copyrights and was assigned the registration number VA 1-643-925. At all relevant times Plaintiff maintained ownership of the copyrighted work.

Defendant operates a wellness center in Sugarloaf, Pennsylvania. Plaintiff alleges that all relevant times Defendant also operated the internet website located at the URL, http://www.lifeexpressionwellness.com/. Defendant is alleged to have copied, distributed, and otherwise used Plaintiff's photograph on this website to further his wellness business. On or about March 15, 2023, Plaintiff discovered the unauthorized use of its copyrighted work in a June 30, 2016, post on Defendant's website about family chiropractic care. On March 29, 2023, Plaintiff through counsel, notified Defendant of his infringement on Plaintiff's copyrighted work and demanded he cease infringing on the work as well as pay a license fee for his unauthorized use. To date Defendant has not agreed to these demands or otherwise settled with Plaintiff.

**II. Legal Standard**

Once a default is entered by the clerk of court, the court may enter default judgment under Fed. R. Civ. P. 55(b)(2) against a properly served defendant who does not file a timely responsive pleading. The entry of default is left primarily to the discretion of the district court." Hritz v. Woma Corp., 732 F.2d 1178, 1180 (3d Cir. 1984). But this discretion is not without limits; as the Third Circuit prefers "cases be disposed of on the merits whenever practicable." Id. at 1181. Thus, when reviewing a motion for default judgment the court must consider: "(1.) the prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." Chamberlain v. Giampapa, 210 F.3d 154, 164 (3d Cir. 2000).

 *2 Still when a defendant has failed to appear or respond in any fashion to the complaint entry of default judgment is typically appropriate at least until the defendant comes forward with a motion to set aside the default judgment pursuant to Rule 55(c). See Broad. Music, Inc. v. Kujo Long, LLC, No. 1:14-CV-00449, 2014 WL 4059711, at *1

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 144 of 237

Grant Heilman Photography, Inc. v. Gallagher, Not Reported in Fed. Supp. (2024)

2024 WL 666147

(M.D. Pa. Aug. 14, 2014) (citing *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 177 n. 9 (3d Cir. 1990).)

Once a default judgment has been entered, the well-pleaded, factual allegations of the complaint, except those relating to the damage amount, are accepted as true and treated as though they were established by proof. *See Coastal Mart, Inc. v. Johnson Auto Repair, Inc.*, 2001 WL 253873, at *2, 2001 U.S. Dist. LEXIS 2645 (E.D. Pa. Mar. 14, 2001); *See also U.S. ex rel. Motley v. Rundle*, 340 F.Supp. 807, 809 (E.D. Pa. 1972) (citing *Thomson v. Wooster*, 114 U.S. 104, 114, 5 S.Ct. 788, 29 L.Ed. 105 (1884)). While these well-pleaded allegations are admitted and accepted, "the Court need not accept the moving party's legal conclusions or factual allegations relating to the amount of damages." *Broad. Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.*, 555 F.Supp.2d 537, 541 (E.D. Pa. 2008) (citing *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990)). A party's default does not suggest that the party has admitted the amount of damages that the moving party seeks. *See Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

However, no hearing is needed where the damages can be determined from the evidence submitted, and "a reasonable calculation of damages should be made by looking at the evidence and the affidavits submitted by the moving party." *E. Elec. Corp. of New Jersey v. Shoemaker Const. Co.*, 652 F. Supp. 2d 599, 605. (citing *J & J Sports Prods. v. Roach*, 2008 U.S. Dist. LEXIS 109055, 2008 WL 8901291 (E.D. Pa. July 8, 2008)). "If a reasonable calculation cannot be made from the evidence and affidavits, then a hearing may be held to better determine the appropriate calculations." *Id.* (citing *Bakley v. A & A Bindery, Inc.*, 1987 WL 12871, 1987 U.S. Dist. LEXIS 5546 (E.D. Pa. June 18, 1987)).

### III. Discussion

Despite recognizing in their motion that the court must consider the three factors articulated by the Third Circuit in *Chamberlain*, Plaintiff makes no specific or explicit arguments on these factors. On this basis alone the court could deny Plaintiff's motion. *See Hurst v. City of Rehoboth Beach*, 288 F. App'x 20, 23 (3d Cir. 2008)(district court did not abuse its discretion when it denied motion for default judgment in which Plaintiff did not show how he would be prejudiced by an order denying his motion or that any delay in responding to the complaint was due to culpable conduct.) Nonetheless

the Chamberlain factors, *i.e.*, prejudice to plaintiff, lack of litigable defenses, and culpable conduct of the defendant, are still implicitly evident through Plaintiff's general arguments.

### A. Prejudice to Plaintiff

Plaintiff asserts that continued infringement of its copyrighted work greatly impairs the market value of that work, because others competing in that business or in related businesses, will not want to obtain a license to Plaintiff's work if it is already associated with a competing business. Furthermore, potential licensees of Plaintiff will not want to pay license fees to Plaintiff if they see others taking and using Plaintiff's work for their own commercial purposes without paying any fee at all. Thus, by not entering default Plaintiff will be prejudiced by Defendant's continued infringement. *See also Strike 3 Holdings, LLC v. Vokoun*, No. 120CV14321NLHAMD, 2022 WL 310201, at *4 (D.N.J. Feb. 2, 2022) (Not entering default judgment would simply result in an interminable delay during which Defendant continues to violate Plaintiff's rights.)

### B. Litigable Defenses

**\*3**   To state a copyright infringement claim, "a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 67 (3d Cir. 2018) (quoting *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002)); accord *Douglas v. Osteen*, 317 F. App'x 97, 99 (3d Cir. 2009). Plaintiff has claimed such here and nothing in the record indicates a defense to that claim. In fact, because Defendant did not respond, the court cannot determine whether Defendant has any meritorious defenses. *See Teamsters Health & Welfare Fund of Philadelphia & Vicinity v. Dubin Paper Co.*, No. CIV. 11-7137 JBS KMW, 2012 WL 3018062, at *4 (D.N.J. July 24, 2012). Thus, Defendant lacks litigable defenses at this time.

### C. Culpable Conduct

In this context the Third Circuit has defined culpable conduct as actions taken willfully or in bad faith. *See Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 123–24 (3d Cir. 1983). Here there is nothing in the record "to suggest that anything other than [defendant's] willful negligence caused [his] failure to file an answer." *Prudential Ins. Co. of AM. V. Taylor*, 2009 WL 536403, at *1 (D.N.J. Feb. 27, 2009). Plaintiff notified Defendant of his alleged infringement prior

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 145 of 237

Grant Heilman Photography, Inc. v. Gallagher, Not Reported in Fed. Supp. (2024)

2024 WL 666147

to even initiating this lawsuit and over six months have passed since Defendant was served. Yet there has been no response from Defendant. Accordingly, the court must assume the Defendant is culpable for his failure to respond and entry of default judgment is appropriate.

**IV. Remedies**

Having determined that default judgment is appropriate, the court next assesses the remedies sought by Plaintiff, mindful of the fact that its damages allegations need not be accepted as true. Plaintiff discusses four remedies: actual damages, statutory damages, attorney's fees and costs, and a permanent injunction stopping Defendant from continuing to use Plaintiff's copyrighted work. The court will address each of these remedies in turn.

**A. Actual Damages**

Pursuant to 🚩 17 U.S.C. § 504(b), a "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement." Actual damages are often measured by injury to the market value of the copyrighted work, which may include, lost revenues. *See Leonard v. Stemtech Int'l Inc.*, 8.34 F.3d 376, 390 (3d Cir. 2016). The copyright owner may also recover the fair market value of the licensing fee that would have been charged for the work that was infringed. *Id.* (citing 🚩 *On Davis v. The Gap, Inc.*, 246 F.3d 152, 165 (2d Cir. 2001)). To demonstrate entitlement to a reasonable license fee, the fair market value of an infringed work may be established by evidence of "what a willing buyer would have been reasonably required to pay a willing seller for the copyright holder's work." 🚩 *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 539-40 (4th Cir. 2007).

Plaintiff has provided evidence that it has licensed the work at issue here for $940 for a limited one-time use as a physical print. While it has never licensed the work for reproduction and display on a website, Plaintiff claims it would have charged at least $1,080 per year to use the work. Since Defendant posted the work on his website over 7 years ago, Plaintiff claims actual damages of $7,560. However, given Defendant's failure to respond and in turn participate in discovery Plaintiff has not been able to determine exactly how long Defendant has been using the work for commercial purposes or identify profits related to his infringement that are recoverable under 🚩 17 U.S.C. § 504(b). Accordingly,

Plaintiff asserts that actual damages alone are inadequate and, in the alternative, seeks an award for statutory damages.

**B. Statutory Damages**

**\*4** Pursuant to 🚩 17 U.S.C. § 504(c), Plaintiff may elect to recover statutory damages for Defendant's infringement of Plaintiff's exclusive rights in its copyrighted work, and enhancement of his statutory award based upon the willfulness of such infringement. Specifically, pursuant to 🚩 17 U.S.C. § 504(c)(2), the court in its discretion may increase an award for statutory damages up to $150,000.00 when infringement was committed willfully.

In determining the amount of statutory damages, "courts should consider (1) expenses saved and profits reaped by the infringer; (2) revenues lost by the plaintiff; (3) the strong public interest in insuring the integrity of the copyright laws; and (4) whether the infringement was willful and knowing or innocent and accidental." *Broad. Music*, 555 F. Supp. 2d at 544 (citing *Original Appalachian Artworks, Inc. v. J.F. Reichert, Inc.*, 658 F. Supp. 458, 465 (E.D. Pa. 1987)). Moreover, "it is important that an infringer not reap a benefit from its violation of the copyright laws [and] that statutory damages should exceed the unpaid license fees so that defendant will be put on notice that it costs less to obey the copyright laws than to violate them." *Id.*, 555 F. Supp. 2d at 544 (quoting *A & N Music Corp. v. Venezia*, 733 F. Supp. 955, 958 (E.D. Pa. 1990)).

Other courts in this district have awarded similarly situated Plaintiffs statutory damages in an amount of three to four times the lost licensing fee. *See Broad. Music, Inc. v. Kujo Long*, LLC, No. 1:14-CV-00449, 2014 WL 4059711 at *5 (M.D. Pa. Aug. 14, 2014) (awarding statutory damages in an amount that was "slightly less than three times the claimed lost fees); *See also Broad. 🚩 Music, Inc. v. It's Amore Corp.*, No. 3:08CV570, 2009 WL 1886038 at *8 (M.D. Pa. June 30, 2009) (awarding statutory damages three and one-half times the cost of the licensing fee"); *See also Broad. 🚩 Music, Inc. v. Shane's Flight Deck, Ltd.*, No. 1:09-CV-2151, 2010 WL 4916208, at *1-2 n. 2 (M.D. Pa. Nov. 24, 2010) (awarding statutory damages in an amount of three times the cost of the licensing fees).

Plaintiff further argues that Defendant's refusal to pay for their commercial use of Plaintiff's copyrighted work or defend this lawsuit, even after he was notified in writing

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 146 of 237

Grant Heilman Photography, Inc. v. Gallagher, Not Reported in Fed. Supp. (2024)

2024 WL 666147

of Plaintiff's copyright evidence actual knowledge or least reckless disregard of the fact that his conduct infringed on Plaintiff's copyright. As such, Plaintiff claims Defendant's infringement was willful. *See Ackourey v. Raja Fashions Bespoke Tailors*, No. 13-cv-2315, 2014 WL 4473656, at *3 (E.D. Pa. Sept. 11, 2014) (A willful copyright violation occurs when a defendant knows or should have known that his or her actions constitute copyright infringement); *See also Broad. Music, Inc.*, 555 F. Supp. 2d 537, 544 (E.D. Pa. 2008) (As a general rule, failure to defend a copyright claim is grounds for concluding that the infringement was willful.) Regardless in cases of non-willful infringement, statutory damages may be awarded up to $30,000.00. See 17 U.S.C. § 504(c) (1). Accordingly, Plaintiff believes his statutory damages for willful copyright infringement to be no less than $22,680 after considering a deterrent multiplier of three times his actual damages.

Despite the foregoing Plaintiff in its conclusion and proposed order only requests statutory damages in the more reasonable amount of $7,560, which is the same amount as its alleged actual damages. Accordingly, the court will award statutory damages of $7,560.00.

### C. Attorney's Fees and Costs

**\*5** Pursuant to 17 U.S.C. § 505, "the court in its discretion may allow the recovery of full costs by or against any party ... the court may also award reasonable attorney's fee to pay the prevailing party as part of the costs." Plaintiff asserts that upon entry of a final judgment, it is the prevailing party in this action. Furthermore, Plaintiff asserts that the willful nature of Defendant's infringement and the added costs as well as delays from Defendant's failure to defend make full attorney's fees and costs appropriate. To that end Plaintiff requests the Court award costs and attorney's fees in the amount of $4,590.00 consisting of fees in the amount of $4042.50 and costs in the amount of $547.50. Based on the court's review of the declaration and bills submitted by Plaintiff's counsel, these amounts are reasonable and will be awarded in their entirety.

### D. Injunctive Relief

As a general rule, a party prevailing on the merits must show four factors to obtain a permanent injunction: (1) it will suffer irreparable injury; (2) no remedy available at law would be sufficient; (3) the balance of hardships tips in its favor; and (4) the injunction would serve public interests. *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019). In the "specialized

context" of a default judgment, where the defendant does not respond and the plaintiff cannot quantify its damages, these factors generally weigh in favor of injunctive relief. *Freddy S.p.A. v. Kalai*, No. CV 20-628-MN, 2022 WL 1411690, at *3 (D. Del. Apr. 28, 2022), *report and recommendation adopted*, No. CV 20-628 (MN), 2022 WL 2915765 (D. Del. July 25, 2022)

Furthermore 17 U.S.C. § 502(a) allows "(a)ny court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." *See also A & N Music Corp.*, 733 F. Supp. at 957 ("[w]hen past infringement and a substantial likelihood of future infringements is established, a copyright holder is ordinarily entitled to a permanent injunction against the infringer.");

*See also Broad. Music, Inc. v. Shane's Flight Deck, Ltd.*, 2010 WL 4916208, at *1 (M.D. Pa. Nov. 24, 2010) (finding a permanent injunction was warranted for alleged copyright infringement on a motion for default judgment "given the past and likely continued violations by defendant."); *See also Ottomanson, Inc. v. UCAI, LLC*, 2020 WL 205945, at *4 (D.N.J. Jan. 10, 2020) ("Merely enjoining infringement does not deprive the defendant of anything to which it is entitled, and it is in the public interest to do so."). Accordingly, the court will issue a permanent injunction against the Defendant.

### E. Interest

In its proposed order Plaintiff also seeks pre and post judgment interest pursuant to 28 U.S.C. § 1961 on all damages, fees, and costs awarded. However, 28 U.S.C. § 1961 only provides for post judgment interest. *See* 28 U.S.C.A. § 1961(a) ("interest shall be calculated from the date of the entry of the judgment.") Since Plaintiff makes no other arguments regarding its entitlement to prejudgment interest, the court will only order interest on Plaintiff's award from the date of judgment.

### V. Conclusion

Based on the foregoing the court will enter default judgment against the Defendant, and award $7,560 in statutory damages, $4,590.00 in attorney's fees and costs, as well as enjoin Defendant from continuing to infringe on Plaintiff's copyright. An appropriate order follows.

Grant Heilman Photography, Inc. v. Gallagher, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 147 of 237
2024 WL 666147

**All Citations**

Not Reported in Fed. Supp., 2024 WL 666147

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT N

**Kennedy v. Creditgo, LLC, Not Reported in Fed. Supp. (2015)**

2015 WL 7760181

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 149 of 237

🚩 KeyCite Yellow Flag

Distinguished by   Tom Hussey Photography, LLC v. BDG Media, Inc.,
D.Del.,   December 18, 2020

2015 WL 7760181
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Stephen KENNEDY, Plaintiff,

v.

CREDITGO, LLC, Defendant.

Civil Action No. 15-1790 (JBS-KMW)

|

Signed 12/02/2015

**Attorneys and Law Firms**

James C. Jensen, Laufer Dalena Cadicina Jensen & Boyd
LLC, Morristown, NJ, for Plaintiff.

**OPINION**

SIMANDLE, Chief Judge:

**\*1**  Presently before the Court is Plaintiff Stephen Kennedy's
Motion for Default Judgment. (Dkt. Entry No. 14.) For the
reasons set forth below, Plaintiff's Motion will be granted in
part and denied without prejudice in part.

**I. BACKGROUND**

Plaintiff Stephen Kennedy, a professional photographer,
brings this action against Defendant Creditgo, LLC
("Defendant" or "Creditgo"), for copyright infringement
and removal of copyright management information ("CMI")
under 17 U.S.C. Chapters 5 and 12.

On December 8, 2008, Plaintiff registered a stock
photography image with the United States Copyright Office,
Registration Number VAu 1-012-293. (Compl. ¶ 15.) The
image, published on Plaintiff's website, captures a model
standing against a car. (Compl. ¶¶ 11, 12.) As the image's
creator, Plaintiff is credited with the rights to the image by an
identifying watermark displayed at the bottom of the image.
(Compl. ¶ 13.)

Subsequent to Plaintiff's registering the image with the
Copyright Office, Defendant used the image in association
with its website, www.carloango.com, without Plaintiff's
permission or consent. (Compl. ¶ 41.) The image was
displayed on Defendant's website above the caption, "24/7
Customer Service & Support" with Plaintiff's identifying
watermark omitted. (Compl. ¶¶ 18, 22.)

On October 8, 2014, after discovering the image on
Defendant's website, Plaintiff, by way of counsel, notified
Defendant of the infringing use of the image. (Compl. ¶ 27.)

Defendant responded to Plaintiff's notification via telephone
on November 14, 2014. (Compl. ¶ 29.) After the telephone
conversation, the infringing image was removed from
Defendant's website. (Compl. Ex. E.)

Plaintiff filed a Summons and Complaint on March 11,
2015, alleging copyright infringement and removal of CMI.
(Greenberg Decl. ¶ 5; Compl. ¶¶ 41-55.)

On August 7, 2015, upon Defendant's failure to submit an
Answer in the required time period, the Clerk of this Court
entered a default against Defendant. (Greenberg Decl. ¶ 10;
Dkt. Entry No. 12.)

Plaintiff now moves for default judgment against Defendant
requesting a permanent injunction, statutory damages totaling
$175,000.00, and costs of $457.00. (Mem. Law Supp. 5, 6, 8.)

**II. ANALYSIS**

The entry of default judgment is a two-step process governed
by 🚩 Federal Rule of Civil Procedure 55. First, the party
seeking default judgment must request that the Clerk of
Court enter a default against the party for failing to plead
or otherwise defend. 🚩 Fed. R. Civ. P. 55(a). Second, after
the Clerk of Court enters default, the party must apply to the
Court for a default judgment. 🚩 Fed. R. Civ. P. 55(b)(2). The
entry of default by the Clerk does not automatically entitle
the non-defaulting party to default judgment; rather, the entry
of default judgment is left primarily to the discretion of the
district court. 🚩 Hritz v. Woma Corp., 732 F.2d 1178, 1180
(3d Cir. 1984).

2015 WL 7760181

The Clerk of Court entered default against Defendant on August 7, 2015 (Dkt. Entry No. 12) fulfilling the first requirement of 🚩 Rule 55. The Court must now consider whether granting default judgment against Defendant is appropriate. For the reasons set forth below, Plaintiff's Motion will be granted as to Defendant's liability.

## A. Legitimate Cause of Action

**\*2**  Before granting a default judgment, the Court must consider "whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." 🚩 *DirecTV, Inc. v. Decroce*, 332 F. Supp. 2d 715, 717 (D.N.J. 2004) (citing 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2688, at 63 (3d ed. 1998)). Once a party has defaulted, the Court must treat the factual allegations as proven by Plaintiff. *See* 🚩 *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

Plaintiff alleges that Defendant committed copyright infringement in violation of section 501 of the Copyright Act by using an image registered to Plaintiff by the United States Copyright Office without Plaintiff's authorization, license or consent. (Compl. ¶¶ 15, 41-42.) Additionally, Plaintiff alleges that Defendant removed Plaintiff's identifying watermark on the image in violation of section 1202(b) of the Digital Millennium Copyright Act ("DMCA"). (Compl. ¶ 50.) Each of these will be addressed in turn.

## 1. Copyright Infringement

First, Plaintiff seeks default judgment against Defendant for copyright infringement under 🚩 17 U.S.C. § 501 of the Copyright Act. To succeed on a claim for copyright infringement, a plaintiff must show: "(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." 🚩 *Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002). "Copying refers to the act of infringing any of the exclusive rights ... as set forth at 🚩 17 U.S.C. § 106, 'including the rights to distribute and reproduce copyrighted material.'" 🚩 *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 207 (3d Cir.

2005) (quoting 🚩 *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991)).

The uncontested record indicates that Plaintiff owned a valid copyright by registering this image with the United States Copyright Office. (Compl. ¶ 15.) Furthermore, the record indicates that Defendant used the registered image on its website without Plaintiff's authorization. (Compl. ¶ 41.) The Court accepts these allegations as true and concludes that Plaintiff has established a legitimate claim for copyright infringement on which relief can be granted.

## 2. Removal of CMI

Next, Plaintiff seeks default judgment for Defendant's removal of copyright management information ("CMI") as prohibited under 17 U.S.C. § 1202 of the DMCA. Section 1202(b) provides in part: "No person shall, without the authority of the copyright owner or the law—(1) intentionally remove or alter any copyright management information." 17 U.S.C. § 1202(b). The definition of "copyright management information" under section 1202(c) includes "[t]he name of, and other identifying information about, the author of a work." 17 U.S.C. § 1202(c)(2). [1]

Plaintiff has established that Defendant removed the CMI in violation of 17 U.S.C. § 1202 by displaying the image on its website in a way that omitted Plaintiff's ownership watermark. (Compl. ¶ 50.) The Court accepts these allegations as true and concludes that Plaintiff has established a legitimate cause of action under the DCMA.

## B. Default Judgment

**\*3**  The Court must now consider three factors that control whether a default judgment should be granted: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." 🚩 *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000).

The Third Circuit's factors weigh in favor of default judgment. First, Plaintiff would suffer prejudice if default judgment were denied because Plaintiff has no other remedy against Defendant. Under the second and third factors, Defendant's

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 151 of 237

Kennedy v. Creditgo, LLC, Not Reported in Fed. Supp. (2015)

2015 WL 7760181

failure to respond indicates the lack of a meritorious defense and constitutes culpable conduct. *See York Int'l Corp. v. York HVAC Sys. Corp.*, No. 09-3546, 2010 U.S. Dist. LEXIS 36709, at *9, 2010 WL 1492851 (D.N.J. Apr. 14, 2010) (holding that failure to respond to the Complaint or Motion for Default Judgment is culpable conduct and indicates no meritorious defenses). Further, no available defense is apparent from the pleadings. Accordingly, default judgment against Defendant is appropriate.

For these reasons, Plaintiff's Motion will be granted as to Defendant's liability for copyright infringement and removal of CMI.

### III. APPROPRIATE RELIEF

The Court must next consider Plaintiff's request for injunctive relief, damages, and costs. "Although the Court should accept as true the well-pleaded factual allegations of the Complaint when considering a motion for default judgment, the Court need not accept the moving party's legal conclusions or factual allegations relating to the amount of damages." *Broad. Music, Inc. v. Spring Mt. Area Bavarian Resort, LTD*, 555 F. Supp. 2d 537, 541 (E.D. Pa. 2008) (citing *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990)).

#### A. Injunctive Relief

Plaintiff requests a permanent injunction against Defendant to guarantee Defendant will not continue to offend Plaintiff's copyrights. Section 502(a) of the Copyright Act provides that the Court may grant "final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).

In order for a permanent injunction to be granted, Plaintiff must show some cognizable danger that, without the injunction, Defendant will continue to injure Plaintiff by infringing on copyrights. *See Granger v. One Call Lender Servs., LLC*, No. 10-3442, 2012 U.S. Dist. LEXIS 104885, at *16, 2012 WL 3063995 (E.D. Pa. July 26, 2012.) ("Because injunctive relief is prospective, 'a permanent injunction will issue only where a threat of harm exists, not just where potential harm exists.'") (quoting *McLendon v. Cont'l Can Co.*, 908 F.2d 1171, 1182 (3d Cir. 1990)); *see also Primepoint, LLC v. PrimePay, Inc.*, 401 F. App'x 663, 664 (3d Cir. 2010.)

("Where the illegal conduct has ceased, the party seeking the injunction bears the burden of proving that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.").

Because the infringing image was removed promptly from Defendant's website upon notice of violation and because there is no indication that such infringement has been, or is likely to be, repeated, Defendant no longer presents a threat of continued copyright infringement against Plaintiff. (Compl. Ex. E.) Furthermore, Plaintiff has shown no basis for an existing threat of harm; rather, Plaintiff's request for an injunction is premised on the *potential* that Defendant may continue to offend the copyrights in the future. Absent any indication of an existing threat against Plaintiff, a permanent injunction is not warranted.

**\*4** For these reasons, Plaintiff's Motion as to injunctive relief is denied without prejudice.

#### B. Damages

Plaintiff also requests maximum statutory damages of $150,000.00 under 17 U.S.C. § 504 for copyright infringement and $25,000.00 under 17 U.S.C. § 1203(c)(3)(B) for removal of CMI.

An award of statutory damages serves two purposes: 1) to compensate the plaintiff for the violation; and 2) to deter the defendant from future violations. *See Broad. Music*, 555 F. Supp. 2d at 544 (quoting *Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*, No. 03-4962, 2005 U.S. Dist. LEXIS 416, at *12, 2005 WL 67077 (E.D. Pa. Jan. 11, 2005)).

When considering the appropriate amount of statutory damages, courts should consider the following factors: "(1) expenses saved and profits reaped by the infringer; (2) revenues lost by the plaintiff; (3) the strong public interest in insuring the integrity of the copyright laws; and (4) whether the infringement was willful and knowing or innocent and accidental." *Original Appalachian Artworks, Inc. v. J.F. Reichert, Inc.*, 658 F. Supp. 458, 465 (E.D. Pa. 1987). "In determining the amount of statutory damages, it is important that an infringer 'not reap a benefit from its violation of the copyright laws [and] that statutory damages should exceed the unpaid license fees so that defendant will be put on notice that it costs less to obey the copyright laws than to violate them.'"

Kennedy v. Creditgo, LLC, Not Reported in Fed. Supp. (2015)

2015 WL 7760181

Broad. *Music,* 555 F. Supp. 2d at 544 (quoting *A & N Music Corp. v. Venezia,* 733 F. Supp. 955, 958 (E.D. Pa. 1990)).

In the context of default judgment cases, courts can award the minimum statutory damages without conducting a hearing [2] and can award above the minimum if the facts and filings provide a sufficient basis to determine whether the requested statutory damages are just. *See id.* at 544-45. In determining the just amount of statutory damages to award, "[t]he defendant's conduct is the most important factor." *Schiffer Publ'g, Ltd v. Chronicle Books, LLC,* No. 03-4962, 2005 U.S. Dist. LEXIS 416, at *14, 2005 WL 67077 (E.D. Pa. Jan. 11, 2005) (citing *Original Appalachian,* 658 F. Supp. at 465).

Each of Plaintiff's requests for statutory damages will be addressed in turn.

### 1. Copyright Infringement

Plaintiff requests the maximum statutory damages of $150,000 for willful copyright infringement. Under 17 U.S.C. § 504(c), a plaintiff may "recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work ... a sum not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1). If the infringement was committed willfully, the court "may increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2).

As willfulness is not defined in either the Copyright Act or its legislative history, its meaning has come from the courts. *See Original Appalachian,* 658 F. Supp. at 464. Courts have defined willfulness "as requiring the plaintiff to show that the infringer acted with actual knowledge or reckless disregard for whether its conduct infringed upon the plaintiff's copyrights." *Id.* A defendant's knowledge or reckless disregard does not have to be shown directly but "may be inferred from the defendant's conduct." *Bly v. Banbury Books, Inc.,* 638 F. Supp. 983, 986 (E.D. Pa 1986).

**\*5** Plaintiff alleges that Defendant's infringement is willful because Defendant purposefully removed Plaintiff's copyright management data before displaying the photo. Because Defendant has defaulted, the Court must accept as true Plaintiff's factual allegations. *See Comdyne I, Inc.,*

908 F.2d at 1149. The uncontested record indicates Defendant removed Plaintiff's watermark, which identified the image as belonging to the Plaintiff. From this behavior, the Court infers evidence of willfulness. This is to be considered, among other evidence, to determine whether Defendant knew it was infringing on Plaintiff's copyright or exhibited reckless disregard by displaying the image in such a manner on its website. [3]

In addition, willful infringement does not automatically give rise to heightened statutory damages. *See Broad. Music,* 555 F. Supp. 2d at 545 (finding plaintiff's request for $2,000 per infringed work reasonable despite willful infringement including defendant's persistent conduct after notification of violation). [4] Some courts will only award enhanced statutory damages in "exceptional cases" or with evidence of "especially egregious circumstances." *See Schiffer Publ'g, Ltd v. Chronicle Books, LLC,* No. 03-4962, 2005 U.S. Dist. LEXIS 416, at *16, 2005 WL 67077 (E.D. Pa. Jan. 11, 2005) ("awards outside the ordinary statutory range are made only in 'exceptional cases,' and there must be evidence of 'especially egregious circumstances.'") (citing *Joe Hand Promotions v. Burg's Lounge,* 955 F. Supp. 42, 44 (E.D. Pa. 1997)(internal citations omitted)).

Because this is a default judgment case with a request for statutory damages above the minimum, and because additional information is needed to address willfulness, Plaintiff must provide a sufficient basis for the Court to determine whether the requested statutory damages are just. *See Broad. Music,* 555 F. Supp. 2d at 544. Plaintiff has not established that Defendant's actions in this case constitute egregious circumstances, especially since Defendant did not persist in the infringing conduct and instead promptly removed the offending image from its website upon Plaintiff's notification and before suit was commenced.

**\*6** To make an appropriate determination on damages, the Court requires more information including, if possible, the methods and motives of this infringement, expenses saved and profits reaped by the infringer and revenues lost by the plaintiff. *See Original Appalachian,* 658 F. Supp. at 465. Plaintiff provided the Court with the relevant ranges for awarding statutory damages under the statute. However, Plaintiff has not advised the Court of his licensing rate, nor has he provided an estimate of the loss he experienced. For this reason, the Court will direct Plaintiff to submit additional briefing and an affidavit or certification of facts relevant to the

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 153 of 237
Kennedy v. Creditgo, LLC, Not Reported in Fed. Supp. (2015)
2015 WL 7760181

question of damages, consistent with the above discussion. In lieu thereof, Plaintiff may indicate that the statutory minimum of $750 is sufficient.

## 2. Removal of CMI

Plaintiff also requests the maximum statutory damages of $25,000 for Defendant's removal of CMI. Under 17 U.S.C. § 1203(c), a plaintiff may "recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000." 17 U.S.C. § 1203(c)(3)(B).

As noted above, the Court requires additional information to determine the appropriate award of statutory damages. The Court must have a basis to make this determination, such as revenues lost by Plaintiff and the amount of expenses saved and profits gained by Defendant. *See Original Appalachian,* 658 F. Supp. at 465. Additionally, the Court requires additional information as to how Defendant's conduct rises to such an egregious level as to warrant the maximum award of statutory damages.

The Court will direct Plaintiff to submit additional briefing and an affidavit or certification on damages. In lieu thereof, Plaintiff may indicate that the statutory minimum of $2,500 is sufficient.

## C. Costs

Finally, Plaintiff requests costs totaling $457.00.

Pursuant to 17 U.S.C. § 505, a court may, at its discretion, award costs and attorneys' fees to a prevailing party in a copyright infringement suit. 17 U.S.C. § 505.

Here, the Court finds the award of costs is appropriate. Plaintiff's request for $457.00 is reasonable. [5]

For these reasons, Plaintiff's Motion as to costs is granted.

## IV. CONCLUSION

In light of the foregoing, Plaintiff's Motion for Default Judgment will be granted as to Defendant's liability, denied as to injunctive relief without prejudice, and granted as to costs. The Court defers the determination of statutory damages pending further submissions; the Court will direct Plaintiff to submit supplemental briefing and an affidavit or certification of facts relevant to damages within fourteen (14) days of entry of this Order. An appropriate Order accompanies this Opinion.

## All Citations

Not Reported in Fed. Supp., 2015 WL 7760181

---

## Footnotes

1    Addressing a similar cause of action under the DCMA, the Third Circuit stated, "the mere fact that [Plaintiff]'s name appeared in a printed gutter credit near the Image rather than as data in an "automated copyright protection or management system" does not prevent it from qualifying as CMI or remove it from the protection of § 1202." *Murphy v. Millennium Radio Grp. LLC,* 650 F.3d 295, 305 (3d Cir. 2011).

2    In *Fonovisa, Inc. v. Merino*, the District Court for the District of New Jersey noted that "[i]n default judgments in copyright infringement cases, federal courts routinely award minimum statutory damages." No. 06-3538, 2006 U.S. Dist. LEXIS 89212, at *6, 2006 WL 3437563 (D.N.J. Nov. 27, 2006).

3    Some courts have inferred willfulness by way of defendant's default alone. *See Sony Music Entertainment v. Cassette Prods.*, No. 92-4494, 1996 U.S. Dist. LEXIS 21552, at *11, 1996 WL 673158 (D.N.J. Aug. 16, 1996) ("The Court may infer that Defendant Lopez willfully infringed Plaintiffs' copyrights in the sound recordings

Kennedy v. Creditgo, LLC, Not Reported in Fed. Supp. (2015)

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 154 of 237

2015 WL 7760181

because Defendant Lopez defaulted and consciously chose not to defend this action"); 🚩 *Peer Int'l Corp. v. Max Music & Entm't, Inc.*, No. 03-0996, 2004 U.S. Dist. LEXIS 12760, at *8, 2004 WL 1542253 (S.D.N.Y. July 9, 2004)* ("Additionally, the entry of default judgment alone supports the finding of willfulness."); 🚩 *Miche Bag, LLC v. Ayers*, No. 4-09-3261, 2010 U.S. Dist. LEXIS 130663, at *10, 2010 WL 5141662 (D.S.C. Sept. 22, 2010)* ("Furthermore, a defendant's default may establish willful copyright infringement.").

4    *See also Granger v. Once Call Lender Servs., LLC*, No. 10-3442, 2012 U.S. Dist. LEXIS 104885, at *8-9, 2012 WL 3063995 (E.D. Pa. July 26, 2012)* (using multiplier of ten to award $12,000 per willful infringement where award of $150,000 was "clearly excessive" because the only evidence presented as to Plaintiff's actual loss was licensing fee); *Palmer v. Slaughter*, No. 99-899, 2000 U.S. Dist. LEXIS 22118, at *14, 2000 WL 1010261 (D. Del. July 13, 2000)* (awarding $10,000 per work where willful infringement involved defendant's refusal to cease infringing activities after plaintiff's repeated requests); *but see Teri Woods Publ'g, L.L.C. v. Williams*, No. 12-4854, 2013 U.S. Dist. LEXIS 167759, at *9-10, 2013 WL 6179182 (E.D. Pa. Nov. 25, 2013)* (awarding maximum statutory damages of $150,000 without evidence of plaintiff's lost profits).

5    Plaintiff has not sought attorneys' fees in connection with counsel's work to date, pointing out that these actions are "routinely" litigated by counsel's office. Because additional services are now required of counsel, Plaintiff may seek fees in an amount documented as required by Local Civil Rule 54.2 within the above fourteen (14) day period.

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT O

KeyCite Yellow Flag

Distinguished by  Coach, Inc. v. Bag Place, Co.,  D.N.J.,  May 7, 2012

2009 WL 3633882
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

LOUIS VUITTON MALLETIER,
S.A., a foreign business entity, Plaintiff,
v.
Joseph MOSSERI, an individual d/b/a Labolso.com,
d/b/a Fashionetailer.com, agent of Pouchette.com,
a/k/a Joseph Moss, d/b/a Sacbelle.com, d/b/
a Leshanta.com, and 613 Camera Corporation, a
New York Corporation d/b/a Pouchette.com, d/
b/a Labolso.com, d/b/a Fashionetailer.com, d/b/
a Sacbelle.com, d/b/a Leshanta.com, and Modena
Apparel Corporation a New York Corporation, d/
b/a Labolso.com, d/b/a Fashionetailer.com, d/
b/a Pouchette.com, d/b/a Sacbelle.com, d/b/a
Leshanta.com, and Esther Shasho, a/k/a Esther Shasha,
and Bilibi, Inc., and JOhn Does 1–10, Defendants.

Civil No. 07–2620.
|
Oct. 28, 2009.

**Attorneys and Law Firms**

Gabriel H. Halpern, Esq., Pinilis Halpern, LLP, Morristown,
NJ, for Plaintiff.

*MEMORANDUM OPINION*

BROWN, Chief Judge.

 **\*1**  This matter comes before the Court on Plaintiff
Louis Vuitton Malletier, S.A.'s ("Louis Vuitton") motion
for default judgment (Doc. No. 23) as against Defendant
613 Camera Corp., a New York Corporation doing
business as Leshanta.com, Fashionetailer.com, Sacbelle.com,
Balenci.com, Labolso.com, Pouchette.com, and Yuella.com
("Defaulting Defendant").[1] For the following reasons, Louis
Vuitton's motion will be granted.

*Background*

Louis Vuitton is a foreign manufacturer and distributer of
luxury handbags, shoes, hats, umbrellas, and belts whose
goods bear federally registered trademarks. According to
Louis Vuitton, Defaulting Defendant, through its various
websites, has sold counterfeit Louis Vuitton products in at
least six varieties—handbags, wallets, key cases, traveling
bags, pocketbooks, and belts—that infringe upon 27 of Louis
Vuitton's registered trademarks.[2] Louis Vuitton contends
that it never authorized Defaulting Defendant to use its
marks and that Defaulting Defendant knew that it did
not have permission to employ Louis Vuitton's marks,
but that it nevertheless advertised and sold goods bearing
Louis Vuitton's marks so that consumers would mistake the
counterfeit goods for genuine products. (*See* Compl. at ¶¶ 2,
13, 15, 21–28.)

On June 5, 2007, Louis Vuitton filed a five-count
Complaint presenting claims of trademark infringement,
false designation of origin, trademark dilution, and unfair
competition.[3] Plaintiff's claims arise under sections 32
and 43(a) and (c) of the Lanham Act, 15 U.S.C. §§
1114, 1125(a) and (c), as well as state common
law. Defaulting Defendant was properly served with the
Complaint, but failed to file a response within the time
allowed under Federal Rule of Civil Procedure 12(a)(1)
(A). On February 3, 2009, the Clerk of the Court entered
default against this Defendant pursuant to Federal Rule of
Civil Procedure 55(a). Louis Vuitton now moves for default
judgment against Defaulting Defendant, seeking statutory
damages under the Lanham Act, a permanent injunction
against Defaulting Defendant, transfer of the internet domain
name Balenci.com to Louis Vuitton, and an award of
reasonable attorneys' fees, costs, and investigative fees.

*Analysis*

Plaintiff has filed claims alleging violations of federal law
pursuant to the Lanham Act, 15 U.S.C. §§ 1051–1127.
This Court exercises jurisdiction over Plaintiff's Lanham
Act claims pursuant to 28 U.S.C. § 1331. This Court has
supplemental jurisdiction over the state law claims pursuant
to 28 U.S.C. § 1367 because (1) this Court has subject-
matter jurisdiction over the Lanham Act claims, (2) the state

law claims and the federal claims derive from a "common nucleus of operative fact," and (3) the claims are such that they would normally "be expected to be tried in one judicial proceeding." *MCI Telecomms. Corp v. Teleconcepts, Inc.,* 71 F.3d 1086, 1102 (3d Cir.1995).

A court may grant default judgment pursuant to *Federal Rule of Civil Procedure* 55(b)(2). On a motion for default judgment, the Court must accept as true all allegations contained in the Complaint, except allegations concerning the amount of damages. *Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149 (3d Cir.1990).

## I. Liability

**\*2** Accepting the allegations of the Complaint as true and admitted by Defaulting Defendant, as this Court must, Louis Vuitton's allegations establish violations of sections 32 and 43(a) of the Lanham Act, *15 U.S.C. §§ 1114* and 1125(a). The record reflects that Plaintiff has valid and legally protectable marks, and, having viewed the counterfeit marks, most of which appear to be exact duplicates of Louis Vuitton marks and products (*see generally* Livadkin Decl. Exs. F–R), this Court is satisfied that Defaulting Defendant's use of the marks is likely to cause consumer confusion.

*See* *Platypus Wear, Inc. v. Bad Boy Club, Inc.,* No. 08–2662, 2009 WL 2147843, at \*2 (D.N.J. July 15, 2009) (citing *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir.2000)). By virtue of these Lanham Act violations, Louis Vuitton has also established its common law claims for trademark infringement and unfair competition. *See, e.g.,* *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1433 (3d Cir.1994) (citations omitted); *Pharmacia Corp. v. Alcon Labs., Inc.,* 201 F.Supp.2d 335, 386 (D.N.J.2002) (citing *Apollo Distrib. Co. v. Jerry Kurtz Carpet Co.,* 696 F.Supp. 140, 143 (D.N.J.1988)). The record also reflects that Louis Vuitton has well-established "famous marks," that Defaulting Defendant is using these marks without permission in interstate commerce, and that Defaulting Defendant's unauthorized use of Plaintiff's marks diminishes the marks' ability to identify Plaintiff's goods. (*See* Compl. ¶¶ 14–28, 48–51.) Accordingly, Louis Vuitton has also established a claim for trademark dilution under section 43(c) of the Lanham Act, *15 U.S.C. § 1125(c). See* *Louis*

*Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F.Supp.2d 567, 581–82 (E.D.Pa.2002).

Defaulting Defendant has presented no meritorious defenses, and Louis Vuitton will be prejudiced in the absence of default judgment. *See* *Chanel, Inc. v. Gordashevsky,* 558 F.Supp.2d 532, 538 (D.N.J.2008) (applying factors enumerated in *Emcasco Ins. Co. v. Sambrick,* 834 F.2d 71, 73 (3d Cir.1987)). Accordingly, this Court will grant default judgment against Defaulting Defendant on Plaintiff's Lanham Act and common law claims of trademark infringement, false designation of origin, trademark dilution, and unfair competition.

## II. Statutory Damages

The Lanham Act provides for the recovery of statutory damages if it is impossible to calculate lost profits. *See* 15 U.S.C. § 1117(c). Because Defaulting Defendant failed to answer the Complaint, Louis Vuitton is unable to calculate its lost profits. The Lanham Act authorizes statutory damages between \$500 and \$100,000 per counterfeit mark per type of good, and up to \$1 million per counterfeit mark per type of good if the offending party's unauthorized use of the trademark was willful. 15 U.S.C. § 1117(c) (1998). [4] This Court has considerable discretion in awarding statutory damages for trademark infringement, and a number of courts in this Circuit have weighed the following considerations in determining the proper amount: "(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the [trademark]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether [the] defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant." *Platypus Wear,* 2009 WL 2147843, at \*6–7 (citation omitted) (adopting factors from copyright law); *see also* *Louis Vuitton Malletier & Oakley, Inc.,* 211 F.Supp.2d at 583–84 (weighing similar factors).

**\*3** Here, Louis Vuitton requests \$4,072,892.22 in statutory damages for the 27 trademarks and six types of goods counterfeited. Louis Vuitton based this request on the average value of inventory listed on Defaulting Defendant's six websites—\$25,141.31—multiplied by the number of trademarks and types of goods counterfeited. (Pl.'s Mot. at

21.[5]) After careful consideration of the above factors, the Court is persuaded that the amount of statutory damages requested by Louis Vuitton is warranted by the circumstances of Defaulting Defendant's misconduct. Defaulting Defendant has not cooperated in this litigation, and, although this measurement of statutory damages, being less than $100,000 per counterfeit mark per type of good, would not require a showing of willfulness, it is clear that Defaulting Defendant did act willfully in advertising and selling counterfeit products as genuine Louis Vuitton products through its websites. *See* *SecuraComm Consulting Inc. v. Securacom Inc.,* 166 F.3d 182, 187 (3d Cir.1999) ("[W]illful infringement [involves] 'an aura of indifference to plaintiff's [trademark] rights' or a 'deliberate[ ] and unnecessar[y] duplicating [of a] plaintiff's mark ... in a way that was calculated to appropriate or otherwise benefit from the good will the plaintiff had nurtured.' " (quoting *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 662 (2d Cir.1970))), *superseded by statute on other grounds as recognized by* *Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 171 (3d Cir.2005); *see also* *Chanel,* 558 F.Supp.2d at 538 ("The fact that Defendant sold goods using marks that were identical to such strong and established marks conclusively demonstrates his desire and purpose to trade upon Chanel's goodwill."). Further, the fact that Defaulting Defendant operated its counterfeit goods-trafficking enterprise on the Internet exponentially increased the damage done, both to Louis Vuitton's reputation and to the public interest in fair markets. *See, e.g., N.V.E., Inc. v. Day,* No. 07–4283, 2009 WL 2526744, at *4 (D.N.J. Aug.18, 2009); *Louis Vuitton,* 211 F.Supp.2d at 584 (expressing concern that advertisements of counterfeit goods would be accessible to more than 143 million Internet consumers). The Court also notes that this Defendant has counterfeited other brands of luxury goods, as evidenced by the default judgment for trademark infringement entered by another court in this District. *Chanel, Inc. v. Joseph Mosseri,* No. 07–2619 (D.N.J.2008) (order of May 20, 2008) (entering default judgment against 613 Camera Corp.).

Other Courts in this District have awarded larger sums for statutory damages in similar trademark infringement cases involving the counterfeiting of comparable luxury goods. *See, e.g., Chanel, Inc. v. Joseph Mosseri,* No. 07–2619 (order of May 20, 2008) (awarding $180,000 per each of the seven infringed marks and three types of goods, for total statutory damages in the amount of $3,780,000); *Chanel, Inc. v. Craddock,* No. 05–1593 (D.N.J.2006) (order

of April 27, 2006) (awarding $100,000 per each of the nine infringed marks and nine types of goods, for total statutory damages in the amount of $8,100,000). This Court is satisfied that Louis Vuitton's requested statutory damages will sufficiently compensate Plaintiff and deter Defaulting Defendant and others from committing similar acts of trademark infringement. Therefore, the Court will award $25,141.31 per each of the 27 counterfeit marks and six types of goods, totaling $4,072,892.22 in statutory damages.

### III. Attorneys' Fees, Costs, and Investigative Fees

**\*4** Louis Vuitton requests attorneys' fees, costs, and investigative fees pursuant to the Lanham Act. With regard to attorneys' fees and costs, the Lanham Act permits an award of costs whenever a plaintiff establishes trademark infringement but limits attorneys' fees to a prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). Louis Vuitton, as the prevailing party, bears the burden of proving that this case qualifies as an exceptional case by clear and convincing evidence. *See, e.g.,* *Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1390 (5th Cir.1996); *Reed Publ'g (Nederland) B.V. v. Execulink, Inc.,* No. 98–1049, 1998 WL 812246, at *3 (D.N.J. Nov.17, 1998). Willful and deliberate trademark infringement constitutes an exceptional case for purposes of attorneys' fees. *See, e.g.,* *SecuraComm Consulting, Inc. v. Securacom, Inc.,* 224 F.3d 273, 280–82 (3d Cir.2000); *Chanel,* 558 F.Supp.2d at 539. The Lanham Act also permits an award of investigative fees incurred by an investigator acting under the supervision of the party's attorney. *Chanel,* 558 F.Supp.2d at 539 (citing *Louis Vuitton S.A. v. Downtown Luggage Ctr.,* 706 F.Supp. 839, 842 (S.D.Fla.1988); Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12083 (1984)).

This Court is satisfied that Louis Vuitton has presented clear and convincing evidence that Defaulting Defendant willfully infringed Louis Vuitton's trademarks. As noted above, Louis Vuitton has submitted copies of product listings from Defaulting Defendant's websites that advertised and sold the counterfeit Louis Vuitton products. (*See generally* Livadkin Decl. Exs. F–R.) This evidence persuades the Court that Defaulting Defendant acted willfully, because it deliberately attempted to deceive consumers so that it could profit from selling counterfeit versions of Louis Vuitton's products. Meanwhile, the Court is satisfied that the investigative fees incurred by Plaintiff were reasonably related to the detection of Defaulting Defendant's trademark infringement. (*See* Livadkin Decl. ¶¶ 10–14, 16–18, 20–22,

24–26, 30–31; *see generally* Holmes Decl., Voyles Decl.) Thus, this Court will award reasonable attorneys' fees, costs, and investigative fees to Louis Vuitton.

Plaintiff requests $14,595 in attorneys' fees for 41.7 hours of work billed by its attorneys. The supporting declarations of Plaintiff's attorneys indicate that Gabriel Halpern billed 13.7 hours and Stephen Gaffigan billed 28 hours on this matter, with each attorney charging $350 per hour. (Gaffigan Decl. ¶ 10; Halpern Decl. ¶ 6.) The Court has reviewed the itemized statements of hours billed submitted by Plaintiff's attorneys, and the Court finds these fees to be reasonable. (Gaffigan Decl. Ex. 1; Halpern Decl. Ex. A.) Plaintiff also requests costs in the amount of $500 (Gaffigan Decl. ¶¶ 14–17 & Ex. 2 (filing fee and process-serving fee)) and investigative fees in the amount of $3,938 (Holmes Decl. ¶ 32; Voyles Decl. ¶ 14.) The Court finds these fees reasonable and will award them.

## IV. Injunctive Relief

**\*5** Finally, Louis Vuitton requests that this Court permanently enjoin Defaulting Defendant from committing future acts of infringement against their trademarks. The Lanham Act empowers this Court to grant injunctive and other equitable relief to prevent further violations of Louis Vuitton's trademark rights. 15 U.S.C § 1116(a). The Supreme Court held in *eBay, Inc. v. MercExchange, LLC* that "well-established principles of equity" dictate that any plaintiff seeking a permanent injunction must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (citations omitted). Courts in this District have applied similar factors in considering permanent injunctions in trademark cases. For example, in *Chanel, Inc. v. Gordashevsky,* the court stated:

> Generally, to obtain a permanent injunction, a plaintiff must show that (1) the Court's exercise of equity jurisdiction is proper, (2) the [p]laintiff succeeded on the merits, and (3) the balance of equities tips in favor of injunctive relief. The first factor contains three sub-parts which require

the plaintiff to show (1) plaintiff has no adequate legal remedy; (2) the threatened injury is real, not imagined; and (3) no equitable defenses exist.

558 F.Supp.2d at 539 (citations omitted); *see also Microsoft Corp. v. Gonzales,* No. 06–4331, 2007 WL 2066363, at \*7 (D.N.J. July 13, 2007) (applying same standard in a copyright and trademark infringement case).

Louis Vuitton has shown all of these elements. Equity jurisdiction is proper under the Lanham Act, and Louis Vuitton has succeeded on the merits. Louis Vuitton has suffered irreparable injury from Defaulting Defendant's advertisement and sale of counterfeit products to the limitless consumer base of the Internet. These acts of infringement have caused a strong likelihood of consumer confusion between the counterfeit Louis Vuitton products and their legitimate counterparts, and likely will continue to cause consumer confusion about these products in the future. *See, e.g., N.V.E.,* 2009 WL 2526744, at \*6–7 (citing *Microsoft Corp. v. McGee,* 490 F.Supp.2d 874, 882–83 (S.D.Ohio 2007)). Further, monetary relief alone will not adequately compensate Louis Vuitton for the reputational injury inflicted or deter future trademark infringement by Defaulting Defendant. *See Gonzales,* 2007 WL 2066363, at \*7. Defaulting Defendant has not presented any equitable defenses, and the balance of equities weigh in favor of injunctive relief. Defaulting Defendant deliberately infringed Louis Vuitton's trademarks by advertising and selling counterfeit products bearing duplicates of those marks on the Internet. This misconduct harms Plaintiff's business reputation and impairs the public interest in preventing consumer confusion and deception in the marketplace. Furthermore, the issuance of an injunction would cause Defaulting Defendant no undue hardship, because "an injunction will merely require Defendant to comply with the ... Lanham Act." *McGee,* 490 F.Supp.2d at 883.

**\*6** Based on these equitable considerations, this Court will grant Louis Vuitton the injunctive relief it seeks by permanently enjoining Defaulting Defendant from imitating, copying, counterfeiting, or making any other infringing use of Louis Vuitton's registered trademarks. In addition, Louis Vuitton requests that this Court order the transfer of the Internet domain name Balenci.com in order to effectuate the purpose of the aforementioned injunctive relief. In the

collateral trademark infringement suit against this Defendant mentioned above, The Honorable Stanley R. Chesler, District Judge, granted control of the following websites employed by Defaulting Defendant to plaintiff Chanel, Inc.: Leshanta.com, Pouchette.com, Sacbelle.com, Labolso.com, Yuella.com, and Fashionetailer.com. *See Chanel Inc. v. Joseph Mosseri,* No. 07–2619 (order of May 20, 2008). The Court finds Plaintiff's request reasonable and will order the transfer of the Internet domain name Balenci.com.

### Conclusion

For the foregoing reasons, this Court will grant Plaintiff's motion for default judgment and award $4,072,892.22 in statutory damages, $14,595 in attorneys' fees, $3,938 in investigative fees, and $500 in costs under the Lanham Act. This Court will also permanently enjoin Defaulting Defendant from infringing Plaintiff's registered trademarks and will grant Louis Vuitton the option to control the Internet domain name Balenci.com. An appropriate form of order accompanies this Memorandum Opinion.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3633882

---

### Footnotes

1    This matter was reassigned to the undersigned by Order of August 10, 2009.

2    The infringed registered trademarks, according to Louis Vuitton, consist of the following:

| Mark | Registration Number |
| --- | --- |
| VL | 0,297,594 |
| LV | 1,519,828 |
| LV | 2,399,161 |
| YELLOW DESIGN | 1,653,663 |
| LV | 1,655,564 |
| DAISY DESIGN | 2,177,828 |
| FLOWER DESIGN | 2,773,107 |
| LOUIS VUITTON | 1,045,932 |
| LOUIS VUITTON | 1,990,760 |
| LV | 1,643,625 |
| DAISY CIRCLE DESIGN | 2,181,753 |
| FLOWER PATTERN | 3,107,072 |
| RECTANGLE DESIGN | 1,653,662 |
| LOCK DESIGN | 1,650,162 |
| PLAIN RECTANGLE | 1,615,681 |

Case 1:25-cv-00388-JPW     Document 23     Filed 10/10/25     Page 161 of 237
Louis Vuitton Malletier, S.A. v. Mosseri, Not Reported in F.Supp.2d (2009)
2009 WL 3633882

| YELLOW/BROWN FLOWER | 1,653,663 |
| --- | --- |
| FLOWER IN SQUARE | 1,841,850 |
| LV BELT | 3,066,114 |
| LOCK DESIGN | 2,828,919 |
| SQUARE DESIGN | 2,378,388 |
| CHECKER PATTERN | 2,421,618 |
| SQUARE DESIGN | 2,263,903 |
| YELLOW SQUARE | 2,075,141 |
| GOLD RECTANGLE | 2,071,273 |
| BLUE SQUARE | 1,931,144 |
| CIRCLE DESIGN | 0,286,345 |
| SPEEDY | 3,189,599 |

(*See* Compl. ¶ 13; Livadkin Decl. ¶ 4 & Ex. C.)

3   The Court notes that Plaintiff amended the Complaint on February 23, 2009, ostensibly to add Defendants and modify its damages request. The factual allegations of the First Amended Complaint do not appear to differ in a material way from the allegations contained in the original Complaint. However, because the Clerk of the Court entered default against Defaulting Defendant prior to the filing of the First Amended Complaint, the Court will consider the factual allegations contained in the original Complaint for purposes of this motion.

4   Effective October 13, 2008, Congress amended the Lanham Act to double the statutory damages range to $1,000–$200,000 per counterfeit mark per type of goods, and up to $2 million per counterfeit mark per type of goods where the infringement is willful. Louis Vuitton does not contend that the amended statutory damages provision applies to this case, which commenced in 2007.

5   The Court notes that Plaintiff's motion brief requests $4,089,792.22, but Plaintiff's proposed formula results in a figure of $4,072,892.22. The Court understands Plaintiff to submit the latter sum as its request for statutory damages.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT P

2016 WL 3670849
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Joseph Alex MARTIN, Plaintiff

v.

NATIONAL CHECK RECOVERY
SERVICES, LLC, Defendant.

CIVIL NO. 1:12-CV-1230
|
Filed 07/11/2016

**Attorneys and Law Firms**

Joseph Alex Martin, Newport, PA, pro se.

*MEMORANDUM*

William W. Caldwell, United States District Judge

*I. Introduction*

 *1  We are considering a motion for default judgment. (Doc. 15). On June 27, 2012, Plaintiff filed a complaint alleging that Defendant violated various sections of the Fair Debt Collection Practices Act. (Doc. 1). We granted him leave to proceed *in forma pauperis*, and pursuant to our order dated October 29, 2015, United States Marshals served Defendant with the complaint on or about December 3, 2015. (Doc. 5; Doc. 9). On May 17, 2016, finding that Defendant failed to appear and that Plaintiff had not filed for default judgment, we ordered the parties to provide a status update. (Doc. 12). Only Plaintiff responded to our order. (Doc. 13). On June 6, 2016, Plaintiff filed a motion for entry of default pursuant to Federal Rule of Civil Procedure 55(a), see (Doc. 14), which the clerk subsequently entered on July 8, 2016. (Doc. 16). At the same time, Plaintiff filed the instant motion for default judgment. (Doc. 15).

*II. Discussion*

The decision to render default judgment rests in the discretion of the court. Emcasco Ins. Co. v. Sambrick, 834 F.2d 71, 74 (3d Cir. 1987). Generally, when considering whether default judgment is appropriate, a court must consider three factors: (1) whether the plaintiff will be prejudiced if the default is denied; (2) whether the defendant has a meritorious defense;

and (3) whether the default was the product of the defendant's culpable conduct. United States v. $55,518.05 in U.S. Currency, 728 F.2d 192, 195 (3d Cir. 1984). If the defendant fails to appear, however, a court need not consider these factors and "is authorized to enter a default judgment based solely on the fact that the default occurred." Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 177 n.9 (3d Cir. 1990). Here, because Defendant has failed to appear, we decline to analyze the factors and find that entry of default judgment is appropriate.

A finding that default judgment is appropriate, however, is not the end of the inquiry. Upon the entry of default, Defendant concedes the well-pleaded facts in Plaintiff's complaint. 10A Charles Alan Wright et al., Federal Practice and Procedure § 2688 (3d ed. 2006). Thus, we accept all factual allegations in the complaint as true, except those relating to the amount of damages. Comdyne I, Inc. v. Corbin, 908 F.3d 1142, 1149 (3d Cir. 1990). But a default does not constitute an admission of liability or establish conclusions of law. Degen v. Bunce, No. 93-5674, 1995 WL 120483 at *2 (E.D. Pa. March 13, 1995). Thus, "it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action." Wright et al., supra, at § 2688.

Here, Plaintiff's complaint alleges that Defendant's representatives called him to collect a debt and refused to identify themselves or the company for whom they worked. It also states that while inquiring about Defendant's contact information, Defendant's employees disconnected the line, breathed heavily into the phone for several minutes, and engaged in other harassing behavior. These allegations, taken as true, state a legitimate cause of action pursuant to the Fair Debt Collection Practices Act. See 15 U.S.C. § 1692(d)(1), (5).

 *2  That leaves the question of damages. In his motion, Plaintiff asks us to award him $1,000 in statutory damages. See 15 U.S.C. § 1692k(a)(2)(A). Although Plaintiff's prayer is for a sum uncertain, see id. (permitting statutory damages up to $1,000); DirecTV, Inc. v. Chorba, No. 3:CV-03-0843, 2005 WL 3095067 at * 1 (M.D. Pa. Nov. 18, 2005) (holding that statutory damages are not a sum certain because the court has discretion with respect to the amount of damages), we find that a hearing pursuant to Federal Rule of Civil Procedure 55(b)(2) is not necessary to determine that a $1,000 in statutory damages is warranted. Rhino Assocs. v.

**Martin v. National Check Recovery Services, LLC, Not Reported in Fed. Supp. (2016)**

2016 WL 3670849

Berg Mfg. & Sales Corp., 531 F. Supp. 2d 652, 657 (M.D. Pa. 2007) (stating that hearing on damages is discretionary, not required).

*III. Conclusion*

For the reasons discussed above, we will grant Plaintiff's motion for default judgment. Judgment will be entered against Defendant in the amount of § 1,000. We will issue an appropriate order.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3670849

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT Q

Moroccanoil, Inc. v. JMG Freight Group LLC, Not Reported in Fed. Supp. (2015)

2015 WL 6673839

---

2015 WL 6673839
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

MOROCCANOIL, INC., Plaintiff,
v.
JMG FREIGHT GROUP LLC and Peru
Transport Services LLC, Defendants.

Civil Action No. 14-5608
|
Signed 10/30/2015

**Attorneys and Law Firms**

John Eric Olson, Jr., Hill, Rivkins, LLP, South Amboy, NJ,
Andrew John Warner, Hill Rivkins LLP, New York, NY, for
Plaintiff.

## OPINION

ARLEO, District Judge

**\*1** This matter comes before the Court on the motion
for default judgment pursuant to Federal Rule of Civil
Procedure 55(b)(2) by Plaintiff Moroccanoil, Inc. against
Defendant Peru Transport Services LLC. Dkt. No. 18. For the
reasons stated below, the motion is **GRANTED**.

## I. BACKGROUND

Moroccanoil, Inc. ("Plaintiff") sues Peru Transport Services
LLC [1] ("Defendant") for losing or stealing its cargo of hair
and skin products. Dkt. No. 1, Comp. ¶ 6. On August 28, 2013,
Plaintiff dropped off the products in good condition for transit
from Kearny New Jersey to Pottsville, Pennsylvania. *Id.* ¶¶
5, 7. As such, Plaintiff alleges that Defendant breached its
duties as a common carries and was also negligent in handling
Plaintiff's cargo. *Id.* ¶ 8. As the insurer of the cargo, Plaintiff
alleges it suffered $165,578.47 in damages. *Id.* ¶¶ 9, 11.

On June 12, 2015, Plaintiff filed the instant motion for default
judgment. Dkt. No. 18.52. The motion is unopposed.

## II. STANDARD OF REVIEW

"The district court has the discretion to enter default
judgment, although entry of default judgments is disfavored
as decisions on the merits are preferred." *Animal Sci.
Prods., Inc. v. China Nat'l Metals & Minerals Imp. &
Exp. Corp.,* 596 F.Supp.2d 842, 847 (D.N.J.2008). Before
entering default judgment the court must: (1) determine it
has jurisdiction both over the subject matter and parties; (2)
determine whether defendants have been properly served; (3)
analyze the Complaint to determine whether it sufficiently
pleads a cause of action; and (4) determine whether
the plaintiff has proved damages. *See Chanel, Inc. v.
Gordashevsky,* 558 F.Supp.2d 532, 535–36 (D.N.J.2008);
*Wilmington Savings Fund Soc., FSB v. Left Field Props., LLC,*
No. 10–4061, 2011 WL 2470672, at *1 (D.N.J. June 20,
2011). Although the facts pled in the Complaint are accepted
as true for the purpose of determining liability, the plaintiff
must prove damages. *See Comdyne I, Inc. v. Corbin,* 908
F.2d 1142, 1149 (3d Cir.1990).

Additionally, prior to granting default judgment, the Court
must make explicit factual findings as to: (1) whether the
party subject to the default has a meritorious defense; (2) the
prejudice suffered by the party seeking default judgment; and
(3) the culpability of the party subject to default. *Doug Brady,
Inc. v. N.J. Bldg. Laborers Statewide Funds,* 250 F.R.D. 171,
177 (D.N.J.2008).

## III. ANALYSIS

### A. Jurisdiction & Service

The Court has both subject matter jurisdiction over this
dispute and personal jurisdiction over Defendant. Subject
matter jurisdiction here is present pursuant to diversity under
28 U.S.C. § 1332–Plaintiff is a New York corporation
and Defendant is a Pennsylvania LLC. [2] Subject matter is
also present pursuant to 49 U.S.C. § 14706(d)(3), which
confers jurisdiction upon federal district courts in a civil
action brought against a motor carrier for delivery of goods.
The Court has personal jurisdiction over Defendant because
this action arises out of a contract to ship goods into New
Jersey. Compl. ¶ 5. Plaintiff provided the Court with proof of
service of Defendant at Defendant's registered address at 142
Robin Lane Apartment R3, Hummelstown, PA 17036. Aff. of
Service, Dkt. No. 8; Affirmation in Support of Request for
Default, Dkt. No. 10–1 ¶ 3. Thus, the Court is satisfied that it
has jurisdiction to enter default judgment.

Moroccanoil, Inc. v. JMG Freight Group LLC, Not Reported in Fed. Supp. (2015)

2015 WL 6673839

### B. Liability

**\*2**  "A consequence of the entry of a default judgment is that the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Comdyne,* 908 F.2d at 1149. The Complaint pleads facts which, taken as true, establish Defendant's liability for breach of duties as a common carrier under the Carmack Amendment, 49 U.S.C. § 14706.

Under the statute, in order for a plaintiff to prove liability to recover the actual value of goods, the following three elements must be shown: "(1) delivery of the goods to the initial carrier in good condition, (2) damage of the goods before delivery to their final destination, and (3) the amount of damages." *Beta Spawn, Inc. v. FFE Transportation Services, Inc.,* 250 F.3d 218, 223 (3d Cir.2001). Plaintiff pleads that it delivered its cargo in good condition to Defendant. Compl. ¶ 6. The cargo was lost or stolen during transit. *Id.* ¶ 7. Damages are discussed below.

### C. Appropriateness of Default Judgment

Next, the Court must consider: (1) whether the party subject to the default has a meritorious defense; (2) the prejudice suffered by the party seeking default judgment; and (3) the culpability of the party subject to default. *Doug Brady,* 250 F.R.D. at 177. The Court concludes that in the absence of any responsive pleading and based upon the facts alleged in the Complaint, Defendant does not have a meritorious defense. Second, the Court finds that Plaintiff will suffer prejudice absent entry of default judgment as he would have no other means of obtaining relief. Finally, the Court finds the Defendant acted culpably as he has been served with the Complaint, is not an infant or otherwise incompetent, and is not presently engaged in military service. *See Nationwide Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc.,* 175 F. App'x 519, 523 (3d Cir.2006) (holding that a defendant's failure to respond to communications from the plaintiff and the court can constitute culpability).

### D. Monetary Damages

Although the facts pled in the Complaint are accepted as true for the purpose of determining liability, the plaintiff must prove damages. *See Comdyne,* 908 F.2d at 1149.

Plaintiff has provided adequate proof of the damages at issue here. It provides a sworn certification by Allan Weizmann, the Chief Financial Officer of Moroccanoil, Inc., that the beauty products in Defendant's care were worth $165,578.47. Dkt. No. 20, Weizmann Aff ¶ 2. Plaintiff also provides the sale and shipping order of all stolen or lost goods, including item numbers, descriptions, quantity, discounts, and discount prices. *Id.* Ex. 1. These discounted prices for all these products equal $165,578.47 in actual damages. That is sufficient to prove that amount of damages in this case.

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Default Judgment is **GRANTED**. An appropriate order accompanies this opinion.

### ORDER

**THIS MATTER** having come before the Court by way of Plaintiff Moroccanoil, Inc.'s ("Plaintiff") Motion for Default Judgment against Defendant Peru Transport Services LLC, Dkt. No. 18;

and for the reasons stated in the accompanying opinion;

**IT IS** on this 30th day of October, 2015,

**ORDERED** that judgment in favor of Plaintiff is hereby entered against Peru Transport Services LLC for $165,578.47 in damages; it is further

**\*3  ORDERED** that this case is closed.

### All Citations

Not Reported in Fed. Supp., 2015 WL 6673839

---

**Footnotes**

2015 WL 6673839

1    Plaintiff also included JMG Freight Group LLC as a defendant in this case. Those parties settled their disagreements. Dkt. No. 23.

2    There is no indication that any of the members of Defendant reside in New Jersey.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT R

2012 WL 12886442

2012 WL 12886442
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Chloe SAS, et al., Plaintiff,
v.
SAWABEH INFORMATION
SERVICES CO., et al., Defendant.

Case No. CV 11-04147 GAF (MANx)
|
Filed 04/06/2012

**Attorneys and Law Firms**

Jason Corbitt Wright, Jones Day, Los Angeles, CA, Jessica D. Bradley, Susan M. Kayser, Jones Day, Washington, DC, Mark A. Finkelstein, Jones Day, Irvine, CA, Thomas Demitrack, Jones Day, Cleveland, OH, for Plaintiff.

Amjad Mahmood Khan, Ethan J. Brown, Geoffrey A. Neri, Brown Neri and Smith LLP, Los Angeles, CA, Nathan M. Smith, Ethan Brown Law, Santa Monica, CA, for Defendant.

MEMORANDUM & ORDER REGARDING
MOTION FOR DEFAULT JUDGMENT

Gary Allen Feess, Judge

**I.**

**INTRODUCTION**

*1 Plaintiffs Chloé SAS ("Chloé"), Alfred Dunhill Limited ("Alfred Dunhill"), Officine Panerai AG ("Panerai"), Montblanc-Simplo GmbH ("Montblanc"), Cartier International AG ("Cartier"), and Lange Uhren GmbH ("Lange") (collectively, "Plaintiffs") seek entry of default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2) against Defendants Cctrue International Trade Co., Ltd., ("Cctrue"), Fancysaler Trading Co. ("Fancysaler"), Fuzhou Sunshine Trade Co., Ltd. ("Fuzhou"), Hengtai International ("Hengtai"), Kk Fashion Love Zone ("Kk Fashion"), Love in Apparel Trade Co., Ltd. ("Love in Apparel"), Melchic International Trade Co., Ltd. ("Melchic"), Mystockwatch Co., Ltd. ("Mystockwatch"), Seven Star Replicass ("Seven Star"), Shanghai Taolan International

Trade Limited Company ("Shanghai Taolan"), Sinoestar Co., Ltd. ("Sinoestar"), V52 International Trade Co., Ltd. ("V52"), Win-Win Trade Co., Ltd. ("Win-Win"), www.Ecwatch.net ("Ecwatch"), Euromed International Trading Co., Limited ("Euromed"), Orient-Online Co., Ltd. ("Orient-Online"), Richen-Online Co., Ltd. ("Richen-Online"), and Win International Trade ("Win International") (collectively, "Defaulting Defendants") in this action alleging that all Defendants offered for sale counterfeit goods infringing various trademarks owned by Plaintiffs. (Docket No. 211 [Not. of Motion]; Docket No. 153 [First Amend. Compl. ("FAC") ] at 4–5, ¶ 11.) Plaintiffs assert claims under (1) § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (trademark infringement and counterfeiting); (2) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (trademark infringement, federal unfair competition, and false designation of origin); (3) § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) (trademark dilution); (4) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq. (unfair competition); (5) Cal. Bus. & Prof. Code § 14247 (trademark dilution); and (6) California common law (trademark infringement and unfair competition). Plaintiffs seek entry of a judgment (1) finding Defaulting Defendants liable on all claims; (2) permanently enjoining Defaulting Defendants from using Plaintiffs' registered marks; (3) transferring the internet domain names on which Defaulting Defendants offer their counterfeit goods for sale to Plaintiffs' control; (4) ordering that Defaulting Defendants deliver up infringing goods and advertisements for destruction; and (5) awarding statutory damages in the amount of $184,000,000 for willful infringement. (Docket No. 261 [Mem.]; Proposed Order.)

After examining Plaintiffs' relevant filings, the Court concludes that Plaintiffs are entitled to default judgment because they have satisfied all of the relevant procedural requirements, have pleaded sufficient facts in their FAC to justify entry of default judgment, seek remedies the Court deems proper, and have shown that they are entitled to relief. Accordingly, Plaintiffs' motion for default judgment is **GRANTED**, for the reasons and on the terms set forth below.

**II.**

**BACKGROUND**

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 171 of 237

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

**\*2**  The following facts are those alleged in Plaintiffs' First Amended Complaint and supported by evidence produced by Plaintiffs in these proceedings.

## A. PLAINTIFFS' PRODUCTS AND TRADEMARKS

Plaintiffs manufacture and sell luxury goods through their own boutiques and through limited authorized distributorships. (FAC ¶¶ 17, 28, 45, 59, 72, 89, 106.)

### 1. CHLOE

Plaintiff Chloé distributes handbags, clothing, footwear, jewelry, and accessories under a number of registered trademarks bearing the name CHLOÉ (the "Chloé Marks"), on which it has expended significant time, effort, and money to promote the marks throughout the world. (Id. ¶¶ 28–30, 33.) The mark has come to symbolize high quality products exclusively originating from Chloé, which has achieved widespread success in marketing its products over the past five years as a result of the brand's popularity. (Id. ¶¶ 31–32, 40–41.) Chloé asserts ownership of the following trademarks and service marks that are either federally registered or pending federal registration: 1,491,810; 2,745,487; 3,291,996; 1,182,862; 950,843; 3,401,846; 3,398,517; 3,696,923; 2,641,982; and 79/083,749 (pending registration). (Id. ¶ 33, Ex. 1.) Some of these trademarks have attained incontestable status. (Id. ¶ 35.) In the year preceding the filing of the FAC, sales of Chloé brand products in the United States exceeded $17 million. (Id. ¶ 39.)

### 2. ALFRED DUNHILL

Plaintiff Alfred Dunhill has continuously manufactured and distributed formal and casual menswear, handcrafted leather goods, fine men's jewelry and timepieces, pens, men's designer clothes, and accessories under multiple trademarks bearing the name Alfred Dunhill (the "Dunhill Marks") since 1893. (Id. ¶ 42.) It has expended significant time, money, and effort developing, producing, marketing, and advertising the Dunhill Marks and the products sold thereunder, and the extensive and continuous use of the marks throughout the United States has come to symbolize high quality products exclusively originating from Alfred Dunhill. (Id. ¶¶ 43–45, 53–55.) The Dunhill Marks include the following trademarks and service marks: 1,172,665; 843,270; 843,178; 858,928; 858,964; 540,389; 1,799,883; 1,734,900; 3,423,210; 3,629,424; 3,763,362; 3,763,494; 1,322,065; 3,748,138; 3,053,189; 2,852,116; 3,486,991; and 2,893,171. (Id. ¶ 46,

Ex. 2.) In the year preceding the filing of the FAC, sales of Alfred Dunhill brand products in the United States exceeded $2 million. (Id. ¶ 52.)

### 3. OFFICINE PANERAI

Plaintiff Panerai has continuously developed and sold precision mechanisms, instruments, and professional divers' instruments since 1860, and has been the supplier of high precision underwater instruments to the Royal Italian Navy for many years. (Id. ¶ 56.) Panerai's timepieces are of such quality that many can withstand pressure equivalent to a depth of 1000 meters, and are sold under famous marks including Radiomir, Luminor, and Slytech, the latter of which was created for Sylvester Stalone. (Id. ¶¶ 56–57.) Panerai's products all bear registered trademarks owned by Panerai (the "Panerai Marks") which Panerai has spent significant time, effort, and money to develop, produce, market, and advertise throughout the world. (Id. ¶¶ 57–58.) The Panerai marks are widely-recognized in the United States, and have gained significant fame and celebrity. (Id. ¶¶ 58, 68.) The Panerai Marks include the following federally registered trademarks and service marks: 2,340,290; 2,673,704; 3,947,004; 2,516,018; 3,889,408; 3,035,995; 3,178,943; 2,418,830; 3,882,739; 3,756,691; 2,731,719; 2,864,075; 2,323,571; 3,947,005; 3,927,967; 2,362,908; 3,174,281; 3,004,529; 2,288,561; 2,624,232; 3,046,425; and 3,857,560. (Id. ¶ 60, Ex. 3.) Some of these marks have achieved incontestable status. (Id. ¶ 62.) In the fiscal year 2011, sales of Panerai branded products in the United States exceeded $50 million. (Id. ¶ 66.)

### 4. MONTBLANC

**\*3**  Plaintiff Montblanc has manufactured and distributed writing instruments, leather goods, jewelry, and watches since 1913, and the Montblanc name has become well-known throughout the world for quality design, tradition, and master craftsmanship. (Id. ¶ 70.) Montblanc has expended significant time, effort, and money developing registered trademarks (the "Montblanc Marks"), which have received considerable fame and celebrity through advertising campaigns in magazines, periodicals, television, film, and on the internet. (Id. ¶¶ 71, 80–81.) The Montblanc Marks include the following federally registered trademarks and service marks: 776,208; 1,884,842; 2,820,561; 2,415,189; 2,515,092; 3,059,776; 3,251,925; 2,717,140; 2,738,532; 839,016; 1,878,584; 2,346,953; 1,347,728; 1,891,033; 1,723,665; 3,752,471; 2,688,023; 3,606,193; 3,454,035; 3,366,186; 3,127,144; 2,875,587; 3,453,962; 1,324,392; 3,933,739; 2,788,900; 2,759,073;

Case 1:25-cv-00388-JPW  Document 23  Filed 10/10/25  Page 172 of 237

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

3,659,753; and 2,975,592. (Id. ¶ 73, Ex. 4.) Many of these marks have achieved incontestable status. (Id. ¶ 75.) For the fiscal year 2010–11, Montblanc's sales in the United States exceeded $70 million. (Id. ¶ 79.)

**5. CARTIER**

Plaintiff Cartier has produced and distributed high quality and expertly crafted jewelry, watches, leather goods, writing instruments, and accessories since 1859, and has composed a collection containing more than 1,360 pieces, including the well-known Trinity and Love Bracelet. (Id. ¶¶ 82–84, 98.) Cartier has created a number of internationally recognized trademarks (the "Cartier Marks") which have reached millions of consumers through advertising campaigns in magazines, periodicals, television, films, and on the internet, as well as through display in museums and use by Hollywood celebrities. (Id. ¶¶ 85–86, 88, 97.) The City of New York officially renamed the intersection of Fifth Avenue and 52nd Street as "Place de Cartier" in honor of the company's New York landmark boutique. (Id. ¶ 87–98.) The Cartier Marks include the following federally registered trademarks and service marks: 759,201; 759,202; 414,435; 414,604; 758,858; 3,832,004; 2,801,764; 3,864,499; 3,418,630; 2,699,360; 3,953,567; 2,092,409; 3,059,210; 3,476,888; 3,032,397; 3,814,704; 2,322,769; 2,436,100; 2,247,421; 2,666,131; 3,418,755; 2,934,297; 3,708,882; 3,906,980; 3,537,349; 3,637,776; 1,005,286; 3,776,794; 3,898,366; 3,557,455; 3,318,649; 3,211,038; 3,208,458; 3,956,751; 3,282,739; 3,282,847; 1,927,987; and 3,133,225. (Id. ¶ 91, Ex. 5.) Many of these trademarks have achieved incontestable status. (Id. ¶ 92.) Annual sales of Cartier brand products in the United States average in the hundreds of millions of dollars. (Id. ¶ 96.)

**6. A. LANGE & SOHNE**

Through its brand A. Lange & Söhne, Plaintiff Lange has produced and distributed high-quality, one-of-a-kind watches and expertly crafted precision timepieces since 1845, which are assembled through a unique and precise process that requires the watches to be cleaned, oiled, polished, and decorated after they have been assembled for the first time. (Id. ¶¶ 99–100.) Each watch is hand-engraved, and some are equipped with special features such as a twenty-four time zone display. (Id. ¶¶ 100–101.) The watches are sold under a number of registered trademarks the "Lange Marks"); these marks have achieved significant fame and celebrity through extensive advertising campaigns in magazines, television, and movies, on the internet, and via celebrity events, and the

products sold thereunder are associated with high technical quality exclusively originating from Lange. (Id. ¶¶ 101–105, 113–114.) The Lange Marks include the following federally registered trademarks: 2,430,848; 1,723,054; 3,071,207; 2,448,703; 2,837,595; 3,010,578; 2,364,492; 2,730,858; 2,852,979; 3,835,352; 2,410,312; and 2,422,336. (Id. ¶ 107, Ex. 6.) Some of these marks have achieved incontestable status. (Id. ¶ 109.)

**B. DEFENDANTS' ACTIONS**

Plaintiffs' FAC alleges that several non-defaulting Defendants, Sawabeh Information Services Co., TradeKey (Pvt) Ltd., Waleed Abalkhail, and Junaid Mansoor, operate a web site, Tradekey.com, that permits businesses, such as Defaulting Defendants, to offer for sale and distribution on a wholesale basis to other businesses counterfeit and unauthorized replica goods, copied from name brand goods such as those offered by Plaintiffs and using registered trademarks. (Id. ¶¶ 18, 115, 117–119, 122, 162, 164–169.) Businesses offer goods for sale on the Tradekey site by purchasing a Goldkey or Silverkey membership, costing from $500 to $25,000 per year, or by enrolling in a free membership with reduced benefits. (Id. ¶¶ 115–116, 163.)

**\*4** All Defaulting Defendants offer counterfeit and unauthorized replica goods for sale on the Tradekey site using Plaintiffs' marks. (Id. ¶¶ 11, 131, 135, 139, 143, 147, 151; Docket No. 212 [Kayser Decl.] ¶¶ 12–55, Exs. 1–18 (screenshots from Tradekey.com and Defaulting Defendants' individual web sites).) Some Defaulting Defendants are Goldkey members of the Tradekey site; most require bulk orders, seek long-term customer relationships, and advertise their individual web sites on the Tradekey site. (Kayser Decl. ¶¶ 13–14, 17–19, 21–22, 24, 26–28, 33–35, 37, 39, 40, 44–45, 46–50, 55.) Although the counterfeit goods sold by Defaulting Defendants are not genuine goods and are of inferior quality and design, they appear substantially indistinguishable from and substantially similar to Plaintiffs' genuine goods. (FAC ¶¶ 132–134, 136–138, 140–142, 144–146, 148–150, 152–156.) Prior to filing the FAC, Plaintiffs employed private investigators to purchase counterfeit goods from Defendants Win-Win, Win International, and Fuzhou, and have confirmed that Plaintiffs' trademarks are being used in counterfeit productions of their goods. (Id. ¶¶ 123–124, 126–127, 130; Kayser Decl. ¶¶ 18, 40, Exs. 3, 13.) Defaulting Defendants knowingly and intentionally continue to use Plaintiffs' marks in offering for sale and distribution counterfeit products, and they use the services of numerous well-known financial institutions, such as PayPal, to carry out

2012 WL 12886442

the unlawful sales. (Id. ¶¶ 155, 157–158, 172.) Many of the Defaulting Defendants continue to openly infringe, even after receiving notice of this lawsuit. (Kayser Decl. ¶¶ 14, 17, 21, 28, 34, 39, 42, 47, 50, 55.)

## C. THE PRESENT ACTION

Plaintiffs filed the present action on May 17, 2011, and filed a First Amended Complaint on October 21, 2011. (Docket No. 1; FAC; Kayser Decl. ¶¶ 2–3.) Plaintiffs served a verified copy of the FAC on Defendants Euromed, Orient-Online, Richen-Online, and Win International on December 16, 2011, via certified e-mail, pursuant to the Court's order. (Kayser Decl. ¶ 6; see Docket No. 168 [Second Holmes Decl.], Ex. 41; Docket No. 173 [12/2/11 Order]; Docket No. 178 [Proof of Service].) Plaintiffs served all other Defaulting Defendants with a copy of the Complaint on June 10 and 23, 2011, and with a copy of the FAC on January 25, 2012, via certified e-mail pursuant to the Court's order. (Kayser Decl. ¶¶ 4–5; see Docket No. 24 [Fourth Holmes Decl.], Ex. 97; Docket No. 33 [5/17/11 Order] at 11–12; Docket Nos. 95, 98, 207 [Proofs of Service].) Defaulting Defendants failed to file an answer or other objection to the Complaint or FAC. (Kayser Decl. ¶ 7.) On February 3, 2012, Plaintiffs sought entry of default against Defendants Euromed, Orient-Online, Richen-Online, and Win International. (Docket No. 190.) On February 9, 2012, Plaintiffs sought entry of default against Defendants Cctrue, Ecwatch, Fancysaler, Fuzhou, Hengtai, Kk Fashion, Love in Apparel, Melchic, Mystockwatch, Seven Star, Shanghai, Sinoestaron, V52, and Win-Win. (Docket No. 206.) The Clerk entered default as to all Defaulting Defendants on February 15, 2012 for failure to respond to the FAC or otherwise defend against this action. (Docket No. 200; Kayser Decl. ¶ 9.) Plaintiffs filed the present motion for default judgment on March 1, 2012. (Docket No. 211.)

## III.

## DISCUSSION

## A. PROCEDURAL REQUIREMENTS FOR ENTRY OF DEFAULT JUDGMENT

Rule 55(b) of the Federal Rules of Civil Procedure permits a court-ordered default judgment following the entry of default by the Court Clerk under Rule 55(a). Elektra Entm't Grp., Inc. v. Bryant, No. 03-6381 GAF (JTLx), 2004 WL 783123, at *1 (C.D. Cal. Feb. 13, 2004) (citing Kloepping

v. Fireman's Fund, No. C 94-2684 THE, 1996 WL 75314, at *2 (N.D. Cal. Feb. 13, 1996)). Local Rule 55-1 requires that motions for default judgment set forth the following information: (1) when and against what party default was entered; (2) identification of the pleading to which default was entered; (3) whether the defaulting party is an infant or incompetent person, and if so, whether that person is adequately represented; (4) that the Servicemembers Civil Relief Act,[1] 50 App. U.S.C. § 521, does not apply; and (5) that notice of the motion has been served on the defaulting party, if required by Federal Rule of Civil Procedure 55(b)(2). C.D. Cal. R. 55-1.

Here, Plaintiffs have satisfied all applicable procedural requirements. Plaintiffs' declaration indicates that the Court Clerk entered default against the Defaulting Defendants on February 15, 2012. (Kayser Decl. ¶ 9; see also Docket No. 200.) The default was entered as to the First Amended Complaint. (Kayser Decl. ¶ 9.) Plaintiffs have also established that Defaulting Defendants are not infants, incompetent persons, or subject to the Servicemembers Civil Relief Act. (Id. ¶ 10.) Finally, Plaintiffs have served notice of the motion on the Defaulting Defendants by their known e-mail addresses. (Id. ¶ 11.) Because the procedural requirements for entry of default judgment are met, the Court proceeds to weigh the merits of Plaintiffs' motion.

## B. FACTORS USED TO DETERMINE WHETHER TO GRANT DEFAULT JUDGMENTS

*5 A district court has discretion to grant or deny a motion for default judgment. Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980). Thus, a defendant's default alone does not entitle a plaintiff to a court-ordered judgment. The Ninth Circuit has held that a district court must examine the following factors when determining whether to enter a default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

Civil Procedure favoring decisions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471–72 (9th Cir. 1986) (citation omitted). "In applying this discretionary standard, default judgments are more often granted than denied." PepsiCo, Inc. v. Triunfo-Mex, Inc., 189 F.R.D. 431, 432 (C.D. Cal. 1999).

On a motion for default judgment, a court must presume the truth of all factual allegations in the complaint except for those pertaining to the amount of damages. TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917–18 (9th Cir. 1987). Along with the complaint, the court may look to affidavits and declarations to determine whether default judgment is appropriate. See William W. Schwarzer et al., California Practice Guide: Federal Civil Procedure Before Trial § 6:91 (2010).

## 1. POSSIBILITY OF PREJUDICE TO PLAINTIFFS

To satisfy the first Eitel factor, Plaintiffs must show that they will face prejudice if the Court does not enter default judgment. Eitel, 782 F.2d at 1471–72. The Court borrows the standard of prejudice employed by courts when evaluating motions to set aside entry of default judgment—namely, whether a plaintiff's ability to pursue its claim will be hindered if the application for default judgment is not granted. See TCI Group Life Ins. Plan v. Knoebber, 244 F.3d 691, 701 (9th Cir. 2001). In other words, the plaintiff must show more than mere delay resulting from a denial of its application; it must establish that it will suffer "tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion" if the application is denied. Thompson v. Am. Home Assur. Co., 95 F.3d 429, 433–34 (6th Cir. 1996). Additionally, courts have held that prejudice is shown where a plaintiff has no "other recourse for recovery" against the defendant. PepsiCo, Inc. v. Cal. Sec. Cans, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).

The Court concludes that Plaintiffs would suffer significant prejudice if the Court were to deny their motion. Notably, Plaintiffs will be left without other recourse for recovery. See id. If default judgment were not entered, Plaintiffs would have no way to protect their marks or to prevent future monetary damage and harm to their reputations caused by Defaulting

Defendants' unauthorized use of the marks to sell counterfeit goods. Defaulting Defendants would effectively be permitted to continue infringing on Plaintiffs' federally registered marks without liability or consequence. Because Plaintiffs would suffer substantial prejudice if default judgment were not entered, the first Eitel factor weighs in favor of granting default judgment.

## 2. SUBSTANTIVE MERITS AND SUFFICIENCY OF THE COMPLAINT

**\*6** The second and third Eitel factors have been interpreted by courts to require a plaintiff to state a claim upon which he or she may recover. Id. at 1175. This means simply that the Court must examine the Complaint to determine whether Plaintiff has adequately pleaded its claims.

Plaintiffs assert claims under (1) § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (trademark infringement and counterfeiting); (2) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (trademark infringement, federal unfair competition, and false designation of origin); (3) § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) (trademark dilution); (4) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq. (unfair competition); (5) Cal. Bus. & Prof. Code § 14247 (trademark dilution); and (6) California common law (trademark infringement and unfair competition). (See FAC.) The Court addresses these claims below.

### a. Trademark Infringement and Unfair Competition

Claims of trademark infringement under 15 U.S.C. § 1114, federal unfair competition and false designation of origin under 15 U.S.C. § 1125(a), and unfair competition under California's UCL and common law "are subject to the same test." Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 632 (9th Cir. 2008); Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1988). To prevail on a these claims, a plaintiff must show that (1) it owns a valid, protectable mark; (2) defendant used the mark without consent; and (3) use of the mark is likely to cause confusion. 15 U.S.C. § 1114(1) (a); Century 21 Real Estate Corp., 846 F.2d at 1178.

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

Plaintiffs allege and present evidence that they own the Chloé Marks, the Dunhill Marks, the Panerai Marks, the Montblanc Marks, the Cartier Marks, and the Lange Marks. (FAC ¶¶ 33–34, 46–47, 60–61, 73–74, 90–91, 107–108, Exs. 1–6.) Some of these marks have achieved incontestable status, which is conclusive evidence of their validity. (See id. ¶¶ 35, 48, 62, 75, 92, 109.) As to the remaining marks, the registration constitutes prima facie evidence of "the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services." 15 U.S.C. § 1115(a). The presumption in favor of Plaintiffs' ownership of the marks has not been rebutted; thus, Plaintiffs' ownership is established on the basis of the federal registrations. Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1047 (9th Cir. 1999); Sengoku Works Ltd. v. RMC Intern., Ltd., 96 F.3d 1217, 1219–20 (9th Cir. 1996). As to the second element, Plaintiffs allege and present evidence that Defaulting Defendants used some or all of these marks without Plaintiffs' consent. (FAC ¶¶ 123–24, 126–127, 130–159; Kayser Decl. ¶¶ 12–55, Exs. 1–18.)

Plaintiffs also adequately allege likelihood of confusion. "The critical determination is whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product." Jada Toys, Inc., 518 F.3d at 632 (citing Brother Records, Inc. v. Jardine, 318 F.3d 900, 908 (9th Cir. 2003) (quotations omitted)). The Ninth Circuit employs an eight factor test in determining the likelihood of confusion. "These factors include: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." Jada Toys, Inc., 518 F.3d at 632 (citing AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348–49 (9th Cir. 1979)).

*7 The first factor—strength of the allegedly infringed mark—weighs in favor of Plaintiffs. "The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir. 2000). Five Plaintiffs began using their marks between 1845 and 1913,

and have been continuously using the marks since then. (FAC ¶¶ 42, 53, 56, 70, 82, 99.) Plaintiff Chloé has long distributed products under its marks. (Id. ¶ 29.) Plaintiffs have expended considerable time and effort advertising, promoting, marketing, and developing their marks and the products sold thereunder, and Plaintiffs have accordingly gained an international reputation for selling high quality luxury goods under their brands. (Id. ¶¶ 29–32, 40–41, 43–44, 53–55, 58, 68–69, 71, 80–81, 83–88, 97–98, 102, 103–105, 113–114.) Indeed, Plaintiffs' marks have attained "fame and celebrity" due to Plaintiffs' efforts. (Id. ¶¶ 40, 54, 58, 80, 97, 113–114.)

The second factor—proximity, or relatedness, of the goods—also favors Plaintiffs. Plaintiffs market and sell watches, handbags, clothing, leather goods, footwear, jewelry, writing instruments, and accessories. (Id. ¶¶ 28, 42, 56, 70, 82, 99.) The goods sold and marketed by the Defaulting Defendant are virtually identical to Plaintiffs'. (Id. ¶¶ 122–124, 126–127, 130–159; Kayser Decl. ¶¶ 12–55, Exs. 1–18.)

The third factor—similarity of the marks—also favors Plaintiffs. "Similarity of the marks is tested on three levels: sight, sound, and meaning." Sleekcraft, 599 F.2d at 351. The counterfeit items incorporate Plaintiffs' marks in their entirety; the marks are thus similar in sight and, if read aloud, also in sound. Further, Defaulting Defendants use these marks to sell the same products as those sold by Plaintiffs, which would lead consumers to deduce that the marks have similar meanings.

The fourth factor—evidence of actual confusion—modestly favors Defaulting Defendants, but only because Plaintiffs have presented no specific allegations of actual consumer confusion. However, given the similarity of the marks and their use on identical products, it would not be a stretch to infer the existence of actual confusion.

The fifth factor—marketing channels used—favors Plaintiffs. Plaintiffs offer their products for sale in international commerce through a variety of channels, including in their boutiques, authorized retail stores, and online, and they employ a variety of advertising media, including internationally circulated print publications, television commercials, films, internet campaigns, and celebrity events. (Id. ¶¶ 30, 43–44, 53, 58, 67, 71, 83, 85–87, 104.) Defaulting Defendants also market and sell their counterfeit products online. (Id. ¶¶ 122, 143; Kayser Decl. ¶¶ 12–55, Exs. 1–18.) Thus, Plaintiffs' and Defaulting Defendants' marketing

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 176 of 237

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

channels overlap, and Defaulting Defendants benefit greatly from Plaintiffs' extensive efforts. (Id. ¶ 155.)

The sixth factor—type of goods and degree of care exercised by the purchaser—favors Defendants. "The standard for assessing purchasing care is the typical customer using ordinary caution." Saks & Co. v. Hill, 843 F. Supp. 620, 624 (S.D. Cal. 1993). " 'It is generally assumed that consumers with expertise or who are buying expensive products or services exercise a greater degree of care when doing so and are thus less easily confused.' " Aurora World, Inc. v. Ty Inc., 719 F. Supp. 2d 1115, 1163 (C.D. Cal. 2009) (quoting Edge Wireless, LLC v. U.S. Cellular Corp., 312 F. Supp. 2d 1325 (D. Or. 2003)). Here, Defaulting Defendants sell directly to other businesses, and they offer knock-off luxury products at a fraction of the cost of the genuine items. Many of the products offered by Defaulting Defendants are specifically labeled as "replica" items. (See Kayser Decl. ¶¶ 17–18, 20–21, 31, 34, 41–42, 44–45, 47, 52, 54–55.) Both the sophistication of the purchasers and the price of the genuine items support the conclusion that the purchasers exercise a high degree of care.

**\*8** The seventh factor—defendant's intent in selecting the mark—weighs in favor of Plaintiffs. "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." Sleekcraft, 599 F.2d at 354. Plaintiffs allege that Defaulting Defendants used identical marks on counterfeit goods, with knowledge that the marks belonged to Plaintiffs and that the goods distributed were counterfeit. (FAC ¶¶ 155–156, 158.) These allegations are sufficient to establish intent to deceive.

The final factor—likelihood of expansion of the product lines—does not apply here, because the Parties offer the same products. Where the goods offered by a markholder and alleged infringer "are already related, ... this factor is irrelevant." Playboy Enters., Inc. v. Netscape Comnc'ns Corp., 354 F.3d 1020, 1029 (9th Cir. 2004).

In light of the foregoing, the Court finds that Plaintiffs have established a likelihood of confusion. All Sleekcraft factors, save for two—evidence of actual confusion and the degree of care exercised by purchasers—strongly favor Plaintiffs. As discussed supra, however, the Court considers it likely that Defaulting Defendants' use of Plaintiffs' marks on replica

goods has actually confused the consuming public. Moreover, the fact that Defaulting Defendants target their sales to retail businesses that are likely to discern the difference between a genuine luxury good and a cheap knockoff does not mean that Defendants' use of the marks will not confuse the end consumer. Indeed, the opposite outcome is more likely. Accordingly, Plaintiffs have adequately pleaded claims under 15 U.S.C. §§ 1114 and 1125 and for statutory and common law trademark infringement and unfair competition in violation of California law.

### b. Trademark Dilution under Federal and California Law

Next, Plaintiffs assert claims for trademark dilution under 15 U.S.C. § 1125(c)(1) and Cal. Bus. & Prof. Code section 14247. A trademark dilution plaintiff must establish that (1) its trademark is famous, (2) the defendant is making commercial use of the trademark, (3) the defendant's use began after the trademark became famous, and (4) the defendant's use dilutes the quality of the trademark by diminishing the trademark's capacity to identify and distinguish goods. Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1324 (9th Cir. 1998) (citing 15 U.S.C. § 1125(c) and California's prior anti-dilution statute, Cal. Bus. & Prof. Code section 14330).

As discussed above, Plaintiffs have extensively advertised, promoted, and marketed goods under the Chloé, Dunhill, Panerai, Montblanc, Cartier, and Lange Marks, and these marks enjoy celebrity as a result of their continuous use in international commerce. (FAC ¶¶ 29–32, 40–41, 43–44, 53–55, 58, 68–69, 71, 80–81, 83–88, 97–98, 102, 103–105, 113–114, 207, 232.) Accordingly, Plaintiffs have sufficiently alleged that these marks are famous. Plaintiffs have also established that Defaulting Defendants have used the infringing mark in commerce. (Id. ¶ 122–124, 126–127, 130–159, 208, 233; Kayser Decl. ¶¶ 12–55, Exs. 1–18.) Finally, Plaintiffs have asserted that Defaulting Defendants used the marks after they became famous, and that this use dilutes the distinctive quality of the marks. (Id. ¶¶ 132–134, 136–138, 140–142, 144–146, 148–150, 152–154, 159, 209, 234.) Accordingly, Plaintiffs have stated claims for trademark dilution under federal and California law.

### 3. AMOUNT AT STAKE

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 177 of 237

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

The fourth Eitel factor requires the court to consider the amount of money at stake. Eitel, 782 F.2d at 1471–72. The Court must evaluate the amount at stake because default judgments are disfavored where the amount at stake "is too large or unreasonable in light of [the] defendant's actions." Truong Giang Corp. v. Twinstar Tea Corp., No. 06-03594, 2007 WL 1545173, at *12 (N.D. Cal. May 29, 2007).

**\*9** Here, Plaintiffs seek $184 million from all Defaulting Defendants, which is an average of $10 million per Defaulting Defendant, and $37 million per Plaintiff. (Mem. at 50.) Plaintiffs' request is too large and unreasonable, even in light of Defaulting Defendants' willful and egregious conduct. Plaintiffs provide evidence of 90 instances of infringement by the 18 Defaulting Defendants. (See Mem. at 43–48; Kayser Decl., Ex. 1–18.) They allege that the infringing acts were willful, and they seek the maximum statutory damages available under 15 U.S.C. § 117(c)—$2,000,000—for each instance—even where the instance of infringement consisted merely of the listing of a trademarked name in small type in a long segment of text. Although the amount requested is excessive and weighs against granting default judgment, because default is otherwise appropriate, the Court will exercise its discretion to modify the award.

#### 4. POSSIBILITY OF DISPUTE

The fifth Eitel factor requires the Court to consider the possibility of disputes regarding material facts in the case. Eitel, 782 F.2d at 1471–72. As explained above, upon entry of default, a court must presume the truth of all well-pleaded facts in the complaint except those relating to damages. TeleVideo, 826 F.2d at 917–18.

Here, Plaintiffs' FAC, which the Court takes as true, alleges sufficient facts to establish Plaintiffs' claims for relief. By failing to respond, Defaulting Defendants have failed to rebut the presumption that Plaintiffs' allegations are true. Thus, no genuine dispute exists, or is likely to exist, regarding the material facts at issue in this case. This Eitel factor therefore favors entering default judgment.

#### 5. POSSIBILITY OF EXCUSABLE NEGLECT

In considering the sixth Eitel factor, the Court must account for the possibility that Defaulting Defendants' default resulted from excusable neglect. Due process requires that all interested parties be given notice reasonably calculated to apprise them of the pendency of the action, and that they be afforded an opportunity to present their objections before a final judgment is rendered. Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

Plaintiffs served a copy of the FAC via e-mail to Defendants Euromed, Orient-Online, Richen-Online, and Win International on December 16, 2011, at their known email addresses, and on all other Defaulting Defendants on January 25, 2012, at their known e-mail addresses. (Kayser Decl. ¶¶ 4–6.) Courts in this Circuit have recognized the sufficiency of service of process on foreign business entities via e-mail, especially in circumstances in which, as here, it is the only means of effecting service of process, because, for example, the defendant is evading service or simply cannot be located. See, e.g., Rio Properties, Inc. v. Rio Intern. Interlink, 284 F.3d 1007, 1014–18 (9th Cir. 2002); Xcentric Ventures, LLC v. Karsen, Ltd., No. CV 11–1055–PHX–FJM, 2011 WL 3156966, at *2 (D. Ariz. July 26, 2011); Bank Julius Baer & Co. Ltd. v. Wikileaks, No. C 08-00824 JSW, 2008 WL 413737, at *2 (N.D. Cal. Feb. 13, 2008). Defaulting Defendants are foreign business entities, and the Court granted Plaintiffs' requests to serve process on them by electronic mail. (5/17/11 Order at 11–12; 12/2/11 Order.) The e-mail addresses employed by Plaintiffs are the most reliable contact information Plaintiffs possesses for Defaulting Defendants, and the e-mail messages delivering the FAC included a proof of posting certificate confirming delivery and receipt. (Kayser Decl. ¶¶ 4–6.) Under these circumstances, the Court is satisfied that Defaulting Defendants have been effectively served.

Defaulting Defendants have had ample time to resolve this matter by filing motions or interposing an answer, but have done nothing. The Court thus concludes that their default was the result of an affirmative decision not to litigate the action rather than excusable neglect. The sixth Eitel factor favors entering default judgment.

#### 6. POLICY FAVORING DECISIONS ON THE MERITS

**\*10** The seventh Eitel factor requires the Court to account for the policy favoring decisions on the merits. Eitel, 782 F.2d at 1471–72. The very existence of Rule 55(b), however, indicates that "this preference, standing alone, is not dispositive." PepsiCo, 238 F. Supp. 2d at 1177 (internal

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 178 of 237

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

quotation marks omitted) (quoting Kloepping, 1996 WL 75314, at *3). Rule 55(a) permits a district court to render a judgment before adjudicating the merits of the case where the defendant fails to defend against the action. Fed. R. Civ. P. 55(a); see also Schwarzer, supra, § 6:102, at 6-26.

Here, Defaulting Defendants' failure to answer the complaint or otherwise respond in this matter renders the Court unable to adjudicate the case on the merits. Accordingly, the policy of deciding cases on the merits does not preclude the Court from entering default judgment.

### 7. CONCLUSION RE: EITEL FACTORS
After analyzing each Eitel factor, the Court concludes that, on balance, the factors weigh in favor of entering default judgment against Defaulting Defendants. Accordingly, Plaintiffs' Motion for Entry of Default Judgment is **GRANTED**.

### C. REMEDIES
The Court proceeds to assess whether Plaintiffs are entitled to the remedies they seek. District courts do not automatically presume the truth of allegations relating to damages upon entry of default; rather, the plaintiff must "prove up" damages. Philip Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494, 501 (C.D. Cal. 2003). When determining the amount of damages to be awarded in a default judgment proceeding, a plaintiff is required to prove all damages sought in the complaint. See Geddes v. United Fin. Grp., 559 F.2d 557, 560 (9th Cir. 1977) (stating the general rule of law that allegations in the complaint are not accepted as true with regard to damages). Accordingly, the demand for relief must be specific, Fed. R. Civ. P. 8(a), and the damages sought cannot "differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). These rules limit the scope of relief and ensure fundamental fairness as required by due process. Schwarzer, supra, § 6:131, at 6–33.

A plaintiff's burden in "proving up" damages is relatively lenient. This Court has ruled that "[i]f proximate cause is properly alleged in the complaint, it is admitted upon default." Castworld Prods., Inc., 219 F.R.D. at 498 (citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 159 (2d Cir. 1992)). The plaintiff need only prove that the compensation sought relates to the

damages that flow naturally from the well-pleaded injuries. See id. (citation omitted). However, if the facts necessary to determine damages are not contained in the complaint or are legally insufficient, they are not established by default. See Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992). Finally, damages calculation may not be "clearly erroneous" and must have some basis in declarations, testimony, deposition transcripts, or other material evidence. Swoboda v. Pala Min., Inc., 844 F.2d 654, 659 (9th Cir. 1988).

Plaintiffs request monetary and injunctive relief, as follows: (1) $184,000,000 in statutory damages, pursuant to 15 U.S.C. § 1117(c); (2) a permanent injunction restraining Defaulting Defendants from infringing Plaintiffs' marks; (3) an order transferring Defaulting Defendants' domain names to Plaintiffs; (4) an order that Defaulting Defendants deliver up infringing goods and advertisements for destruction; and (5) an order that funds in any account held by Defaulting Defendants be transferred to Plaintiffs to satisfy the damages award. (See Mem. at 50; Proposed Order.) The relief requested does not differ in kind from the relief prayed for in Plaintiffs' FAC, and is also sufficiently specific. (See FAC at 81–86.) However, not all of the requested relief is warranted. The Court provides its reasoning below.

### 1. STATUTORY DAMAGES
 **\*11** The Lanham Act permits a trademark plaintiff to elect to recover statutory damages instead of actual damages and profits. 15 U.S.C. § 1117(c). Statutory damages are permitted in amounts not less than $1,000 and not more than $200,000 per counterfeit mark per type of goods sold, offered for sale, or distributed, and, in the case of willful infringement, in an amount not more than $2,000,000 per counterfeit mark per type of goods sold or distributed. 15 U.S.C. § 1117(c). Willful infringement occurs when the defendant knowingly and intentionally infringes on a trademark, and can be inferred from a defendant's failure to defend. Feiya Cosmetics, LLC v. Beyond Beauty Int'l, LLC, No. C–10–00967 JCS, 2011 WL 4506182, at *13 (N.D. Cal. Aug. 29, 2011) (citing Earthquake Sound Corp. v. Bumper Indus., 352 F.3d 1210, 1216–17 (9th Cir. 2003); Castworld Prods., Inc., 219 F.R.D. at 500). District courts exercise wide discretion in determining the amount of statutory damages awarded, id. (citing Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, 259 F.3d 1186, 1194 (9th Cir. 2001)), and look to the following factors: " '(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff[s];

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 179 of 237

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

(3) the value of the [trademark]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.' " Id. (quoting 🚩 Cartier v. Symbolix Inc., 544 F. Supp. 2d 316, 318 (S.D.N.Y. 2008)). The deterrence factor is particularly important. 🚩 Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1406 (9th Cir. 2003); 🚩⚠ Castworld Prods., Inc., 219 F.R.D. at 501.

Here, Plaintiffs have documented 90 distinct instances of infringement by Defaulting Defendants [2] and seek the maximum statutory damages for willful infringement for each instance. (FAC at 86; Mem. at 44–48, 50.) There can be no doubt that Defaulting Defendants' infringement was willful. Defaulting Defendants offered for sale massive quantities of a wide variety of knock-off products bearing marks identical to Plaintiffs' trademarks; catered to an international market; required customers to buy in bulk; marketed their goods as "replicas" of the genuine items and advertised them as having "1:1" quality as the genuine versions at lower prices; and have not appeared in this action. (See Mem. at 21–41; Kayser Decl., Exs. 1–18.) Many Defaulting Defendants continue to infringe even after receiving notice of this lawsuit. (Kayser Decl. ¶¶ 14, 17, 21, 28, 34, 39, 42, 47, 50, 55.)

However, the Court is not persuaded that the maximum statutory damages should be awarded in this case. In support of their request, Plaintiffs cite several cases in which maximum or near-maximum statutory damages were awarded. (See Mem. at 19–20, 42–43.) In none of these cases did the damages award even approach that sought here; indeed, the maximum award in any case cited by Plaintiffs was for a total of $10.5 million against two defendants. (Id. at 42–43) (citing 🚩 Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., 658 F.3d 936, 947 (9th Cir. 2011).) In addition, in many of these cases, the damages determination was based on admissions by the defendant, specific evidence as to the defendant's total gross sales, or evidence produced in the course of a full trial—in short, evidence far more substantial than the web screenshots and photographs taken in connection with a limited number of investigative purchases that Plaintiffs have adduced here. Thus, although Plaintiffs' trademarks are indeed valuable and Defaulting Defendants have undoubtedly capitalized, to

some unknown extent, on Plaintiffs' substantial marketing efforts, the Court is persuaded that an award of $60,000 per instance of infringement, when combined with the extensive injunctive relief awarded infra, adequately serves the deterrence purpose.

**\*12**  Accordingly, Defaulting Defendants are **ORDERED** to pay **$5,400,000** in statutory damages, as follows:

(1) Cctrue is ordered to pay a total of $480,000 ($60,000 to Montblanc; $60,000 to Chloé; $60,000 to Panerai; $60,000 to Lange; and $240,000 to Alfred Dunhill);

(2) Fancysaler is ordered to pay a total of $240,000 ($60,000 to Alfred Dunhill; $60,000 to Montblanc; $60,000 to Cartier; and $60,000 to Chloé);

(3) Fuzhou is ordered to pay a total of $600,000 ($60,000 to Alfred Dunhill; $60,000 to Chloé; $180,000 to Montblanc; $300,000 to Panerai);

(4) Hengtai is ordered to pay a total of $480,000 ($60,000 to Chloé; $120,000 to Montblanc; $60,000 to Cartier; $240,000 to Panerai);

(5) Kk Fashion is ordered to pay a total of $240,000 to Chloé;

(6) Love in Apparel is ordered to pay a total of $180,000 ($60,000 to Panerai; $120,000 to Chloé);

(7) Melchic is ordered to pay a total of $360,000 ($300,000 to Alfred Dunhill; $60,000 to Chloé);

(8) Mystockwatch is ordered to pay a total of $180,000 ($60,000 to Panerai; $60,000 to Cartier; $60,000 to Montblanc);

(9) Seven Star is ordered to pay a total of $120,000 to Chloé;

(10) Shanghai Taolin is ordered to pay a total of $120,000 to Chloé;

(11) Sinoestar is ordered to pay a total of $240,000 ($60,000 to Panerai; $60,000 to Cartier; $60,000 to Montblanc; $60,000 to Alfred Dunhill);

(12) V52 is ordered to pay a total of $240,000 ($60,000 to Panerai; $60,000 to Cartier; $60,000 to Montblanc; $60,000 to Chloé);

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 180 of 237

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

(13) Win-Win is ordered to pay a total of $420,000 ($60,000 to Cartier; $360,000 to Panerai);

(14) Ecwatch is ordered to pay a total of $480,000 ($120,000 to Panerai; $180,000 to Cartier; $120,000 to Montblanc; $60,000 to Dunhill);

(15) Euromed is ordered to pay a total of $60,000 to Lange;

(16) Win International is ordered to pay a total of $120,000 ($60,000 to Lange; $60,000 to Chloé);

(17) Richen-online is ordered to pay a total of $540,000 ($60,000 to Alfred Dunhill; $180,000 to Cartier; $180,000 to Panerai; $120,000 to Montblanc);

(18) Orient-Online is ordered to pay a total of $300,000 ($60,000 to Cartier; $60,000 to Montblanc; $180,000 to Panerai).

## 2. INJUNCTIVE RELIEF

Plaintiffs additionally seek a permanent injunction under the Lanham Act, 15 U.S.C. § 1116(a). (FAC at 82–89; Mem. at 48–50.) The Lanham Act expressly permits district courts to issue injunctions "to prevent the violation of any right of the registrant of a [registered] mark ... or to prevent a violation under [ § 1125(a), (c), or (d)]." 15 U.S.C. § 1116(a). To obtain permanent injunctive relief, a plaintiff must prove that (1) it has suffered irreparable injury; (2) remedies at law are inadequate; (3) the balance of hardships favors granting injunctive relief; and (4) the public interest would not be disserved by a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). Based on the allegations in Plaintiffs' FAC, the Court concludes that all four requirements are satisfied and that Plaintiffs are entitled to injunctive relief.

Although it is no longer presumed in the Ninth Circuit that trademark infringement causes irreparable harm, see Flexible Lifeline Sys., Inc. v. Precision Lift, Inc., 654 F.3d 989, 998 (9th Cir. 2011), here, Defaulting Defendants' use of the Chloé, Dunhill, Panerai, Montblanc, Cartier, and Lange Marks is highly likely to confuse consumers and diminish Plaintiffs' goodwill. This harm is irreparable. Second, Plaintiffs have no adequate remedy at law, because monetary damages cannot rectify the consumer confusion and loss of goodwill threatened. Century 21 Real Estate

Corp., 846 F.2d at 1180 ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."). Third, the balance of hardships weighs in Plaintiffs' favor. Plaintiffs have long used their registered trademarks, and have committed substantial time, money, and effort to developing consumer recognition of these marks and building significant goodwill. (FAC ¶¶ 29–32, 40–41, 43–44, 53–55, 58, 68–69, 71, 80–81, 83–88, 97–98, 102, 103–105, 113–114.) Defaulting Defendants, on the other hand, have used the marks without authorization or payment, and an injunction would only prevent them from engaging in further infringing conduct. Fourth, a permanent injunction would advance the public interest by preventing further consumer deception or confusion due to Defaulting Defendants' infringement of Plaintiffs' marks. Accordingly, Plaintiffs are entitled to a permanent injunction.

**\*13** The Court must next determine the appropriate scope of the injunctive relief. Federal Rule of Civil Procedure 65 requires that "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). "[A]n injunction must be narrowly tailored ... to remedy only the specific harms shown by the plaintiff[ ], rather than to enjoin all possible breaches of the law." Price v. City of Stockton, 390 F.3d 1105, 1117 (9th Cir. 2004) (internal quotations, citation omitted).

Plaintiffs seek the following injunctive relief:

### a. Injunction Against Further Infringement

An injunction against Defaulting Defendants and their officers, agents, servants, employees and attorneys, and all persons acting in concert and participation with Defaulting Defendants, including but not limited to Internet Service Providers ("ISPs"), and any successor in interest or future owner of Defaulting Defendants, who receive actual notice of this Order, restraining and enjoining them from:

(1) using any of Plaintiffs' Marks, or any colorable imitation thereof or any mark confusingly similar thereto or likely to dilute by blurring and/or tarnishing any of Plaintiffs' Marks, or counterfeit reproductions thereof, in advertising, marketing, promoting, selling, offering

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 181 of 237

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

for sale, designing, creating, manufacturing, distributing, delivering, shipping, importing, or exporting any goods or services or facilitating, inducing, or assisting any of the activity set forth above;

(2) using any of Plaintiffs' Marks, or any colorable imitation thereof or any mark confusingly similar thereto or likely to dilute by blurring and/or tarnishing any of Plaintiffs' Marks, or counterfeit reproductions thereof, in any text or content including, without limitation, as or part of keywords; mobile application or optimization; applications (apps); metatags; metadata; creating, buying, or selling of links; blogs; on-line postings; domain names; forums; social media; or otherwise in any way that directs customers to Defaulting Defendants or Defaulting Defendants' web sites including search engine optimization; or in any way that constitutes or leads to advertising or optimizing;

(3) operating or hosting any web sites used by Defaulting Defendants to sell or offer to sell goods using any of Plaintiffs' Marks or any colorable imitation thereof or any mark confusingly similar thereto or likely to dilute by blurring and/or tarnishing any of Plaintiffs' Marks, or counterfeit reproductions thereof;

(4) making or employing any other use of Plaintiffs' Marks, or any colorable imitation thereof or any mark confusingly similar thereto or likely to dilute by blurring and/or tarnishing any of Plaintiffs' Marks, or counterfeit reproductions thereof;

(5) using any false designation of origin, false description or representation, or any other thing calculated or likely to cause confusion or mistake in the mind of the trade or public or to deceive the trade or public into believing that Defaulting Defendants' activities, including the sale of goods bearing counterfeit Plaintiffs' Marks, are in any way sponsored, licensed, endorsed, authorized, affiliated, or connected with and/or originated from Plaintiffs;

(6) doing any other acts or things calculated or likely to cause confusion or mistake in the mind of the public or to lead purchasers, consumers, or investors into the belief that the products or services promoted, offered, or sponsored by Defaulting Defendants emanate from or originate with Plaintiffs or their licensees, or are somehow sponsored, licensed, endorsed, authorized, affiliated, or connected with Plaintiffs and/or originate from Plaintiffs;

**\*14** (7) secreting, destroying, altering, removing, deleting any electronic copies, or otherwise dealing with the unauthorized products or offers to sell or means of making such marks and products, or any books, documentation or records thereto (electronic or otherwise) which contain any information relating to selling, marketing, offering for sale, advertising, promoting, displaying, designing, creating, importing, manufacturing, producing, distributing, or circulating of all unauthorized products which infringe Plaintiffs' marks;

(8) otherwise competing unfairly with Plaintiffs or any of their authorized retailers or dealers in any manner; and

(9) facilitating, inducing, assisting, aiding, abetting, or supplying the means for any other person or business entity to engage in or perform any of the activities referred to in the above subparagraphs (1) through (8), or effecting any assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (1) through (8).

(See Proposed Order at 4–5.) This relief is sufficiently narrowly tailored and concretely described. It is therefore warranted, and is **GRANTED**.

### b. Transfer of Control to Plaintiffs of Defaulting Defendants' Web Sites

In addition, Plaintiffs seek to have Defaulting Defendants' domain names transferred to their control, as follows: (1) www.cctrue.com; (2) www.fancysaler.com; (3) www.sweetywoman.com; (4) www.watches138.com; (5) www.melchic.com; (6) www.fumingapparel.com; (7) www.v52trade.com; (8) www.51winwintrade.com; (9) www.ecwatch.net; (10) www.goecwatch.net; (11) www.winfasionbiz.com; (11) www.goec5.com; (12) www.gowatch321.com; and (13) www.hrywide.com (collectively, the "Subject Domain Names"). (Mem. at 48–49.) Specifically, Plaintiffs seek an order from this Court that:

(1) The Subject Domain Names and any other domain name registered by or on behalf of Defaulting Defendants for the purpose of evading this Order shall be canceled by the Registry and/or Registrar, or, at Plaintiffs' election, transferred to one of the Plaintiffs

(2) In accordance with this Court's inherent equitable powers and its power to coerce compliance with its lawful orders, and due to Defaulting Defendants' ongoing counterfeit activities:

(a) As Plaintiffs discover new domain names, registered by Defaulting Defendants, containing Plaintiffs' Marks or marks confusingly similar thereto, and/or used in conjunction with the sale of counterfeit goods (whether or not the newly-detected domains contain Plaintiffs' marks or marks confusingly similar thereto) ("Newly-Detected Domains"), Plaintiffs shall have the ongoing authority to provide notice of this Order for Default Judgment and Permanent Injunction on the domain name registries and/or the individual registrars holding and/or listing one or more of the Newly-Detected Domains; and

(b) The domain name registries and/or the individual registrars holding and/or listing one or more of the Newly-Detected Domains, within two days after having been provided notice shall temporarily disable any Newly-Detected Domains and make them inactive and untransferable; and

(c) Within two days after any Newly-Detected Domains are disabled, Plaintiffs shall serve this Order for Default Judgment and Permanent Injunction by email or other reasonable means to the contact information associated with that domain name in the WhoIs database, containing a notification that the Newly-Detected Domains have been disabled pursuant to this Order for Default Judgment and Permanent Injunction; and

***15** (d) After ten business days following the service of this Order for Default Judgment and Permanent Injunction, the registries and/or the individual registrars shall transfer the Newly-Detected Domains to the ownership and control of Plaintiffs, through the registrar of Plaintiffs' choosing, unless Plaintiffs request that such Newly-Detected Domains be released rather than transferred or the registries and/or the individual registrars file a motion with this Court objecting to such transfer.

(3) In accordance with this Court's inherent equitable powers and its power to coerce compliance with its lawful orders, and due to Defaulting Defendants' ongoing proliferation of web sites for operation of their counterfeiting activities:

(a) As Plaintiffs discover new counterfeiting web sites operated by Defaulting Defendants, Plaintiffs shall have the ongoing authority to provide notice of this Order for Default Judgment and permanent Injunction on any third party providing services in connection with any Defaulting Defendant and/or Defaulting Defendants' web sites, including without limitation ISPs, back-end service providers, web designers, sponsored search engine or adword providers, and any parties delegating IP address ("Internet Providers"); and

(b) The Internet Providers shall within two days discontinue all services for Defaulting Defendants' web site(s).

(4) E-commerce and auction web sites having notice of this Order for Default Judgment and Permanent Injunction permanently delete and remove any and all accounts and listings associated with Defaulting Defendants.

(See Proposed Order at 8–10.) This relief is also sufficiently narrowly tailored and concretely described, and it accords with the practice in this Circuit. See Chanel v. Lin, No. C-09-04996 JCS, 2010 WL 2557503, at *12 (N.D. Cal. May 7, 2010) (recommending that the district court grant Chanel's similar request), report and recommendation adopted by No. C 09-04996 SI, 2010 WL 2557561 (N.D. Cal. June 21, 2010). It is therefore warranted, and is **GRANTED**.

### *c. Seizure and Destruction of Infringing Goods and Advertisements*

Plaintiffs also seek an order for the seizure and destruction of the infringing goods. Specifically, Plaintiffs seek an order requiring Defaulting Defendants to:

(1) permanently delete, remove, and recall from all web sites, blogs, online auctions, stores, shops, markets, outlets, catalogues, or other channels of commerce (and all of the foregoing applying to electronic forms in addition to brick and mortar or paper), any listing for goods bearing Plaintiffs' Marks, or replicas/copies of goods bearing Plaintiffs' Marks, or that otherwise bear, contain, display, or utilize Plaintiffs' Marks, or any mark confusingly similar thereto, or likely to dilute by blurring and/or tarnishing any of Plaintiffs' Marks, or counterfeit reproduction thereof;

(2) in accordance with § 36 of the Federal Trademark Act, 15 U.S.C. § 1118, deliver up for destruction all

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 183 of 237

Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)

2012 WL 12886442

counterfeit goods that bear Plaintiffs' Marks, and/or any replicas/copies of goods bearing Plaintiffs' Marks, or that otherwise bear, contain, display, or utilize Plaintiffs' Marks, or any mark confusingly similar thereto, or likely to dilute by blurring and/or tarnishing any of Plaintiffs' Marks, or counterfeit reproductions thereof, that are in Defaulting Defendants' possession, custody, or control and all means of making the same;

(3) in accordance with § 36 of the Federal Trademark Act, 15 U.S.C. § 1118, deliver up for destruction any and all guarantees, circulars, price lists, labels, signs, prints, packages, wrappers, receptacles, advertising and promotional matter, electronic files, and other materials in the possession or control of Defaulting Defendants (and all of the foregoing applying to electronic files and copies in addition to paper copies) bearing Plaintiffs' Marks, or any mark confusingly similar thereto, or likely to dilute by blurring and/or tarnishing any of Plaintiffs' Marks, or counterfeit reproductions thereof;

**\*16**  (See Proposed Order at 6.) This relief is permissible under 15 U.S.C. § 1116(d)(1), and is sufficiently specific. It is therefore warranted, and is **GRANTED**.

### d. Seizure of Assets

Finally, Plaintiffs seek an order seizing Defaulting Defendants' assets in order to satisfy the monetary awarded granted above. Specifically, Plaintiffs seek an order that:

(1) banks, savings and loan associations, payment processors or other financial institutions, including without limitation PayPayl®, or other merchant account providers, payment providers, third party processors or e-commerce or auction web sites or providers for any of Defaulting Defendants, any of Defaulting Defendants' operations, or any of Defaulting Defendants' web sites, including, but not limited to, those associated with Defaulting Defendants' domain names, transfer all money in accounts connected to Defaulting Defendants or their web sites to Plaintiffs to be released to Plaintiffs as partial payment of the abovementioned damages up to and including the respective total amount owed by each of Defaulting Defendants; and

(2) in accordance with this Court's inherent equitable powers and its power to coerce compliance with its lawful orders, until Plaintiffs have recovered the full payment of

monies owed to them by Defaulting Defendants under this Default Judgment and Permanent Injunction:

(a) As Plaintiffs discover new monies belonging to or controlled by or on behalf of Defaulting Defendants, Plaintiffs shall have the ongoing authority to provide notice of this Order for Default Judgment and Permanent Injunction on Defaulting Defendants or any party controlling or otherwise holding such accounts, including but not limited to PayPal® or other merchant account providers, payment providers, third party processors or e-commerce or auction web sites or providers (collectively, "Account Holders") shall immediately locate all accounts and/or assets connected to Defaulting Defendants' and/or Defaulting Defendants' web sites and/or accounts, provide Plaintiffs with the contact information for those web sites and/or accounts and immediately be temporarily restrained and enjoined from transferring or disposing of any money, stock or other of the Defaulting Defendants' assets, and restrain all monies and/or assets, not allowing such funds to be transferred or withdrawn, and not allowing any refunds, charge-backs, or other diminutions to be made from such accounts; and

(b) Within two days after any account is restrained, Plaintiffs shall serve this Order for Default Judgment and Permanent Injunction by e-mail or other reasonable means to the contact information associated with that account containing a notification that the account has been restrained pursuant to this Order for Default Judgment and Permanent Injunction; and

(c) After ten business days following service of this Order for Default Judgment and Permanent Injunction, Account Holders shall transfer all monies in the restrained accounts to Plaintiffs, unless the Account Holders have filed with the Court and served upon Plaintiffs' counsel a request that such monies be exempted from this order because, inter alia, particular assets are not proceeds of Defaulting Defendants' counterfeiting activities and/or do not belong to Defaulting Defendants, in which case those particular assets shall not be transferred unless and until a decision is rendered by this Court.

**\*17**  (See Proposed Order at 7–8.) Plaintiffs do not provide authority for seeking this relief, and the Court concludes that it is too expansive; this request is therefore **DENIED**.

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 184 of 237
Sas v. Sawabeh Information Services Co., Not Reported in Fed. Supp. (2012)
2012 WL 12886442

### e. Defaulting Defendants' Report

Defaulting Defendants are required "to file with the court and serve on plaintiff within thirty days after the service on the defendant of such injunction ... a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction." 15 U.S.C. § 1116(a).

### 3. COSTS

A plaintiff is entitled to recover "costs of the action" in a trademark infringement action. 15 U.S.C. § 1117(a)(3). Based on Defaulting Defendants' conduct in this case and the conclusion that their actions were willful, the Court holds that Plaintiffs are entitled to recover their costs incurred in bringing this action against Defaulting Defendants. Plaintiffs are to file a bill of costs within 15 days of the date of this order.

## IV.

## CONCLUSION

Consistent with the reasoning above, Plaintiffs' Motion for Default Judgment is **GRANTED.** Defaulting Defendants are **ORDERED** to pay **$5,400,000** and are **ENJOINED** as set forth above. If Plaintiffs seek costs, they are **ORDERED** to file their bill of costs within 15 days from the date of this order. Plaintiffs are **ORDERED** to lodge a proposed judgment consistent with this order no later than **April 10, 2012**. The hearing presently scheduled for April 9, 2012, is hereby **VACATED.**

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2012 WL 12886442

---

## Footnotes

1    The Servicemembers Civil Relief Act was formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940.

2    Plaintiffs seek damages for a total of 92 instances; however, evidence was not provided of Cctrue's infringement of Cartier's 414,435 mark as to pocketbooks, and one of the instances of infringement attributed to Orient-Online, relating to Dunhill's 1,734,900 mark as to belts, appears to have been perpetrated by a different company called Orient Trade Co., Ltd. (See Mem. at 44, 48; Kayser Decl., Exs. 1 at 25, 18 at 362.)

---

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT S

2022 WL 952728

2022 WL 952728
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

STRIKE 3 HOLDINGS, LLC, Plaintiff,
v.
John DOE subscriber assigned IP
address 100.11.204.106, Defendant

CIVIL ACTION NO. 20-5122
|
Filed 03/30/2022

**Attorneys and Law Firms**

John C. Atkin, The Atkin Firm LLC, Morristown, NJ, for
Plaintiff.

### MEMORANDUM OPINION

Rufe, District Judge

**\*1** Plaintiff Strike 3 Holdings, LLC moves for default
judgment against Defendant Bernard S. Gray pursuant to
Federal Rule of Civil Procedure 55(b)(2). [1] To date,
Defendant has not answered the Amended Complaint or
entered an appearance, despite multiple attempts at service
at his home address and two successful instances of personal
service on Defendant's wife at that address. For the reasons
stated below, Plaintiff's motion will be granted.

### I. BACKGROUND

Plaintiff is a Delaware limited liability company that owns
and distributes pornographic films. [2] Plaintiff distributes
these films in the United States through subscription-based
websites, licensing to third-party broadcasters, and the sale of
physical DVDs. [3] Plaintiff regularly copyrights these films.

"BitTorrent is a system designed to quickly distribute large
files over the Internet." [4] BitTorrent allows a user to
simultaneously download (or "torrent") a file from multiple
other BitTorrent users who each have copies of that file on
their personal computers. [5] It does this by algorithmically
assigning "Info Hashes" to fragments of data in each file,
which can then be downloaded in parallel from multiple
different computers and then reassembled. [6] These Info

Hashes are each specific to the underlying data fragments, and
together are specific to the digital file; any change to the data
in the file will result in a different set of Info Hashes. [7]

Since Plaintiff's works are frequently pirated, Plaintiff "has
developed, owns, and operates [a copyright] infringement
detection system, named 'VXN Scan,' " which searches for
unauthorized BitTorrent files that purport to be Plaintiff's
copyrighted works. [8] VXN Scan torrents complete copies of
the suspected files, which are reviewed by Plaintiff's staff
and compared to Plaintiff's copyrighted works. If the files
are determined to be copyrighted, VXN Scan then uses the
Info Hash values to download the data fragments again, and
documents the IP addresses from which the fragments
originate (i.e., the IP addresses whose users are distributing
identical copies of the reviewed file). [9]

On October 15, 2020, Plaintiff filed suit under the Copyright
Act against a John Doe defendant (assigned IP address
100.11.204.106) based on IP address information drawn from
VXN Scan. [10] Shortly thereafter Plaintiff sought leave to
serve a third-party subpoena on Verizon Fios, the internet
service provider associated with this IP address, to determine
to whom the IP address is assigned. [11] Verizon Fios's response
to the subpoena identified the IP address as assigned to
a Verizon Fios customer living at a specific residence in
Philadelphia, Pennsylvania. [12]

**\*2** This customer was not Defendant Bernard S.
Gray. [13] However, investigation by Plaintiff indicated that
Defendant lived at this residence during the period of
infringement, that Defendant had public social media profiles
indicating a professional interest in comedy, filmmaking, and
screenwriting, and that the IP address associated with the
Philadelphia residence had torrented multiple works relating
to these interests, including a number of "Master Class"
instructional videos related to comedy, filmmaking, and
screenwriting. [14]

In January 2021, Plaintiff filed two versions of the Amended
Complaint—the first a redacted version that did not name
Defendant, [15] and the second an unredacted version filed
under temporary seal by leave of the Court that provided
identifying details of Defendant. [16] The First Amended
Complaint and the associated summons was served on
February 20, 2021 at Defendant's address on a woman who
identified herself as Defendant's wife. [17] To date, Defendant

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 187 of 237

Strike 3 Holdings, LLC v. Doe, Not Reported in Fed. Supp. (2022)
2022 WL 952728

has not responded to the Amended Complaint and has not sought an extension of the response deadline.

After the Clerk entered default, Plaintiff moved for entry of default judgment. [18] On February 1, 2022, the Court held a hearing on Plaintiff's Motion for Default Judgment. Prior to that hearing, and pursuant to the Court's orders, Plaintiff served notice of the hearing, the Motion for Default Judgment and another copy of the Amended Complaint on Defendant via personal service at Defendant's address to a woman who again identified herself as Defendant's wife. [19] Defendant did not attend the hearing.

Following the hearing, the Court ordered Plaintiff to again serve copies of Plaintiff's Motion for Default Judgment on Defendant and allowed Plaintiff to file supplemental briefs addressing "(a) whether the technical operation of the BitTorrent protocol and the operation of Plaintiff's VXN Scan software, as described in the Amended Complaint, sufficiently establishes that the identified BitTorrent uploader was in possession of readable files containing Plaintiff's intellectual property; and (b) whether the Amended Complaint sufficiently establishes that each piece of allegedly infringed copyrighted media qualifies as a separate 'work' for the purposes of calculating statutory damages under ⚑ 17 U.S.C. § 504(c)(1)." [20] Plaintiff filed supplemental briefing and supporting affidavits in response to this order, and again attempted to serve relevant documents on Defendant by certified mail and personal service. [21] The Court now addresses Plaintiff's motion for default judgment and the related filings.

## II. LEGAL STANDARD

⚑ Federal Rule of Civil Procedure 55(b)(2) authorizes a court to enter default judgment against a properly served defendant who fails to file a timely responsive pleading. [22]

**\*3** When considering a motion for default judgment, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." [23] To grant default judgment, a court first "must ascertain whether the unchallenged facts constitute a legitimate cause of action." [24] If the complaint pleads a legitimate cause of action, the question of whether a court should grant default judgment is governed by the *Chamberlain* factors: (1) the potential for prejudice to the plaintiff if default judgment is denied; (2)

whether the defendant appears to have a litigable defense; and (3) whether the defendant's failure to respond is due to culpable conduct. [25]

## III. DISCUSSION

### A. Default Judgment

As a threshold issue, the Court finds that Plaintiff has sufficiently served the Amended Complaint on Defendant. [26] Once service is established, the Court must then determine whether the Amended Complaint alleges facts that allow the Court to draw the reasonable inference that Defendant is liable for copyright infringement. [27] The elements of copyright infringement are "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." [28]

Plaintiff has alleged that it owns valid copyrights for each work, and provided a unique publication date, copyright registration date, and copyright registration number for each of the 97 works that Defendant allegedly infringed. [29] Plaintiff has also alleged that Defendant copied constituent elements of those works when Defendant "downloaded, reproduced, and distributed Plaintiff's works through the BitTorrent protocol." [30] The detail about the operation of VXN Scan provided in the Amended Complaint and the description of Plaintiff's subsequent investigation sufficiently allege that Defendant, and not any other resident of the dwelling to which the IP address was assigned, was responsible for the infringements. [31]

**\*4** Each of the three *Chamberlain* factors weighs in favor of granting default judgment. First, Plaintiff will be prejudiced if default judgment is denied because Defendant has failed to answer or otherwise defend this matter. Thus, "denying the request for default judgment will prejudice Plaintiff because it has no other means of vindicating its claims." [32] Second, Defendant does not appear to have a litigable defense to Plaintiff's claim, as he has "not asserted any defense in this action, whether by responding to the Complaint or by responding to this Motion ... or by otherwise contesting the allegations." [33] Lastly, Defendant caused the default because he has failed "to engage in the litigation process and to offer [any] reason for this failure," [34] which can be considered culpable conduct.

2022 WL 952728

## B. Relief Sought

Plaintiff seeks multiple forms of relief. First, Plaintiff seeks a permanent injunction, enjoining Defendant from continued distribution of Plaintiff's copyrighted works and requiring Defendant to delete any infringing files from computers in Defendant's possession or control. [35] Next, Plaintiff seeks minimum statutory damages in the amount of $72,750. [36] Finally, Plaintiff seeks a statutory award of certain litigation costs, in the total amount of $590. [37]

### 1. Permanent Injunction

A district court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." [38] "In deciding whether to grant a permanent injunction, the district court must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest." [39] Courts in this District applying these factors in granting default judgment have regularly held that injunctive relief is appropriate against a repeat infringer who has actively distributed copyrighted works, "to ensure the misconduct does not recur." [40] An injunction that only requires Defendant to delete infringing works and refrain from distributing Plaintiff's intellectual property is narrowly tailored to the purposes of the Copyright Act, prevents ongoing harm to Plaintiff by preventing the free distribution of Plaintiff's intellectual property, and presents minimal harm to Defendant as it only enjoins activity that is already prohibited by statute.

### 2. Statutory Damages

"Unlike liability, damages 'cannot be awarded simply on the basis of the pleadings, but must instead be established at an evidentiary hearing held pursuant to [ Rule] 55(b) (2),' unless damages are 'liquidated or computable' or the plaintiff otherwise submits such proof without a hearing." [41] The Copyright Act provides that a copyright owner may elect to recover statutory damages–rather than actual damages–

for each work infringed. [42] The provision further provides that "[f]or the purposes of this subsection, all the parts of a compilation or derivative work constitute one work." [43]

**\*5** Here Plaintiff has elected to seek the minimum statutory damages provided by the Copyright Act of $750 per infringement, and so no hearing is necessary to establish the harm suffered by Plaintiff. [44] However, to calculate damages under the Copyright Act in any default judgment, the Court must make a factual finding about the number of infringed "works." [45] 17 U.S.C. § 504(c) provides that "[f]or the purposes of [calculation of statutory damages], all the parts of a compilation or derivative work constitute one work." [45] Where a plaintiff moving for default judgment claims multiple infringements, the Court must determine whether each allegedly infringed property should be considered a "separate work" for the purpose of § 504.

When determining whether a work is part of a compilation for purposes of § 504(c)(1), a court must look at "whether the protected works have value only in and through their composite whole (and thus meeting the definition of a 'compilation'[ ]) or instead have standalone value at the level of 'one work.' " [46] Considerations like the existence of separate copyrights for each element of a copyrighted work are informative, but not dispositive. [47] The focus is on "whether the plaintiff—the copyright holder—issued its works separately, or together as a unit," [48] and whether each individually copyrighted work has its own "copyright life." [49] For instance, courts have held that each infringed episode of a television series constitutes a separate work for purposes of § 504(c) where each episode has independent economic value. [50] Similarly, courts have held that illustrations constitute separate works for purposes of § 504(c) when each illustration has "distinct and discernible value." [51]

**\*6** The Amended Complaint and Plaintiff's supplemental briefing supports a finding that each of Plaintiff's 97 works was created, registered, and issued separately, [52] constituting separate works under § 504. Plaintiff cites to *Arista Recordings LLC v. Lime Group. LLC*, [53] which held that several record companies could "recover a statutory damage award with respect to each sound recording," on an album. [54]

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 189 of 237
Strike 3 Holdings, LLC v. Doe, Not Reported in Fed. Supp. (2022)
2022 WL 952728

The court in *Arista* explained that "[a]lthough the Copyright Act states that 'all parts of a compilation ... constitute one work,' it does not say that any work included in a compilation cannot also exist as a separate, independent work." [55] Thus, the court concluded that each individual track infringed upon was a "work" issued by the plaintiffs, "to which Plaintiffs may seek to recover a statutory damage award." [56] Like the plaintiffs in *Arista*, Plaintiff issued and released each of its works individually. [57] Even though 15 of the 97 videos were later distributed on DVD, and some DVD distributions compiled more than one of the videos in question, [58] this subsequent compilation does not negate the fact that Plaintiff's works were originally issued individually. Therefore, each work "has independent economic value and is, in itself, viable," [59] and each of the 97 works is entitled to a separate award. [60] As Plaintiff has provided substantial proof that Defendant infringed on 97 separate copyrighted works by Plaintiff, 🚩17 U.S.C.A. § 504 entitles Plaintiff to minimum statutory damages of $750.00 per infringed work, for a total amount of $72,750.00.

### 3. Fees and Costs

Under 17 U.S.C. § 505, a district court may, in its discretion, award costs to the prevailing party in a copyright infringement suit. [61] These costs may be awarded on default judgment. [62] Plaintiff has provided documentation of certain costs associated with this action, which comprise a $350.00 statutory filing fee, [63] a $50.00 administrative fee, [64] and a $190.00 charge to serve process on Defendant. [65] The Court finds that these costs are reasonable in the context of this litigation, and will award Plaintiff costs in an amount of $590.00 pursuant to § 505. [66]

### IV. CONCLUSION

Plaintiff Strike 3 Holdings, LLC has repeatedly served Defendant Bernard S. Gray with the Amended Complaint, and the Court has offered multiple opportunities for Defendant to appear. Defendant has not appeared before this Court or responded to the Amended Complaint in any manner. The Amended Complaint states a claim against Defendant, and the *Chamberlain* factors weigh in favor of granting default judgment. For the foregoing reasons, Plaintiff's Motion for Default Judgment will be granted, and Plaintiff will be awarded statutory damages totaling $72,750.00 and costs associated with this litigation in the amount of $590.00. An order will be entered.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 952728

---

## Footnotes

1    Mot. Default J. [Doc. Nos. 15 & 16].

2    Am. Compl. [Doc. Nos. 5 & 8] ¶ 3.

3    Am. Compl. [Doc. Nos. 5 & 8] ¶ 13.

4    Am. Compl. [Doc. Nos. 5 & 8] ¶ 17.

5    Am. Compl. [Doc. Nos. 5 & 8] ¶ 17.

6    Am. Compl. [Doc. Nos. 5 & 8] ¶¶ 23–26.

7    Am. Compl. [Doc. Nos. 5 & 8] ¶ 21.

8    Am. Compl. [Doc. Nos. 5 & 8] ¶¶ 27, 32.

9    Am. Compl. [Doc. Nos. 5 & 8] ¶¶ 32–35.

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 190 of 237

Strike 3 Holdings, LLC v. Doe, Not Reported in Fed. Supp. (2022)

2022 WL 952728

10    🚩 17 U.S.C. § 101 et seq.; *see* Compl. [Doc. No. 1] ¶¶ 5–7.

11    Mot. Leave Serve Third-Party Subpoena [Doc. No. 3].

12    Am. Compl. [Doc. Nos. 5 & 8] ¶ 48.

13    Am. Compl. [Doc. Nos. 5 & 8] ¶ 48.

14    Am. Compl. [Doc. Nos. 5 & 8] ¶¶ 49–52.

15    Am. Compl. [Doc. No. 5] (redacted).

16    Am. Compl. [Doc. No. 8] (unredacted).

17    *See* Summons [Doc. No. 10]; Suppl. Aff. Supp. Service of Process [Doc. Nos. 27-1 & 29] at ECF page 3.

18    Mot. Default J. [Doc. No. 15].

19    *See* Certificate Service [Doc. No. 22] at ECF page 4; Suppl. Aff. Supp. Service of Process [Doc. Nos. 27-1 & 29] at ECF page 3.

20    Order [Doc. No. 23] at 2–3.

21    Although four attempts at personal service in early February were unsuccessful, Defendant was also served three copies of the documents by United States Postal Service—once by regular mail and twice by electronically signed certified mail. *See* Certificate Service [Doc. No. 25] ¶¶ 2–15, Ex. A.

22    *See* 🚩 *Anchorage Assocs. v. V.I. Bd. of Tax Rev.*, 922 F.2d 168, 177 n.9 (3d Cir. 1990).

23    🚩 *DIRECTV, Inc. v. Albright*, No. 03-4603, 2003 WL 22956416, at *1 (E.D. Pa. Dec. 9, 2003) (quoting 🚩 *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990)).

24    *Phoenix Ins. Co. v. Small*, 307 F.R.D. 426, 433 (E.D. Pa. 2015) (citing 🚩 *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 (D.N.J. 2008)).

25    🚩 *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000) (citing 🚩 *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984)).

26    "A default judgment entered when there has been no proper service of the complaint is, *a fortiori*, void, and should be set aside." 🚩 *Gold Kist, Inc. v. Laurinburg Oil Co.*, 756 F.2d 14, 19 (3d Cir. 1985). Plaintiff has documented two successful attempts to serve the Amended Complaint on an adult residing at Defendant's dwelling, in accordance with Federal Rule of Civil Procedure 4(e)(2)(B). In addition, Plaintiff has made multiple unsuccessful attempts at personal service and repeatedly served copies of relevant filings to Defendant by USPS certified and regular mail.

27    🚩 *Sweda v. Univ. of Penn.*, 923 F.3d 320, 325–26 (3d Cir. 2019). Where a default occurs, the well-pleaded factual allegations set forth in a complaint relating to liability are deemed true. *See* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied.")

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 191 of 237

Strike 3 Holdings, LLC v. Doe, Not Reported in Fed. Supp. (2022)

2022 WL 952728

28    ⚑ *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

29    *See* Am. Compl. Ex. A [Doc. Nos. 5-1 & 8-1].

30    Mot. Default J. [Doc. No. 15-1] at 2. For a more in-depth discussion of the BitTorrent protocol and how the file sharing system works, see Am. Compl. [Doc. No. 5] ¶¶17–46; *see also* Suppl. Mem. L. Supp. Mot. Default J. [Doc. No. 26], at 2–3.

31    *Compare Malibu Media, LLC v. Flanagan*, No. 13-CV-5890, 2014 WL 2957701, at *1 (E.D. Pa. July 1, 2014) (finding that identity was sufficiently alleged to grant default judgment in a BitTorrent copyright case where Plaintiff identified "Defendant's online activities, hobbies, and interest[s] [that] implicate he was the infringer, and not his wife.") *with* ⚑ *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142, 1145 (9th Cir. 2018) (dismissing copyright claims where the plaintiff alleged only that the defendant was the subscriber assigned the infringing IP address. "Because multiple devices and individuals may be able to connect via an IP address, simply identifying the IP subscriber solves only part of the puzzle. A plaintiff must allege something more to create a reasonable inference that a subscriber is also an infringer.").

32    *Commodity Futures Trading Comm'n v. Salerno*, No. 18-1585, 2020 WL 7122418, at *2 (E.D. Pa. Sept. 23, 2020) (internal quotations omitted).

33    *Id.* at 3 (internal quotations omitted).

34    *Id.*

35    Mot. Default J. [Doc. Nos. 15, 16] ¶¶ 2–4; Mem. L. Supp. Mot. Default J. [Doc. Nos. 15-1 & 16-1] at 4–5.

36    Mot. Default J. [Doc. Nos. 15, 16] ¶ 5; Mem. L. Supp. Mot. Default J. [Doc. Nos. 15-1 & 16-1] at 6.

37    Mot. Default J. [Doc. Nos. 15, 16] ¶ 6; Mem. L. Supp. Mot. Default J. [Doc. Nos. 15-1 & 16-1] at 6–7.

38    17 U.S.C. § 502(a).

39    ⚑ *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001).

40    *Malibu Media, LLC v. Flanagan*, No. 13-5890, 2014 WL 2957701, at *5 (E.D. Pa. July 1, 2014); *Malibu Media, LLC v. Brickhouse*, No. 18-3139, 2019 WL 4061754, at *4 (E.D. Pa. Aug. 27, 2019).

41    *Brickhouse*, 2019 WL 4061754 at *2 (quoting ⚑ *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1152 (3d Cir. 1990)).

42    ⚑ 17 U.S.C. § 504(c)(1).

43    *Id.*

44    Mem. L. Supp. Mot. Default J. [Doc. No. 15-1, 16-1] at 6. "In default judgment cases [under the Copyright Act], courts can order the minimum statutory damages without conducting a hearing." *Broad. Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.*, 555 F. Supp. 2d 537, 544 (E.D. Pa. 2008).

45    ⚑ 17 U.S.C. § 504(c)(1).

46    ⚑ *Sullivan v. Flora, Inc.*, 936 F.3d 562, 571 (7th Cir. 2019).

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 192 of 237

Strike 3 Holdings, LLC v. Doe, Not Reported in Fed. Supp. (2022)

2022 WL 952728

47    🚩 *Sony Music Ent. v. Cox Comms. Inc.*, 464 F. Supp. 3d 795, 821 (E.D. Va. 2020) (citation omitted). Pieces of media individually registered under separate copyrights may still be considered part of a collective work for the purposes of calculating statutory damages. *See* 🚩 *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 141 (2d Cir. 2010) (noting that "[t]he fact that each [work] may have received a separate copyright is irrelevant to [statutory damages] analysis"). Conversely, even if multiple works are registered under a single copyright form, they may sometimes still qualify as separate individual works for the purposes of calculating statutory damages under 🚩 17 U.S.C. § 504(c). 🚩 *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1117 (1st Cir. 1993).

48    🚩 *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016) (internal quotations omitted).

49    *Capitani v. World of Miniature Bears, Inc.*, No. 3:19-CV-00120, 2021 WL 3362044, at *11 (M.D. Tenn. Aug. 2, 2021) ("A protected work has standalone value if the evidence shows that work has distinct and discernable value to the copyright holder ... The inquiry and fact finding demanded by 🚩 § 504(c)(1) is more functional than formal, taking account of the economic value, if any, of a protected work more than the fact that the protection came about by an artist registering multiple works in a single application. The necessary finding requires a focus on where the market assigns value. By way of an analogy, imperfect though it may be, think in the first instance of the multiple protected works as a quilt and then ask whether any one individual patch has discernable, independent economic value—whether once separated from the quilt a particular patch lives its own copyright life (as "one work")—or instead whether the value lies in the patches' combined assembly into the quilt as a whole (as a "compilation").") (quoting 🚩 *Sullivan v. Flora, Inc.*, 936 F.3d 562, 571–72 (7th Cir. 2019)).

50    *See, e.g.,* 🚩 *Gamma Audio & Video, Inc.*, 11 F.3d at 1117 (focusing on whether each television episode "has an independent economic value and is, in itself, viable"); 🚩 *Walt Disney Co. v. Powell*, 897 F.2d 565, 569 (D.C. Cir. 1990) (stating that "separate copyrights are not distinct works unless they can 'live their own copyright life' ") (internal quotations omitted).

51    *Capitani*, 2021 WL 3362044, at *11–12 (holding that each image in question was a separate work with distinct and discernable value in part because the images' values were not "derived solely from their combination and assembly" and because each separate image had its own license).

52    Suppl. Mem. L. Supp. Mot. Default J. [Doc. No. 26], at 6–7; *see also* Am. Compl. [Doc. No. 5] Ex. A.

53    🚩 No. 06-5936, 2011 WL 1311771 (S.D.N.Y. Apr. 4, 2011).

54    *Id.* at *4.

55    Suppl. Mem. L. Supp. Mot. Default J. [Doc. No. 26], at 8 (quoting *Arista Recs.* 🚩 *LLC v. Lime Grp. LLC*, No. 06-5936, 2011 WL 1311771, at *3 (S.D.N.Y. Apr. 4, 2011)).

56    *Id.*

57    Am. Compl. [Doc. Nos. 5 & 8] Ex. A (listing separate publication dates for each work).

58    *See* Suppl. Mem. L. Supp. Mot. Default J. [Doc. No. 26] at 7.

59    🚩 *Gamma Audio & Video, Inc.*, 11 F.3d at 1116–17 (citing to 🚩 *Walt Disney Co.*, 897 F.2d at 569).

60    🚩 *Playboy Enter., Inc. v. Sanfilippo*, No. 97-0670, 1998 WL 207856, at *5 (S.D. Cal. Mar. 24, 1998).

61    17 U.S.C. § 505.

62    *See Malibu Media, LLC v. Brickhouse*, No. 18-3139, 2019 WL 4061754, at *3–4 (E.D. Pa. Aug. 27, 2019).

63    *See* 28 U.S.C. § 1914(a); Pl.'s Mot. Default J. Ex. A [Doc. No. 16-2] ¶ 17.

64    *See* Judicial Conference Schedule of Fees, District Court Misc. Fee Schedule, § 14 (eff. Dec. 1, 2014); Pl.'s Mot. Default J. Ex. A [Doc. No. 16-2] ¶ 17.

65    Pl.'s Mot. Default J. Ex. A [Doc. No. 16-2] at ECF pages 5–6.

66    The Court notes that while Plaintiff has likely incurred additional service charges since entering the Motion for Default Judgment, including supplemental service specifically ordered by the Court, Plaintiff has not provided documentation of those charges.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT T

2013 WL 6179182

United States District Court,
E.D. Pennsylvania.

TERI WOODS PUBLISHING, L.L.C., et al., Plaintiffs,

v.

Desean WILLIAMS, et al., Defendants.

Civil Action No. 12–4854.
|
Nov. 25, 2013.

**Attorneys and Law Firms**

Simon Rosen, Law Office of Simon Rosen, Philadelphia, PA,
Joseph Dominic Dinoto, Cherry Hill, NJ, for Plaintiffs.

The Globe Printing Co., Inc., New Wilmington, PA, pro se.

*MEMORANDUM*

ROBERT F. KELLY, Senior District Judge.

**\*1** Presently before this Court are Plaintiffs, Teri Woods
and Teri Woods Publishing, L.L.C.'s, Requests for Default
Judgment against Defendants, DeSean Williams and Seaburn
Publishing Group. For the reasons set forth below, Plaintiffs'
Requests are granted.

**I. *BACKGROUND***

Plaintiff, Teri Woods Publishing, L.L.C. ("Plaintiff
Publishing"), is a domestic, limited liability company
engaged as a "mom-and-pop sort of book publishing
company" located in Philadelphia, Pennsylvania. Compl. at
2. Plaintiff, Teri Woods ("Plaintiff Woods"), is an adult
individual and a "well known, New York Times best-selling
author" residing in Philadelphia, Pennsylvania. *Id.* Plaintiffs,
Publishing and Woods (collectively "Plaintiffs"), aver that
they are the rightful and lawful copyright holders of certain
literary works, including, but not limited to, the following
books: "Dutch I"; "Dutch II" a/k/a "Dutch II: Angel's
Revenge"; "Dutch III: International Gangster" (collectively,
"Dutch Series"); "Deadly Reigns I"; "Deadly Reigns II"; and
"Deadly Reigns III" (collectively, "Deadly Reigns Series"). [1]
*Id.*

On August 23, 2012, Plaintiffs filed suit against
seven Defendants including Defendants, DeSean Williams
("Defendant Williams") and Seaburn Publishing Group
("Defendant Seaburn") (collectively "Defendants"). *Id.*
Plaintiffs' Complaint sets forth fourteen counts including:
Copyright Infringement; Civil Conspiracy; Unjust
Enrichment; Accounting; Constructive Trust; Permanent
Injunction; Violation of the N.J. Racketeer Influenced Corrupt
Organizations ("RICO") statute; False Light Invasion of
Privacy; and New Jersey State Civil Rights Violations. *Id.* at
6–18.

In the Complaint, Plaintiffs allege that Defendants undertook
the following illegal actions. Defendant Williams was
the "mastermind behind the unlawful and improper
counterfeiting" of Plaintiffs' copyrighted works, and
"engaged in a scheme to unlawfully manufacture, distribute
and sell" these works for his own personal gain. *Id.* at 4.
Defendant Seaburn illegally manufactured, distributed and/or
sold bootleg copies of Plaintiffs' copyrighted literary works
and illegal derivative works. *Id.* at 6A.

After service of process on Defendants initially proved
problematic, Plaintiffs served Defendant Williams on
December 18, 2012, and Defendant Seaburn on February
28, 2013. See Doc. Nos. 5, 32. When Defendants failed to
plead or otherwise defend the suit, Plaintiffs filed Requests
for Default with the Clerk of Court against each Defendant
pursuant to Federal Rule of Civil Procedure 55(a). See
Doc. Nos. 24, 56. Default was subsequently entered in favor
of Plaintiffs as to Defendant Williams on February 7, 2013,
and as to Defendant Seaburn on July 23, 2013. *Id.* Defendants
did not move to have the entry of default vacated or set aside
under Federal Rule of Civil Procedure 55(c). Furthermore,
throughout the entirety of this suit, Defendants have neglected
to answer or defend Plaintiffs' suit in any manner. This
includes Defendant Seaburn's failure to respond or appear
at an in court hearing on April 4, 2013, to defend against
Plaintiffs' Motion for Preliminary Injunction against it, which
was subsequently granted. See Doc. No. 42.

**\*2** On November 6, 2013, Plaintiffs filed requests with
this Court for default judgment in favor of Plaintiffs against
each Defendant. See Doc. Nos. 67, 68. Specifically, Plaintiffs
allege that six "separate, willful violations of the Copyright
Act of 1976" were committed by each Defendant. *Id.*
As compensation for Defendants' allegedly illegal actions,
Plaintiffs seek the statutory maximum amount of $150,000

109 U.S.P.Q.2d 1301

per violation. A finding in favor of Plaintiffs on all counts for this amount would result in an award of $900,000 in damages to be paid by each Defendant. *Id.* Moreover, Plaintiffs seek $7,000 in attorney's fees, and $400 in costs from each Defendant. *Id.* In total, Plaintiff requests default judgment by the Court in the amount of $907,400 against each Defendant. *Id.*

## II. STANDARD OF LAW

Under 🚩 Rule 55 of the Federal Rules of Civil Procedure, a default may be entered when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." 🚩 Fed.R.Civ.P. 55(a). A court's power to grant default judgment "has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." 🚩 *HICA Ed. Loan Corp. v. Lepera,* No. 11–960, 2011 WL 3515911, at * 1 (D.N.J. Aug.10, 2011) (quoting 🚩 *Hritz v. Woma Corp.,* 732 F.2d 1178, 1181 (3d Cir.1984)).

Due to the fact that default judgments deny the disposition of claims on the merits, courts frown upon their entry. *Culver v. O.S.H.A.,* 248 F. App'x 403, 408 (3d Cir.2007). However, default judgment is appropriate where: "(1) the plaintiff would suffer prejudice if default is denied, (2) the defendant does not appear to have a litigable defense, and (3) defendant's delay is due to culpable conduct." 🚩 *Chamberlain v. Giampapa,* 210 F.3d 154, 164 (3d Cir.2000); *see also Bibbs v. Sec. Atlantic Mort. Co., Inc.,* No. 10–346, 2012 WL 3113963, at *2 (E.D.Pa. Aug.1, 2012).

## III. DISCUSSION

Plaintiffs seek default judgment against each Defendant for six separate acts of copyright infringement. The entry of a default judgment is a two-step process. *See* 🚩 Fed.R.Civ.P. 55(a) & (b). First, the party seeking default must request that the Clerk of Court enter a default against the party for failing to plead or otherwise defend itself. *See* 🚩 Fed.R.Civ.P. 55(a). Upon the Clerk of Court's entrance of default, the party must then apply to the Court for a default judgment. *See* 🚩 Fed.R.Civ.P. 55(b)(2).

Here, the Clerk of Court entered default in favor of Plaintiffs against Defendant Williams on February 7, 2013, and Defendant Seaburn on July 23, 2013. See Doc. Nos. 24, 56. Thus, we now determine whether Plaintiffs' Requests for Default Judgments against Defendants are appropriate in this case.

### A. *Default Judgment*

Since Plaintiff would suffer prejudice if default is denied, and because Defendants failure to respond signifies the absence of a litigable defense and constitutes culpable conduct, we find default judgment against Defendants to be proper in this case. See *Bibbs,* 2012 WL 3113975, at *2; *see also Carpenters Health and Welfare Fund of Phila. v. NDK Gen. Contractors, Inc.,* No. 06–3283, 2007 WL 1018227, at * 1 (E.D.Pa. Mar.29, 2007) (finding that defendant had no litigable defense where it had not filed a responsive pleading); *York Int'l Corp. v. York HVAC Sys. Corp.,* No. 09–3546, 2010 WL 1492851, at *3 (D.N.J. Apr.14, 2010) (holding that failure to respond to the Complaint or the Motion for Default Judgment is culpable conduct). Consequently, we grant Plaintiffs' Requests for Default Judgment against Defendant Williams and Defendant Seaburn.

**\*3** Once a party has defaulted, the court must treat the factual allegations set forth in the Complaint as proven except for those contentions relating to damages. 🚩 *DIRECTV, Inc. v. Pepe,* 431 F.3d 162, 165 (3d Cir.2005). A proper claim for copyright infringement requires that the Complaint state "which specific original work is subject of the copyright claim, that plaintiff owns the copyright, that the work in question has been registered in compliance with the statute and by what acts and during what time defendant infringed upon the copyright." *Flynn v. Health Advocate, Inc.,* No. 03–3764, 2004 WL 51929, at *12 (E.D.Pa. Jan.13, 2004) (quoting 🚩 *Gee v. CBS, Inc.,* 471 F.Supp. 600, 643 (E.D.Pa.1979) *aff'd,* 612 F.2d 572 (3d Cir.1979)). In light of default judgment being granted against Defendant Williams and Defendant Seaburn, we treat Plaintiffs' factual allegations as proven, and therefore, sufficient to establish six acts of copyright infringement committed by each Defendant. *See* 🚩 *DIRECTV, Inc.,* 431 F.3d at 165.

We now proceed to consider the proper damages to be awarded in this case against each Defendant.

### B. *Damages*

Teri Woods Publishing, L.L.C. v. Williams, Not Reported in F.Supp.2d (2013)

109 U.S.P.Q.2d 1301

Under federal copyright law, an infringer is liable for either statutory damages, or the copyright owners' actual damages plus any additional profits gained by the infringer. 17 U.S.C. § 504(a). Here, Plaintiffs request that this Court award the maximum statutory damages against each Defendant for the six separate counts of copyright infringement alleged within the Complaint. See Doc. Nos. 67, 68. Where a plaintiff seeks statutory damages, the amount to be awarded is at the discretion of the court. 17 U.S.C. § 504(c). Pursuant to § 504(c), the ceiling for statutory damages is set at not more than $150,000 per infringement. See 17 U.S.C. § 504(c) (2). However, in order for Plaintiffs to prevail and receive the maximum damages, they must show that the infringements were committed willfully. *Id.* A defendant acts willfully when they actually or constructively know that their actions constitute an infringement. *See Id.; see also Granger v. One Call Lender Services, LLC,* No. 10–3442, 2012 WL 3065271, at *2 (July 26, 2012). A default judgment presupposes a finding of willfulness on behalf of the defendant. See *Broadcast Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.,* 555 F.Supp.2d 537, 542 (E.D.Pa.2008).

Courts have found that the following three factors are relevant in determining the appropriate amount of statutory damages under § 504:(1) expenses saved and profits reaped by defendants in connection with the infringement; (2) revenues lost by the plaintiff; and, (3) whether the infringement was willful and knowing, or whether it was accidental and innocent. *Broadcast Music, Inc. v. Golden Horse Inn Corp.,* 709 F.Supp. 580, 581 (E.D.Pa.1989). However, these factors are not weighted equally, as most Courts focus on the element of intent because profits gained and income lost is usually very difficult to monetize. *See Original Appalachian Artworks, Inc. v. J.F. Reicher, Inc.,* 658 F.Supp. 458, 465 (E.D.Pa.1987).

**\*4** In this case, we award Plaintiffs the maximum amount of damages allowed under 17 U.S.C. § 504 against Defendant Williams and Defendant Seaburn for each count of copyright infringement. See *Univ. City Studios, Inc., v. Ahmed,* No. 93–3266, 1994 WL 185622, at *4 (E.D.Pa. May 13, 1994) (finding in similar circumstances that the plaintiff was entitled to the maximum statutory damages even though exact proof as to damages was lacking). We reach this finding even

though the Court is not privy to any evidence of Defendants' profits, Defendants' costs avoided or Plaintiffs' lost profits. See *Univ. City,* 1994 WL 185622, at *3 (citing *American Med. Colleges v. Mikaelian,* No. 83–2745, 1986 WL 332, at *11 (E.D.Pa. Mar.18, 1986)) (finding that the court may award statutory damages in such cases). However, the lack of this information is "hardly surprising" in cases like this, where Defendants have neglected to answer Plaintiffs' Complaint or participate in the litigation in any manner including discovery. See *Univ. City,* 1994 WL 185622, at *3; *see also Granger,* 2012 WL 3065271, at *2 (quoting *Evony, LLC, v. Holland,* No. 11–0064, 2011 WL 1230405, at *3 (W.D.Pa. Mar.31, 2011)) (finding that statutory damages are especially fitting in the default judgment context, where Plaintiffs have been deprived of any discovery).

Furthermore, awarding the maximum statutory damages in this case serves several purposes. This amount fully compensates Plaintiffs for their damages, and deters others from engaging in such illegal behavior. This rings especially true with Defendants in this case. This result also admonishes Defendants for neglecting to participate in this litigation, and counsels those in similar situations to act differently. This in turn promotes the efficiency of the judiciary, the just resolution of legal matters and protects litigants from incurring needless costs in the pursuit of justice. Finally, there are strong public interests at play here. An award of the statutory maximum protects not only the copyrighted materials at issue, but also the entire entrepreneurial system upon which an author such as Plaintiff Williams relies. In essence, our finding acts to ensure the continued integrity of the legal framework designed to accomplish these objectives. See *Microsoft Corp. v. Gonzales,* No. 06–4331, 2007 WL 2066363, at *5 (D.N.J. Jul.13, 2007); *Broadcast Music,* 709 F.Supp. at 581.

Our award of damages to Plaintiffs is not without regard to Seventh Amendment implications. In *Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998), the United States Supreme Court ("Supreme Court") found that in copyright infringement actions the Seventh Amendment provides a right to a jury trial to determine the amount of statutory damages to be awarded, even though the statute is silent on the issue. *Id.* at 353. However, the Supreme Court's decision in Feltner did not address a defendant's right to a jury trial on the damages, where the party has defaulted. While the Court of Appeals

109 U.S.P.Q.2d 1301

for the Third Circuit ("Third Circuit") has not spoken on this issue, a broad, cross-section of courts have found that no such right exists following the entry of a default judgment. 🚩 *Graham v. Malone Freight Lines, Inc.,* 314 F.3d 7, 16 (1st Cir.1999) (stating that after the entry of default a jury trial to assess damages is not required under the Constitution nor the Federal Rules of Civil Procedure); 🚩 *In re Dierschke,* 975 F.2d 181, 185 (5th Cir.1992) (holding that there is no constitutional right to a jury trial on the issue of damages in a default case); *Heisen v. Pacific Coast Bldg. Prods., Inc.,* 26 F.3d 130 (9th Cir.1994) (finding no right to jury trial on damages after default); 🚩 *Adriana Int'l Corp. v. Thoeren,* 913 F.3d 1406, 1414 (9th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (finding that a party has no right to a jury trial on its copyright infringement claim pursuant to 🚩 Rule 55(b)(2) or the Seventh Amendment); 🚩 *Olcott v. Delaware Flood Co.,* 327 F.3d 1115, 1124 (10th Cir.2003) (asserting that a party bears no constitutional right to a jury trial following the entrance of default); *In re Game Tracker, Inc.,* No. 10–189, 2011 WL 5117569, at *1 (D.Me. Oct.24, 2011) (holding that the right to a jury trial does not survive default); *Two Old Hippies, LLC, v. Catch the Bus, LLC,* 784 F.Supp.2d 1221, 1232 (D.N.M.2011); *Coton v. Televised Visual X–Ography, Inc.,* No. 07–1332, 2010 WL 813345, at *2 (M.D.Fla. Mar.9, 2010); 🚩 *Manno v. Tenn. Prod. Ctr., Inc.,* 657 F.Supp.2d 425, 429–30 (S.D.N.Y.2009). Germane to this case, courts have found that a defaulting defendant has no right to a jury trial on damages in copyright infringement actions. See 🚩 *Adriana Int'l Corp.,* 913 F.2d at 1414; *Coton,* 2010 WL 813345, at *2; 🚩 *Manno,* 657 F.Supp.2d at 429–30. These cases represent the fact that neither the Constitution nor federal statutory law confers the right to a jury trial on damages following the entry of default. We agree with these well-reasoned decisions and hold that Defendants' right to a jury trial as to damages has been abrogated by Defendants' total neglection resulting in default judgment in the matter before this Court.

**\*5** Our finding coheres with the permissive nature of the federal rule pertaining to default judgment, which asserts that "the court may conduct hearings ... preserving any federal statutory right to a trial-when, to enter or effectuate judgment, it needs to ... determine the amount of damages." 🚩 Fed.R.Civ.P. 55(b)(2)(C). The clear language of the statute places the discretion within the court to determine whether hearings are necessary to determine damages. In light of Defendants' complete lack of participation in this litigation, we do not believe a hearing would be prudent. Such a ruling is within our discretion, and finding otherwise, would make the "permissive" the "mandatory," thereby subverting the plain meaning of the statute. We reject this contention and find that 🚩 Rule 55(b) explicitly supports our finding that a jury trial is not mandated in this case. *Id.*

### C. Attorney's Fees and Costs

The Copyright Act empowers the Court with the discretion to award reasonable attorney's fees and costs to the prevailing party in a copyright infringement action. 17 U.S.C. § 505. In this case, Plaintiffs seek attorney's fees for the work of Simon J. Rosen, Esq. ("Attorney Rosen"), and costs in the amount of $7,400 for the filing of each Request for Default Judgment against Defendant Williams and Defendant Seaburn. See Doc. Nos. 67, 68. This sum reflects Plaintiffs' calculation of $7,000 expended on attorney's fees and $400 in costs. *Id.*

The District Court makes the determination as to what fees and costs are reasonable. 🚩 *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).[2] The computation of reasonable attorney's fees is ascertained by multiplying the applicable hourly rate for legal services times the hours expended. *Id.* Plaintiffs reach the sum of $7,000 in attorney's fees by multiplying Attorney Rosen's hourly rate of $350 times the twenty hours he expended on each matter. See Doc. Nos. 67, 68.

The determination of what constitutes a reasonable hourly rate rests firmly within the sound discretion of this Court. See *Doe v. Terhune,* 121 F.Supp.2d 773, 781 (D.N.J.2000). Attorney Rosen cites his thirty years of experience practicing law as the basis for setting his hourly rate at $350. *Id.* In *Harris v. Paige,* a previous Opinion by this Court, we noted that "the Third Circuit and several courts in this District, have turned to the Philadelphia Community Legal Services' fee schedule for guidance" as to the hourly rates charged by attorney's for legal work. *Harris v. Paige,* No. 08–2126, 2013 WL 4718949, at *4 (E.D.Pa. Sept.3, 2003). Under this fee schedule, an attorney with more than twenty-five years of experience charges an hourly rate of between $360 and $460.[3] Taking into account Attorney Rosen's legal experience and the fact that his rate falls below the recommended rate, we find his hourly rate to be reasonable.

Teri Woods Publishing, L.L.C. v. Williams, Not Reported in F.Supp.2d (2013)

109 U.S.P.Q.2d 1301

However, we do take issue with the number of hours Attorney Rosen claims to have expended on these two filings, and exercise our discretion to reduce Rosen's fee award for the following reasons. *See* Hensley, *461 U.S. at 433*. First, it is evident that the Requests for Default Judgment submitted by Attorney Rosen are essentially identical. The sole difference between the documents is the insertion of the appropriate name of the Defendant into the corresponding Request. However, Attorney Rosen submits that each Request required twenty hours of his time to complete. We find a total of forty hours to produce less than six pages of standard legal documents to be excessive. See *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 414, 422 (3d Cir.1993)* (stating that courts may reduce a fee award if a bill contains an excessive amount of time to perform a task or contains duplicative entries). Second, the Requests did not involve any unusually complex legal or factual issues, nor did they require a demanding workload. The brevity and simplicity of the Requests echoes this notion. Third, the burden rests with the party seeking attorney's fees to demonstrate the reasonableness of the hours expended and the hourly rates. See *Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 703 (3d Cir.2005)*. Here, Plaintiffs baldly state in each Request that Attorney Rosen "expended twenty hours of time on this matter," but neglect to provide any further details itemizing the allotment of his time and/ or resources. This conclusory assertion fails to meet the burden imposed upon Plaintiffs and favors our finding of a reduced award. *Id.; see also* Hensley, *461 U.S. at 433* (finding where the documentation is inadequate the court may reduce the award accordingly). For these reasons, we reduce Attorney Rosen's billable hours to four at his stipulated rate of three hundred and fifty dollars per hour for a total of $1,400 in reasonable attorney's fees payable by each Defendant.

**\*6** Finally, Plaintiffs seek costs in the amount of $350 for the filing of each request and $50 for the corresponding service of process. See Doc. Nos. 67, 68. These amounts are reasonable, and Plaintiffs are entitled to their recovery. See *Trustees of Nat. Elevator Indus. v. The Elevator Guild, LLC, No. 11–2870, 2013 WL 271888,* at\*4 n. 43 (E.D.Pa. Jan. 23, 2013) (finding that plaintiff could recover a $350 filing fee and $70 service of process fee).

In conclusion, Plaintiffs' Request for Attorney's Fees and Costs is granted in part and denied in part. Each Defendant must pay Plaintiffs $1,800 in attorney's fees and costs related to Plaintiffs' filing of the instant motions.

**D. *The Poulis Factors***

As a general rule, courts disfavor default judgments in lieu of decisions on the merits. *See* Culver v. U.S. Dept. of Labor O.S.H.A., *248 F. App'x 403, 408 (3d Cir.2007)*. The Third Circuit has consistently demanded that district courts consider the six factors set forth in *Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863 (3d Cir.1984)*, prior to entering default judgment under Rule 55(b) as a sanction for failure to plead or otherwise defend. *Knoll v. City of Allentown, 707 F.3d 406, 409 (3d Cir.2013)*; *Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1148 (3d Cir.1990)*; Poulis, *747 F.2d at 868*. These factors operate to filter out the cases that truly warrant dismissal from those that demand the preservation of the ability to proceed toward a judgment on the merits.

*747 F.2d at 868*. The six considerations set forth in Poulis are: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal; and (6) the meritoriousness of the claim or defense. *Id.* Even though each factor need not be satisfied to permit a finding of default judgment, the circumstances of this case clearly militate in favor of such a finding.

**IV. CONCLUSION**

For the aforementioned reasons, we grant Plaintiffs' Requests for Default Judgment against Defendant Williams and Defendant Seaburn. Furthermore, we award Plaintiffs the maximum amount of statutory damages permitted under the Copyright Act for each of the six instances of copyright infringement for a total of $900,000. Moreover, an award of $400 against each Defendant for costs associated with this matter is reasonable and so awarded. However, we reject Attorney Rosen's summation of attorney's fees and reduce said fees to $1,400 per Defendant. In total, Defendant Williams and Defendant Seaburn are each to pay Plaintiffs $901,800.

An appropriate Order follows.

*ORDER*

**AND NOW,** this 25th day of November, 2013, upon consideration of the Plaintiffs Teri Woods and Teri Woods Publishing, L.L.C.'s Requests for Default Judgment against Defendant DeSean Williams and Defendant Seaburn Publishing Group filed on November 6, 2013 (Doc. Nos. 67 & 68), and Defendants failure to respond thereto, it is hereby ORDERED that said Requests are **GRANTED.**

**\*7** It is **FURTHER ORDERED** that Judgment is entered in the sum of $901,800 in favor of Plaintiffs. Accordingly, Defendant DeSean Williams and Defendant Seaburn Publishing Group are to each pay Plaintiffs a sum of $901,800 as damages for the six separate acts of copyright infringement committed in violation of the Copyright Act.[4]

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 6179182, 109 U.S.P.Q.2d 1301

---

## Footnotes

1    Plaintiffs provide documentation evidencing ownership of the copyrights at issue in this matter in the form of copyright catalog entries and certificates of copyright registration. See Compl. Ex. 1–6.

2    The Third Circuit has consistently directed that court's must apply a burden shifting analysis to properly determine if the attorney's fees requested are reasonable. *Carey v. City of Wilkes–Barre,* 496 F. App'x 234, 236 (3d Cir.2012) (citing *Evans v. Port. Auth. of N.Y.,* 273 F.3d 346, 361 (3d Cir.2001). However, such an analysis is impossible in default judgment cases where the non-moving party has neglected to respond. Consequently, we utilize our discretion to determine the reasonableness of Attorney Rosen's fee petition. See *Hensley,* 461 U.S. at 433.

3    The Philadelphia Community Legal Services fee schedule is available at the following website: http://clsphila.org/about-cls/attorney-fees (November 19, 2013, 1:46 P.M.).

4    Such fines are available pursuant to 17 U.S.C. § 504(c)(2) (referring to the award of statutory damages) and 17 U.S.C. § 505 (allowing for the recovery of reasonable attorney's fees and costs).

---

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT U

2025 WL 1134449
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

The UNITED STATES of America, Plaintiff,

v.

Joseph OSBORN, Defendant.

No. 5:24-cv-4444
|
Signed April 16, 2025

**Attorneys and Law Firms**

Michael T. McKeever, KML Law Group PC, Philadelphia, PA, for Plaintiff.

**OPINION**

**Plaintiff's Request for Default Judgment, ECF No. 19 – Granted**

Joseph F. Leeson, Jr., United States District Judge

**I. INTRODUCTION & BACKGROUND**

 **\*1**  The United States initiated this action by filing a Complaint on August 26, 2024. *See* ECF No. 1. The Complaint alleges that Defendant Joseph Osborn is indebted to the United States in the amount of $6,893.66 plus an annual interest rate of 10.25%. Compl. ¶ 3; *see also* ECF No.19-3.

On December 17, 2024, Osborn was served with the summons and Complaint. *See* ECF No. 9. He has failed to answer or otherwise defend himself. On March 6, 2025, the United States filed a request for entry of default. *See* ECF No. 15. The same was granted on March 11, 2025. On March 11, 2025, the United States filed a Request for Default Judgment. *See* ECF No. 16. This Court denied the Request without prejudice on March 26, 2025. *See* ECF No. 18. Presently before the Court is a second Request for Default Judgment filed April 8, 2025. *See* ECF No. 19. The United States has attached an affidavit in support, proof of service, a certificate of indebtedness, and an affidavit of non-military service to the Request. *See* ECF No. 19-20. For the reasons that follow, that Request will be granted.

**II. LEGAL STANDARD**

**A. Default Judgment – Review of Applicable Law**

Federal Rule of Civil Procedure 55(b)(2) provides that a district court may enter default judgment against a properly served defendant when a default has been entered by the Clerk of Court. *See* Fed. R. Civ. P. 55(b)(2); *see also Anchorage Assocs. v. Virgin Is. Bd. of Tax Rev.*, 922 F.2d 168, 177 n.9 (3d Cir. 1990). "It is well settled in this Circuit that the entry of a default judgment is left primarily to the discretion of the district court." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984). The Court considers three factors in determining whether to enter default judgment: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000). In considering these factors, the "court should accept as true the well-pleaded factual allegations of the complaint, but the court need not accept the moving party's legal conclusions[.]" *Polidoro v. Saluti*, 675 F. App'x 189, 190 (3d Cir. 2017). Because "a party in default does not admit mere conclusions of law[,]" the district court must "ascertain whether 'the unchallenged facts constitute a legitimate cause of action,' " before granting default judgment. *Broad. Music, Inc. v. Spring Mt. Area Bavarian Resort, LTD*, 555 F. Supp. 2d 537, 541 (E.D. Pa. May 21, 2008) (citation omitted).

**III. ANALYSIS**

"[W]hen entry of a default judgment is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties." *D'Onofrio v. Il Mattino*, 430 F. Supp. 2d 431, 437 (E.D. Pa. 2006) (quoting *Williams v. Life Sav. and Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986)). Here, the Court finds that it has subject matter jurisdiction over the instant case pursuant to 28 U.S.C. § 1345 which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress." 28 U.S.C. § 1345. The Court also finds that it has personal jurisdiction over Osborn because he is a resident of Pennsylvania. Compl. ¶ 2. Service was also properly effectuated in this case pursuant to Federal Rule of Civil Procedure 4. *See* ECF No. 9.

**\*2** Next, the Court finds that the United States has a valid cause of action against Defendant in light of the Certificate of Indebtedness indicating his delinquency on the overpayment for CMS services rendered. ECF No. 19-3; *see also* Compl. ¶ 3. Having found that the United States has a valid cause of action, the Court next considers the *Chamberlain* factors: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain*, 210 F.3d at 164.

First, "[p]rejudice to the plaintiff exists where denial of a default judgment would 'impair the plaintiff's ability to effectively pursue his or her claim.' " *Spring Valley Produce*, 2015 WL 2365573, at \*3 (quoting *Grove v. Rizzi 1857 S.P.A.*, No. 04–2053, 2013 WL 943283, at \*2 (E.D. Pa. March 12, 2013)). "Where, as here, a defendant fails to respond to the complaint, the potential delay threatens to carry on indefinitely, and that potential delay establishes prejudice to the plaintiff." *Id.* Second, "outside of the court's obligation to decide whether it has jurisdiction and whether the complaint states a claim, the court may presume that an absent defendant who has failed to answer has no meritorious defense." *Joe*

*Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 271-72 (E.D. Pa. 2014). Third, "the defendant's failure or refusal to 'engage[ ] in the litigation process and [to] offer[ ] no reason for this failure or refusal' may 'qualif[y] as culpable conduct with respect to the entry of a default judgment—indeed, for the Court to conclude otherwise would be to reward the recalcitrant or the oppositional and uncooperative.' " *Id.* (quoting *E. Elec. Corp. of N.J. v. Shoemaker Constr. Co.*, 657 F. Supp. 2d 545, 554 (E.D. Pa. 2009)). Accordingly, under the three *Chamberlain* factors, default judgment is warranted in this case.

**IV. CONCLUSION**

For the above noted reasons, the Court will grant the United States' Request for Default Judgment.

A separate Order follows.

**All Citations**

Slip Copy, 2025 WL 1134449

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT V

2009 WL 2170153
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

VIRGIN RECORDS AMERICA, INC. et al., Plaintiffs,

v.

Darius M. BAGAN, Defendant.

Civ. No. 08–4694 (WHW).
|
July 21, 2009.

**Attorneys and Law Firms**

Sterns & Weinroth, P.C., Trenton, NJ, for Plaintiffs Virgin Records America, Inc. et al.

**OPINION**

WALLS, Senior District Judge.

**\*1** Plaintiffs Virgin Records America, Inc., et al., move for default judgment, pursuant to ⚑ Fed.R.Civ.P. 55(c), against Defendant Darius M. Bagan. Defendant has not answered nor responded to Plaintiffs' motion for default judgment. Pursuant to Fed.R.Civ.P. 78, the Court decides this motion without oral argument. The motion is granted.

**FACTS AND PROCEDURAL BACKGROUND**

Plaintiffs Virgin Records America, Inc., Arista Records LLC, Elektra Entertainment Group Inc., Interscope Records, and Sony BMG Music Entertainment are "copyright owners or licensees of exclusive rights under United States copyright law with respect to certain copyrighted sound recordings ['Copyrighted Recordings']. [1] " (Compl.¶ 11.) Plaintiffs have the exclusive right to reproduce and distribute the Copyrighted Recordings. (*Id.* ¶ 12.) On the album cover of each of the Copyrighted Recordings is a notice of copyright pursuant to ⚑ 17 U.S.C. § 401. (*Id.* ¶ 17.)

Defendant Darius M. Bagan is a resident of Wallington, N.J. (*Id* . ¶ 9.) As of February 5, 2007, Defendant has allegedly downloaded and distributed to the public eight Copyrighted Recordings over a "peer-to-peer" ("P2P")

file copying network called AresWarez, without Plaintiffs' permission or consent. (*Id.* ¶ 15.) Plaintiffs identified Defendant as responsible for the IP address used to download and distribute audio files over the network. (*Id.*) Plaintiffs allege that Defendant's actions were willful and intentional and "constitute infringement of Plaintiffs' copyrights and exclusive rights under copyright." (*Id* . ¶¶ 15, 18.)

Plaintiffs filed their complaint on September 19, 2008. The summons and complaint were personally served upon Defendant at his home on January 6, 2009. (Decl. of Service.) Defendant has not answered nor appeared in this action to date. The Clerk of the Court entered default against Defendant on May 20, 2009. (Dkt. Entry No. 13.) Plaintiffs now move for default judgment.

**STANDARD OF REVIEW**

⚑ Fed.R.Civ.P. 55(b)(2) governs a court's entry of default judgment. The party against whom default judgment is requested must have been properly served with process. *See Local Union No. 98, Int'l Bd. Of Elec. Workers v. Cableco, Inc.,* No. 99–755, 1999 WL 269903, at *1 (E.D.Pa. Apr.28, 1999).* Before default judgment may be entered by a court, the moving party must have obtained an entry of default pursuant to ⚑ Fed.R.Civ.P. 55(a). *See* 10A Wright, et al., *Federal Practice & Procedure* § 2682 (3d ed.1998). If a party seeks default judgment against a minor or an incompetent person, such default may be entered only if the minor or incompetent person is represented by a "general guardian, conservator, or other like fiduciary who has appeared." ⚑ Fed.R.Civ.P. 55(b)(2). Before entering a default judgment, the plaintiff must file an affidavit with the court "stating whether or not the defendant is in military service and showing necessary facts to support the affidavit." 50 U.S.C. app. § 521.

**\*2** A party seeking default judgment is not entitled to such relief as a matter of right, even where the defendant was served with process and default has been noted pursuant to ⚑ Fed.R.Civ.P. 55(a). *See, e.g., Cableco,* 1999 WL 269903 at *1 (citing *Petrucelli v. Bohringer & Ratzinger,* 46 F.3d 1298, 1303 (3d Cir.1995)). The district court has the discretion to enter default judgment, although entry of default judgments is disfavored as decisions on the merits are preferred. *See Hritz v. Woma Corp.,* 732 F.2d 1178, 1181 (3d Cir.1984). When considering a motion for default

Virgin Records America, Inc. v. Bagan, Not Reported in F.Supp.2d (2009)

2009 WL 2170153

judgment, a court may consider the following factors: the potential amount of damages; whether issues of material fact or substantial public concern are implicated; whether the default is primarily technical; whether the moving party has been substantially prejudiced by the delay involved; whether the grounds for default are clearly established or in doubt; whether the default was attributable to good faith, mistake, or excusable neglect; and whether the court may later be obliged to set aside the default. *See Franklin v. Nat'l Maritime Union of Am.,* No. 91–0480, 1991 WL 131182, at * 1 (D.N.J. July 16, 1991) (citing 10 Wright, et al., Federal Practice & Procedure § 2685 (2d ed.1983)).

Although a court should accept as true the well-pleaded factual allegations of the complaint, it need not accept the moving party's legal conclusions or factual allegations relating to the amount of damages. *See Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149 (3d Cir.1990) (citing 10 Wright, et al., Federal Practice & Procedure § 2688 (2d ed.1983)). Consequently, before granting a default judgment, a court must first ascertain whether "the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *Directv, Inc. v. Asher,* No. 03–1969, 2006 WL 680533, at *1 (D.N.J. Mar.14, 2006) (citing 10A Wright, et al., Federal Practice & Procedure § 2688 (3d ed.1998)). A court must also "conduct its own inquiry 'in order to ascertain the amount of damages with reasonable certainty.' " *Int'l Assoc. of Heat & Frost Insulators v. S. Jersey Insulation Servs.,* No. 05–3143, 2007 WL 276137, at *1 (D.N.J. Jan.26, 2007) (quoting *In re Indus. Diamonds,* 119 F.Supp.2d 418, 420 (S.D.N.Y.2000)).

## DISCUSSION

### 1. Entry of Default and Jurisdiction

Entry of default by the Clerk and valid service of process is a prerequisite to a default judgment motion. *See* Fed.R.Civ.P. 55(a). The Clerk entered default against Defendant Bagan on May 20, 2009. (Dkt. Entry No. 13.) The Court has personal jurisdiction over Defendant because he is a resident of New Jersey. The Court has subject matter jurisdiction pursuant to 28 U.S.C § 1338(a) which confers on district courts original jurisdiction over "any civil action arising under any Act of Congress relating to ... copyrights."

### 2. Liability

**\*3** As noted, Defendant was personally served at his home with a summons and the complaint on January 6, 2009. (Decl. of Service.) Defendant is approximately 21 to 25 years old and is not an incompetent person nor serving in the military. (*Id.;* Decl. of Karen A. Confoy in Supp. of the Entry of Default J. ¶ 5.) As such, Defendant was validly served. Defendant was also served with this motion for default judgment on May 20, 2009. (Cert. of Serv.; Notice of Entry of Default by Clerk.) Defendant has had ample notice of the Complaint and of this motion but has chosen not to respond. Accordingly, the Court treats the allegations as to liability in the Complaint as true and admitted by Defendant. *See Comdyne,* 908 F.2d at 1149.

Plaintiffs' allegations are factually and legally sufficient to support its copyright infringement claim. To succeed on a claim of copyright infringement, each plaintiff must prove that: 1) it owned a valid copyright in the work allegedly infringed; and 2) defendant copied protected elements of that work. *See Ford Motor Co. v. Summit Motor Products,* 930 F.2d 277, 290 (3rd Cir.1991) (citations omitted). A certificate of registration issued by the United States Copyright Office constitutes prima facie evidence of validity and ownership of the disputed material. *See* 17 U.S.C. § 410(c); *see also Ford Motor Co.,* 930 F.2d at 290–91 (citing cases).

Plaintiffs aver that they are the "copyright owners or licensees of exclusive rights under United States copyright law" of the eight Copyrighted Recordings Defendant has downloaded and distributed. (Compl.¶ 11.) The Register of Copyrights has issued a valid Certificate of Copyright Registration for each of the Copyrighted Recordings. (*Id.*) Plaintiffs have met the first element.

As to the second element, courts have held that using P2P network software to download copyrighted recordings and distribute them over the network without permission of the copyright holder constitutes copyright infringement. *See In re Aimster Copyright Litig.,* 334 F.3d 643, 645 (7th Cir.2003), *cert. denied,* 540 U.S. 1107, 124 S.Ct. 1069, 157 L.Ed.2d 893 (2004) ("If the music is copyrighted, such swapping [of music files over the Internet], which involves making and transmitting a digital copy of the music, infringes copyright."); *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1014 (9th Cir.2001) (where individuals who used a P2P network to download and upload copyrighted music violated copyright holders' distribution and reproduction rights). By downloading the Copyrighted

Recordings and distributing them to other users on the P2P network, Defendant has infringed Plaintiffs' copyrights on those recordings. Accepting these allegations as true, as the Court must, Plaintiffs have established grounds to impose liability on Defendant for copyright infringement.

### 3. Damages

Plaintiffs seek statutory damages for each of the infringed Copyrighted Recording under the Copyright Act. Although the only allegations in a complaint not treated as true upon consideration of a motion for default judgment are those pertaining to the amount of damages, *see Comdyne,* 908 F.2d at 1149, a further evidentiary inquiry is not necessary when damages are for a "sum certain or for a sum which can by computation be made certain," *See* Fed.R.Civ.P. 55(b)(1); *KPS & Assocs., Inc. v. Designs by FMC, Inc.,* 318 F.3d 1, 19 (1st Cir.2003); *Comdyne,* 908 F.2d at 1149. A claim for damages is a sum certain when "there is no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default." *KPS & Assocs.,* 318 F.3d at 19. Sum certain situations include "actions on money judgments, negotiable instruments, or similar actions where the damages sought can be determined without resort to extrinsic proof." *Id.* at 19–20.

**\*4** The Copyright Act provides that "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work ... in a sum of not less than $750 or more than $30,000 as the court considers just."

17 U.S.C. § 504(c)(1). Plaintiffs do not have to prove actual damages to be entitled to statutory damages. *See Axact (PVT), Ltd. v. Student Network Resources, Inc.,* No. 07–5491, 2008 U.S. Dist. LEXIS 86455, \*6, 2008 WL 4754907(D.N.J. Oct. 20, 2008)* (awarding maximum statutory damages on default judgment for defendants' counterclaims of copyright infringement of academic works and term papers) (citing *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.,* 149 F.3d 987, 996 (9th Cir.1998), *cert. denied,* 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999)). Courts have also awarded statutory damages on a motion for default judgment. *Axact,* at \*6 (citing *Warner Bros. Records, Inc., v. Novak,* No. 06–5342, 2007 U.S. Dist. LEXIS 33967, \*5–7, 2007 WL 1381748 (D.N.J. May 9, 2007) (granting minimum statutory

damages of $750 per infringement where defendant used an online media distribution system to download and distribute plaintiffs' copyrighted recordings without permission from the plaintiffs).

Here, Plaintiffs have pled damages in the amount of $750 per copyright infringement, the minimum statutory damages under the Copyright Act, for a total of $6,000.00. (Pls' Br. at 3); 17 U.S.C. § 504(c). Because damages asked for by Plaintiffs are for a sum certain set forth by the Copyright Act, no further evidentiary inquiry is necessary. *See* 17 U.S.C. § 504(c); Fed.R.Civ.P. 55(b)(1); *KPS & Assocs.,* 318 F.3d at 19; *Comdyne,* 908 F.2d at 1149. The Court grants the minimum statutory damages of $750 per infringement.

### 4. Permanent Injunction

Plaintiffs also seek an injunction "prohibiting Defendant from further infringing Plaintiffs' copyrights, and ordering Defendant to destroy all copies of sound recordings made in violation of Plaintiffs' exclusive rights." (Compl. ¶ 20.) Permanent injunctive relief to prevent or restrain copyright infringement is authorized under the Copyright Act. *See* 17 U.S.C. § 502(a). The Copyright Act further provides that "the court may order the destruction ... of all copies ... found to have been made or used in violation of the copyright owner's exclusive rights." 17 U.S.C. § 503(b). This District has issued injunctive relief as part of a default judgment in a case much like this one where the defendant used an online media distribution system to download and distribute plaintiffs' copyrighted recordings without permission from the plaintiffs. *See Warner Bros.,* at \*7–8 (finding that a permanent injunction enjoining defendant from infringing on plaintiffs' copyrighted sound recordings "is appropriate and reasonable given [d]efendant's continuing infringement on [p]laintiff's sound recordings, and [d]efendant's failure to respond"); *see also Axact,* at \*7 (granting injunctive relief to defendants on default judgment of copyright infringement claims of academic works and term papers). A plaintiff seeking a permanent injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v.*

*MercExchange, LLC,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

**\*5** Here, Plaintiffs allege that an injunction is necessary because without it, Defendant "will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money." (*Id.* ¶ 20.) Specifically, Plaintiffs assert that Defendant's conduct has exposed their recordings to "viral" infringement, which will continue unless an injunction is issued. (Pls.' Br. at 8.) Defendant was distributing 307 total audio files over the P2P network, which Plaintiffs allege has left their "sound recordings vulnerable to massive, repeated, near-instantaneous, and worldwide infringement ... and available for further unlawful distribution by the users who download them." (*Id.* at 8.) Furthermore, Plaintiffs claim that Defendant continues to download and distribute their recordings and that Defendant will not stop infringing upon their copyrights unless an injunction is issued, as "Defendant's failure to respond to the Complaint suggests that Defendant does not take seriously the illegality of the infringing activity." (*Id.* at 9; Compl. ¶ 15–16.) Finally, Plaintiffs state that preventing copyright infringement is in the public interest because it "preserve[s] the integrity of the copyright laws which seek to encourage individual efforts and creativity by granting valuable enforceable rights." (*Id.* at 6 (quoting *Atari, Inc. v. North Am. Philips Consumer Elec. Corp.,* 672 F.2d 607, 620 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982))).

Plaintiffs have demonstrated that they have suffered an irreparable harm and that remedies at law are inadequate.

A permanent injunction is appropriate as it will cause no greater harm to Defendant and such relief will be in the public interest. The Court grants Plaintiffs the requested injunctive relief.

### a. Costs

Finally, Plaintiffs request an award of costs pursuant to 17 U.S.C. § 505. (Compl. ¶ 19.) Section 505 provides that "the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof." Fed.R.Civ.P. 54(d)(1) also provides that "costs—other than attorney's fees—should be allowed to the prevailing party." *Id.* The Court will allow Plaintiffs to recover costs incurred to make this motion.

### CONCLUSION

The Court grants Plaintiffs' motion for default judgment. Judgment is entered against Defendant for statutory damages in the amount of $6,000.00 and costs. Defendant is hereby prohibited from further infringing Plaintiffs' copyrights and ordered to destroy all copies of sound recordings made in violation of Plaintiffs' exclusive rights.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2170153

### Footnotes

1     The copyrighted songs at issue are: "Red Red Wine," on album "Labour of Love," by artist "UB40" (SR# 49–244); "Summer Girls," on album "LFO," by artist "LFO" (SR# 306–981); "Give Me One Reason," on album "New Beginning," by artist "Tracy Chapman" (SR# 188–489); "Wifey," on album "Welcome II Nextasy," by artist "Next" (SR# 284–980); "Marshall Mathers," on album "The Marshall Mathers LP," by artist "Eminem" (SR# 287–944); "One Mic," on album "Stillmatic," by artist "Nas" (SR# 305–698); "Piano Man," on album "Piano Man," by artist "Billy Joel" (SR# N12214); "I Will Always Love You," on album "Bodyguard Soundtrack," by artist "Whitney Houston" (SR # 152–583).

# EXHIBIT W

Warner Bros. Entertainment Inc. v. Doe, Not Reported in Fed. Supp. (2014)

2014 WL 12543818

2014 WL 12543818

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

WARNER BROS. ENTERTAINMENT INC.;

Twentieth Century Fox Film Corporation;

Columbia Pictures Industries, Inc.; Sony

Pictures Television Inc.; Universal City Studios

LLC; Universal Studios Home Entertainment

LLC; and Disney Enterprises, Inc., Plaintiffs

v.

John DOE 1 a/k/a Wang Wei d/b/a Dvdsea.com; John

Doe 2 a/k/a Bill Urey d/b/a Cheapdvdmart.com; John

Doe 3 a/k/a Joy Senchy d/b/a Dvds-Home.net; John

Doe 4 a/k/a Olyes Chey d/b/a Idvdset.com; John Doe

5 a/k/a Dvdshop AU d/b/a Dvdshopau.com; John

Doe 6 a/k/a Ecwards L d/b/a Entertainwho.com;

John Doe 7 a/k/a Cailyna K d/b/a Tvstoredvd.com;

John Doe 8 d/b/a Boxsetsales.com; XYZ Companies

1-100 and John and Jane Does 9-100., Defendants.

CIVIL ACTION NO. 14-CV-3492 (KPF)
|
Signed 05/29/2014

**Attorneys and Law Firms**

G. Roxanne Elings, Greenberg, Traurig, L.L.P., George Pearson Wukoson, Davis Wright Tremaine LLP, New York, NY, for Plaintiffs.

**[PROPOSED] PRELIMINARY INJUNCTION ORDER**

Hon. Katherine Polk Failla, USDJ

**\*1** Plaintiffs WARNER BROS. ENTERTAINMENT INC., TWENTIETH CENTURY FOX FILM CORPORATION, COLUMBIA PICTURES INDUSTRIES, INC., SONY PICTURES TELEVISION INC., UNIVERSAL CITY STUDIOS LLC, UNIVERSAL STUDIOS HOME ENTERTAINMENT LLC, and DISNEY ENTERPRISES, INC. (collectively, "Plaintiffs"), having moved ex parte against JOHN DOE 1 a/k/a WANG WEI d/b/a DVDSEA.COM, JOHN DOE 2 a/k/a BILL UREY d/b/ a CHEAPDVDMART.COM, JOHN DOE 3 a/k/a JOY SENCHY d/b/a DVDS-HOME.NET, JOHN DOE 4 a/k/a OLYES CHEY d/b/a IDVDSET.COM, JOHN DOE 5 a/k/a

DVDSHOP AU d/b/a DVDSHOPAU.COM, JOHN DOE 6 a/k/a ECWARDS L d/b/a ENTERTAINWHO.COM, JOHN DOE 7 a/k/a CAILYNA K d/b/a TVSTOREDVD.COM, JOHN DOE 8 d/b/a BOXSETSALES.COM, as well as XYZ COMPANIES 1-100 and JOHN and JANE DOES 9-100 (collectively, "Defendants") for a Temporary Restraining Order, Order to Disable Certain Websites, Asset Restraining Order, Expedited Discovery Order and Order to Show Cause for Preliminary Injunction (collectively, the "Order") pursuant to Federal Rule of Civil Procedure 65 and the Trademark Act of 1946, 15 U.S.C. §§ 1051, et seq., as amended by the Trademark Counterfeiting Act of 1984, Public Law 98-473 (October 12, 1984), the Anticybersquatting Consumer Protection Act of 1996, Pub. L. 104-153 (July 2, 1996), and the Prioritizing Resources and Organization for Intellectual Property Act of 2007, H.R. 4279 (October 13, 2008) (the "Lanham Act") and

⚑ 17 U.S.C. § 501, et. seq. (the "Copyright Act"), for the reason that Defendants are copying, distributing, offering for sale and/or selling, via the Internet, goods bearing counterfeit reproductions of the Plaintiffs' federally-registered trademarks ("Plaintiffs' Marks") and infringing Plaintiffs' exclusive rights in Plaintiffs' validly-owned copyrights ("Plaintiffs' Copyrights"), which trademarks and copyrights are owned and/or controlled by Plaintiffs and used in connection with various goods and services – including production of pre-recorded DVDs and Blu-ray discs (and box sets thereof) featuring and promoting motion pictures and television programs, and other related products listed in Plaintiffs' Complaint and incorporated herein by reference (collectively, the "Plaintiffs' Products");

The Court having entered the Order on May 15, 2014;

Plaintiffs having served all Defendants associated with the domain names identified in **Exhibit A** hereto; and

The Court having reviewed the Complaint, Memorandum of Law in support of the Order, and supporting declarations and exhibits submitted therewith, this Court now finds with respect to the Defendants identified in **Exhibit A** hereto (collectively, the "Enjoined Defendants"), the following:

1. Plaintiffs have demonstrated that they are entitled to preliminary injunctive relief by establishing that they are likely to succeed in showing: (a) that they will succeed on the merits of the claims set forth in their complaint; (b) that they are suffering irreparable injury in the absence of an injunction based on Enjoined Defendants'

Warner Bros. Entertainment Inc. v. Doe, Not Reported in Fed. Supp. (2014)

2014 WL 12543818

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 211 of 237

copying, distribution, offering for sale and sale of goods bearing counterfeits of Plaintiffs' Marks and/or pirated copies of the works protected by Plaintiffs' Copyrights ("Infringing Products"); (c) that the balance of hardships tips in Plaintiffs' favor; and (d) that the public would not be disserved by the issuance of injunctive relief.

**\*2**  2. With respect to likelihood of success on the merits, Plaintiffs have demonstrated they are likely to succeed in showing that: (a) Plaintiffs' Marks and Plaintiffs' Copyrights are valid and protectable and entitled to protection; (b) Enjoined Defendants are copying, distributing, offering for sale and/or selling Infringing Products to buyers in the United States, including in this Judicial District through a network of websites ("Infringing Websites") resolving at various domain names set forth in **Exhibit A** attached hereto.

3.  The copying, distribution, offering for sale and sale of Infringing Products will result in immediate and irreparable injury to Plaintiffs if injunctive relief is not granted.

4.  Enjoined Defendants have gone to great lengths to conceal themselves and their ill-gotten proceeds from Plaintiffs' and this Court's detection, including by using multiple false identities and addresses associated with their operations and purposely-deceptive contact information for the Infringing Websites.

5.  Plaintiffs' harm from denial of the requested Preliminary Injunction would outweigh any harm to Enjoined Defendants' legitimate interests from granting such a Preliminary Injunction.

6.  Enjoined Defendants have each been properly served with the Order, Complaint, Summons and supporting papers, including notice of the show cause hearing to be held on May 29, 2014 at 10:00 a.m. in Courtroom 618 in the United States District Court for the Southern District of New York, 40 Foley Square, New York, New York 10007.

7.  None of the Enjoined Defendants have filed a response to Plaintiffs' moving papers or otherwise appeared in this action.

## I. **Preliminary Injunction Order**

IT IS HEREBY ORDERED, that Enjoined Defendants, including their agents, servants, employees, confederates and any persons acting in concert or participation with them or third parties providing services used in connection with Enjoined Defendants' operations, having actual knowledge of this Preliminary Injunction Order by service, actual notice or otherwise — be, and are, hereby preliminarily enjoined and restrained from:

(a) using Plaintiffs' Marks or any reproduction, counterfeit, copy or colorable imitation of the Plaintiffs' Marks in connection with the distribution, advertising, offer for sale and/or sale of merchandise not the genuine products of Plaintiffs; and

(b) passing off, inducing or enabling others to sell or pass off any Infringing Products as and for Plaintiffs' Products; and

(c) directly or indirectly infringing any of Plaintiffs' exclusive rights in Plaintiffs' Copyrights for motion pictures and television programs, whether now in existence or later created, including without limitation by copying, distributing, offering for sale or selling (via the Internet or through other means) any copies of Plaintiffs' copyrighted works, except pursuant to a lawful license or with the express authority of Plaintiffs; and

(d) committing any acts calculated to cause purchasers to believe that Enjoined Defendants' products are those sold under the control and supervision of Plaintiffs, or sponsored by or approved by, or connected with, or guaranteed by, or produced under the control and supervision of Plaintiffs; and

(e) further infringing Plaintiffs' Marks, Plaintiffs' Copyrights and/or damaging Plaintiffs' goodwill; and

(f) otherwise competing unfairly with Plaintiffs in any manner; and

(g) shipping, delivering, holding for sale, copying, distributing, returning, transferring or otherwise moving, storing, or disposing of, in any manner, pre-recorded DVDs or Blu-ray discs, or box sets thereof, or other items falsely bearing Plaintiffs' Marks or any reproduction, counterfeit, copy, or colorable imitation of same, or reproducing or containing works protected by Plaintiffs' Copyrights (or any portions thereof); and

Warner Bros. Entertainment Inc. v. Doe, Not Reported in Fed. Supp. (2014)

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 212 of 237

2014 WL 12543818

**\*3** (h) operating and/or hosting Enjoined Defendants' Infringing Websites; and

(i) moving, destroying, or otherwise disposing of any items, merchandise or documents relating to the Infringing Products, Enjoined Defendants' Infringing Websites, and/or Enjoined Defendants' assets and operations; and/or

(j) removing, destroying or otherwise disposing of any computer files, electronic files, business records, or documents relating to Enjoined Defendants' Infringing Websites, Enjoined Defendants' assets and operations or relating in any way to the distribution, offer for sale and/or sale of Infringing Products or any reproduction, counterfeit, copy or colorable imitation of Plaintiffs' Marks or any infringement of Plaintiffs' Copyrights.

ORDERED, that in accordance with 15 U.S.C. § 1116(a) and this Court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief, the domain name registries, including but not limited to VeriSign, Inc., NeuStar, Inc., Afilias Limited, Nominet UK, and Public Interest Registry, and/or the individual registrars holding or listing one or more of the domain names used in conjunction with the Infringing Websites shall continue to disable these domain names, or any subset of these domain names specified by Plaintiffs, through a registry hold or otherwise, and make them inactive and non-transferable pending further order from this Court, unless Plaintiffs request that particular domain names be released from such restraints.

ORDERED, that third party service providers providing services to Enjoined Defendants in connection with any of the Infringing Websites and/or domain names for the Infringing Websites – including without limitation, web hosting providers, back-end service providers, affiliate program providers, web designers, shippers, search-based online advertising services (such as through paid inclusion, paid search results, sponsored search results, sponsored links, and Internet keyword advertising) and any banks, savings and loan associations, merchant account providers, payment processors and providers, credit card associations, or other financial institutions, including without limitation, PayPal – and who receive actual notice of this Preliminary Injunction Order, shall within three (3) days of receipt of this Preliminary Injunction Order, cease or disable such services to i) Enjoined

Defendants in relation to the Infringing Products; and ii) any and all of the Infringing Websites.

ORDERED, that this Preliminary Injunction Order shall remain in effect until disposition of this action.

## II. **Expedited Discovery**

ORDERED, that Plaintiffs may continue to obtain expedited discovery by providing actual notice, pursuant to subpoena or otherwise, of this Preliminary Injunction Order to any of the following: (1) Enjoined Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them; (2) any banks, savings and loan associations, merchant account providers, payment processors or providers, credit card associations, or other financial institutions, including without limitation, PayPal, which receive payments or hold assets on behalf of Enjoined Defendants or any of the Infringing Websites; and/or (3) any third party service providers to Enjoined Defendants and/or the Infringing Websites, including without limitation, domain name registration privacy protection services (e.g., Domains By Proxy and PrivacyProtect.org), web hosting providers, back-end service providers, affiliate program providers, web designers, shippers, search-based online advertising services (such as through paid inclusion, paid search results, sponsored search results, sponsored links, and Internet keyword advertising), and domain name registries and registrars who have provided services for Enjoined Defendants and/or the Infringing Websites; and it is further

**\*4** ORDERED, that any third party providing services in connection with any Enjoined Defendant, any Infringing Websites and/or domain names for the Infringing Websites, including without limitation, domain name registration privacy protection services (e.g., Domains By Proxy and PrivacyProtect.org), web hosting providers, back-end service providers, affiliate program providers, web designers, shippers, search-based online advertising services (such as through paid inclusion, paid search results, sponsored search results, sponsored links, and Internet keyword advertising), and any banks, savings and loan associations, merchant account providers, payment processors or providers, credit card associations, or other financial institutions, including without limitation, PayPal, and domain name registries and registrars who have provided services for Enjoined Defendants, shall within five (5) days after receipt of such

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 213 of 237
Warner Bros. Entertainment Inc. v. Doe, Not Reported in Fed. Supp. (2014)
2014 WL 12543818

notice, provide copies of all documents and records in such person or entity's possession or control relating to:

(a) The identities and addresses (physical and email) of Enjoined Defendants, their agents, servants, employees, confederates, and any persons acting in concert or participation with them and the locations and identities of Enjoined Defendants' operations, including without limitation, identifying information associated with Enjoined Defendants' Infringing Websites and financial accounts, and the trade of Infringing Products (domain name registration privacy protection services shall provide the information in this subparagraph (a) within two (2) days after receipt of notice);

(b) The Infringing Websites;

(c) Any domain names registered by Enjoined Defendants associated with the Infringing Websites; and

(d) Any financial accounts owned or controlled by Enjoined Defendants, including their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, merchant account providers, payment processors and providers, credit card associations, or other financial institutions, including without limitation, PayPal. ORDERED, that Local Rule 33.3 shall not apply to the expedited discovery granted

Plaintiffs herein.

### III. **Service of Process via Email**

ORDERED, that Plaintiffs may continue to serve process on Enjoined Defendants by electronic mail at the unique email addresses used by Enjoined Defendants in conjunction with their Infringing Websites and listed in the Order, which Plaintiffs have demonstrated will provide adequate notice to Enjoined Defendants pursuant to Fed. R. Civ. P. 4.

### IV. **Ex Parte Asset Restraint**

ORDERED, that in accordance with 15 U.S.C. § 1116(a), 17 U.S.C. § 504(b) and this Court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief, that the asset restraint provisions contained in the Order shall remain in place until the disposition of this action as to Enjoined Defendants and their officers, servants, employees, agents and any persons in active concert or participation with them, and that any banks, savings and loan associations, merchant account providers, payment processors or providers, credit card associations, or other financial institutions, including without limitation, PayPal, for any Enjoined Defendant, any of Enjoined Defendants' operations, Enjoined Defendants' Infringing Websites, or for any other website owned or controlled by Enjoined Defendants, who receive actual notice of this Preliminary Injunction Order, shall immediately locate and restrain any new accounts connected to Enjoined Defendants and/or to the Infringing Websites and maintain the asset restraint with respect to known existing accounts connected to Enjoined Defendants and/or to the Infringing Websites, and that all such accounts be preliminarily restrained and enjoined from transferring or disposing of any money or other of Enjoined Defendants' assets, not allowing such funds to be transferred or withdrawn.

**\*5** ORDERED, that upon two (2) business day's written notice to the Court and Plaintiffs' counsel, any Enjoined Defendant may, upon proper showing, appear and move for the dissolution or modification of the provisions of this Preliminary Injunction Order concerning the restriction upon transfer of Enjoined Defendants' assets.

SIGNED this 29th day of May, 2014.

**Exhibit A**

| Domain Name | Registrant Name |
| --- | --- |
| Dvdsea.com | Wang Wei |
| Cheapdvdmart.com | Bill Urey |
| Dvds-home.net | Joy Senchy |

**Warner Bros. Entertainment Inc. v. Doe, Not Reported in Fed. Supp. (2014)**

2014 WL 12543818

| | |
|---|---|
| Idvdset.com | Olyes Chey |
| Dvdshopau.com | Dvdshop Au |
| Entertainwho.com | Ecwards L |
| Tvstoredvd.com | Cailyna K |
| Boxsetsales.com | Domain Administrator |

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12543818

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT X

Warner Bros. Entertainment, Inc. v. Tusa, Not Reported in Fed. Supp. (2021)

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 216 of 237

2021 WL 6104399

2021 WL 6104399
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

WARNER BROS. ENTERTAINMENT,
INC., et al., Plaintiff,
v.
Jason TUSA, et al., Defendant.

2:21-cv-05456-VAP-ASx
|
Signed 10/25/2021

**Attorneys and Law Firms**

Kelly M. Klaus, Rose Leda Ehler, Oliver Lewis Brown, Munger Tolles and Olson, Los Angeles, CA, for Plaintiff.

**Order GRANTING Motion
for Default Judgment (Dkt. 32)**

Virginia A. Phillips, United States District Judge

*1 Before the Court is Plaintiffs Amazon Content Services, LLC, Columbia Pictures Industries, Inc., Disney Enterprises, Inc., Netflix Studios, LLC, Open 4 Business Productions, LLC, Paramount Pictures Corporation, Screen Gems, Inc., Sony Pictures Animation, Inc., Universal City Studios, LLC, Universal City Studio Productions, LLLP, Universal Content Productions, LLC, Universal Television, LLC, and Warner Bros. Entertainment, Inc.'s ("Plaintiffs") Motion for Default Judgment. (Dkt. 32, "Motion"). Defendant Jason Tusa ("Tusa" or "Defendant") has not opposed the Motion. (Dkt. 23).

Having considered the papers filed in support of the Motion, the Court finds this matter appropriate for resolution without oral argument pursuant to Local Rule 7-15. The Court **GRANTS** the Motion.

# I. BACKGROUND

## A. Factual Background

Plaintiffs and their affiliates produce and distribute "a significant portion of the world's most sought-after" movies and television programs. (Dkt. 1). Plaintiffs bring this copyright infringement action against Defendant Jason Tusa

for the alleged operation of an unauthorized digital streaming service, Altered.Carbon TV ("Altered Carbon"), that Plaintiffs claim infringes upon their Copyrighted Works. [1] (Dkt. 32). According to Plaintiffs, Tusa's subscribers access infringing content through Altered Carbon applications that "download directly onto smart TVs, computers, and mobile devices." (Dkt. 1, ¶ 29). In exchange for a subscription fee of seven to ten dollars per month, Plaintiffs allege that Tusa "provides his subscribers with an internet protocol television ("IPTV") service that includes nearly 2,600 channels as well as pay-per view events." (*Id.*, ¶ 2). Plaintiffs claim that, despite Tusa's knowledge that he has no license from Plaintiffs to do any of this, Tusa's infringing conduct has gone "on and on." (*Id.*)

According to Plaintiffs, Altered Carbon is not Tusa's first "offering that infringes Plaintiffs' rights." (Dkt. 13, at 4) ("Within the last year, Tusa has operated at least three other unauthorized streaming services—Area 51, Singularity Media, and Digital UniCorn Media"). Plaintiffs confronted Tusa about his first infringing service in June 2020 by serving him with a cease-and-desist letter. (*See* Declaration of Van Voorn, "Van Voorn Dec.," Dkt. 15, ¶ 32). As a result, Tusa shut Area 51 down and negotiated a Settlement Agreement with Plaintiffs on October 12, 2020, in which Tusa agreed to halt and not resume his infringing services. (*Id.* ¶ 36). Nevertheless, the following month, Tusa launched another allegedly infringing program, Singularity Media. (*Id.*, ¶ 33). Plaintiffs again confronted Tusa who thereafter shut Singularity Media down on or around July 11, 2020. (*Id.*, ¶ 35).

On October 20, 2020, approximately a week after the Settlement Agreement was executed, Plaintiffs discovered that Tusa launched a third infringing service, Digital UniCorn Media. (*Id.*, ¶ 37). Plaintiffs sent Tusa another letter on November 18, 2020 regarding his infringing activities and breach of the parties' Settlement Agreement. (*Id.*, ¶ 39). Tusa denied any involvement with Digital UniCorn Media. (*Id.*, ¶¶ 39-40).

*2 On February 26, 2021, Plaintiffs' investigative team identified Tusa's latest infringing service, Altered Carbon. (*Id.*, ¶¶ 41-48). Plaintiffs' investigation revealed that Tusa had taken several steps to conceal his role in Altered Carbon, including using only privacy-protected web domains, accepting cryptocurrency, and warning customers it would be "too risky" to post channel listings online. (*Id.*, ¶ 42). According to Plaintiffs, "Tusa is a recidivist mass infringer

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 217 of 237

Warner Bros. Entertainment, Inc. v. Tusa, Not Reported in Fed. Supp. (2021)

2021 WL 6104399

[who] has made clear that he will not stop his unlawful conduct unless and until the Court issues an injunction ordering him to do so." (Dkt. 1, ¶ 3).

### B. Procedural Background

On July 6, 2021, Plaintiffs commenced this action against Defendant Jason Tusa alleging claims for: (1) Direct Copyright Infringement; (2) Contributory Copyright Infringement by Knowingly and Materially Contributing to the Infringement of the Copyrighted Works; (3) Intentionally Inducing the Infringement of the Copyrighted Works; and (4) Breach of Contract. (Dkt. 1, ¶ 1).

Plaintiffs served Tusa with the Summons and Complaint on July 10, 2021. (Dkt. 21). Tusa's original deadline to file an Answer to the Complaint was August 2, 2021. (Dkt. 27). Tusa engaged counsel, however, who sought and received a stipulation to extend Tusa's deadline to answer or otherwise respond to August 12, 2021. (Dkt. 25). Fed. R. Civ. P. 12. Despite being served with all relevant papers and receiving an extension of his answer deadline, Tusa has not answered or responded to the Complaint.

On August 16, 2021, Plaintiffs moved for, and on August 17, 2021, the Clerk of Court entered, default against Tusa. Tusa was on notice of Plaintiffs' Application for Entry of Default and Default by Clerk given the proper service of these documents on August 17, 2021. (Dkt. 31). On September 13, 2021, Tusa was also served with Plaintiffs' Notice of Motion and Motion for Default Judgment. (Dkt. 33). On August 16, 2021, this Court granted Plaintiffs' Motion for Preliminary Injunction, restraining and enjoining Tusa from, directly or secondarily, infringing any of Plaintiffs' Copyrighted Works. (Dkt. 28).

## II. LEGAL STANDARD

### A. Local Rule 55-1

Local Rule 55-1 provides that an application for default judgment must be accompanied by a declaration in compliance with Federal Rule of Civil Procedure 55(b) setting forth, *inter alia*, when and against what party the default was entered and the identification of the pleading to which default was entered. Plaintiffs have provided this. (*See* Declaration of Rose Leda Ehler, "Ehler Dec.," Dkt. 32-1).

### B. Default Judgment

Federal Rule of Civil Procedure 55 authorizes the Court to enter a default judgment against a party who "fail[s] to plead or otherwise defend" a claim. Fed. R. Civ. P. 55 (a)-(b)(2). "Even if entry of default has been made by the court clerk, granting a default judgment is not automatic; rather it is left to the sound discretion of the court." *PepsiCo v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999) (citing *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980)).

In exercising its discretion to grant or deny an application for default judgment, the Court considers the following factors: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits (collectively, "*Eitel* factors"). *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). The merits of the plaintiff's substantive claim and the sufficiency of the complaint are often treated by courts as the most important *Eitel* factors. *Mnatsakanyan v. Goldsmith & Hull APC*, No. 2:12-cv-04358-MMM-PLAx, 2013 WL 10155707, at *10 (C.D. Cal. May 14, 2013).

## III. DISCUSSION

 **\*3** Generally, upon default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true. *Televideo Sys. Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987); *see also DirecTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007); Fed. R. Civ. P. 8(b)(6). Pursuant to Rule 8(b)(6), the Court accepts as true the allegations in the unanswered Complaint and the statements in the declarations submitted in support of Plaintiffs' Motion for Default Judgment.

In applying the *Eitel* factors, the Court finds that Plaintiffs are entitled to default judgment. The Court will discuss each factor in turn.

### A. Possibility of Prejudice to Plaintiff

Warner Bros. Entertainment, Inc. v. Tusa, Not Reported in Fed. Supp. (2021)
2021 WL 6104399

The first *Eitel* factor considers "whether the plaintiff will suffer prejudice if default judgment is not entered." *PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Here, Tusa has chosen not to participate in this litigation or defend his conduct, and Plaintiffs contend that, without a default judgment, "[they] will be deprived of any remedy for the injuries Tusa's massive infringement has caused them." (Dkt. 32, at 6). *See Star Fabrics, Inc. v. 3Free NYC, Inc.*, 2013 WL 12124095, at *2 (C.D. Cal. 2013) (noting that the first factor favors entry of default where plaintiff would otherwise be unable to recover damages from infringer). Although Tusa did shut down Altered Carbon after Plaintiffs filed the present action, his conduct shows that he will not refrain from further infringement absent an injunction. If Tusa is not enjoined, Plaintiffs argue that Tusa "will simply rebrand his service and start his infringing conduct all over again." *See Warner Bros. Entm't, Inc. v. Caridi*, 346 F. Supp. 2d 1068, 1071 (C.D. Cal 2004) (finding that the first factor favors default judgment where there is a risk of continued infringement). Accordingly, this factor weighs in favor of default judgment.

**B. The Merits of Plaintiffs' Substantive Claims and Sufficiency of the Complaint**

The second and third *Eitel* factors "require that a plaintiff state a claim on which [the plaintiff] may recover." *PepsiCo*, 238 F. Supp. 2d at 1175. On June 23, 2021, Plaintiffs filed this lawsuit against Defendant alleging claims for: (1) Direct Copyright Infringement; (2) Contributory Copyright Infringement by Knowingly and Materially Contributing to the Infringement of the Copyrighted Works; (3) Intentionally Inducing the Infringement of the Copyrighted Works; and (4) Breach of Contract. (Dkt. 1). The Court will address the merits of each claim in turn.

1. Direct Copyright Infringement

To establish a claim for direct copyright infringement, a plaintiff must demonstrate: (1) it owns a valid copyright in a work, and (2) defendant's violation of plaintiff's exclusive rights under the Copyright Act. 17 U.S.C. §§ 106, 501; *see also Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006). "In addition, direct infringement requires the plaintiff to show causation (also referred to as 'volitional conduct') by the defendant."

*Perfect 10, Inc. v. Giganews Inc.*, 847 F.3d 657, 666 (9th Cir. 2017).

Plaintiffs have provided certificates of registration from the United States Copyright Office, which presumptively establish the validity of the Copyrights in question. (*See* Dkt. 13, at 11; Dkt. 16 "*Ehler Dec.*"); *Ent. Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997) (explaining that a certificate of registration bearing the plaintiff's name "creates a presumption of ownership of a valid copyright"). Without contest, the Court accepts these certificates as proof of ownership.

**\*4** As copyright holders, Plaintiffs have the exclusive rights to reproduce, prepare, distribute, publicly perform, and import their exclusive rights. 17 U.S.C. §§ 106. Plaintiffs allege Tusa infringes their exclusive right to perform the Copyrighted Works publicly. (Dkt. 13, at 12); 17 U.S.C. §§ 106(4). By streaming the Copyrighted Works on Altered Carbon without authorization, Defendant likely violates this exclusive right. Accordingly, Plaintiffs are likely to be successful on their direct copyright claim.

2. Contributory Copyright Infringement by Knowingly and Materially Contributing to the Infringement of the Copyrighted Works

To be held liable for contributory copyright infringement, a defendant must show: (1) direct infringement by a third party; (2) actual or constructive knowledge by the defendant that third parties were directly infringing; and (3) material contribution by the defendant to infringing activities. *In re Napster, Inc. Copy. Litig.*, 377 F. Supp. 2d 796, 801 (N.D. Cal. 2005).

First, as discussed in detail in the subsection above, direct copyright infringement has been established.

Second, Tusa has actual knowledge of the third parties' infringement. Tusa "systematically amasses thousands of live television channels" containing Copyrighted Works that can only be lawfully accessed through a limited number of legitimate services, "in specific geographic regions, and in specific content packages." (Dkt. 1, ¶ 80). Despite Tusa's knowledge that third parties are not authorized to reproduce Plaintiffs' Copyrighted Works to make 24/7 channels or

Warner Bros. Entertainment, Inc. v. Tusa, Not Reported in Fed. Supp. (2021)

2021 WL 6104399

publicly perform Copyrighted Works by streaming these channels en masse, Tusa continues to sell access to these streams to his own subscribers. (*Id.*) In sum, Tusa knows, from sources such as his correspondence with Plaintiffs and his having executed the Settlement Agreement, that his subscribers have no authorization to receive the streams of the Copyrighted Works he provides to those subscribers. Therefore, the second element is satisfied here.

Third, Tusa materially contributes to the third parties' infringement. Tusa "configures and promotes the use of the IPTV Service to connect subscribers to unauthorized streams of Plaintiff[s'] Copyrighted Works, including the 24/7 channels." (*Id.*, ¶ 81). The third parties behind these unauthorized streams control the facilities and equipment used to copy and stream performances of Plaintiffs' Copyrighted Works. (*Id.*) Those third parties directly infringe Plaintiffs' exclusive reproduction and/or public performance rights by copying and/or publicly performing the Copyrighted Works without Plaintiffs' authorization. By operating the Altered Carbon websites and supplying the IPTV Service, Tusa facilitates, encourages, and enables the direct infringement of Plaintiffs' Copyrighted Works. Thus, the third element is also established.

In sum, Plaintiffs are also likely to succeed on their contributory copyright infringement claim.

### 3. Intentionally Inducing the Infringement of the Copyrighted Works

A defendant may be held liable for copyright infringement under an inducement theory where four elements are present: "(1) the distribution of a device or product [by the defendant], (2) acts of infringement [by third parties], (3) an object [of the defendant] of promoting [the device's or product's] use to infringe copyright, and (4) causation." *Columbia Pictures Indus., Inc. v. Fung,* 710 F.3d 1020, 1032 (9th Cir. 2013) (hereinafter "*Fung*").

 **\*5** First, Tusa distributed and sold subscriptions to the Altered Carbon service, which constitutes "the distribution of a device or product by the defendant." (Dkt. 32, at 17); *see also Fung,* 710 F3.D at 1033 ("[S]ervices available on the Internet" provide a basis for inducement liability). Therefore, the first element has been met.

Second, Tusa's unlawful streaming service creates demand for unauthorized reproductions of Plaintiffs copyrighted works to make the 24/7 channels. (*Id.*) Tusa thereby induced the direct infringement of Plaintiffs' reproduction right. *Columbia Pictures Indus., Inc. v. Galindo,* No. 2:20-cv-03129-SVW-GJS, 2020 WL 3124347, at \*2 (C.D. Cal. 2020) (digital reproductions for 24/7 channels likely infringed plaintiffs' copyrights). Thus, the second element is satisfied here.

Third, Tusa knowingly distributed the Altered Carbon service "with the object of promoting its use to infringe copyright."

*Fung,* 710 F.3d at 1034 (quoting *Grokster,* 545 U.S. at 936-37). In January 2020, Tusa ran a promotional raffle "sponsored by Altered Carbon" in which the top prize was a subscription to Altered Carbon and compatible hardware device. (Dkt. 32, at 9). Tusa's associates also directed customers to Altered Carbon boasting its reliability based on its status as "one of two main suppliers of all US channels." (*Id.*) As the Supreme Court said in *Grokster,* " 'entic[ing] or persuad[ing] another to infringe ... by advertising" is the "classic case" of inducing infringement.

 545 U.S. at 935-36; *id. at* 936 ("[A]t common law a copyright ... defendant who 'not only expected but invoked [infringing use] by advertisement' was liable for infringement 'on principles recognized in every part of the law' " (quoting

*Kalem Co. v. Harper Bros.,* 222 U.S. 55, 62-63 (1911)); *see* Van Voorn Dec. ¶¶ 23-28 (Tusa and his affiliates' conduct to promote Altered Carbon for the purpose of infringement). Further, Tusa's repeated rebranding and relaunching on infringing services has shown that he is "aiming to satisfy a known source of demand for copyright infringement."

*Grokster,* 545 U.S. at 939. Therefore, the third element is established here.

Fourth, "if one provides a service that could be used to infringe copyrights, with the manifested intent that the service actually be used in that manner, that person is liable for the infringement that occurs through the use of the service."

*Fung,* 710 F.3d at 1037. Tusa distributed and promoted the Altered Carbon service for infringing uses, and the infringing conduct predictably followed. (Dkt. 32, at 18). Thus, the causation requirement is satisfied.

Accordingly, Plaintiffs are likely to be successful on their copyright claim under an inducement theory.

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 220 of 237

Warner Bros. Entertainment, Inc. v. Tusa, Not Reported in Fed. Supp. (2021)

2021 WL 6104399

#### 4. Breach of Contract

"To be entitled to damages for breach of contract, a plaintiff must plead and prove: (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff." *See First American Commercial Bancorp, Inc. v. Vantari Genetics, LLC*, No. 2:19-cv-04483-VAP (FFMx), 2020 WL 5027990, at *3 (C.D. Cal. 2020).

On October 12, 2020, Tusa signed a Settlement Agreement with Plaintiffs. (Dkt. 32, at 19.) A term of that Settlement Agreement required Tusa to "cease infringing Plaintiff[s'] [c]opyrighted [w]orks" and to "refrain from doing so in the future." (*Id.*) Plaintiffs complied with their obligations under the settlement. (*Id.*) When Tusa subsequently launched his "follow-on infringing IPTV streaming devices, including Altered Carbon," however, Tusa materially breached that agreement. (*Id.*) As a result, Plaintiffs suffered both "irreparable harm and concrete damage in additional costs to bring Tusa into compliance." (*Id.*) Therefore, Tusa is likely liable for breach of contract.

#### C. The Sum of Money at Stake

**\*6** The fourth *Eitel* factor "takes into account the amount of money at stake and the seriousness of the defendant's conduct, which involves an assessment of whether the recovery sought is proportional to the harm which the defendant's conduct has caused." *Trustees of Teamsters Local 631 Sec. Fund for S. Nevada v. Knox Installation-Dismantling & Servs., Inc.*, No. 2:12-cv-1689-JAD-GWF, 2013 WL 4857897, at *2 (D. Nev. Sept. 9, 2013). Where the harm has the potential to continue and its full magnitude cannot be quantified, this *Eitel* factor weighs in favor of default judgment. *Caridi*, 346 F. Supp. 2d at 1072 (holding that factor favored copyright owner plaintiff when defendant's conduct may be continuing).

Plaintiffs request statutory damages in the amount of $16,350,000. (Dkt. 32, at 19.) This figure represents the statutory maximum of $150,000 for willful infringement for Tusa's direct infringement of each of the 109 Copyrighted Works listed in Exhibit A to the Complaint. (*Id.*) *See* 17 U.S.C. § 504(c)(1)-(2) (range of damages for willful copyright infringement is $750 to $150,000 per work infringed). Here, Plaintiffs' investigators used the Altered Carbon service to obtain unauthorized streams of each of these 109 Copyrighted Works. (Van Voorn Dec., ¶ 10).

Strikingly, even the sample of representative works discussed above constitutes only a small fraction of the thousands of Plaintiffs' Copyrighted Works that Tusa infringed and for which he would be liable if he were to appear and litigate this case. Apparent from Tusa's history of operating infringing services—including his video-on-demand services, the inducement of others to infringe the reproduction right by sourcing 24/7 channels from copies of Plaintiffs' works, and the fact that Tusa offered thousands of channels for around-the-clock streaming—is the massive scale of Tusa's infringement. (*Id.*, at 20.) A complete accounting of the scope of Tusa's infringement would likely run to thousands of Plaintiffs' Copyrighted Works, and Tusa's repeated conduct in launching infringing streaming services shows that Tusa's conduct is continuous.

Therefore, this factor weighs in favor of entering default judgment.

#### D. Possibility of a Dispute Concerning Material Facts

"The fifth *Eitel* factor considers the possibility of dispute as to any material facts in the case." *PepsiCo*, 238 F.Supp.2d at 1177. Upon entry of default by the clerk, the factual allegations of the complaint, except those relating to the amount of damages, are taken as true. *Televideo Sys. Inc.*, 826 F.2d at 917-18. Here, Plaintiffs have adequately alleged Direct Copyright Infringement, Contributory Copyright Infringement by Knowingly and Materially Contributing to the Infringement of the Copyrighted Works, Intentionally Inducing the Infringement of the Copyrighted Works, and Breach of Contract in their Complaint. There is therefore little possibility of a dispute concerning material facts, and thus this factor weighs in favor of default judgment. *Elektra Entm't Grp. Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists.").

#### E. Possibility of Excusable Neglect

"The sixth *Eitel* factor considers the possibility that the default resulted from excusable neglect." *PepsiCo*, 238 F.Supp.2d at 1177. Where the defaulting party is "properly served with the Complaint, the notice of entry of default, as well as the

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 221 of 237

Warner Bros. Entertainment, Inc. v. Tusa, Not Reported in Fed. Supp. (2021)

2021 WL 6104399

papers in support of the [default] motion," the failure to defend cannot be attributed to excusable neglect." *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1005 (N.D. Cal. 2001). Here, Defendant was served with the Complaint (Dkt. 21) as well as Plaintiffs' Application for Entry of Default Against Defendant, the Declaration of Rose Leda Ehler in Support of Plaintiffs' Application for Entry of Default, and Default by Clerk (Dkt. 31). Thus, there appears little likelihood that the default resulted from excusable neglect. This factor also favors entry of default judgment.

**F. The Strong Public Policy Favoring Decisions on the Merits**

**\*7** Though "[c]ases should be decided upon their merits whenever reasonably possible," a defendant's failure to respond "makes a decision on the merits impractical if not impossible." *Eitel*, 782 F.2d at 1472. As the Federal Rules of Civil Procedure allow for termination of a case before a hearing on the merits where a defendant fails to defend an action, this factor also favors entry of default judgment against Defendant.

On balance, each of the *Eitel* factors favor entry of default. Therefore, the Court enters default judgment against Defendant.

**G. Plaintiffs' Requested Relief**

Having granted Plaintiffs' Motion for Default Judgment as to Plaintiffs' claims, the Court next considers Plaintiffs' requested relief. Federal Rule of Civil Procedure 55(b)(2) "explicitly grants the district court wide latitude" in providing relief in a default judgment. *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993); *Elektra Entm't*, 226 F.R.D. at 394.

1. Damages

Plaintiff requests that the Court enter a default judgment awarding: (1) maximum statutory damages for willful infringement in the amount of $150,000 per work, for a total sum of $16,350,000; (2) the confidential liquidated damages "Settlement Sum" for breach of the parties' settlement agreement; (3) post-judgment interest; and (4) attorneys' fees and costs.

a. Statutory Damages

The Court finds that statutory damages are suitable. In assessing the appropriateness of the amount of damages, courts consider compensation for lost profits, punishment of willful infringement, and deterrence of further infringing activity. *See Philip Morris USA, Inc. v. Castworld Products, Inc.*, 219 F.R.D. 494, at 501-02 (C.D. Cal. 2003).

The Court has discretion to determine the amount of statutory damages to be awarded pursuant to 17 U.S.C. § 504(c)(1)-(2). Plaintiffs seek $16,350,000 in statutory damages. (Dkt. 32, at 21). Section 504(c)(1)-(2) permits an award ranging from a minimum of $750 up to $30,000 per infringed work. 17 U.S.C. § 504(c)(1). The maximum award may be increased to $150,000 per infringed work if the infringement was willful. *Id.* at (c)(2). Willful infringement can be inferred from a defendant's failure to defend. *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F. 2d 1332, n.3 (9th Cir. 1990); *see Castworld Prods.*, 219 F.R.D. 494, 501 (C.D. Cal. 2003). Here, the Complaint alleges that Defendant willfully engaged in direct and secondary copyright infringement. (Dkt. 1). Taking the allegations in the Complaint as true, Section 504(c)(2) consequently permits a damages award of up to $150,000 per infringed work ($150,000 for each of 109 copyrights at issue, for a total of $16,350,000). *See* 17 U.S.C. § 504(c)(2).

"In measuring the damages, the court is to be guided by 'what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like ....' " *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir.1990) (quoting *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 232, 73 S.Ct. 222, 97 L.Ed. 276 (1952)).

In this case, the conduct at issue is particularly egregious. Defendant signed a written settlement agreement in which he promised to never again operate a similar illegal streaming service. Nevertheless, Defendant instead relaunched and continued to operate his infringing business under a different name. Defendant has thus shown that "a binding contractual commitment will not deter his brazen infringement." (Dkt. 1, ¶ 1). Plaintiffs bring the present action because there is

2021 WL 6104399

no other way to put an end to Defendant's infringement. Altered Carbon is now the fourth in a series of infringing services through which Defendant makes money by exploiting Plaintiffs' rights. Considering the sheer volume of unauthorized content available on the Altered Carbon service, "its availability round-the-clock and Tusa's widespread consumer base amassed over the course of operating several streaming services," Tusa infringed Plaintiffs' Copyrighted Works on a massive scale. Given such egregious conduct —which Defendant compounded by failing to mount any defense or participate in discovery or engage in settlement negotiations—a substantial financial penalty is warranted. The Court awards $2,500 for each of 109 copyrights at issue, for a total of $272,500. Despite the egregiousness of Defendant's behavior in this case, the Court declines to award the statutory maximum in damages because the number of copyrighted works at issue would amount to an excessively large award of $16,350,000. *Contra Warner Bros. Ent. Inc. v. Caridi*, 346 F. Supp. 2d 1068 (C.D. Cal. 2004) (awarding $150,000 per infringed work where there were only two works at issue).

**\*8** The Court concludes that statutory damages of $272,500 for direct and secondary copyright infringement are sufficient to compensate Plaintiffs for financial losses incurred from Defendant's infringement of Plaintiffs' Copyrighted Works and deter Defendant from future infringement.

### b. Confidential Liquidated Damages (Settlement Sum)

On October 12, 2020, Plaintiffs and Tusa executed a confidential Settlement Agreement which resolved claims arising from Tusa's infringing operation of Area 51 and Singularity Media. (Dkt. 1 ¶ 3). The Settlement Agreement mandated that Tusa, *inter alia*, [redacted] (*Id.*, ¶ 97-98). Pursuant to the terms of the Settlement Agreement, in the event of a breach by Tusa, [redacted] (*Id.*, ¶ 99). [redacted] (*Id.*).

Plaintiffs have performed all obligations required of them under the Settlement Agreement or, to the extent Plaintiffs have not done so, their performance is excused. Thus, pursuant to Paragraphs 1 and 2 of the parties' confidential Settlement Agreement, the Court concludes [redacted]

### 2. Injunctive Relief

Plaintiffs also request that the Court award a permanent injunction prohibiting Tusa from engaging in the same or similar conduct going forward and ordering the infringing domains to be turned over to Plaintiffs. The Copyright Act permits permanent injunctions to prevent future infringement, so long as the terms are reasonable. *See* 17 U.S.C. §§ 502(a), 1203(b)(1). To obtain such relief, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 126 S.Ct. 1837, 1839 (2006) (citations omitted). Central District courts routinely grant such injunctions on motions for default judgment when a plaintiff meets the requirements of *eBay*. *See e.g.*, *Amini Innovation Corp. v. KTY International Marketing*, 768 F.Supp.2d 1049, 1057 (C.D. Cal. 2011); *Munhwa Broadcasting Corp. v. Create New Tech. Co.*, No. CV 14-04213 RGK (RZx), 2015 WL 12752536, at \*8 (C.D. Cal. 2015); *Chan Luu Inc. v. Guang Gao d/b/a Wrapbraceletshut.com*, No. CV 13-2997 FMO (JCx), 2014 WL 12567141, at \*8 (C.D. Cal. 2014); *Nexon America Inc. v. Kumar*, No. CV 11-06991 ODW (PJWx), 2012 WL 1116328, at \*7 (C.D. Cal. 2012).

The Court finds an injunction to be appropriate in this case. First, Plaintiffs would be irreparably harmed by further infringement. Second, monetary damages are inadequate to compensate Plaintiffs, as Tusa's refusal to participate in this case has deprived Plaintiffs of the opportunity to determine their damages with precision. Third, considering the balance of the hardships, Tusa's distribution of infringing material means that an injunction merely compels Tusa to comply with the law. Finally, the public interest weighs in favor of an injunction, as permitting Tusa to infringe copyrighted material serves no public interest whatsoever. The Court therefore **GRANTS** Plaintiffs' request for a permanent injunction enjoining Tusa from distributing Plaintiffs' infringing material. The specifics of the injunction are set forth in the judgment that will be issued concurrently with this Order.

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 223 of 237
Warner Bros. Entertainment, Inc. v. Tusa, Not Reported in Fed. Supp. (2021)
2021 WL 6104399

### 3. Attorneys' Fees and Costs

**\*9** Plaintiffs further request an award for attorneys' fees in the amount of $330,600 pursuant to Local Rule 55-3 and 17 U.S.C. § 505, which permits a court to award reasonable attorneys' fees to the prevailing party in an action under the Copyright Act. (Dkt. 32, at 27). The Court accepts Plaintiffs' request that damages be calculated according to Local Rule 55-3. Plaintiffs' counsel did not submit billing records in this case.

#### a. 17 U.S.C. § 505

The Ninth Circuit has noted five non-exclusive factors that a court may consider in deciding whether to award attorneys' fees pursuant to § 505: (1) the degree of success obtained; (2) frivolousness; (3) motivation; (4) objective unreasonableness; and (5) the need in particular circumstances to advance considerations of compensation and deterrence. *Caridi*, 346 F. Supp. 2d at 1074-75.

Each of the five factors weigh in favor of a fee award here. First, Plaintiffs succeeded on the merits. Second, Plaintiffs' claims are not frivolous. Third, Plaintiffs' claims are not brought for an improper purpose, considering that Plaintiffs gave Tusa several opportunities to resolve the matter short of court intervention. Fourth, Tusa's failure to cease his infringement—even after settling—is unreasonable.

And fifth, both Tusa and other would-be infringers must be deterred.

Therefore, the Court concludes that an award of attorneys' fees is proper here.

#### b. Local Rule 55-3

Local Rule 55-3 provides that where the amount of judgment is over $100,000, an award of attorneys' fees should be made in the amount of $5,600 plus two percent of the amount over $100,000. L.R. 55-3. As the amount of the (public) judgment is $272,500, the rule dictates an award of $5,600 plus $3,450, for a total of $9,050. This amount is reasonable in light of the fees incurred by Plaintiffs at this stage of the litigation.

Given the above, the Court finds that attorneys' fees of $9,050 are appropriate.

### IV. CONCLUSION

The Court **GRANTS** Plaintiffs' Motion for Default Judgment. The Court awards Plaintiffs $272,500 in damages, injunctive relief, [redacted] and $9,050 in attorneys' fees.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 6104399

---

### Footnotes

1    The Copyrighted Works include, but are not limited to, movies and television programs such as "The Accountant," "Friends," and "The Hangover Part II."

---

# EXHIBIT Y

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 225 of 237

Warner Bros. Entertainment, Inc. v. Vega, Not Reported in Fed. Supp. (2012)

2012 WL 13008442

2012 WL 13008442
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

WARNER BROS. ENTERTAINMENT, INC.
v.
Lisa VEGA, et al.

CV 11–05895 SJO (SPx)
|
Filed 03/29/2012

**Attorneys and Law Firms**

James Andrew Coombs, Nicole L. Drey, Law Offices of
J. Andrew Coombs APC, Glendale, CA, for Warner Bros.
Entertainment, Inc.

Lisa Vega, Menifee, CA, pro se.

Cindy Vega, Menifee, CA, pro se.

**PROCEEDINGS (in chambers): ORDER
GRANTING PLAINTIFF'S MOTION FOR
DEFAULT JUDGMENT** [Docket No. 17]

S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

 **\*1** This matter is before the Court on Plaintiff Warner
Bros. Entertainment, Inc.'s ("Plaintiff") Motion for Default
Judgment ("Motion"), filed February 23, 2012. (Docket No.
17.) Defendants Lisa Vega and Cindy Vega (collectively,
"Defendants") have not filed an opposition. The Court found
this matter suitable for disposition without oral argument and
vacated the hearing set for March 26, 2012. *See* Fed. R.
Civ. P. 78(b). For the following reasons, Plaintiff's Motion is
**GRANTED**.

I. FACTUAL AND PROCEDURAL BACKGROUND
Plaintiff's Complaint alleges the following. Plaintiff is a
corporation that produces, distributes, and owns various
creative works, including motion pictures and television
shows. (Compl. ¶¶ 3–4, July 18, 2011, ECF No. 1.) Plaintiff
owns, co-owns, or has exclusive rights under the Copyright
Act to reproduce, distribute, and license the reproduction and
distribution in home video format of episodic series entitled:
(1) "Goober and the Ghost Chasers"; (2) "Touche Turtle";

(3) "Snagglepuss"; (4) "Shazzan"; and (5) "Thundarr the
Barbarian." (Compl. ¶ 6 and Ex. A).

Defendants are individuals residing in California who
conduct business under the name "Anime–Me." (Compl. ¶¶
10–11.) Defendants operate a number of websites through
which they conduct business. (Compl. ¶¶ 10–11.) Defendants
have allegedly copied, reproduced, distributed, advertised,
sold, or offered to distribute or sell unauthorized copies of the
following works, each of which is protected by a copyright
owned by Plaintiff: (1) 16 distinct episodes of "Goober and
the Ghost Chasers"; (2) 51 distinct episodes of "Touche
Turtle"; (3) 32 distinct episodes of "Snagglepuss"; (4) 36
distinct episodes of "Shazzan"; and (5) 21 distinct episodes of
"Thundarr the Barbarian" (collectively, "Copyrights"). (FAC
¶ 13 and Ex. A.)

A private investigator hired by Plaintiff
completed several transactions through the websites
www.crazy–4cartoons.com, www.be-tooned.com, and
www.toons4us.net. (Decl. of Mariela Fernandez in Supp.
of Mot. ("Fernandez Decl.") ¶¶ 5, 9, 13, Feb. 23,
2012, ECF No. 17.) From the order placed through
www.crazy-4cartoons.com, the investigator received two
standard DVD cases, one case containing four discs from
the series "Deputy Dawg," and the second case containing
three discs from the series "Shazzan." (Fernandez Decl. ¶
7.) From the order placed through www.be-tooned.com,
the investigator received three DVD cases containing the
series "Snagglepuss," "Thundarr the Barbarian," and "Touche
Turtle." (Fernandez Decl. ¶ 11.) Finally, from the order
placed through www.toons4us.net, the investigator received
a DVD case containing the series "Goober and the Ghost
Chasers." (Fernandez Decl. ¶ 15.)

All of the packages had a return address of "Anime–Me" in
"Menifee, California 92584." (Fernandez Decl. ¶¶ 7, 11, 15.)
All of the discs received by the investigator were recorded on
multi-region DVD–R discs, and the packages were designed
by www.Crazy4Cartoons.com, which contained poor quality
artwork. (Fernandez Decl. ¶¶ 7, 11, 15.) All of the discs
contained animated television episodes that had not been
released by Plaintiff in the DVD–R format. (Decl. of Dale
Nelson in Supp. of Mot. ("Nelson Decl.") ¶ 5, Feb. 23,
2012, ECF No. 17.) The quality and format of the discs
were found to be inconsistent with industry standards and did
not contain the standard region codes and Content Scramble
System encryption scheme, designed to protect against piracy.
(Nelson Decl. ¶¶ 3, 5.)

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 226 of 237

Warner Bros. Entertainment, Inc. v. Vega, Not Reported in Fed. Supp. (2012)
2012 WL 13008442

**\*2** On July 18, 2011, Plaintiff filed a Complaint alleging copyright infringement pursuant to the Copyright Act of 1976, 17 U.S.C. § 101, et seq. (*See generally* Compl., ECF No. 1.) On August 22, 2011, Defendants filed an Answer. (ECF No. 6.) However, Defendants' Answer was struck due to Defendants' failure to appear at a Scheduling Conference on January 9, 2012. (Minute Order, Jan. 9, 2012, ECF No. 9.) Defendants effectively withdrew from participating in the litigation since before the Scheduling Conference at which they were absent, and they have not participated in the litigation since. (Decl. of Nicole L. Drey in Supp. of Mot. ("Drey Decl.") ¶¶ 5–6, Feb. 23, 2012, ECF No. 17.) The clerk entered default on January 23, 2012. (Default by Clerk, ECF No. 15.) This Motion followed.

## II. DISCUSSION

### A. Procedural Requirements for Default Judgment
Obtaining a default judgment is a two-step process. First, the plaintiff must establish default by affidavit or otherwise, and if established, the court clerk enters default. *See* Fed. R. Civ. P. 55(a). Second, the plaintiff must apply to the court for a default judgment if plaintiff's claim is for a sum that is not certain or a sum that cannot be made by computation. *See* Fed. R. Civ. P. 55(b).

Pursuant to local rules in the Central District of California, applications for default judgment must be accompanied by a declaration that includes the following information:

(a) When and against what party the default was entered;

(b) The identification of the pleading to which default was entered;

(c) Whether the defaulting party is an infant or incompetent person, and if so, whether that person is represented by a general guardian, committee, conservator or other representative;

(d) That the Servicemembers Civil Relief Act (50 App. U.S.C. § 521) does not apply; and

(e) That notice has been served on the defaulting party, if required by F.R.Civ.P. 55(b)(2).

L.R. 55–1; *see also* Fed. R. Civ. P. 55(b)(2).

Plaintiff satisfied these procedural requirements because the instant Motion shows that: (1) default was entered against Defendants on January 23, 2012 (Drey Decl. ¶ 7); (2) default was entered after Defendants' Answer was stricken for failure to appear at the January 9, 2012 Scheduling Conference (Drey Decl. ¶ 6); (3) Defendants are not infants or incompetent persons (Drey Decl. ¶ 9); (4) Defendants are not in military service, such that the Soldiers' and Sailors' Civil Relief Act of 1940 does not apply (Drey Decl. ¶ 10); and (5) Plaintiff notified Defendants of the Motion through the United States Postal Service on February 23, 2012 (Drey Decl. ¶ 12; Mot. Proof of Service). Accordingly, the procedural requirements of Local Rule 55–1 for entry of final default judgment have been met.

### B. Substantive Requirements for Default Judgment
The grant or denial of a default judgment is within the Court's discretion. *See* Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980). The Court, in exercising its discretion, considers the following factors:

(1) the possibility of prejudice to the plaintiff,

(2) the merits of plaintiff's substantive claim,

(3) the sufficiency of the complaint,

(4) the sum of money at stake in the action,

(5) the possibility of a dispute concerning material facts,

(6) whether the default was due to excusable neglect, and

(7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel*, 782 F.2d at 1471–72.

#### 1. Possibility of Prejudice to Plaintiff

Under the first *Eitel* factor, the Court examines whether a plaintiff will be prejudiced if the request for entry of default judgment is denied. *Eitel*, 782 F.2d at 1471. Here, Defendants have declined to participate in this lawsuit by failing to comply with the Court's Initial Standing Order and not appearing at the mandatory Scheduling Conference. Plaintiff would suffer prejudice if default judgment is not

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 227 of 237

Warner Bros. Entertainment, Inc. v. Vega, Not Reported in Fed. Supp. (2012)

2012 WL 13008442

entered because it will be left without recourse for its injuries. Accordingly, this factor weighs in favor of an entry of default judgment.

## 2. Sufficiency of the Complaint and Likelihood of Success on the Merits

**\*3** The second and third *Eitel* factors focus on the merits of a plaintiff's substantive claims and the sufficiency of the complaint. *See Eitel*, 782 F.2d at 1471. Together, these two factors require that a plaintiff states claims upon which it may recover. *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002) (citation omitted).

To establish a claim of copyright infringement, a plaintiff must show: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original. *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Plaintiff's Complaint sets forth the facts necessary to prove copyright infringement by Defendants. First, Plaintiff has shown that it owned the Copyrights when the alleged infringement occurred. (Compl. ¶ 6; Nelson Decl. Ex. E.) Second, Plaintiff alleges infringement of the Copyrights by Defendants who, without consent, sold pirated copies of Plaintiff's copyrighted material. (Compl. ¶¶ 13, 14.) Thus, Plaintiff has sufficiently pled a copyright infringement claim upon which it may recover.

## 3. The Sum of Money at Stake in the Action

The fourth *Eitel* factor addresses the amount of money at stake in relation to the seriousness of a defendant's conduct. *Cal. Sec. Cans*, 238 F. Supp. 2d at 1176. In its Motion, Plaintiff prays for the Court to enter judgment in the amount of \$785,000 for statutory damages as provided under 17 U.S.C. § 504(c), \$19,300 for attorneys' fees as provided under 17 U.S.C. § 505, and interest on the judgment as provided under 28 U.S.C. § 1961(a). Plaintiff has sufficiently pleaded copyright infringement. Because Plaintiff seeks damages which are appropriate under the Copyright Act and within the Court's discretion, this factor weighs in favor of entering default judgment.

## 4. Possibility of Dispute Concerning Material Facts

The fifth *Eitel* factor examines the likelihood of dispute between the parties regarding the material facts surrounding the case. *Eitel*, 782 F.2d at 1471–72. Once the court clerk has entered a party's default, "the well-pleaded factual allegations of the complaint are taken as true, except for those allegations relating to damages." *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 498 (C.D. Cal. 2003) (citing *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987)). Here, Plaintiff's Complaint alleging copyright infringement contains facts to establish Plaintiff's claim, and the court clerk has entered default against Defendants. Although Defendants filed an Answer to the Complaint, Defendants' Answer was stricken for failure to appear at the Scheduling Conference. Thus, there is no genuine dispute as to any of the material facts of Plaintiff's claim, and the likelihood that any genuine issue may exist is remote.

## 5. Possibility of Excusable Negligence

The sixth *Eitel* factor examines whether Defendants' failure to respond to Plaintiff's allegations is the result of excusable neglect. *Eitel*, 782 F.2d at 1472. Defendants were served with the Complaint on or about August 7, 2011. (Drey Decl. ¶ 3.) On August 22, 2011, Defendants filed their Answer to the Complaint. Subsequently, the Court issued an Order setting a Scheduling Conference on January 9, 2012, with the Joint Rule 26(f) Report to be filed by December 9, 2011. (Minute Order, Oct. 26, 2011, ECF No. 7.) On or about November 16, 2011, Plaintiff's counsel and Defendants, apparently unrepresented by counsel, held a Rule 26 conference telephonically. (Decl. of Non–Compliance Re Rule 26 Meeting ("Non–Compliance Decl.") ¶ 8, ECF No. 8.) Plaintiff attempted to prepare the Joint Rule 26(f) Report with Defendants' participation, but despite several attempts to engage Defendants, Defendants became non-responsive. (Drey Decl. ¶ 5; Non–Compliance Decl. ¶¶ 11–14.) On January 9, 2012, Defendants failed to appear at the Scheduling Conference, and the Court issued an Order striking Defendants' Answer. (Minute Order, Jan. 9, 2012.) On January 23, 2012, default was entered by the Court Clerk. Defendants were served with notice of the instant Motion on February 23, 2012. (Drey Decl. ¶ 12.) Defendants failed to

Case 1:25-cv-00388-JPW   Document 23   Filed 10/10/25   Page 228 of 237

Warner Bros. Entertainment, Inc. v. Vega, Not Reported in Fed. Supp. (2012)

2012 WL 13008442

answer or file an opposition despite having ample opportunity to respond. Thus, the possibility of excusable neglect is unlikely.

### 6. Policy for Deciding on the Merits

**\*4** The last *Eitel* factor examines whether the policy of deciding a case based on the merits precludes entry of default judgment. *Eitel*, 782 F.2d at 1472. In *Eitel*, the Ninth Circuit stated that "[c]ases should be decided on their merits whenever reasonably possible." *Id.* (citation omitted). However, courts have recognized that "the mere existence of [Rule 55(b)] indicates that this preference, standing alone, is not dispositive." *Cal. Sec. Cans*, 238 F. Supp. 2d at 1177 (internal quotation marks and citations omitted). "Moreover, Defendant[s'] failure to answer Plaintiff['s] Complaint makes a decision on the merits impractical, if not impossible." *Id.* Under Rule 55(a), "termination of a case before hearing the merits is allowed whenever a defendant fails to defend an action." *Id.* Because Defendants' Answer has been stricken and an opposition to the instant Motion has not been filed, Defendants have failed to defend this action. Accordingly, the *Eitel* factors weigh in favor of an entry of default judgment as to Plaintiff's claims.

### C. Remedies

As previously stated, upon entry of default, all well-pleaded facts in the complaint are taken as true except those relating to damages. *Castworld Prods.*, 219 F.R.D. at 498. A plaintiff "is required to prove all damages sought in the complaint." *Id.* However, a default judgment shall not exceed the amount demanded in the pleadings. *Id.* (citing Fed. R. Civ. P. 54(c)). The Court, in determining damages, may "rely on declarations submitted by the plaintiff or order a full evidentiary hearing." *Id.* (citing Fed. R. Civ. P. 55(b)(2)).

### 1. Injunctive Relief

The Copyright Act gives a court the power to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). For a permanent injunction, a plaintiff must show: (1) it has suffered an irreparable injury; (2) the remedies available at law are inadequate to compensate

for the injury; (3) considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) the permanent injunction will serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Generally, "a permanent injunction will be granted when liability has been established and there is a threat of continuing violations." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993).

Here, the Court finds that failure to issue a permanent injunction will expose Plaintiff to continuing irreparable injury. Without such an injunction, Defendants may continue to engage in the unauthorized use and sale of Plaintiff's copyrighted material. Additionally, Defendants have made no indication of participating in this litigation or ceasing their infringing behavior, making remedies at law inadequate to compensate for Plaintiff's injuries. While Plaintiff will be harmed by the continuing infringement, there appears to be no harm to Defendants in issuing an injunction, because an injunction would merely require Defendants to comply with the Copyright Act. A permanent injunction would serve the public interest by upholding the rights that "Congress has elected to grant ... to the owner of a copyright in a protected work," *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) (quoting *Klitzner Indus., Inc. v. H.K. James & Co.*, 535 F. Supp. 1249, 1259–60 (D. Pa. 1982)), rather than allowing Defendants to continue selling Plaintiff's copyrighted material to the public. Thus, the Court GRANTS the permanent injunction.

### 2. Damages & Attorneys' Fees

Under the Copyright Act, Plaintiff "may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages ... in a sum of not less than $750 or more than $30,000 as the Court considers just." 17 U.S.C. § 504(c)(1). Where the "infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2). An infringement is willful if the defendant "had reason to know, or recklessly disregarded the fact that his or her conduct constituted copyright infringement." *A & M Records, Inc. v. Gen. Audio Video Cassettes, Inc.*, 948 F. Supp. 1449, 1457

Case 1:25-cv-00388-JPW    Document 23    Filed 10/10/25    Page 229 of 237

Warner Bros. Entertainment, Inc. v. Vega, Not Reported in Fed. Supp. (2012)

2012 WL 13008442

(C.D. Cal. 1996) (citing 🚩 *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335–36 (9th Cir. 1990)).

**\*5**  Here, Plaintiff requests the Court award statutory damages pursuant to 🚩 17 U.S.C. § 504(c) in the amount of $5,000 per copyright infringed. (Mot. 16–17.) Other Circuit courts have held that separately copyrighted television episodes from a single television series may be considered separate works under the Copyright Act for purposes of awarding statutory damages. *See* 🚩 *Twin Peaks Prod., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1381 (2d Cir. 1993); 🚩 *Gamma Audio & Video, Inc. v. Ean–Chea*, 11 F.3d 1106, 1116–17 (1st Cir. 1993); 🚩 *MCA Television Ltd. v. Feltner*, 89 F.3d 766, 768–70 (11th Cir. 1996). Relying on this approach, the Court concludes that Plaintiff should be awarded the requested statutory damages of $5,000 for each of the 156 works infringed by Defendants, for a total of $780,000. [1] Plaintiff is also entitled to post-judgment interest on this amount pursuant to 28 U.S.C. § 1961(a).

Additionally, Plaintiff requests reasonable attorneys' fees pursuant to 17 U.S.C. § 505. (Mot. 7.) Local Rule 55–3 sets forth the schedule of attorneys' fees a court may award on a default judgment. *See* L.R. 55–3. When the amount of judgment is over $100,000, the attorneys' fees award is $5,600 plus two percent of the amount over $100,000. *Id.* Here, the Court awards $780,000 in damages, entitling Plaintiff to attorneys' fees in the amount of $19,200.

III. RULING

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Default Judgment, and judgment is entered as follows:

(1) Defendants and all of Defendants' agents, servants, employees, officers, associates, attorneys, and all persons acting by, through, or in concert with any of them, are permanently enjoined from:

(a) infringing Plaintiff's Copyrights, either directly or contributorily, in any manner, including generally, but not limited to manufacturing, reproducing, importing, distributing, advertising, selling and/or offering for sale any unauthorized product which features any of Plaintiff's Copyrights;

(b) engaging in any conduct that tends falsely to represent that, or is likely to confuse, mislead or deceive purchasers, Defendants' customers and/or members of the public to believe, the actions of Defendants, the products sold by Defendants, or Defendants themselves are connected with Plaintiff, are sponsored, approved or licensed by Plaintiff, or are affiliated with Plaintiff; and

(c) affixing, applying, annexing or using in connection with the importation, manufacture, distribution, advertising, sale and/or offer for sale or other use of any goods or services, a false description or representation, including words or other symbols, tending to falsely describe or represent such goods as being those of Plaintiff.

(2) In order to give practical effect to the Permanent Injunction, the following domain names are hereby ordered to be immediately transferred by the Defendants, their assignees and/or successors-in-interest or title, and/or the Registrar to Plaintiff's control:

(a) www.crazy4cartoons.com;

(b) www.betoonedin.com;

(c) www.crazy4–cartoons.com;

(d) www.crazy–4cartoons.com;

(e) www.crazy–4–cartoons.com;

(f) www.toonmein.net;

(g) www.toons4us.net;

(h) www.toonsrus.net; and

(i) www.be-toonedin.com.

To the extent the current Registrar does not facilitate the transfer of the domain name to Plaintiff's control within ten (10) days of receipt of this judgment, the U.S.-based Registry shall, within thirty (30) days, transfer the domain names to a U.S.-based Registrar of Plaintiff's choosing, and that Registrar shall transfer the domain names to Plaintiff.

**\*6**  (3) Plaintiff is awarded statutory damages of $780,000 pursuant to 🚩 17 U.S.C. § 504(c), post-judgment

interest on this amount pursuant to 28 U.S.C. § 1961(a), and attorneys' fees in the amount of $19,200.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2012 WL 13008442

---

## Footnotes

1    Plaintiff states that Defendants willfully infringed upon at least 157 of Plaintiff's copyrighted works, resulting in statutory damages of $785,000. (Mot. 16.) However, Plaintiff only lists 156 copyrighted works in its Complaint (*see* Compl. Ex. A), bringing the total amount of statutory damages to $780,000.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT Z

2025 WL 1699354
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

ZUFFA, LLC, Plaintiff,
v.
Derick CUEBAS, et al., Defendants.

CIVIL ACTION NO. 3:24-CV-01269
|
Signed June 17, 2025

**Attorneys and Law Firms**

Wayne D. Lonstein, Lonstein Law Office PC, Ellenville, NY, for Plaintiff.

## MEMORANDUM

KAROLINE MEHALCHICK, United States District Judge

**\*1** Pending before the Court is motion for default judgment of Plaintiff Zuffa, LLC doing business as Ultimate Fighting Championship, ("Plaintiff"), filed pursuant to 🚩 Fed. R. Civ. P. 55 against Defendants Derick Cuebas ("Cuebas") and 1 Cue Cigar Lounge, LLC ("Cue") (together, "Defendants"). (Doc. 12). On July 29, 2024, Plaintiff initiated this action by filing a complaint against Defendants. (Doc. 1). On October 16, 2024, the Clerk of Court issued an entry of default against Defendants. (Doc. 8). On June 17, 2025, the Court conducted a hearing to determine Plaintiff's damages. Defendants did not appear. For the following reasons, Plaintiff's motion for default judgment is **GRANTED**. (Doc. 12).

## I. BACKGROUND AND PROCEDURAL HISTORY

The following factual summary is taken from the complaint, and for the purposes of the instant motion, is taken as true. (Doc. 1). Plaintiff is a Nevada corporation which owns the broadcast rights to "UFC 285 Jones vs. Gane PPV Broadcast" (the "Broadcast"). (Doc. 1, ¶¶ 5-6). The Broadcast was an Ultimate Fighting Championship ("UFC") fight which occurred on March 4, 2023. (Doc. 1, ¶ 6). Plaintiff owns the rights to the Broadcast including the rights to "all undercard matches and the entire television Broadcast, via encrypted closed[-]circuit television, encrypted satellite, radio signals and/or digital streaming technology." (Doc. 1, ¶¶ 5-6). Under Plaintiff's rights to the Broadcast, a commercial business cannot show the Broadcast without paying Plaintiff a commercial use fee. (Doc. 1, ¶ 21). Cue is a commercial business located in East Stroudsburg, Pennsylvania. (Doc. 1, ¶¶ 9, 12-13). Cuebas is the manager and operator of Cue. (Doc. 1, ¶¶ 9, 12-13). On March 3, 2023, Defendants posted a Facebook advertisement stating they would be playing the Broadcast at Cue on March 4, 2023. (Doc. 1, ¶ 14). Defendants showed the Broadcast at Cue for a commercial benefit without paying Plaintiff the commercial use fee. (Doc. 1, ¶¶ 22-25).

On July 29, 2024, Plaintiff initiated this action against Defendants alleging violations of the Communications Act of 1934 and other copyright laws of the United States. (Doc. 1). On September 3, 2024, Plaintiff filed affidavits of service showing personal service on Defendants. (Doc. 5; Doc. 6). On October 9, 2024, Plaintiff filed a request for entry of default against Defendants which the Clerk of Court entered on October 16, 2024. (Doc. 7; Doc. 8). On February 24, 2025, Plaintiff filed a motion for default judgment and filed a brief in support on February 25, 2025. (Doc. 12; Doc. 14). Plaintiff seeks an award of up to $51,665 in damages against Defendants under a theory of joint and several liability. (Doc. 14, at 18-19).

On June 17, 2025, the Court held a hearing on the motion for default judgment. Defendants did not appear. To date, no counsel has entered an appearance on Defendants' behalf and Defendants have not filed any documents with the Court in connection with this case.

## II. LEGAL STANDARD

Default judgments are governed by a two-step process set forth under 🚩 Rule 55 of the Federal Rules of Civil Procedure. An entry of default by the Clerk of Court under 🚩 Rule 55(a) is a prerequisite to a later entry of a default judgment under 🚩 Rule 55(b). See 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2682 (3d ed. 2007) (noting that, "[p]rior to obtaining a default judgment under either 🚩 Rule 55(b)(1) or 🚩 Rule 55(b)(2), there must be an entry of default as provided by 🚩 Rule 55(a)"). Once the Clerk of Court has entered a default, the party seeking the default may then move the Court to enter a default judgment under 🚩 Rule 55(b)(2). Entry of default does not entitle a claimant to default judgment as a matter of right. 10 James Wm. Moore et al., *Moore's Federal Practice*

§ 55.31 (Matthew Bender ed. 2010). Indeed, it is well settled that decisions relating to the entry of default judgments are committed to the sound discretion of the district court. *See* 🔖 *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir. 1987).

**\*2**  Three factors control the exercise of the district court's discretion in assessing whether default judgment should be granted following the entry of default: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." 🔖 *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000) (citing 🔖 *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984)). Even so, a court may "enter a default judgment based solely on the fact that the default occurred" without considering the *Chamberlain* factors if the defendant has been properly served but fails to appear, plead, or defend an action. *See* 🔖 *Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 177 n.9 (3d Cir. 1990).

"A finding that default judgment is appropriate, however, is not the end of the inquiry." *Martin v. Nat'l Check Recovery Servs., LLC*, No. 1:12-cv-01230, 2016 WL 3670849, at \*1 (M.D. Pa. July 11, 2016). Prior to entering a default judgment, the Court must also determine whether the "unchallenged facts constitute a legitimate cause of action." *See* *Wright et al., at* § 2688; *see also Broad. Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.*, 555 F. Supp. 2d 537, 541 (E.D. Pa. 2008) (stating that, "before granting a default judgment, the Court must ... ascertain whether 'the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law' " (citations omitted)). In conducting this inquiry, "the well-pleaded, factual allegations of the complaint ... are accepted as true and treated as though they were established by proof." *See E. Elec. Corp. of N.J. v. Shoemaker Const. Co.*, 652 F. Supp. 2d 599, 605 (E.D. Pa. 2009) (citation omitted). While the Court must accept as true the well-pleaded factual allegations of the complaint, the Court need not accept the moving party's factual allegations or legal conclusions relating to the amount of damages. *See* 🔖 *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

## III. DISCUSSION

Plaintiff moves for default judgment and requests up to $51,665 in damages under a theory of joint and several liability. (Doc. 14, at 18-19). The Court will first address the Court's jurisdiction over this matter. The Court will then access whether default judgment is warranted. Finally, the Court will assess damages.

### A. THE COURT HAS JURISDICTION.

Although Defendants have failed to make any appearance or challenge jurisdiction, "when a default judgment is requested, a court is required to make a threshold determination regarding any jurisdictional defects." *See Allaham v. Naddaf*, 635 F. App'x 32, 36 (3d Cir. 2015) (nonprecedential). The Court finds that Plaintiff properly alleges subject matter jurisdiction and personal jurisdiction over Defendants.

Regarding subject matter jurisdiction, Plaintiff brings his claims pursuant to federal copyright laws, and accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C.A. § 1331. Turning to personal jurisdiction, Cuebas is domiciled in Pennsylvania and Cue is located in Pennsylvania. (Doc. 1, ¶¶ 7, 13). Accordingly, the Court has general jurisdiction over Defendants. 🔖 *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) (stating "the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home"). There are no jurisdictional defects preventing the Court from granting this motion.

### B. DEFAULT JUDGMENT IS WARRANTED.

**\*3**  The Court finds that Plaintiff is entitled to default judgment. Before granting default judgment, "the Court must 'ascertain whether [  ]the unchallenged facts constitute a legitimate cause of action.' " *Adlife Mktg. & Commc'ns Co. v. Ad Post Graphics Media Mktg., Inc.*, 708 F. Supp. 3d 567, 573 (M.D. Pa. 2023) (quoting *Broad. Music, Inc.*, 555 F. Supp. 2d at 541). Plaintiff requests default judgment on his Communications Act claim under 47 U.S.C.A. § 605 ("Section 605") and on his copyright infringement claim under 🚩 17 U.S.C.A. § 501 ("🚩 Section 501") and 🔖 17 U.S.C.A. § 504 ("🚩 Section 504"). [1] (Doc. 14, at 18). The Court will address each claim in turn.

Plaintiff alleges Defendants violated Section 605 by intercepting the Broadcast and playing it at Cue. (Doc. 1, ¶¶ 16-32). "[Section] 605, holds any person or individual liable

for the unauthorized interception and publication of airborne satellite cable transmissions for non-private viewing." *J&J Sports Prods., Inc. v. Ramsey*, 757 F. App'x 93, 95 (3d Cir. 2018). To state a claim under Section 605, a plaintiff must show "(1) interception of a satellite transmission or broadcast, (2) lack of authorization, and (3) publication." *J&J Sports Prods., Inc.*, 757 F. App'x at 95; *see also G & G Closed Cir. Events, LLC v. La Famosa, Inc.*, No. CV 19-13025 (FLW), 2020 WL 3129540, at *3 (D.N.J. June 12, 2020). Further, when a plaintiff alleges an individual defendant is vicariously liable with a corporate defendant under Section 605, the plaintiff must show the individual defendant:

> (1) has the right and ability to supervise the violative activity, although he need not actually be supervising, because he need not know of the violative activity, and (2) has a direct financial interest in the violation, i.e., financial benefits, even if not proportional or precisely calculable, that directly flow from the violative activity.

*J&J Sports Prods., Inc.*, 757 F. App'x at 95 (citing *Joe Hand Promotions, Inc. v. Yakubets*, 3 F.Supp.3d 261, 296 (E.D. Pa. 2014)). Here, Plaintiff alleges Defendants intercepted the Broadcast, did not pay the requisite commercial fee to have authorization to show the Broadcast, and showed the Broadcast at Cue. (Doc. 1, ¶¶ 19, 21-25). Further, Plaintiff alleges Cuebas was the manager of Cue and received a financial benefit from his operation of Cue. (Doc. 1, ¶¶ 8-10). As such, Plaintiff has sufficiently stated a claim under Section 605. *See J&J Sports Prods., Inc.*, 757 F. App'x at 95; *see also G & G Closed Cir. Events, LLC*, 2020 WL 3129540, at *3; *see also Zuffa, LLC v. Perris*, No. 2:19-CV-00938, 2020 WL 502645, at *3 (W.D. Pa. Jan. 31, 2020) (finding a plaintiff stated a claim under Section 605 by alleging a bar showed a UFC fight without authorization).

Turning to Plaintiff's copyright infringement claim, Plaintiff alleges Defendants are liable for copyright infringement because Plaintiff had the rights to the Broadcast and Defendants showed it at Cue without authorization. (Doc. 1, ¶¶ 40-48). "[T]o establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright,

and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991); *see also Adlife Mktg. & Commc'ns Co.*, 708 F. Supp. 3d at 574. "Copying is a 'shorthand reference to the act of infringing any of the copyright owner's ... exclusive rights set forth at 17 U.S.C. § 106.' Section 106 provides in pertinent part that 'the owner of copyright under this title has the exclusive rights to do and to authorize... reproduc[tion] [of] the copyrighted work.' " *Adlife Mktg. & Commc'ns Co.*, 708 F. Supp. 3d at 574 (citations omitted). A defendant who plays or shows a copyrighted work at a commercial venue without authorization infringes on the copyright. *See Broad. Music, Inc.*, 555 F. Supp. 2d at 541 (finding a resort infringed on a copyright by having copyrighted songs performed without authorization); *see also Zuffa, LLC*, 2020 WL 502645, at *3 (finding a bar infringed on a copyright by showing a UFC fight without authorization).

**\*4** Here, Plaintiff alleges he owns the exclusive rights to the Broadcast. (Doc. 1, ¶¶ 6, 17, 43). Plaintiff further alleges Defendants unlawfully obtained the Broadcast and publicly showed it without authorization. (Doc. 1, ¶¶ 43-45). Accordingly, Plaintiff has adequately stated a claim for copyright infringement. *See Broad. Music, Inc.*, 555 F. Supp. 2d at 541; *see also Zuffa, LLC*, 2020 WL 502645, at *3. The Court is thus satisfied that the unchallenged facts constitute a legitimate cause of action for both of Plaintiff's claims. *See Adlife Mktg. & Commc'ns Co.*, 708 F. Supp. 3d at 573.

The Court next turns to the *Chamberlain* factors. 210 F.3d at 164. Under *Chamberlain* the Court must consider, "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." 210 F.3d at 164. These factors weigh in favor of entering default judgment against Defendants.

First, Plaintiff will be prejudiced if the Court declines to enter default judgment. This prejudice stems from the fact that Plaintiff would be unable to otherwise obtain relief or pursue his case due to Defendants' failure to respond. *See Fridline v. Millennia Tax Relief, LLC*, 727 F. Supp. 3d 517, 522 (M.D. Pa. 2024) (stating "Plaintiff would be prejudiced [if default is denied] by his 'current inability to proceed with [his] action due to Defendant['s] failure to defend' " (quoting *Broad. Music, Inc. v. Kujo Long, LLC*, No. 1:14-CV-00449, 2014 WL 4059711, at *2 (M.D. Pa. Aug. 14, 2014)); *see*

also *Adlife Mktg. & Commc'ns Co.*, 708 F. Supp. 3d at 573 (stating "[a]bsent the default judgment, Plaintiff will be faced with an indefinite, and possibly permanent, delay in the adjudication... and is left with no alternative means to vindicate its claim against the defaulting parties").

Second, Defendants do not appear to have a litigable defense. "The showing of a meritorious defense is accomplished when 'allegations of defendant's answer, if established on trial, would constitute a complete defense to the action.' " *$55,518.05 in U.S. Currency*, 728 F.2d at 195 (quoting *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 244 (3d Cir. 1951)). Here, the court cannot ascertain a litigable defense because Defendants have not "responded to the allegations and, therefore, have failed to assert a defense." *Adlife Mktg. & Commc'ns Co.*, 708 F. Supp. 3d at 573; *see also Fridline*, 727 F. Supp. 3d at 522.

Third, Defendants' delay is due to culpable conduct because they have failed to respond despite receiving service of process months ago. *See Fridline*, 727 F. Supp. 3d at 522 (finding culpability where a Defendant received service of process but failed "to respond or appear in this action... [and] offered no explanation for its failure to engage in the litigation"). "In [the] context [of a default] culpable conduct means action taken willfully or in bad faith." *Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 123-124 (3d Cir. 1983). The record reflects Defendants were served on August 31, 2024. (Doc. 5; Doc. 6). Despite this, Defendants have failed to respond to the complaint or take any other action which "amounts to deliberate and willful conduct." *Adlife Mktg. & Commc'ns Co.*, 708 F. Supp. 3d at 573; *see also Fridline*, 727 F. Supp. 3d at 522 (stating "[h]aving received service, Defendant has yet to respond or appear in this action. Because Defendant has offered no explanation for its failure to engage in the litigation, the Court finds that Defendant is culpable").

**\*5** This all considered, the Court is satisfied that the *Chamberlain* factors weigh in favor of entering default judgment in Plaintiff's favor. *210 F.3d at 164*. Accordingly, the Court **GRANTS** Plaintiff's motion for default judgment. (Doc. 12).

## C. THE COURT WILL AWARD PLAINTIFF $6,795 IN DAMAGES.

Having determined that Plaintiff is entitled to the entry of default judgment, the Court next evaluates Plaintiff's request for up to $51,665 in damages. (Doc. 14, at 18-19). Plaintiff requests the Court find Defendants jointly and severally liable for up to $10,000 in statutory damages under Section 605, up to $15,000 for willful violation of Section 605, up to $10,000 for copyright infringement under Section 504, up to $15,000 for willful infringement on Plaintiff's copyright under Section 504, and $1,665 in costs and fees pursuant to 17 U.S.C.A. § 505 ("Section 505"). (Doc. 14, at 18-19). The Court will first address Plaintiff's Section 605 claims, then turn to Plaintiff's copyright infringement claims, and then assess Plaintiff's request for costs and fees.

### 1. The Court will Award Plaintiff $1,095 in Section 605 Statutory Damages.

Plaintiff seeks up to $10,000 in statutory damages under Section 605. (Doc. 14, at 10, 18-19). Under Section 605, Plaintiff may recover "a sum of not less than $1,000 or more than $10,000" in statutory damages. 47 U.S.C.A. § 605 (e)(C)(i)(II). While assessing defaults, courts generally base Section 605 statutory damage determinations on the amount of money a plaintiff would have received had the defendants paid their licensing fee. *See G & G Closed Cir. Events, LLC*, 2020 WL 3129540, at \*4 (awarding plaintiff the amount they would have received had defendants paid the licensing fee); *see also Zuffa, LLC*, 2020 WL 502645, at \*4 (basing damages off of both the amount plaintiffs would have received had defendants paid the licensing fee and the high viewership of the UFC fight); *see also Joe Hand Promotions, Inc. v. Concrete City Cafe Inc.*, No. CV 3:22-251, 2023 WL 6461244, at \*4 (M.D. Pa. Sept. 29, 2023) (awarding statutory fees based off the licensing fee).

Here, the Court will not award Plaintiff the maximum damages allowed under Section 605 and instead will follow "the practice followed by other courts, where the plaintiff is awarded 'the license fee the defendant, based on the maximum capacity, would have paid if it had legally purchased the event.' " *Zuffa, LLC*, 2020 WL 502645, at \*4 (quoting *Zuffa, LLC v. Al-Shaikh*, No. CIV.A. 10-00085-KD-C, 2011 WL 1539878, at \*7 (S.D. Ala. Apr. 21, 2011)); *see also G & G Closed Cir. Events, LLC*, 2020 WL 3129540, at \*4; *see also Joe Hand Promotions, Inc*, 2023 WL 6461244, at \*4. According to Plaintiff, the licensing fee for Cue would have been $1,095. (Doc. 12-9, at 2; Doc. 12-10; Doc. 12-12, at

2025 WL 1699354

2; Doc. 14, at 14). Accordingly, the Court will award statutory damages of $1,095 under a theory of joint and several liability.

### 2. The Court will Award Plaintiff $3,285 in Section 605 Enhanced Damages

Plaintiff requests an award of $15,000 in enhanced damages pursuant to Section 605. (Doc. 14, at 18-19). Section 605 allows plaintiffs to recover enhanced damages of up to $100,000 if a defendant willfully violates the Section 605 for financial gain. 47 U.S.C.A. § 605 (e)(c)(ii). The Third Circuit has not established a test for enhanced damages under Section 605, however, courts in this circuit generally consider "several factors: (1) the number of violations; (2) defendant's unlawful monetary gains; (3) plaintiff's significant actual damages; (4) whether defendant advertised for the event; and (5) whether defendant collected a cover charge." *Zuffa, LLC*, 2020 WL 502645, at *5 (citing *Joe Hand Promotions, Inc. v. McBroom*, No. 5:09-CV-276(CAR), 2009 WL 5031580, at *5 (M.D. Ga. Dec. 15, 2009); *see also G & G Closed Cir. Events*, 2020 WL 3129540, at *5 (articulating the same test); *see also J&J Sports Prods., Inc. v. Old Bailey Corp.*, No. 18CV8829KSHCLW, 2019 WL 4267856, at *4 (D.N.J. Sept. 9, 2019) (same). Where a defendant is not a repeat offender, courts generally award enhanced damages of three times the statutory damages. *See Zuffa, LLC*, 2020 WL 502645, at *5 (awarding enhanced damages of three times the statutory damages where a defendant was a first time offender); *see also G & G Closed Cir. Events*, 2020 WL 3129540, at *5 (same); *see also J&J Sports Prods.*, 2019 WL 4267856, at *4 (awarding enhanced damages of three times the statutory damages where a defendant had only violated Section 605 once before because one violation was insufficient to show defendant was a repeat offender).

**\*6** Here, Defendants have admitted by default that they willfully violated Section 605. *See Zuffa*, 2020 WL 502645, at *4. Turning to the relevant factors for determining enhanced damages, there are no allegations in the complaint that Defendants are repeat offenders. It is also unclear from the complaint what Defendants' unlawful gains were or if Defendants collected a cover charge. Defendants did advertise their showing of the Broadcast. (Doc. 1, ¶ 14). Finally, Plaintiff's financial losses were $1,905. (Doc. 12-9, at 2; Doc. 12-10; Doc. 12-12, at 2; Doc. 14, at 14). Courts addressing similar circumstances have awarded enhanced damages of three times the awarded statutory damages. *See Zuffa, LLC*, 2020 WL 502645, at *5; *see also G & G Closed*

*Cir. Events*, 2020 WL 3129540, at *5; *see also J&J Sports Prods.*, 2019 WL 4267856, at *4. The Court will follow this approach and award enhanced damages of $3,285 under a theory of joint and several liability.

### 3. The Court will Award Plaintiff $750 Under Section 504.

Plaintiff requests up to $10,000 in statutory damages and up to $15,000 in enhanced damages under Section 504. (Doc. 14, 18-19). Section 504 allows courts to award statutory damages awards of "not less than $750 or more than $30,000" for copyright infringement. 17 U.S.C.A. § 504 (c)(1). Section 504 also allows courts to award up to $150,000 in enhanced damages for willful copyright infringement. 17 U.S.C.A. § 504 (c)(2). Courts have discretion when determining damages for copyright infringement. *Adlife Mktg. & Commc'ns Co.*, 708 F. Supp. 3d at 577. Federal courts have taken the view that where a plaintiff seeks damages under both Section 605 and Section 504, courts should consider whether the award of damages under Section 605 "sufficiently compensates [the plaintiff] for the statutory violations committed by the Defendants and deters future violations." *Zuffa, LLC v. Perris*, 2020 WL 502645, at *6; *see also Joe Hand Promotions, Inc. v. Aguilar*, No. TDC-19-0458, 2019 WL 4071776, at *4 (D. Md. Aug. 29, 2019), *report and recommendation adopted*, No. CV TDC-19-0458, 2019 WL 5588857 (D. Md. Sept. 20, 2019); *see also Joe Hand Promotions, Inc. v. Garcia-Nunez*, No. 6:18-CV-01452-MC, 2019 WL 2437456, at *3 (D. Or. June 11, 2019); *see also Joe Hand Promotions, Inc. v. Levin*, No. 18-CV-9389 (JPO), 2019 WL 3050852, at *6 (S.D.N.Y. July 12, 2019). Where an award of damages under Section 605 adequately redresses a plaintiff's injuries, courts should substantially reduce the plaintiff's damages under Section 504. *Zuffa, LLC v. Perris*, 2020 WL 502645, at *6 (awarding plaintiff the statutory minimum damages of $750 under section 504); *see also Joe Hand Promotions, Inc.*, 2019 WL 4071776, at *4 (same); *see also Garcia-Nunez*, 2019 WL 2437456, at *3 (denying damages under Section 504); *see also Levin*, 2019 WL 3050852, at *6 (reducing plaintiff's request for damages under Section 504 by eighty percent).

Here, Plaintiff's actual injuries were $1,095 in licensing fees. (Doc. 12-9, at 2; Doc. 12-10; Doc. 12-12, at 2; Doc. 14, at 14). As discussed *supra*, the Court is awarding Plaintiff damages in that amount plus an additional $3,285 in enhanced damages under Plaintiff's Section 605 claim. Accordingly, the Court will follow the Western District of Pennsylvania's approach and only award Plaintiff the Section 504 statutory minimum of $750 in statutory damages under a theory of joint and several liability. *Zuffa, LLC*, 2020 WL 502645, at \*6. The Court will not award enhanced damages under Section 504.

### 4. The Court will Award Plaintiff $1,665 in Costs and Fees.

Plaintiff requests $1,665 in costs and fees under 17 U.S.C.A. § 505 ("Section 505"). (Doc. 14, at 18-19). Where a court finds a defendant liable for copyright infringement, "the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof." 17 U.S.C.A. § 505. Courts will grant requests for costs and fees under Section 505 where the defendant fails to appear, and the plaintiff submits evidence of their costs and fees. *See Adlife Mktg. & Commc'ns Co.*, 708 F. Supp. 3d at 579 (awarding costs and fees under Section 505 where defendants failed to appear, and plaintiff presented evidence of their costs and fees); *see also Grant Heilman Photography, Inc. v. Gallagher*, No. 3:23-CV-1129, 2024 WL 666147, at \*5 (M.D. Pa. Feb. 16, 2024) (same).

**\*7** Here, the docket reflects Plaintiff paid a filing fee of $405. (Doc. 1). Further, Plaintiff has provided invoices showing it paid $510 in service fees and $750 in audit fees. (Doc. 12-7). These fees add up to Plaintiff's requested $1,665. (Doc. 14, 18-19). Defendants have also failed to appear. Thus, the Court will grant Plaintiff's request for costs and fees under Section 505. *See Adlife Mktg. & Commc'ns Co.*, 708 F. Supp. 3d at 579 ; *see also Grant Heilman Photography, Inc.*, 2024 WL 666147, at \*5. The Court will award Plaintiff $1,665 in fees under a theory of joint and several liability.

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for default judgment is **GRANTED**. (Doc. 12). Judgment is entered in favor of Plaintiff and against Defendants in the amount of $6,795 under a theory of joint and several liability. The Clerk of Court shall mark this matter as **CLOSED**. An appropriate order follows.

### All Citations

Slip Copy, 2025 WL 1699354

---

### Footnotes

1    The complaint raises Four Counts. (Doc. 1, ¶¶ 16-57). However, Plaintiff's only request default judgment on Counts I and III. (Doc. 14, at 18). Accordingly, the Court only considers Counts I and III. (Doc. 1, ¶¶ 16-32, 40-48).

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    6